IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

NORRIS G. HOLDER, )
)
Appellant, )
) No. 10-1304
vs. )
) **CAPITAL § 2255 PROCEEDING**
UNITED STATES OF AMERICA, )
)
Appellee. )

## MOTION TO EXPAND CERTIFICATE OF APPEALABILITY

COMES NOW appellant, Norris G. Holder, by and through counsel, and moves the Court to certify three additional claims for appeal in this capital § 2255 action. In support of his motion, appellant states as follows:

### Jurisdiction and Standard of Review

A circuit judge or judges, as prescribed by the Court, have the authority to consider and issue a certificate of appealability (COA) in a 28 U.S.C. § 2255 proceeding. Fed.R.App. 22(b). A COA must issue when the application has "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Appellant need not demonstrate an entitlement to relief on the merits. *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983). It suffices to show that "reasonable jurists" would find the district court's assessment of the constitutional claims or application of AEDPA to be "debatable or wrong." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Any doubts are to be resolved in favor of granting of a COA, "and the severity of the penalty may be considered in making this determination." *Haynes v. Quarterman*, 526 F.3d 189, 193 (5th Cir. 2008).

**Procedural History**

Appellant Norris G. Holder was convicted and sentenced to death for his role in the fatal armed robbery at the Lindell Bank & Trust in St. Louis, Missouri, on March 17, 1997. Security guard Richard Heflin was killed during the robbery, which was also carried out by Billie Allen. Mr. Holder was convicted of bank robbery (Count 1), and carrying a firearm during a crime of violence and murder resulting from a crime of violence (Count 2). *See* 18 U.S.C. §§ 924(c)(1)(A), 924(j), 2113(e). United States District Judge E. Richard Webber sentenced petitioner to death in accordance with the jury's verdict. This Court affirmed Mr. Holder's convictions and sentence on direct appeal. *United States v. Allen*, 247 F.3d 741 (8th Cir. 2001), *cert. denied*, 539 U.S. 916 (2003). Petitioner later moved for post-conviction relief under 28 U.S.C. § 2255. The district court denied relief, but granted a certificate of appealability on several of petitioner's claims. Mr. Holder now moves the Court to expand the COA to include three additional claims.

> **Claim 12C(e):** **Reasonable jurists could debate the district court's rulings that (a) counsel "reasonably" chose not to call a jail witness to describe Mr. Holder's remorse, without the benefit of interviewing the witness, (b) that the disinterested witness' testimony would have duplicated the remorse described by petitioner's close relatives, and (c) that the witness lacked credibility and persuasiveness despite the district court's refusal to assess the witness through an evidentiary hearing.**

Trial counsel failed to investigate and call an available witness with whom petitioner was placed in a holding cell at the federal courthouse in St. Louis. A summary of this witness' potential testimony was included in a report prepared by FBI Special Agent Jan Hartman, which was available to counsel prior to trial.[1] Specifically, the inmate witness could have been called to testify regarding

---

[1] Although the inmate was apparently not identified by name in the FBI report, petitioner identified the inmate at his July 7, 2005 deposition. *See* Holder's Depo. Tr. at 80. Petitioner stated

2

petitioner's genuine expression of remorse regarding the death of Mr. Heflin. The FBI reported the witness' recollection as follows:

> He [movant] said that the robbery was Allen's idea. They were supposed to go in and out. No one was to get shot; no one was to get hurt. Holder told Allen "no bodies" no murders. Once in the bank Holder suddenly heard a shot. Holder panicked. He did not see the guard reach for his gun. He said that Allen shouldn't have shot the cop as a charge would have only been for bank robbery … Holder also told [the witness] that he could not watch the guard's funeral on television. Holder appeared remorseful.

The witness, who had also spent time in jail with Billie Allen, also told Agent Hartman of Mr. Allen's reaction to the guard's death. Allen "laughed during the guard's funeral" and, according to the witness, had never shown a shred of remorse for the guard's death.

Evidence of sincere remorse is a powerful mitigating factor. There is a reasonable probability that if the jury had heard the testimony of a neutral witness who had no ties to petitioner, and who would not have received any benefit in exchange for his testimony, regarding petitioner's genuine expression of remorse, the outcome of the sentencing proceeding would have been different. Trial counsel, however, made no attempt to locate and call this witness on behalf of petitioner.

The district court denied relief on this claim, concluding that counsel's failure to locate and call the witness was a "reasonable strategic decision," Memorandum & Order denying Pet.'s § 2255 Mot., 75 (July 22, 2008), and in any event, that the evidence would not 'have affected the jury's verdict" in the penalty phase. *Id*. The district court's ruling is, at the very least, debatable among jurists of reason, and warrants the issuance of a certificate of appealability.

---

that he provided this information to counsel Shaw and that counsel Shaw said that he would speak to these witnesses, but that Shaw ultimately did not do so. *Id*. at 79-84.

