# IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

| | |
|---|---|
| NORRIS G. HOLDER, | ) |
| | ) |
| Appellant, | ) |
| | ) |
| v. | )    No. 10-1304 EMSL |
| | ) |
| UNITED STATES OF AMERICA, | )    CAPITAL § 2255 PROCEEDING |
| | ) |
| Appellee. | ) |

## GOVERNMENT'S RESPONSE TO HOLDER'S
## MOTION TO EXPAND CERTIFICATE OF APPEALABILITY

**COMES NOW** the United States of America, by and through its attorneys, Richard G.

Callahan, United States Attorney for the Eastern District of Missouri, and Joseph M. Landolt and

Steven E. Holtshouser, Assistant United States Attorneys for said District, and responds to

appellant's motion to expand certificate of appealability, as follows:

## I. INTRODUCTION:

The District Court entered a 100 page "Memorandum and Order" (hereinafter "Order")

denying Petitioner Holder's (hereinafter "Holder") petition for relief under 28 U.S.C. Section 2255.

A copy is attached hereto as Appendix A. The District Court presided over the underlying trial in

1998. The trial lasted over a month and resulted in Holder's convictions and 2 death sentences.

Pages 1 through 37 of the Order detailed an overview of the evidence presented at trial.

The procedural history of the case, from indictment through hearings and briefing on the

Section 2255 motion, was described at pages 37 through 39 of the Order. At trial, Holder was

represented by two learned capital counsel, Charles Shaw and Jennifer (Brewer) Herndon. Holder's

Section 2255 motion presented substantive and ineffective assistance claims. The District Court

1

received briefs from the parties on Holder's allegations and supporting affidavits. The Court then allowed discovery and hearings on several of these issues. The hearings spanned 3 court days in July, 2005. Mr. Shaw was deceased by the time of Holder's petition, but the evidence included a deposition by Holder, the testimony of Ms. Herndon and several other members of Holder's defense team. The parties were thereafter permitted extensive briefing.

Included within the District Court's Order denying relief was a certificate of appealability. The District Court granted a certificate on 1 substantive claim and 5 ineffective assistance claims, but denied certification another substantive claim and 6 ineffective assistance claims. In doing so, the District Court concluded that a substantial showing had not been made on the non-certified claims.

Before appealing the Order, Holder filed a 46 page Motion to Alter or Amend pursuant to Rule 59(e). The District Court again evaluated Holder's claims, including claims of errors made by the District Court in the Order, and denied the request to alter or amend the Order. The District Court's ruling on the Rule 59(e) motion was 37 pages in length and directly considered several of the issues raised in the present Motion to Expand the Certificate of Appealability. A copy of the District Court's Memorandum and Order dated December 14, 2009 (hereinafter "Memorandum and Order") is attached as Appendix B. Thus, the District Court has given Holder's various claims a great deal of consideration and scrutiny.

Holder now asks this Court to expand the claims which he can appeal from 6 to 9, claiming that the District Court should have granted a certificate of appealability on 3 additional ineffective assistance claims. The 3 claims concern: 1) the failure of either defense counsel to personally interview and call a jailhouse informant to whom Holder allegedly made statements, some of which

were refuted by the weight of the evidence and some of which had cumulative mitigating value; 2) the propriety of Mr. Shaw's decision to give the penalty phase closing argument rather than Ms. Herndon who was trying her first federal capital case; and 3) the belated claim that Mr. Shaw was sleeping at unspecified times during the trial.

As demonstrated herein, Holder is not entitled to expansion of the certificate of appealability. Holder bases his motion on an incomplete and one-sided presentation of the relevant facts rather than the entire record, including the District Court's unique experience in the underlying guilt and punishment trial. Holder appears not to challenge the District Court's understanding of the applicable law as much as he challenges the District Court's factual findings. A fair consideration of the entire factual and legal record establishes that the motion to expand the certificate of appealability should be denied. Reasonable jurists equipped with the complete factual record, as was the District Court, would not find its rejection of the 3 ineffective assistance claims at issue herein wrong or otherwise debatable.

## II. LEGAL STANDARDS:

To expand the certificate of appealability, Petitioner must demonstrate that "' a reasonable jurist' would find the district court ruling on the constitutional claim 'debatable or wrong'" *Winfield v. Roper*, 460 F.3d 1026, 1040 (8th Cir. 2006), *quoting*, *Tennard v. Dretke*, 542 U.S. 274, 276 (2004). Although the Court has "the discretion to expand the certificate of appealability, [it] exercise[s] the discretion carefully." *Winfield*, 460 F.3d at 1040, *citing*, *Watts v. Norris*, 356 F.3d 937, 941 (8th Cir. 2004).