**A.** **The district court's conclusion that counsel's failure to interview and call the inmate witness was a reasonable strategic decision is wrong, or at the very least, debatable among jurists of reason.**

It is undisputed that counsel never made any effort to locate or interview this witness prior to making the decision not to call him at trial. Thus, trial counsel was not in a position to make an informed strategic choice about whether to present this witness because he failed to undertake a reasonable investigation *before* making that choice. *Strickland v. Washington*, 466 U.S. 668, 691 (1984) (counsel has a duty to make reasonable investigations that make particular investigations unnecessary). Trial counsel could not have possibly assessed the witness' credibility or compared the quality of that witness' testimony regarding petitioner's remorse with that of the other penalty phase witnesses without first locating and interviewing the witness. Failure to undertake such preliminary investigations prior to making a decision not to use a witness constitutes deficient performance under *Strickland*. *See Wiggins v. Smith*, 539 U.S. 510, 522 (2003) ("failure to uncover and present ... mitigating evidence ... could not be justified as a tactical decision because counsel had not 'fulfill[ed] their obligation to conduct a thorough investigation"); *Hill v. Lockhart*, 28 F.3d 832, 845 (8th Cir. 1994) ("[c]ounsel's 'strategy' not to use [certain witnesses] was not so much trial strategy as it was an accommodation to his own inadequate trial preparation. ... although it may have been a trial decision of counsel not to pursue [certain] testimony it was counsel's lack of preparation which went a long way in inducing him to make it"); *Kenley v. Armontrout*, 937 F.2d 1298, 1308 (8th Cir. 1991) ("Counsel can hardly be said to have made a strategic choice against pursuing a

certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made").[2]

The district court also concluded that counsel's failure to adequately investigate the witness was excusable because inmate testimony is "inherently limited." Order at 74. But, as the district court correctly noted earlier in its Memorandum and Order, "the credibility of the witness is uniquely the function of the jury, and therefore the court cannot decide whether or not the jury would have credited the unknown witness's testimony." Order at 74-75. In the absence of an evidentiary hearing, at which there would have been an opportunity to observe the witness and make an independent credibility determination, the district court cannot simply credit the government's blanket assertion that the witness' status as an inmate would have "inherently limited" his testimony. *See*, *e.g.*, *Schlup v. Delo*, 513 U.S. 298, 309 n.19, 331-332 (1995) (reversing district court's denial of habeas petition, which focused primarily on the "suspect" nature of affidavits provided by inmate witnesses on the petitioner's behalf, and finding that the affidavits were sufficient to establish a threshold showing regarding "actual innocence" in order to entitle the petitioner to an evidentiary

---

[2] *See also* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989), Commentary to Guideline 11.4.1 (counsel may not "sit idly by, thinking that investigation would be futile. The attorney must first evaluate the potential avenues of action and then advise the client on the merits of each. Without investigation, counsel's evaluation and advice amount to little more than a guess.") (internal quotation marks omitted). In *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000), *Wiggins v. Smith*, 539 U.S. 510, 521 (2003), and *Rompilla v. Beard*, 545 U.S. 374, 387 (2005), the Supreme Court held that the ABA Guidelines are the appropriate guides for establishing what constitutes reasonably effective assistance in capital cases under the Sixth Amendment.

hearing on his claims).  For that matter, the government itself *routinely* relies on inmate witnesses in order to secure convictions.[3]

If anything, the inmate witness in this case would have been deemed *more* reliable than the other witnesses who testified about petitioner's remorse for his participation in the offense.  Those witnesses were all family members and friends of petitioner –  persons whose testimony the jury might have discounted on account of their perceived bias for petitioner.  The inmate witness, on the other hand, had absolutely no connection to petitioner, other than incidental contact while being held in the same cell at the Federal Courthouse in St. Louis.  At the time that petitioner briefly shared a cell with the inmate witness, petitioner had no reason to believe that he could potentially receive any benefit from expressing his remorse in the presence of this inmate, or that the inmate witness was in any position to help petitioner, so petitioner had no reason or incentive to express his anguish and regret about the offense other than because that is what he was genuinely feeling at the time.  The inmate was simply a neutral observer of petitioner's sincere expressions of remorse over the death of Mr. Heflin.  As such, his testimony would have had a level of credibility that petitioner's family and friends inherently lacked by virtue of their ties to petitioner and interest in the outcome of his sentencing.

Although the district court described the proposed testimony from the inmate witness as "duplicative of other testimony presented," Order at 75, that assessment is clearly debatable.  First,

---

[3] Indeed, the reason why inmate witnesses are deemed unreliable is not because of their mere status as inmates, but because of the concern that they are attempting to curry favor with authorities in order to receive some benefit, such as a reduced sentence.  In petitioner's case, however, that danger was not present; the inmate witness had absolutely nothing to gain in return for testifying on behalf of petitioner, and it is this *lack* of an improper or corrupting motive that would have been a powerful indicator of the credibility of the inmate witness' testimony.

the inmate witness' inherent neutrality suffices to dispute this conclusion. Testimony from an uninterested party that petitioner appeared to be genuinely remorseful about this crime is of much greater value than such statements coming from petitioner, or from his family and friends, and would thus have carried much more weight with the jury. *Cf. Skipper v. South Carolina*, 476 U.S. 1, 8 (1986) ("The evidence petitioner was allowed to present on the issue of his conduct in jail [from himself and his ex-wife] was the sort of evidence that a jury naturally would tend to discount as self-serving. The testimony of more disinterested witnesses-and, in particular, of jailers who would have had no particular reason to be favorably predisposed toward one of their charges-would quite naturally be given much greater weight by the jury.").