The standard for expanding a certificate of appealability should be applied in the context of the standard of appellate review of a district court's denial of a petition for habeas corpus. On appeal,

the district court's factual findings would be reviewed for clear error and the ultimate issue of ineffective assistance would be reviewed de novo. To succeed on a Sixth Amendment ineffective assistance of counsel claim, defendant must demonstrate that (1) trial counsel's performance was so deficient as to fall below an objective standard of the customary skill and diligence displayed by a reasonably competent attorney, and (2) trial counsel's deficient performance prejudiced the defense. *United States v. Martinez-Salinas*, 573 F.3d 595 (8th Cir. 2009).

### III. ARGUMENT:

#### A. Claim 12C(e): Failure to Interview/Call Jailhouse Informant Was Not Ineffective

Holder claimed that his attorneys were ineffective for not interviewing or calling a jailhouse informant to whom Holder had made statements <u>after</u> Holder had been charged with capital crimes. This informant was interviewed by the FBI and the agent prepared a summary of Holder's alleged statements to the informant. The FBI report protected the witness' identity, but the report was given to Holder's counsel. The informant also had conversations with Holder's companion in the bank robbery, Billie Allen. The portion concerning Holder was, as follows:

> He [the Petitioner] said that the robbery was Allen's idea. They were supposed to go in and out. No one was to get shot; no one was to get hurt. Holder told Allen "no bodies" no murders. Once in the bank Holder suddenly heard a shot. Holder panicked. He did not see the guard reach for his gun. He said that Allen shouldn't have shot the cop as a charge would have only been for bank robbery. . . . Holder also told [the witness] that he could not watch the guard's funeral on television. Holder appeared remorseful.

The alleged value of the evidence was that the informant would have incriminated Allen as the one who fired the fatal shots and mitigated Holder's punishment if it was true that he did not intend for the guard to be harmed or killed and that Holder was remorseful. Holder argues that the District Court's denial of this ground was debatable or wrong, because defense counsel should have personally interviewed the informant and that the District Court should not have evaluated the

4

credibility of the informant without a hearing.

The District Court's consideration of this claim appeared at pages 71-75 of the Order. The District Court evaluated the prejudice prong first in the guilt phase context and concluded: "Considering the evidence presented by Petitioner's trial counsel regarding Petitioner's lack of intention that anybody be hurt, and the likelihood that he did not fire the fatal shots at Heflin, the Court cannot conclude that the outcome would have been different had the additional testimony been presented." Order at 73. Reasonable jurists would not find this conclusion debatable or wrong, because there was other, more credible, evidence that Holder did not fire the fatal shots (Government's own expert and eyewitness testimony). In addition, Holder testified in the guilt phase and ably presented his claim that he did not intend for anyone to be harmed. At best, his earlier statements to a jailhouse informant would have been viewed as a prior consistent statement. The District Court also relied on *Amrine v. Bowersox*, 238 F.3d 1023, 1031 (8th Cir. 2001) to support its conclusion with respect to the guilt phase.

Although unnecessary to its conclusion, the District Court also found that the decision to not interview or call the witness was a reasonable strategic decision and the District Court cited authorities supporting its conclusion. The Court agreed with the Government that a jailhouse informant's testimony is "inherently limited" and that the timing of the statements made them unreliable. The Court did not determine the witness' credibility in a hearing, and no affidavit was ever presented by the Holder in support of this claim, but it did not need to. The Court's decision not to permit a hearing on this issue was not debatable of wrong, because regardless of the Court's view of the witness' personal credibility, the circumstances of Holder's alleged statement were still post-arrest and post-charge such that Holder's motives for making the statements would be subject

5

to attack. Further, the credibility of the witness would be subject to attack given his circumstances at the time and his motivations for talking to the FBI. Thus, the Court concluded that defense counsel's decision not to spend valuable time and resources locating and interviewing the witness was not unprofessional or unreasonable. Indeed, given the content of the FBI report of interview, calling the witness would have injected cross-examination and impeachment that would have distracted from the ultimate issue the witness allegedly supported: the claim that Holder did not fire the fatal shots and that he was remorseful.