Second, the fact that the *topic* of the testimony is similar does not automatically mean that the testimony of the witnesses is of equivalent value or interchangeable. *See*, *e.g., Outten v. Kearney*, 464 F.3d 401 (3d Cir. 2006) (reversing death sentence and finding counsel ineffective for failing to put on additional evidence of childhood abuse, despite the fact that such evidence was presented at trial, because the trial testimony likely failed to give the jury a comprehensive understanding of the abuse given the discrepancy in depth and detail between the trial testimony and the habeas testimony). Because counsel failed to interview the potential witness, they had no foundation from which to compare his testimony with the other mitigation witnesses and make a reasonable decision as to who would be the best witness to call on the matter of petitioner's remorse. Indeed, as mitigation investigator Caryn Tatelli testified at the evidentiary hearing, the defense team "didn't put a lot of effort" into identifying such witnesses or offering evidence regarding petitioner's remorse as part of its mitigation presentation. Hrg. Transcr., Vol. I at 52. In light of that, reasonable jurists could certainly debate whether counsel's failure to investigate and ascertain the necessary

7

information regarding the inmate witness before choosing not to call him in favor of other witnesses constituted deficient performance under *Strickland*. *See Pickens v. Lockhart*, 714 F.2d 1455, 1467 (8th Cir. 1983) ("it is only after a full investigation of *all* the mitigating circumstances that counsel can make an informed, tactical decision about which information would be the most helpful to the client's case") (emphasis in original).

> **B.** **The district court's conclusion that there was no reasonable probability that trial counsel's failure to interview and call the inmate witness would have affected the outcome of the sentencing proceeding is debatable among jurists of reason.**

Reasonable jurists could debate whether there is a reasonable probability that outcome of the sentencing proceeding would have been different had the jury heard testimony regarding petitioner's remorse from a neutral, uninterested witness. As numerous studies of capital juries have shown, jurors' perceptions of the presence or absence of remorse plays a pivotal role in their decision to vote for life or death. *See*, *e.g.*, Theodore Eisenberg, Stephen P. Garvey & Martin T. Wells, *Mitigation Means Having to Say You're Sorry: The Role of Remorse in Capital Sentencing,* 83 Cornell L.Rev. 1599, 1617 (1998) (finding that aside from the seriousness of the crime and the defendant's future dangerousness, no other factor plays a greater role in capital sentencing than remorse, and that if jurors believe the defendant is sorry for what he has done, they tend to sentence him to life imprisonment, not death; conversely, if jurors think the defendant has no remorse they are more apt to sentence him to death); Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What do Jurors Think?* 98 Colum. L. Rev. 1538, 1560 (1998) (finding that almost 40% of jurors were more likely to vote for death if the defendant expressed no remorse for his offense, and that, in terms of aggravation, lack of remorse was second only to the defendant's prior history of violent crime and

8

future dangerousness). Given the importance that evidence of remorse plays in a capital jury's decision-making about whether to sentence someone to death, it was incumbent on counsel to present any such information to the jury in the most effective and credible way possible.

Here, counsel failed to avail himself of an available witness whose testimony would have enhanced the penalty phase presentation because the witness had no motive to offer anything other than honest testimony about his observations of petitioner's genuine expressions of remorse. The testimony would have supported counsel's *own theory* that petitioner had not intended for anyone to be shot during the robber, and that he was remorseful for Mr. Heflin's death. Trial Transcr. Vol. XII, 202-04. Trial counsel's unreasonable decision to forego the testimony of neutral witness on a matter of undisputed importance to the jury's sentencing determination resulted in prejudice to petitioner.

The witness in question was not only neutral, but could have rebutted an important aspect of the government's case for death. The prosecution asserted Mr. Holder's future dangerousness as a non-statutory aggravating factor, and relied primarily on petitioner's alleged lack of remorse. It argued, on closing, that petitioner lacked remorse for Mr. Heflin's death when we walked past his dying body while escaping from the bank, when being questioned by police officers, and when testifying at trial. Trial Transcr. Vol. IX, 35-37; Vol. XII, 176-79 ("Somebody who really had remorse would have stopped to help him."), 226-27. Credible evidence of genuine remorse would have greatly assisted the defense.

Moreover, as the verdict form demonstrates, this was not a case in which the jury's findings indicate that the facts established an overwhelming case for death. The jury unanimously rejected one of the non-statutory aggravating factors (i.e., the "victim impact" aggravator), on which the

government spent a considerable amount of time presenting evidence at the penalty phase. Additionally, numerous jurors found, in various combinations, twelve of the non-statutory mitigating factors that were presented. Given the central role that evidence of genuine remorse plays in the deliberations of capital juries, there is a reasonable probability that if this jury was presented with such evidence from a neutral witness, it would have altered the balance between mitigation and aggravation, and the outcome of the proceeding would have been different.

**C.** **The district court erred by crediting trial counsel's imputed "reasonable" judgment and discounting the witness' credibility without the benefit of an evidentiary hearing.**

Petitioner's request for a hearing on this claim was denied by the district court. *See* Doc. #26. In doing so, the district court relied on facts outside the record and made credibility findings regarding the proposed inmate witness without ever having heard from the witness.

Specifically, the district court noted that "Petitioner's trial counsel reviewed the testimony the unknown witness would provide, and determined, in the exercise of his professional judgment, that such evidence would not be beneficial to the Petitioner's defense." Order at 75. The district court's characterization of trial counsel's actions with respect to the inmate witness has no support in the record. Petitioner's request for an evidentiary hearing with respect to this claim was denied, so there is no evidence in the record as to whether counsel ever reviewed the testimony of the inmate witness, much less whether the decision not to locate the witness was the result of the exercise of professional judgment. The district court's reliance on such unsupported "facts" to dispose of Petitioner's claim constitutes error. *See Shaw v. United States*, 24 F.3d 1040, 1043 (8th Cir. 1994) (holding that a § 2255 motion may not be dismissed without a hearing unless "the record affirmatively refutes the factual assertions upon which it is based," and remanding for an evidentiary

10

hearing so that a record could be made as to the reasons why counsel failed to offer certain evidence in defense of his client at trial).