The District Court did not need to personally evaluate the informant nor hear evidence from the informant for the same reason defense counsel could reasonably decide not to do so - all of the information needed to make a reasonable choice was known from the FBI report itself. Holder criticizes the refusal of the District Court to grant a hearing on this issue, but fails to state what would have been presented at the hearing to evaluate the propriety of defense counsel's decision not to pursue the matter based solely on the FBI report.

Simply failing to interview a witness "does not automatically lead to the conclusion that counsel was ineffective. . . ." *Vazquez-Garcia*, 211 Fed.Appx. at 546. "To prove prejudice from a trial attorney's failure to investigate potential witnesses, a petitioner must show that the uncalled witness would have testified at trial and that their testimony would have probably changed the outcome of the trial." *Stewart v. Nix*, 31 F.3d 741, 744 (8th Cir. 1994), *citing*, *Lawrence v. Armontrout*, 900 F.2d 127, 130 (8th Cir. 1990). In other words, Holder must prove that his trial attorney's failure to physically interview the unidentified witness fell below an objectively reasonable standard and resulting prejudice. *Sanders v. Trickey*, 875 F.2d 205, 207-08 (8th Cir. 1989).

In making this determination, the Court should consider: "(1) the credibility of all witnesses, including the likely impeachment of the uncalled defense witnesses; (2) the interplay of the uncalled witnesses with the actual defense witnesses called; and (3) the strength of the evidence actually presented by the prosecution." *Siers v. Weber*, 259 F.3d 969, 974 (8th Cir. 2001), *cert. denied*, 534 U.S. 1138, 122 S.Ct. 1087 (2002). Here, each of these factors supported the District Court's determination. Trial counsel's decision not to interview a witness is "based on information available to [him] at the time it was made." *United States v. Williams*, 562 F.3d 938, 941 (8th Cir. 2009).

Petitioner cannot prove that trial counsel's conduct fell below an objectively reasonable standard. An attorney "has a duty to conduct a reasonable investigation or to make a reasonable determination that an investigation is unnecessary." *Owsley v. Bowersox*, 48 F.Supp.2d 1195, 1208 n. 6 (W.D. Mo. 1999), *aff'd*, 234 F.3d 1055 (8th Cir. 2000), *cert. denied*, 534 U.S. 903, 122 S.Ct. 233 (2001). Trial counsel might satisfy this obligation by reviewing reports compiled by investigative agencies. *See, e.g.*, *Kwak v. Frank*, No. 07-00534 SOM-KSC, 2008 WL 5791929, *11 (D. Hawai'i. Oct. 22, 2008), *report and recommendation adopted as modified*, 2009 WL 929313 (D. Hawai'i Apr. 2, 2009); *United States v. Buhl*, No. Civ. A. 91-3596, 1992 WL 221333, *3 (E.D. Pa. Sept. 3, 1992). A claim that trial counsel was ineffective because he failed to investigate "must be assessed in light of all circumstances, and a significant degree of deference given to counsel and his or her professional judgment." *Griffin v. Delo*, 33 F.3d 895, 901 (8th Cir. 1994). An attorney need not physically speak with a potential witness before making a strategic decision not to further interview or call the witness where the attorney, as here, knows the substance of the witness's purported testimony. *Chandler v. United States*, 218 F.3d 1305, 1322 n. 32 (11th Cir. 2000), *cert. denied*, 531 U.S. 1204, 121 S.Ct. 1217 (2001). Instead, a trial attorney, with knowledge of the testimony's

substance, might "assume the most favorable testimony that you might get and then form some judgment, not the most reliable judgment in the world, but some judgment about how compelling it might be." *Id.* Armed with this knowledge, the trial attorney satisfies his duties where he makes a strategic decision not to further interview or call the witness.