Additionally, the district court erred in passing on the credibility of the inmate witness based on inferences from the pleadings alone. As noted earlier, the district court's negative credibility assessment of the witness was not warranted in this case because the inmate witness' statements regarding petitioner's remorse were not made in exchange for, or in the hopes of, receiving some benefit neutralizes the suspicion commonly associated with relying on the testimony of inmates. More importantly, however, the district court's decision to make a credibility finding solely on the basis of the pleadings runs contrary to established precedent which states that a district court cannot make credibility determinations based on the pleadings alone. *See*, *e.g.*, *Koskela v. United States*, 235 F.3d 1148 (8th Cir. 2001) (district court abused its discretion in finding a hearing unnecessary and making credibility determinations about the witnesses based solely on competing affidavits); *Watson v. United States*, 493 F.3d 960, 964 (8th Cir. 2007) ("Although the district court was not required to credit [the movant's] assertion, it was required to hold a hearing before making factual determinations about [the movant's] credibility."); *Latorre v. United States*, 193 F.3d 1035, 1039 (8th Cir. 1999) (government's proffer of testimony by trial counsel and other witnesses to refute movant's allegations was an insufficient basis to deny an evidentiary hearing; "[T]hese witnesses were not heard at the § 2255 hearing in the District Court. Assertions by counsel cannot foreclose an evidentiary hearing, at which such testimony can be taken and subject to cross-examination."); *Smith v. United States*, 182 F.3d 1023, 1026 (8th Cir. 1999) (where movant and trial counsel filed conflicting affidavits regarding their out-of-court discussions, a hearing was necessary to resolve the facts that were in dispute).

Despite the fact that every inference must be drawn in a petitioner's favor, where, as here, one has pled facts that if true would entitle him to relief, the district court, contrary to the applicable law, denied this claim without the benefit of an evidentiary hearing. *See* 28 U.S.C. § 2255 ¶ 2; *Townsend v. Sain*, 372 U.S. 293, 312-13 (1963) (requiring a hearing in federal habeas proceedings where the petitioner has alleged facts which, if proven, would entitle him to relief and where the district court has not resolved the merits of the factual dispute in a full and fair hearing); *Fontaine v. United States*, 411 U.S. 213, 215 (1973); *Aron v. United States*, 291 F.3d 708, 715 n.6 (11th Cir. 2002) ("The law is clear that, in order to be entitled to an evidentiary hearing, a petitioner need only allege–not prove– reasonably specific, non-conclusory facts that, if true, would entitle him to relief.") (emphasis in original); *See Parkus v. Delo*, 33 F.3d 933 (8th Cir. 1994) (remanding to the district court for evidentiary hearing on ineffective assistance of counsel claims); *Lawrence v. Armontrout*, 900 F.2d 127 (8th Cir. 1990); *Simmons v. Lockhart*, 856 F.2d 1144 (8th Cir. 1988); *Grigsby v. Mabry*, 637 F.2d 525 (8th Cir. 1980) (citing *Townsend v. Sain*).

The district court's denial of this claim, without the benefit of an evidentiary hearing, on the basis of facts outside the record, and its perceived credibility of the proposed witness, is clearly debatable among jurists of reason. Accordingly, a COA should issue allowing appellant to raise this claim on appeal.

**Claim 12C(k):** **Reasonable jurists could debate the district court's ruling that Mr. Holder was not deprived of the effective assistance of counsel when, despite his lack of interest and knowledge of the penalty phase strategy and evidence, counsel Shaw gave the penalty phase closing argument and, in the course thereof, failed to properly present the mitigating evidence developed by co-counsel Herndon and mitigation specialist Tatelli.**

Caryn Tatelli was hired by the defense team as a mitigation specialist. She worked closely and exclusively with Jennifer Herndon, f/n/a Brewer, in developing the mitigation case for Mr. Holder. Hrg. Transcr. Vol. I, 15, 116, 125. Counsel Shaw, on the other hand, had nothing to do with preparation of the mitigation case. *Id*. at 22, 118. While Ms. Tatelli prepared and tendered mitigation witness summaries to Shaw for his review, he told her to give them to Ms. Herndon. *Id*. at 46, 119. Shaw's reason for doing so stemmed from his belief that there wasn't going to be a penalty phase because Holder did not shoot the guard. *Id*. at 13, 22, 46, 79, 114-15. Shaw had little use or patience for mitigating evidence in any event, describing it to co-counsel as "touchy-feely, fluffy stuff." Hrg. Transcr. Vol. II, 58; *see also id.* at 4-5 ("It used to be that you could just walk in [to trial] with your folder, and now you guys have all these boxes."); *id.* at 58 ("actively and openly refused to be a part of the mitigation investigation").

Ms. Herndon got into the case approximately five weeks before trial. Hrg. Transcr., Vol. I, 118. She and Ms. Tatelli worked around the clock to develop the mitigation case. During the course of developing the mitigation strategy, there never was a meeting with Charles Shaw in which a consistent guilt/penalty phase strategy was discussed. *Id*. at 17. Again, counsel Shaw's position was that there wasn't going to be a penalty phase, so why bother.