Petitioner's cases do not stand for the proposition that trial counsel, with knowledge of a witness's proposed testimony, must <u>actually speak</u> with the witness to satisfy his duty to investigate. Indeed, they specifically reject that proposition. *See, e.g., Kenley v. Armontrout*, 937 F.2d 1298, 1304 (8th Cir. 1991), *quoting, Strickland*, 466 U.S. at 690-91 (counsel's "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgements support the limitations on investigation"); *Pickens v. Lockhart*, 714 F.2d 1455, 1467 (8th Cir. 1983) (decision not to pursue line of investigation is sound so long as "such a strategy [is] a reasoned choice based on sound assumptions"). Said cases hold that trial counsel cannot make a strategic decision not to physically interview or call a witness where the trial counsel was <u>unaware</u> of the potential mitigating information because he failed to undertake the necessary investigation in order to learn the information. *See, e.g., Wiggins v. Smith*, 539 U.S. 510, 525, 123 S.Ct. 2527, 2537 (2003) (failure to investigate prevented counsel from learning about defendant's pervious sexual abuse); *Hill v. Lockhart*, 28 F.3d 832, 845 (8th Cir. 1994) (failure to request 1968 medical records prevented counsel from learning about defendant's "positive response to anti-psychotic drugs"); *Kenley*, 937 F.2d at 1304 - 1307 (counsel's failure to investigate prevented counsel from learning about multiple mitigating factors); *Pickens*, 714 F.2d at 1467(counsel "did no investigation into any possible mitigating evidence.").

Trial counsel can make a strategic decision not to further interview or call a witness to testify

where he <u>has knowledge</u> about what evidence the witness might provide. Here, the FBI report of interview gave him the requisite knowledge and therefore a basis for the reasonable judgment not to present the informant as a witness. A defense attorney with knowledge of a witness's potential testimony may consider a witness's credibility before a jury when determining whether or not to interview or call the person as a witness. *See Lawson v. Caspari*, 963 F.2d 1094, 1096 (8th Cir. 1992). An attorney may gain his knowledge simply by reviewing the police report containing the prospective witness's testimony without physically interviewing the witness. *See Kwak*, 2008 WL 5791929, at * 11 (counsel "was aware of information [the witness] possessed by way of transcripts documenting her statements to police (including the initial sworn statement that turned out to be a lie) and therefore had the requisite knowledge upon which to base her strategic decision").

In addition to credibility issues, Petitioner overlooks the fact that the witness would have done him more harm than good, because the statements attributed to Holder by the witness were essentially proved false by other, stronger evidence in the case. For example, the robbery was not Allen's idea. Holder was an account holder at the bank, planned the robbery, equipped himself for violence, prepared for violence by watching violent takeover robbery movies, and continued to be violent even as police were attempting to arrest him. The District Court cited the following evidence: "the amount of weapons and ammunition that were carried by Petitioner, his wearing an armored vest, the statements made prior to the robbery regarding the presence of the guard, . . . the decision to attempt to set fire to the getaway vehicle after abandoning it in Forest Park, . . . [and the fact] that the weapons he used could shoot through police cars." Order at 79.

In addition, the District Court did not have to ignore the fact that later penalty phase evidence established that a non-violent plan (stun gun) for neutralizing the guard had been scrapped by

9

Holder. The defense did not need additional opportunities, which the informant would have provided, for the Government to discredit Holder's defense theories. The witness in question would have backfired on Holder. The effect would have been that Holder was attempting to falsely manufacture favorable witnesses in the only venue available to him, a jail cell, to manipulate the jury.

As to the penalty phase, the District Court found that the testimony of the jailhouse informant would have provided only additional, incremental information regarding Holder's alleged remorse, not otherwise unavailable information. The jailhouse informant would have suffered from the same credibility issues, which would have served to distract the jury from other more mitigating information, regardless of whether the District Court found the witness personally credible or not. Being duplicative of other evidence which did not convince the jury to spare Holder's life, the District Court correctly concluded that prejudice could not be established to satisfy *Strickland*. The cases Holder cites in his Motion to Expand - - *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669 (1986), and *Outten v. Kearney*, 464 F.3d 401 (3d Cir. 2006) - - support the proposition that trial counsel is reasonable in deciding not to offer evidence, including witness testimony, where the evidence is cumulative. Similarly, the decision to not interview or call the witness in the penalty phase was not unreasonable, given the volume of other evidence available to establish Holder's claim of remorse, especially his own testimony.

Suggestions that a jury "was wrestling with the adequacy of the evidence and that it would not have taken much more to convince the jury" to return a verdict of life in prison rather than the death sentence is mere speculation on Petitioner's part. *Sanders*, 875 F.2d at 210. As the District Court held, "Petitioner's argument is based on mere speculation about what *might* have happened

10

to the balance of the mitigation and aggravation factors if the unknown witness had testified. Speculation of prejudice is not sufficient to establish prejudice under *Strickland*." Memorandum and Order at 21 (Appendix B).