Contrary to counsel Shaw's prediction, Holder was convicted of both counts of the indictment, warranting a penalty phase hearing. Counsel Herndon handled all the penalty phase

13

witnesses. The mitigation strategy, as developed by her and Ms. Tatelli, was to give the jury a reason for the robbery. The mitigation theory revolved around the fact that Holder was, in effect, the man of the house and foster father to his three siblings. Petitioner's father had left the home, and his mother was on drugs. He had to provide for his family. But, when he lost his leg in a train accident, it impacted his ability to do so. He needed money to obtain a new prosthetic leg in order to better support his family, and an appropriate device would have cost about $10,000. His solution was to rob a bank in order to obtain the money to do so – an ill-conceived (if elaborate) idea, developed by a troubled individual under trying circumstances. *Id*. at 116-17.

Counsel Shaw was unaware of the mitigation strategy, having neither read the mitigation summaries nor shown any interest in that part of the trial. *Id*. at 16, 118-19, 125. During the penalty phase proceeding, Ms. Tatelli saw counsel Shaw's head bobbing with his eyes closed as if he were sleeping. *Id*. 28-30. Shaw's apparent sleeping was consistent with the lack of interest he had previously shown in the mitigation case. It would not have mattered if Shaw would have stayed totally out of the mitigation case. But, unfortunately he did not.

Despite his lack of involved in the mitigation case, counsel Shaw told counsel Herndon that he was going to give the penalty phase closing argument. *Id*. at 126. Counsel Herndon was alarmed at this development and believed that it would be disastrous to the mitigation case. *Id*. at 126-27. Her reaction was to call Richard Burr, Federal Death Penalty Resource Council, and ask that he come to St. Louis to try to talk Shaw out of giving the penalty phase closing argument. *Id*. The next day, Richard Burr flew to St. Louis and met with Shaw and Herndon. During the course of that meeting, counsel Shaw's position became clear - that the penalty phase evidence adduced by Ms.

14

Herndon didn't make any difference.  The only thing that mattered was that Norris didn't shoot the guard.  *Id*.

Counsel Herndon disagreed.  She believed that the penalty phase evidence needed to be linked together and that she was the proper person to do so, having worked exclusively on the mitigation case with Ms. Tatelli.  *Id*. at 124.  At the end of the meeting, Ms. Herndon believed that the matter had been resolved and that she was going to give the closing argument.  *Id*. at 128.  But, the next day, Mr. Shaw came to court and told her that he was going to present the penalty phase closing argument.  *Id*.  He proceeded to do so, arguing the same thing that he did at the guilt phase - that Holder shouldn't be eligible for the death penalty because he didn't shoot the bank guard.  Tr. Transcr. Vol. XII, 199-202, 208.

The district court denied this claim, finding that "Mr. Shaw embraced a sound trial strategy under practical (*sic.*) impossible defense options and did not . . . provide ineffective assistance of counsel."  Order at 96.  The court concluded that Mr. Shaw argued the "mitigation evidence presented so well by Ms. Brewer" by emphasizing petitioner's early childhood in the slums, his remorsefulness, and the fact that he did not shoot the victim.  *Id*.  In addition, the district court concluded that had "counsel Herndon given the closing argument, and focused less on  the residual doubt, and more on the mitigating factors developed," there is no reasonable likelihood that the outcome of the penalty phase would have been different.  *Id*. at 97.  Given the facts presented at the evidentiary hearing as outlined above, the district court's ruling is clearly debatable.

A defendant is entitled to the effective assistance of counsel at critical stages of the proceeding.  The penalty phase of a capital trial is clearly a most critical stage of the proceeding.  *See, Wiggins v. Smith, supra; Williams v. Taylor, supra*.  Holder was entitled to the effective

assistance of counsel throughout the penalty phase. He was entitled to have a lawyer familiar with the mitigation case not only present the evidence to the jury, but also explain to the jury how said evidence tied together and why it warranted a life sentence. *See Hall v. Washington*, 106 F.3d 742, 749 (7th Cir. 1997) (defense counsel must make a significant effort to focus the jury's attention on mitigating factors). Mr. Shaw had no way of knowing how to do this because he was unfamiliar with the mitigation strategy. Other than brief references to the fact that Holder was raised in a fatherless home in a ghetto and that his mother was on drugs, *id*. at 212, counsel Shaw simply argued to the jury that Holder shouldn't get the death penalty because he didn't shoot the guard - a theory that the jury rejected during the guilt phase of the trial.

The district court devoted nineteen pages of its *Memorandum and Order* to summarizing the mitigation case presented by Ms. Herndon. *See Order*, 17-36. After reading this summary and comparing it to Mr. Shaw's penalty phase closing argument, it is obvious that Mr. Shaw either ignored the bulk of the mitigating evidence or was ignorant of it. *Compare Order* at 17-36 with Tr. Transcr. Vol. 12, 194-215. In fact, at no time during his closing argument did Mr. Shaw make any mention of the train accident which resulted in the loss of Holder's leg and had a dramatic impact on his life, changing him from an outgoing athlete to a quiet and withdrawn person. Had counsel Herndon given the closing argument, she would have emphasized this fact, along with other events in Holder's background and family life – including his role as *de facto* father to three younger siblings – and explained how these events resulted in Holder's life spiraling downward, and eventually to the tragic events of March 17, 1997. *See* Hrg. Transcr., Vol. I, 116-17. The district court's conclusion that Mr. Shaw properly "referenced" the mitigation evidence presented by Ms. Herndon is wrong and plainly contradicted by its own *Order*.