Given that the informant's testimony would have conflicted with the overwhelming weight of the evidence of Holder's role in the crime as well as some of his own mitigation witnesses, the conclusion that the decision not to call this witness did not rise to the level of constitutionally ineffective assistance of counsel was neither debatable nor wrong. The District Court also specifically considered and rejected the arguments made by Holder in his Motion to Expand in the District Court's separate Memorandum and Order dated December 14, 2009 denying the Rule 59(e) motion. Memorandum and Order at 14-20. The certificate of appealability should not be expanded to include this claim.

### B. Claim 12C(k): Mr. Shaw's Closing Argument Was Not Ineffective

Mr. Shaw was a seasoned criminal defense attorney with a long record of trial success. He had previously defended other capital cases. This was Ms. Herndon's first federal capital trial. She had not previously given a capital closing argument. Mr. Shaw did primarily handle the guilt phase evidence and Ms. Herndon did primarily handle the penalty phase evidence. The District Court described her presentation of the "strong character of" Holder as "masterful" and "extensive." Order at 94.

At the hearing on this claim, Ms. Herndon consistently claimed that she believed that she should have given the penalty closing argument and that there were strategic differences of opinion between Mr. Shaw and Ms. Herndon. Mr. Shaw believed that the best strategy was to convince the jury of residual doubt and to emphasize the fact that Holder was not primarily responsible for the

11

death of Richard Heflin, the bank guard.  Mr. Shaw was not persuaded that the jury would give

sufficient weight to the mitigation "themes" developed by Ms. Herndon.  Ms. Herndon believed in

the primary value of the evidence that she was personally invested in.  Ms. Herndon was not that

versed in the guilt evidence and had not been one of Holder's attorneys as long as Mr. Shaw.  Ms.

Herndon never gave the District Court a detailed example of what she would have argued

differently[1], but generally claimed that her argument would have made a difference because it would

have given the jury "a reason for the robbery."  Motion to Expand Certificate of Appealability at 14.


The District Court's discussion of this claim appears at pages 94-98 of the Order.  It noted

that Mr. Shaw did not ignore the mitigation evidence, as Holder and Ms. Herndon claimed, and that

Mr. Shaw explained the "exemplary mosaic of the life of this defendant."  Order at 95.  The District

Court cited numerous examples from the transcript of Mr. Shaw's closing argument where he argued

the mitigating value of the evidence presented by Ms. Herndon.  This included his life history, his

prior lack of violent behavior, the difficult environment in which he was raised, the family that loved

Holder, and Holder's lack of good male role model.  But, he also continued to drive home the

---

[1]The argument that Ms. Herndon would have given is still not presented with any
specificity and this was a tactical choice in Holder's Section 2255 proof.  If Ms. Herndon's
argument would have made such a difference, why was the District Court not provided with a
specific statement, or even performance, of the argument?  What the District Court received
were mere generalizations that Ms. Herndon would have tied it all together and would have
explained "how these events resulted in Holder's life spiraling downward, and eventually to the
tragic events of March 17, 1997."  Motion to Expand at 16.  Ms. Herndon's naivete, which
perhaps concerned Mr. Shaw, is evident even after all these years.  The notion that the jury
would have spared Holder's life against the backdrop of the circumstances of this offense,
because the loss of his leg impacted his life and his parents were not ideal was fanciful.  If
anything, Ms. Herndon's argument would have opened the way to even more powerful rebuttal
argument by the Government.

argument, front-loaded[2] during the guilty phase, that Holder did not deserve death because of his role in the robbery and death of Mr. Heflin and because he was remorseful. The District Court summarized its review of all the evidence before it: "Mr. Shaw embraced a sound trial strategy under practical [sic] impossible defense options and did not in any particular provide ineffective assistance of counsel." Order at 96.

A further discussion of this issue was provided by the District Court in its December, 2009 Memorandum and Order at pages 32-34. The District Court again explained why it was not convinced that Mr. Shaw was unprepared or that his closing argument was constitutionally ineffective. The District Court noted that "what is important is that the jury was presented with very thorough, credible and persuasive mitigation evidence, and then was presented with a closing argument that embraced a sound and <u>consistent</u> trial strategy." Memorandum and Order at 33 (emphasis added). It is not at all clear that Ms. Herndon's closing argument strategy would have been consistent with the credible themes that Mr. Shaw had developed throughout the trial.