Further, the verdict form outlining the mitigating factors which the jurors found to exist supports the premise that Holder was prejudiced by Shaw's failure to fully explain the mitigating evidence. The jury found the existence of a number of mitigators that were part of Ms. Herndon's and Ms. Tatelli's mitigation strategy, to-wit: that Holder suffered a series of losses in his life which he failed to process, including the desertion of his father at a young age, the loss of his leg, and the death of his grandfather; that in the absence of his father, Holder assumed the role of the man of the house at a very young age; that Holder lacked a positive role model while growing up; that he felt a sense of responsibility to provide emotional and financial support to his younger brothers and sisters; that Holder provided a positive role model to his younger siblings; that Holder did not have a history of violent behavior and the offenses of which he was convicted are inconsistent with his personality and usual behaviors; that Holder did not present a substantial risk of being dangerous or violent if confined to prison for life; and that Holder has made an adequate adjustment to being confined in jail and not a problem inmate. *See* Special Verdict Form, 9-12. Conversely, the jury did not find the existence of the factors argued by counsel Shaw - that Holder neither fired the shots which resulted in the guard's death, nor intended for any person to be killed during the robbery. *Id*. 8-9. Given these findings, it is clear that the jury had no guidance as to how all the mitigation circumstances tied together.

Reasonable jurists could certainly debate whether Mr. Shaw, who was completely unfamiliar with the mitigation case and slept through portions of the penalty phase, was ineffective in giving the penalty phase closing argument, and whether, had the jury been given the complete picture of all the mitigating evidence presented, there is a reasonable likelihood that at least one of the jurors

would have voted for a life sentence. Thus, this Court should issue a certificate of appealability with respect to this claim.

> **Claim 12C(h):** **Reasonable jurists could debate the district court's rejection of Mr. Holder's claim that lead counsel Charles Shaw slept during portions of the trial.**

A criminal defendant "requires the guiding hand of counsel at every step in the proceedings against him." *Powell v. Alabama*, 287 U.S. 45, 69 (1932). The absence of counsel at a "critical stage" of the proceedings requires a presumption that the defendant was prejudiced by that deficiency. *Cronic v. United States*, 466 U.S. 648, 659 & n.25 (1984). Therefore, a defendant's Sixth Amendment rights are violated, and prejudice is presumed, when counsel is sleeping during "not insubstantial portions" of a death penalty trial. *Burdine v. Johnson*, 262 F.3d 336, 341 (5th Cir. 2001) (en banc).

Three witnesses testified that attorney Shaw fell asleep during the trial on multiple occasions. Mitigation investigator Caryn Tatelli observed counsel Shaw sleeping during the penalty phase. Hrg. Transcr., Vol. II, 28. Specifically, she noticed counsel Shaw sleeping at counsel table while counsel Herndon was conducting direct examination of defense mitigation witnesses. *Id.* at 28, 30. Ms. Tatelli described her observation as follows:

> I saw that [counsel Shaw's] eyes were closed. I saw his head sort of bobbling back and forth the way a sleeping person – somebody who is sort of fighting to stay awake – the head forward/head back jerking movement kind of thing.

*Id.* at 28. She explained that Shaw appeared to be sleeping, rather than fighting off sleep. *Id.* at 29-30. She observed Shaw sleeping at least twice during the testimony of mitigation witnesses. *Id.* at 30. She told attorney Herndon that Shaw was sleeping during the testimony, to which Ms. Herndon responded, "I know." *Id.* at 31.

Ms. Herndon also testified in support of Mr. Holder's claim. She first observed co-counsel sleeping during the guilt phase proceedings. Hrg. Transcr., Vol. I, 142. It was initially petitioner who pointed it out to her. *Id.* Petitioner nudged her and motioned his head towards counsel Shaw, and when counsel Herndon looked over at him, she saw counsel Shaw with his face in his hands and his eyes closed. *Id.* She was convinced that counsel Shaw was not merely "resting his eyes" after she observed "him kind of do . . . like when you're asleep and you realize you're asleep and you kind of jerk your head up a little bit" and noticed "his head kind of bob up to attention a little bit, like you do when you're asleep and you don't want to be[.]" *Id.* at 143. Counsel Herndon also confirmed that Ms. Tatelli told her during the trial that she had observed counsel Shaw sleeping during the penalty phase witness testimony. *Id.* at 145-46.

Shaw's sleeping was also noticed by his client. Mr. Holder testified in his deposition, which was admitted in lieu of his testifying at the hearing, that Shaw had been sleeping, and was resting his head in his hand with eyes closed. Holder Depo. Transcr. at 128-30. On about four or five occasions, petitioner also observed counsel Shaw's head "bobb[ing] heavily," as if he were nodding off. *Id.* at 129-30. Sometimes, petitioner would nudge counsel Shaw to wake him up out of his sleep. *Id.* at 130. Petitioner would also motion over to counsel Herndon to alert her to the fact that counsel Shaw was sleeping. *Id.* at 130-31.

The three witnesses, then, testified to similar and consistent effect. All three gave consistent descriptions of seeing counsel Shaw bobbing his head while asleep, and both counsel Herndon and petitioner gave consistent descriptions regarding instances when counsel Shaw would rest his head in his hand and close his eyes. *Cf. Burdine*, 262 F.3d at 339 (Juror Strickland "recalled seeing Cannon doze or nod off between two and five times," while Juror Davis observed that Cannon

"'would nod his head down on his chest' with his eyes closed during the questioning of witnesses").