The chief problem with Holder's claim is that it is pure speculation that the outcome would have been different if Ms. Herndon had given the penalty closing argument. The argument clearly over-emphasizes the value of closing argument, which jurors are told is not even evidence. The jury

_____

[2]Mr. Shaw, who is not here to defend his reputation, is treated by Holder as a bumbling, sleeping idiot. Yet, the practice of front-loading arguments for a life sentence in the guilt phase is deemed advisable and recommended by the ABA for competent capital counsel. ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases §10.11 (rev. ed. 2003)("the theory of the trial must complement, support and lay the groundwork for the theory of mitigation"). See also, Jesse Cheng, *"Frontloading Mitigation: The 'Legal' and the 'Human' in Death Penalty Defense,"* 35 LAW AND SOC. INQUIRY 39, 54 (2010). What would have been ill-advised was for Mr. Shaw to pursue one strategy and then have Ms. Herndon pursue a conflicting and inconsistent strategy in penalty phase. Mr. Shaw successfully blended the 2 strategies in his penalty closing argument. _____

had before it the body of evidence developed in the penalty phase, but several pieces of it had not

gone well and had become aggravating rather than mitigating. A particularly egregious example of

this was a mitigation witness who provided mitigating information, but on cross-examination gave

damaging, unrefuted testimony concerning Holder's plans to neutralize the guard. The simple fact

is that Holder's loss of his leg during a teenage criminal episode, his dysfunctional home life and

his desire to use a portion of the proceeds to purchase a new prosthetic leg[3] were never likely to be

given more weight by the jury than the claimed fact that Holder was remorseful, had not fired the

fatal shots or that there was any residual doubt as to his role and intentions in the bank robbery. Mr.

Shaw gave Holder not only his best chance at a life verdict, but at a minimum a constitutionally

adequate argument.

In this motion, Holder claims that Mr. Shaw was unaware of the mitigation strategy and

"completely unfamiliar" with the mitigation evidence. This is refuted by the record and the fact of

the debate that existed between Mr. Shaw and Ms. Herndon. The unproven claim that Mr. Shaw was

sleeping during the penalty phase evidence is irrelevant to this claim, but the content of his closing

is further evidence that the sleeping claim was nothing more than a contrivance. The District Court

again considered the evidence of Mr. Shaw's alleged sleeping in its December, 2009 Memorandum

and Order and again characterized that evidence as "not reliable." Memorandum and Order at 33.

Holder also asserts that Mr. Shaw's position was that the mitigation evidence "didn't make

---

[3]Holder was receiving disability benefits. Therefore, he had income, just not enough
income to acquire the material things he wanted for himself and his family.

any difference." Motion to Expand at 15. If this is so[4], then why did Mr. Shaw argue that evidence at all? Holder also states that the only thing that mattered to Mr. Shaw "was that [Holder] didn't shoot the guard." Again, if this was true, why did Mr. Shaw argue remorse and residual doubt in addition to the circumstances of Holder's life? In this motion, Holder stretches the truth beyond credulity by stating that Mr. Shaw argued the exact same thing in the penalty phase as the guilt phase.

Holder also claims that without Ms. Herndon's argument the jury was not given the "complete picture of all the mitigating evidence presented." Motion to Expand at 17. However, the jury heard all the evidence and it did not need Ms. Herndon to explain it to them to get the "complete picture." It was not complicated nor difficult to follow. Much of it was redundant. Closing argument is a time-management problem and it is not evidence. The jury was not less aware of the mitigation evidence because defense counsel did not devote all of the argument time to review it. There is no reason to think that any particular mitigating fact was confusing to the jury without argument. Moreover, the time between the presentation of the mitigation evidence and jury deliberations was relatively brief so that the jury had no difficulty recalling it.

As Holder has to admit, the jury found many of the factors mitigating based on the evidence presented by Ms. Herndon. The fact that Mr. Shaw was unable to convince the jury of the factual basis for the weightier arguments concerning Holder's role and state of mind with respect to the guard's death, the crime he was being punished for, does not detract from the wisdom of his judgment. He correctly assessed the jurors that if he could not convince them that Holder did not

---

[4]Mr. Shaw may very well have expressed such a sentiment privately to his co-counsel, but that did not stop him from effectively arguing the evidence of mitigation.

play an important role in the guard's death and planned for the guard to be killed, then no difficulties in Holder's personal life would spare him. The result was not a factor of an unwise choice of emphasis in closing, but on the weight of the evidence relating to the factors that would be most important to the jurors in assessing punishment. As in *Griffin v. Delo*, 33 F.3d 895, 903 (8th Cir. 1994), "there is no reason to conclude that a longer or more passionate closing argument would have resulted in an alternative sentence."