Additionally, counsel Herndon was able to corroborate both petitioner's and Ms. Tatelli's testimony that they had contemporaneously informed counsel Herndon about their concerns that counsel Shaw was sleeping during the trial.

The district court advanced essentially three rationales for rejecting Mr. Holder's claim, both in its order denying relief and in its later order declining to alter or amend the judgment. First, the court found a lack of specificity in the witnesses' testimony concerning precisely when Mr. Shaw was sleeping, during which witnesses' testimony, for how long, and on how many occasions. Memorandum and Order denying § 2255 Mot (July 22, 2008), at 85-87; Memorandum and Order denying Rule 59(e) Mot (Dec. 14, 2009), at 32-34. Second, the court ruled that prejudice could not be presumed on a denial of counsel, because Mr. Holder was represented by a second attorney who was not sleeping during the trial: Ms. Herndon. Order of July 22, 2008, at 87-88. Third, the court itself did not notice Mr. Shaw sleeping during the trial, and it observed that the court would have likely "noticed such misbehavior" if it had occurred. Order of July 22, 2008, at 85, 87-88; Order of Dec. 14, 2009, at 30. All of these rationales are problematic for the reasons explained below.

A. **The district court's requirement of precise testimony identifying the exact portions of trial during which counsel was sleeping is debatable among reasonable jurists and contrary to the Fifth Circuit's *en banc* opinion in *Burdine v. Johnson*, 262 F.3d 336 (5th Cir. 2001).**

Consistent with the Government's briefing, the court's dispositive order required Mr. Holder to show that counsel slept "through substantial portions of the trial." Order of July 22, 2008, at 86-88. Petitioner pointed out that the court's test was more stringent than the Fifth Circuit's, which ascertains whether counsel was sleeping during "not insubstantial portions" of trial. *See* Motion to

Alter or Amend Judgment, at 33-34, citing *Burdine v. Johnson*, 262 F.3d 336, 341 (5th Cir. 2001). Under the rationale of *Burdine*, petitioner need only demonstrate that Shaw slept through what amounts to something more than insubstantial portions of the trial. That amount need not itself be "substantial" in order to cross the threshold of being more than insubstantial. The district court largely conceded the point in its order denying Rule 59(e) relief. Without analyzing the distinction between "substantial" and "not insubstantial" portions of the trial, the court reasoned that Mr. Holder could not satisfy either standard, because his evidence simply wasn't specific enough in identifying when Mr. Shaw slept and for how long. Order of Dec. 14, 2009, at 32-34. But *that* ruling conflicts with *Burdine* as well.

The prisoner in *Burdine* could not have prevailed under the evidentiary standards imposed by the district court in this case. The Fifth Circuit specifically rejected such requirements:

> The State next argues that because Burdine cannot demonstrate precisely when [counsel] slept during his trial, he cannot prove that [counsel] slept during critical stages of his criminal proceeding. In this regard, the State asks more of Burdine than the Supreme Court or this Court has ever asked of a defendant attempting to show the absence of counsel during a critical stage of a trial. To justify a particular stage as "critical," the Court has not required the defendant to explain how having counsel would have altered the outcome of his specific case. Rather, the Court has looked to whether the substantial rights of a defendant may be affected during that type of proceeding.

*Burdine*, 262 F.3d at 347; *accord id.* at 355 (Higginbotham, J., concurring) ("The search for the precise evidence that came in as Burdine's counsel slept rests upon a view of trial dynamics and reality that confounds my forty years in the courtroom. With respect to my colleagues, that is not the way it works, and for the same reasons it is not the law."). The district court's imposition of such a requirement, then, is debatable among reasonable jurists and justifies a COA.

The fact that the district court imposed its "specificity" requirement under the guise of a credibility finding, does not immunize that requirement from appellate review. The district court found the evidence non-credible because the witnesses could not recall the precise portions of trial during which counsel slept. *See* Order of July 22, 2008, at 86-87; Order of Dec. 14, 2009, at 34. The issue in this appeal is not whether the court's ruling is "clearly erroneous" on the factual question of whether Mr. Shaw was sleeping during "not insubstantial" portions of trial. Rather, the question is whether the court's choice of an over-arching measure for the claim (specificity) is legally erroneous or at least debatable. Taken to its logical end, the district court's analysis would reject, as non-credible, ***any*** sleeping-lawyer claim unsupported by testimony describing the exact time frame of counsel's slumber. That requirement is at least problematic under *Burdine*, and it justifies further proceedings. *See Leonard v. Dorsey & Whitney LLP*, 553 F.3d 609, 613 (8th Cir. 2009) ("We will overturn a factual finding that is based on the application of an erroneous legal standard.").

**B.** **Lead counsel's sleeping constructively deprived petitioner of counsel during a critical stage of trial, even though petitioner was nominally represented by another attorney appointed five weeks earlier.**

Another debatable aspect of the district court's ruling is its surmise that Mr. Holder cannot have been constructively denied counsel under *Cronic*, because he was represented by two attorneys at the time of the relevant events. *See* Order of July 22, 2008, at 87-88 ("[T]he Court notes that Petitioner was, at all times throughout both the guilt and penalty phases of the trial, represented by both counsel Shaw and counsel Herndon. Petitioner was never without the representation of competent counsel"). The court's ruling overlooks important facts in the record regarding the division of labor between counsels Shaw and Herndon, and it misapplies the presumed prejudice standard articulated in *United States v. Cronic*, 466 U.S. 648 (1984).