In 1998, Mr. Shaw had been trying criminal cases for longer than Ms. Herndon had been alive and she had been in Holder's case since 5 weeks before the trial started. Yet, Holder argues that Mr. Shaw's closing argument was ineffective and Ms. Herndon knew better. Holder also claims that an outsider to the case, Richard Burr, knew better. The simple fact is that there is always more than one way to argue a case. The issue presented by Holder's claim is not whether Ms. Herndon's way might have been better than Mr. Shaw's. It might have[5], but whether it was or it was not is a matter of speculation. Holder failed to prove that the way chosen by Mr. Shaw was constitutionally ineffective and reasonable jurists who were as familiar with the trial and the facts as the District Court would not find the District Court's rejection of this ineffective assistance claim wrong or debatable.

### C. Claim 12C(h): Holder Failed To Prove That Mr. Shaw Was Sleeping

---

[5]For reasons argued by the Government in the Section 2255 hearing and subsequent briefing, had Ms. Herndon given the closing argument it certainly would not have changed the outcome. Clearly, Ms. Herndon would have ignored the themes developed by Mr. Shaw, themes with which she admittedly was unfamiliar, and emphasized her own themes. Mr. Shaw's assessment of juries, gained from years of experience, as to what might make a difference to them was entitled to more respect than Ms. Herndon's limited experience. Moreover, the mitigation evidence here was not that compelling as compared to the facts and circumstances of the horrific manner in which Mr. Helfin was killed and the compelling stories of the victims harmed by Holder's actions. At least Mr. Shaw argued a balance of all available themes.

Evidence was heard on the claim that Mr. Shaw was sleeping during portions of the trial. The three witnesses who claimed to have observed the now-deceased Mr. Shaw sleeping were his co-counsel, a mitigation expert and the defendant himself. The District Court also contributed its recollections, as follows:

> We are on the record, and I will tell you I recall that Mr. Shaw came to the hearings almost always before anyone. He was frequently there before I arrived, and we passed the time of day, but nothing certainly about the case, and I have, because the issue arose, I have searched my memory and have no recollection whatsoever of ever seeing Mr. Shaw sleeping, or was there ever any, that I can recall, ever anytime when I had formed an impression that he was being less than attentive to the case, so that's my recollection about the case.
> There were times when Ms. [Herndon] was actively pursuing the questioning and so forth, and during those times, I had my attention focused on her, but I have searched my memory, and that's my best recollection, as I recall.

March 22, 2005 Status Conference Transcript at 4-5.

Holder raises the same 3 arguments to this Court that he did in his Rule 59(e) motion to the District Court. To support his claim that the District Court's ultimate finding was debatable or wrong, Holder misstates what the District Court found and the method of analysis used to make its findings. The District Court's consideration of this claim is found at pages 83-88 of the Order as well as pages 25-32 of the December, 2009, Memorandum and Order.

In its Order, the District Court evaluated the testimony of the witnesses together with its own recollection and the transcript of Mr. Shaw's on-the-record performance to find as a matter of fact that Mr. Shaw "was not sleeping during periods of the trial." Order at 85. This was essentially a credibility finding. It is not reasonable to suggest that other reasonable jurists, with the same first-hand knowledge of the facts and the trial itself, would find this credibility finding debatable or wrong. Aside from the fact that the testimony conflicted with the Court's recollections, the District Court evaluated the evidence carefully and found it "unpersuasive." Order at 85. Portions of the

17

testimony were inconsistent with the transcript of the trial. The District Court cited an example from the cross-examination of a bank employee by Mr. Shaw. Order at 86.

More importantly, the testimony "was lacking in details sufficient to support a finding that" Mr. Shaw slept. Order at 86. If the witnesses observed what they claimed, "they would have been able to recall the specific times this occurred." Order at 87. Similarly, if it had occurred to the extent described by the witnesses, the District Court "likely" would have "noticed such behavior."

Finally, the Court indicated that the failure of Ms. Herndon to bring the alleged sleeping to the Court's attention during trial was another indicator that the claimed observations were simply not credible. Telling is the fact that in not bringing it to the Court's attention[6] at any time (including when Mr. Shaw made known his intention to give the penalty phase closing argument) Ms. Herndon, if Mr. Shaw was actually sleeping at all, concluded that it was neither a substantial nor an insubstantial portion of the trial.