22

First, it should be noted that Ms. Herndon did not appear as counsel until some five weeks before trial. Hrg. Transcr., Vol. I, 118. As she testified during the evidentiary hearing, her representation of petitioner was limited to preparing the penalty phase case. *Id.* at 115. She did not participate in the preparation for the guilt phase proceedings, and testified that even after the guilt-phase proceedings had already commenced, she had not read all of the pre-trial discovery provided by the government. *Id.* at 144. Counsel Herndon was simply not prepared to represent petitioner during the guilt phase proceedings, and therefore, during those times when counsel Shaw slept through the guilt phase testimony, petitioner was effectively without the representation of competent counsel.

Second, with respect to the penalty phase, the court's ruling overlooks the fact that even though it was counsel Herndon who examined the mitigation witnesses, it was counsel Shaw that gave the closing argument. Shaw insisted on doing so, and exercised his authority as lead counsel in order to argue the penalty phase. *Id.* at 126-29. It should go without saying that counsel cannot reasonably deliver a closing argument to explain the mitigating force of testimony that was presented while counsel was sleeping. Otherwise stated, the testimony of penalty phase witnesses is a "critical stage" of the trial for an attorney who presents the ensuing closing argument. *See Cronic*, 466 U.S. at 659 & n.25 ("a trial is unfair if the accused is denied counsel at a critical stage of his trial"). Having neither heard portions of the testimony himself, nor observed the jurors during the receipt of that testimony, counsel Shaw was in no position to make a reasoned judgment as to what themes and evidence would be most effective on closing. "The unconscious attorney is in fact no different from an attorney that is physically absent from trial since both are equally unable to exercise judgment on behalf of their clients. Such absence of counsel at a critical stage of a proceeding makes

the adversary process unreliable, and thus a presumption of prejudice is warranted pursuant to *Cronic*." *Burdine*, 262 F.3d at 349.

> **C.** **Although a court may rely on its own memory of trial proceedings, the district court deprived petitioner of a fair evidentiary hearing to test and assess the ability of the district court to have noticed Mr. Shaw's sleeping under the circumstances of petitioner's complex capital trial.**

The court's memory of trial events was highly relevant to its ruling on the merits. It observed that "had counsel Shaw been sleeping for substantial periods of time, or if at all, *it is likely* that the Court would have noticed such behavior." Order of July 22, 2008, at 87 (emphasis added). The court first reported its recollections during a routine status conference on March 22, 2005, at which the court stated that it had no memory of seeing Mr. Shaw sleeping. That, of course, is a narrower proposition and holding than the court ultimately reached, which is that the court would have noticed the sleeping if it had occurred – otherwise stated, that a preponderance of evidence shows that Mr. Shaw was not sleeping, because if he were, the court is "likely" to have remembered it.

The issue of the court's ability to notice an attorney sleeping, particularly while it observes *another* attorney eliciting testimony during a complex penalty phase trial, was not explored at the evidentiary hearing. It could not have been explored, because the first time the court attested to its powers of observation was in its written order. If petitioner had had sufficient notice of the court's view, he would have explored the matter at the hearing and examined such issues as (a) the court's duties during the course of trial; (b) where the court was directing its attention during the receipt of witness testimony; (c) how carefully the court was observing attorney Shaw while he was seated at the counsel table; (d) where the court was directing its attention when attorney Herndon examined penalty phase witnesses; and (e) whether the witnesses presented at the evidentiary hearing

24

(Herndon, Tatelli, and Holder) had a better opportunity, as well as more chances, to directly observe Shaw than the court did. The district court, then, made implied findings about its own ability and opportunity to observe the relevant events, but without notice that such findings would govern Mr. Holder's claim.

The court later insisted that its observations were not "dispositive" or "definitive." Order of Dec. 14, 2009, at 29-30. But neither were they irrelevant, for the court adhered to its view that "it was *likely* (not certain) that the Court would have noticed if trial counsel were sleeping." *Id.* at 30 (emphasis in original). That likelihood ought to explored at a full and fair hearing before it can serve as even a partial basis for denying the claim. *Cf. Burdine*, 262 F.3d at 339 (noting that state appellate court credited the testimony that counsel was sleeping, even though the trial judge and prosecutor did not notice any sleeping).

WHEREFORE, for each and all of the foregoing reasons, appellant respectfully requests that this Court expand the certificate of appealability issued by the district court to include Claims 12C(e), 12C(h), and 12C(k) of his 2255 motion.

Respectfully submitted,

/s/ Michael J. Gorla
Michael J. Gorla, #26399
720 Olive Street, Suite 1630
St. Louis, Missouri 63101
(314) 621-1617
(314) 621-7448 - Facsimile
E-mail: mjgorla@msn.com

/s/ Joseph W. Luby
Joseph W. Luby, #48951
Public Interest Litigation Clinic
6155 Oak Street, Suite C
Kansas City, Missouri 64133
(816) 363-2795
(816) 363-2799 - Facsimile
E-mail: jluby@pilc.net

*Attorneys for Petitioner-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2010, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following: Mr. Steven E. Holtshouser and Mr. Joseph M. Landolt, Assistant United States Attorneys, 111 South 10th Street, 20th Floor, St. Louis, Missouri 63102.

/s/ Michael J. Gorla