The District Court's analysis was a straight-forward credibility analysis and Holder's position was not factually credible. The Court was not rejecting the *Burdine/Cronic* presumption of prejudice standard by pointing to the lack of specificity, but relying on the absence of such information as a barometer of credibility to determine whether there was sleeping at all. The presumption of prejudice cannot arise without proof of sleeping and the Court found that Holder had

---

[6]Ms. Herndon actually made the assumption that Mr. Shaw was sleeping based on observing him. If she actually believed he was sleeping, as opposed to listening with eyes closed, wouldn't she have attempted to verify her assumption by nudging him or bringing to his attention, to give Holder the full benefit of 2 counsel, that he appeared to be sleeping? If she observed it, jurors could have observed it and if she was competent counsel she would not have wanted the jury to get the impression that either counsel was disinterested in the evidence.

not made such a showing. Order at 87. In fact, the Court clearly accepted the presumption of prejudice if sleeping could be established, but questioned its applicability to cases where the defendant is represented by two competent counsel.[7] Order at 87-88.

The District Court further addressed each of the arguments made in the Motion to Expand in the Court's December, 2009 Memorandum and Order. The Court's statement of personal recollection was not dispositive of the sleeping issue. Habeas counsel did not avail themselves of the opportunity to ask the District Court questions at the time the record was made or any later time. The statement that it is likely that the District Court would have noticed the behavior if it occurred was "not the basis for the Court's ultimate conclusion." Memorandum and Order at 28. The "likely" observation was an example of drawing reasonable inferences from facts as any factfinder is permitted to and must do. The Court found that the "lack of detail and the existence of contradictory evidence," which were not rebutted by Holder, were entitled to more weight in making the credibility finding than the consistency of the witnesses. Memorandum and Order at 30. Moreover, the Court made clear that it's reliance on the lack of details was not a departure from *Burdine*, but a factor in making its *"credibility determination."* Memorandum and Order at 31 (emphasis in original).

What Holder asks this Court to accept is the notion that if any evidence of sleeping is presented, regardless of its credibility, then a defendant is entitled to habeas relief under *Cronic* and

---

[7]What if Mr. Shaw needed to be absent from the courtroom to prepare another witness? The existence of second counsel is crucial to the Court's decision not only because she was present, but because she was considered competent and qualified capital counsel. Ms. Herndon clearly thought she was competent enough to give the penalty closing argument. If so, why was she not competent to represent Holder if Mr. Shaw was absent from the courtroom during any testimony? Ms. Herndon was not there as a second-chair or apprentice, but as a second counsel.

*Burdine*. This converts *Cronic* into some sort of "gotcha" litmus test whereby a defendant is entitled to habeas relief, regardless of the circumstances, if it appears to biased observers that one of two counsel is momentarily sleeping. Reasonable jurists would also not find the impropriety of such a test debatable or wrong where one of those counsel claims to have been aware of the other sleeping and intentionally chose not to bring it to the Court's attention in an effort to save the issue for habeas review. If Ms. Herndon had any concerns, she still could have brought them to the Court's attention immediately after the trial and before sentencing or as part of a motion for new trial. That she did not do so renders the District Court's factual finding that Mr. Shaw was not sleeping correct and not debatable among reasonable jurists.

## IV. CONCLUSION

Holder is should not be permitted to expand the certificate of appealability. The District Court's careful and thorough rulings on these 3 claims, made with the benefit of first-hand knowledge of all of the facts and witnesses, would not be viewed by reasonable jurists equipped with the same knowledge as debatable or wrong.

WHEREFORE, the Government respectfully requests that Holder's Motion to Expand the Certificate of Appealability be denied.

Respectfully submitted,

RICHARD G. CALLAHAN
United States Attorney

*/s/ Steven E. Holtshouser*
STEVEN E. HOLTSHOUSER, #24277
JOSEPH M. LANDOLT, #6484
Assistant United States Attorneys
111 South 10th Street, 20th Floor
St. Louis, MO 63101
(314) 539-6894

## CERTIFICATE OF SERVICE

20

I hereby certify that on June 24, 2010, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:

Michael J. Gorla
Attorney at Law
720 Olive Street, Suite 1630
St. Louis, MO 63101

Joseph W. Luby
Public Interest Litigation Clinic
6155 Oak Street, Suite C
Kansas City, MO 64133

*/s/Steven E. Holtshouser*