UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| NORRIS HOLDER, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Case No. 4:03CV00923 ERW |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

**<u>MEMORANDUM AND ORDER</u>**

This matter comes before the Court on Petitioner's Motion under 28 U.S.C. § 2255 to

Vacate, Set Aside, or Correct Conviction and Sentencing [doc. #12].

## I.  BACKGROUND FACTS

Petitioner was charged and found guilty under a two count indictment.  Count I charged

Petitioner with Bank Robbery by Force or Violence under 18 U.S.C. § 2113(e) and Count II

charged carrying a firearm during a crime of violence under 18 U.S.C. § 924(c)(1)(A) and murder

resulting from a crime of violence under 18 U.S.C. § 924(j).  These charges stemmed from the

bank robbery of the Lindell Bank and Trust Company ("the Bank") by Petitioner and Billie

Jerome Allen ("Allen") on March 17, 1997 ("the robbery").

Overwhelming credible evidence was presented at trial proving beyond a reasonable doubt

that Petitioner planned the bank robbery, executed the deliberate detailed plan, was apprehended

near the van driven from the Bank after the robbery, and confessed to robbing the Bank.

Petitioner and Allen entered the Bank heavily armed, wearing dark clothes ad masks.  Petitioner

wore a bullet proof vest.  Shortly after they entered the Bank, shooting began.  The evidence

presented supported a finding that both Petitioner and Allen fired their weapons inside the Bank,

1

however, most likely it was Allen who fired his weapon first.  The shooting resulted in the death of the bank security guard, Richard Heflin ("Heflin").   Following the Bank robbery, Petitioner and Allen fled the bank in a van that had been previously stolen.  The two accomplices had intended to leave the getaway van in Forest Park,[1] and continue their escape in a second vehicle. They had doused the getaway van's interior in gasoline, intending to burn the vehicle after abandoning it in Forest Park.  Petitioner and Allen exited the vehicle after entering Forest Park, where Allen was able to secure a ride away from Forest Park, but Petitioner, less mobile because he was fitted with a prosthesis after the loss of his leg, was apprehended by police.  Following his arrest, Petitioner identified Allen as the other participant in the robbery.  Allen was subsequently arrested and both were charged with the same offenses.  Allen, in a separate trial, like Petitioner, was found guilty and sentenced to death.  The Court will now recite more detailed facts with volume and page references.

It was Petitioner who conceived the plan to rob the Bank.  Terry Gear, an employee at H&W Janitorial Service "grew-up" with Gerald Vaughn and knew Petitioner "from living in the neighborhood." (Vol. I p.143 L.1-6, p.144 L.4-5).  In the Fall of 1996, while looking for a CD player to put in his car, Mr. Gear had a conversation with Petitioner and saw a pump shotgun in his bedroom which he identified as Government Exhibit 60. (Vol. I p.144 L.14-15,P.145 L.7-16). Lonzetta Blockton is a cousin of Petitioner.  In April 1995, she accompanied Petitioner to the Marshall Gun Shop where she bought a shotgun for Petitioner.  (Vol.I p.114 L.5,16-21, p.115 L.8-12).  Petitioner was ineligible to purchase a firearm.  Later, Petitioner asked Mr. Gear if he knew anyone who was selling guns.  Mr. Gear accompanied Gerald Vaughn to Marshall's Gun shop to look for a gun for Mr. Vaughn who wanted one to fire in celebration on New Year's Eve,

---

[1]Forest Park is a large urban park, located in St. Louis, Missouri.

2

a common observance in St. Louis City.  Gerald Vaughn, in the company of Terry Gear, purchased a Russian SKS assault rifle fitted with a bayonet at the Marshall Gun Store on November 19, 1996.   Mr. Vaughn's mother insisted, shortly after the purchase, that it be removed from their house.  (Vol. I p.146 L.10-14, p.147 L.4-22).  After Mr. Vaughn's mother objected to the weapon being located in her house, Petitioner had a conversation with Terry Gear and Mr. Vaughn took the rifle to Petitioner for sale.  Petitioner paid Mr. Vaughn $300.00 for the rifle.  (Vol. I p.124 L.1-9, p.125 L.19, p.125 L.4, p.132 L.3, L.10-12,p.135 L.14).  In November, 1996, Mr. Gear learned that Petitioner had purchased the gun from Mr. Vaughn for $300.00.  (Vol. I p.  p.150 L.16-25).  On New Year's Day, 1997, Petitioner approached Mr. Gear and asked him if "I had ever thought about robbing a bank."  Petitioner told Mr. Gear he needed the money and he would not get caught.  (Vol. I p.151 L.9-p.152 L.10).  He asked Mr. Gear if he had ever seen the movies *Heat* and *Set It Off*.  When Mr. Gear reminded him that people in those movies died, Petitioner told him, "he said he would not get caught because he had a plan."  (Vol. I p.152 L.11-p.153 L.16).  He told Mr. Gear that no one would be crazy enough to stop them because of all of the firepower they had, an assault rifle that "can go through the bulletproof vests and the police cars."  (Vol. I p.153 L.12-16).  Petitioner told Mr. Gear that if there was a police chase he would shoot at the cars and get rid of them. (Vol. I p.155 L.6-9).

Wayne Ross, a full-time student at Southern Illinois University, has known Petitioner since the fourth grade.  (Vol. I p.173 L.22-23, p.175 L3).  Since the amputation of Petitioner's leg by a train, he and Mr. Ross became close friends and played basketball and football together and on opposing teams.  (Vol. I p.13, p.176 L.8-12).  On March 7, 1997, ten days before the robbery, Mr. Ross was with the Petitioner at Cloud Nine, an Illinois nightclub, where he saw Billie Allen and Petitioner talking.   (Vol. I p.180 L.1-p.181 L.3) .  During that week, Mr. Ross watched the

3

movie *Heat* with Petitioner and three other young men.   (Vol. I p. p.182 L.1-12).   On March 15, 1997, when Mr. Ross and Petitioner were leaving a bowling alley, Petitioner told Mr. Ross that he was waiting for someone.   A car carrying Billie Allen approached.   (Vol. I p.184 L.12, p.186 L.7-8,22-25, p.187 L.1-3).   Petitioner and Mr. Allen went inside.   Mr. Ross overheard parts of the conversation.   Petitioner said he knew the perfect place.   Mr. Allen agreed because he had checked it out and it had two doors.   (Vol. I p.188 L.1-13).   Mr. Ross heard them say they had to do it quick.   (Vol. I p.189 L.15-17).   The next day, Mr. Ross went to say goodbye to Petitioner.   On March 16, 1997, one day before the bank robbery, in Petitioner's closet, Mr. Ross saw "two guns and some clips and a bulletproof vest."   One rifle had a bayonet and the other had some Chinese writing on it.   (Vol. I p.191 L.2-10, p.192 L.12-20).   Mr. Ross identified Government's Exhibit 38, the gun with the bayonet and Government's Exhibit 37, the gun with Asian writing, as the guns he saw at Petitioner's house on March 16, 1997, except they were not in the same condition as when he saw them in the closet.   (Vol. I p.193 L.1-p.194 L.19).   Petitioner declined Mr. Ross's invitation to accompany him back to Carbondale, saying he had to "pull a lick;" he needed to get some money.   (Vol. I p.200 L.5-9).   On cross-examination, Mr. Shaw repeatedly asked Mr. Ross if Petitioner insisted that if there was a robbery, no one would get hurt and he confirmed that Petitioner said no one would get hurt.   (Vol. I p.201 L.23-25, p.211 L.1-6,11-13, p.213 L.4-7, p.214 L.2-8, p.219-24-p.220 L.2).

Thomas Mundell testified that he owned a self-defense station at the St. Louis Center, a shopping Mall in Downtown St. Louis, where he sold, among other things, bulletproof vests. (Vol. II p.7 L.6,14-15).   On March 13, 1997, Mr. Mundell testified that Petitioner and Billy Allen, whom he identified from a photograph, came to his kiosk "inquiring about body armor."   (Vol. II p.10 L.15-18, P.11L. 14-18).   The Petitioner asked Mr. Mundell the description of bullets the

body armor would stop.  "He asked me what type of bullets the vest would stop." (Vol. II p.13 L.23-p.14 L.3).  Mr. Mundell told the Petitioner that the armor "would stop 9-millimeter, .44 magnums, .357's, .22's, 38's. 10 millimeter, 12-gauge slugs, and 12 gauge-double ought buckshot."  He sold Petitioner a ballistic armor set including a front panel, a back panel, and a side panel-vest.  He identified Government's Exhibit 34(b) as the bulletproof vest he sold to Petitioner.  (Vol. II p.14 L.7-24, p.15 L.3-4, 15-18, 19-P.16 L.7).  He said Billy Allen expressed an interest in purchasing a vest but did not have money to buy one for himself.  (Vol. II p.16 13-19).

Many witnesses testified regarding the events from the time the van arrived at the Bank until Petitioner was  apprehended at the site of the burning van, which Petitioner ignited.  There was detailed testimony from several bank employees inside the Bank, during the robbery, including a witness who identified Petitioner from his voice.

Kelly Davis was employed at the Lindell Bank & Trust Company as the Customer Service Manager.  (Vol. I p.72 L.6).  She described the clothing worn by Richard Heflin and testified that he carried a gun on March 17, 1997, when he was on duty.   (Vol. I p.72 L.3-9, 23-25).  She testified that she knew Petitioner because she had seen him in the Bank before.  (Vol. I p.106 L.8-13).  She did not identify him as one of the robbers.

Amy Boehlje was employed as a customer services representative at the Lindell Bank &Trust Company on March 17, 1997.  (Vol. II p.31 L.14-25).  She was in the safe deposit area in the Bank.  She said she saw "what appeared to be the barrel of a gun, . . ." and "I heard instructions to get down to get down on the floor." (Vol. II p.33 L.19, p.37 L.14-16).

Sandra Foppe was employed at the Lindell Bank &Trust Company on March 17, 1997.  She testified, "[t]here was blood and pieces of his [Rich Heflin's] uniform flying around. . .  They

5

were flying all over the counter and all over the desk . . . towards me." (Vol. II p.57 L.6-13). She then saw "somebody" she had not seen before. "He was dressed in dark clothes, and he had his back to me. . . He went here to the gate, and he sat on the gate and swung his feet over." (Vol. II p.57 L.23, L.6-p.58 L.6). She observed that the soles of his feet were black. She identified Government's Exhibit 35(e) as the shoes that went over the gate. (Vol. II p.p.58 L.11, L.19-22). She observed this person then go to a second gate and "he sat on that gate and swung his feet over and went back behind the tellers' area . . . where the money is." (Vol. II p.59 L.8-11,18-19). The person she saw go over the counter had a big gun with a "banana-shaped thing on the end of it." (Vol. II p.60 L.10-13). The Russian assault rifle carried by Petitioner had a banana clip.

Michael West was employed as custodian at the Lindell Bank &Trust Company on March 17, 1997, and at 10:35 p.m. was standing at Lisa Moore's teller's cage. (Vol. II p.68 L.1, P.70 L.7-11, P.71 L.6). Mr. West saw a man with a rifle in his hands. . . "just inside the area of the east door. . . he had a mask on or a ski mask on. . . And he was pointing it up in the air and then he turned and saw Rich and then he pointed the gun at Rich and shot him." (Vol. II p.73 L.3-9, 17-20). The man who shot Rick "moved back to the center of the door." (Vol. II p.75 L.7-9). Mr. West saw "another guy come in and jump over the counter. . . He had just a ski mask on and like a long coat." (Vol. II p.75 L.9-13). Mr. West then jumped over the counter and ran through an exit door through the basement.  Mr. Shaw effectively cross-examined Mr. West by getting him to admit that the second man who came to Lisa Moore's window was "a different person than the one that did the shooting . . ." (Vol. II p.79 L.12-23). He asked Mr. West to testify about the man who came to where Lisa was standing, he "is not the same person that did the shooting that killed this - - friend of yours; is that correct? Mr. Moore answered, "Yes." (Vol. II p.80 L.18-23).

6

Mary Garvels was a teller at the Lindell Bank &Trust Company at 10:35 a.m. on March 17, 1997, located to the left of Lisa Moore's window.  At the time of the incident, her supervisor was training another person named Laura.  (Vol. II p.84 L.18-25, p.85 L.4-14).  During the shooting, a bullet hit a piece of wood that flew and hit her in the face.  She saw someone approach Lisa's window.  (Vol. II p.90 L.8-10, L.15-17).  Ms. Garvels testified, "I think the one that was in Lisa's window had said '[w]e have 30 seconds.  We have 30 seconds."  She was not really sure but she thought it was the one next to her.  Mr. Shaw, on cross-examination, asked Ms. Garvels if the fellow she saw shoot Rich was "not the fellow that came behind the counter?"  She confirmed by saying, "[n]o."  It was always Mr. Shaw's strategy that Petitioner was the man behind the counter and not the robber who did all of the shooting in the front of the Bank.

Lisa Moore was assistant head teller at the Lindell Bank &Trust Company on March 17, 1997.  At the time, she was four and one-half months pregnant.  (Vol. II p.105 L.17, p.107 L.3).  She had previously had the opportunity to "wait on" Petitioner at the Bank as a depositor.  She identified Government's Exhibit no. 7 as a a series of withdrawal certificates for Petitioner from January 1, 1996 through March 1997.  (Vol. II p.107 L.18-23, p.108L.7-25).  During that period, Petitioner went to the Bank to make withdrawals each for $500.00, fifteen times.  (Vol. II p.109 .8-20, p.110 L.7-9).  Petitioner's last withdrawal from the Bank before March 17, 1997, was March 13, 1997.  Each time Petitioner made a withdrawal before March 13, 1997, Petitioner came to the Bank alone.  On March 13, 1997, Petitioner came to the Bank with "[a]nother black young male." (Vol. II p.112 L.919).  On March 17, 1997, Petitioner asked Ms. Moore, "[d]amn girl. You pregnant again?"  He also asked her, "[d]oes this bank always be this empty? Of the fifteen times he had been in the Bank, this was the only time Petitioner ever asked Ms. Moore about the "workings of the bank or how busy the bank was."  (Vol. II p.117 L.7,21, 25-p.118

7

L.5).  On March 17, 1997, she saw someone come through the east door of the Bank with a long gun, and she heard two loud sounds that sounded like gunshots.   (Vol. II p.125 L.18-p.126 L.6). The gunman came towards her and Mr. West, who jumped over the table, as the gunman fired two shots at Mr. West.  Ms. Moore got down on the floor.  She noticed the presence of someone standing behind her.  He was coming over the gate.  He said, "[b]itch, I say, get down." (Vol. II p.127 L.19-p.128 L.25).  Ms. Moore testified that the person standing behind her, who came around the back, "[h]e fired one.  He fired one up behind the wall behind me."  She testified that the shot "was shot down in the corner of the wall."  When asked if she remembered where the bulet came from, she said, "[t]he gunman that took the money out of the drawer." (Vol. II p.148 L.1-21).  Ms. Moore testified that when the gun was fired, she was on her knees, because she was four months pregnant, and could not get too far down.  The gunman held the gun to her head. (Vol. II p.149 L.10-19).  She testified that she looked up at the person coming over the gate, "[A]nd he said, 'Bitch, I said get down' and he had the gun like that, and he turned and shot it at the wall, as if to say, 'I do mean business.'"  (Vol. II p.150 L.10-14).  Ms. Moore testified that the day after the March 17th robbery, on March 18, 1997, she told Detective Toretta that "[h]e jumps over the cage by me; comes over; and he hollers at me, Bitch, get the blank down.  He points the gun at me, but he shoots towards his right."  She testified that would be toward the wall.  (Vol. II p.163 L.4-15).  She testified that the voice coming from the lobby was a voice she recognized as the voice of Norris Holder, because of "[t]he way he phrases the word, 'Bitch.'" (Vol. II p.164 L.4-10).

Virginia Michael testified as Teller Supervisor for Lindell Bank &Trust Company.  On March 13, 1997, she was introduced to a person named "Norris" as a bank customer by Lisa Moore.  (Vol. III p.10 L.1-3, P.12 L.10-22).  On March 17, 1997, at 10:35 a.m., Ms. Michael

was working with a teller trainee named Laura Riehmann.  (Vol. III p.16 L.2-4).  About 10:45 a.m., she saw a person coming in the east door raising a gun, she testified testified that "[h]e came in shooting." (Vol. III p.17 L.9-25).  She noticed a lot of smoke and a lot of people screaming. After the shooting stopped, "for a second," she noticed someone coming over to the safety deposit box door.  (Vol. III p.18 L.17-24).  At that time, she saw Mr. West, another bank employee running towards her, who did not jump, but "flew over the counter," as there were more gunshots.  (Vol. III p.20 L.1-14).  Ms. Michael was looking down the teller-line towards Lisa Moore and Mary Garvels, when she saw someone with a gun come over the gate.  (Vol. III p.21 L.9-23, p.22 L.5).  At that point, she and Laura went into the drive-up area.  She heard footsteps and then gunshots, more than one.  (Vol. III p.22 L.7-25).  She could not tell who did the shooting, "I only seen one man coming in and one man jump over that door." (Vol. III p.32 L.7-8).

Frank Stubits is a firearm and toolmark examiner for the Metropolitan St. Louis Police Department.  (Vol. V p.60 L.6-10).  He has testified "many hundreds of times."  (Vol. V p.62 L.20).  He testified that the Russian made semiautomatic rifle with the bayonet and modified clip, all of which was in a burned condition, was loaded before it was damaged by fire in the van that burned.  (Vol. V p.91 L.20-92 L.8;p.92 L.18-25).  The evidence supported the conclusion that Petitioner carried the Russian SKS assault rifle and Allen carried the Chinese SKS assault rifle. Mr. Stubits concluded that 9 cartridges found in and around the Bank had never been inside the firing chamber of a weapon.  (Vol. V p.116 L.22-p.117 L.1).  He testified that "[t]he rifling [on the bullets from Mr. Heflin's body] is consistent with both firearms, and other than a microscopic positive examination, everything was inconclusive, consistent with either gun, with the exception of my positive exams." (Vol. V p.117 L.7-14;p.118 L.17-20).  Two bullets taken from the body

of Richard Heflin were positively identified with having been fired from the Chinese made firearm. (Vol. V p.119 L.1-3).  Bullet fragment 28c, taken from Mr. Heflin's liver; bullet fragment 28d, taken from Mr. Heflin's right thigh; bullet fragment 28e, taken from Mr. Heflin's left thigh; and bullet fragment 28f, taken from Mr. Heflin's left knee lack scientific identifiable striations, and his examination as to the identity as to whether the bullets were fired from the Russian made rifle of the Chinese rifle was inconclusive.  He testified, "[t]hey could have been fired from either gun. They are consistent with either of the SKS's that I had submitted; however, the results are inconclusive due to mutilation and lack of identifiable striations on the specimens." (Vol. V p.122 L.6-10; 17-23; P.123 L.4-8; L.17-19;p.124 L.1-15).

Mr. Stubits examined other bullet fragments collected from the Bank building.  His examination of those were inconclusive for identification of which firearm projected those bullets. As to those, he found consistencies with both firearms and inconsistencies with neither.  There were not enough individualizing characteristics to say which of the two fired those shots,  but he could not exclude either.  (Vol. V p.125 L.20-p.126 L.20).

Additionally, Mr. Stubits examined 16 shell casings he categorized in three groups, 11 in one group, 3 in another group and 2 in a third group.  The two in group three lacked sufficient identifiable marks to put them in either one or the other two groups.  (Vol. V p.127 L.2-18).  Of the 11 shell casings, 8 "definitely matched my test bullets fired from the Chinese firearm, therefore eight out of the 11 were definitely fired from the Chinese firearm" (Vol. V p.128 L.2-8).   The other three of the 11 were consistent with the Chinese gun, but the results were inconclusive.  The Chinese gun "holds 11 maximum." (Vol. V p.129 L.17-18).  In the second group of three casings, Government's Exhibit 25f, 25g and 25n-1, Mr. Stubits testified that the microscopic examination was "inconclusive with the Russian-made firearm."  He concluded that 25f  "is consistent with the

10

Russian , however it is inconclusive, due to lack of sufficient markings." When asked if it is absolutely negative from the Chinese, Mr. Stubits testified, "[y]es it is." (Vol. V p.138 L.17-19). Of the two weapons given to him to examine, 25f "could only have been fired from the Russian, considering these two firearms." (Vol. V p.139 L.11-15). Exhibit 25g was microscopically examined with the Russian test shells. The results were inconclusive, but when compared microscopically with the Chinese firearm, it was negative, but consistent and inconclusive to the Russian Firearm. Of the two firearms presented to him for testing, 25g is consistent with the Russian firearm and negative with the Chinese firearm (Vol. V p.139 L.18-p.139 L.24). Exhibit 25n-1 was microscopically compared to the Russian and Chinese rifle test shell casings; found to be negative to the Chinese firearm, consistent with the Russian firearm but inconclusive. Mr. Stubits testified that 25n-1 "[c]ould have been fired in the Russian only, considering two firearms." (Vol. V p.140 L.23-143 L.12). Mr. Stubits testified that the Chinese rifle held only 11 cartridges, and to fire more than 11 bullets, it must be reloaded. (Vol. V p.146 L.9-19). He then testified,

> Q.   (by Mr. Landolt): And that gun was reloaded by means of stripper clips, is that correct?
>
> A.   Either the stripper clip or manually, yes.
>
> Q.   Given if you – the stripper clips are the quicker way to do it?
>
> A.   That would be the quicker way that the firearm is designed to be loaded.
>
> Q.   And if a stripper clip were used, ten rounds would have been introduced into the weapon at one time?
>
> A.   Considering the stripper clip would have ten live cartridges, you would put ten into the magazine.
>
> Q.   And had there been any left in the magazine at the time of the fire, those rounds would have been cooked off?

11

A.      I would expect to see some damage to the magazine, and the
cartridges that were still in the Chinese would have exploded and
recreated damage to the firearm.

Q.      However you discovered none of that, is that correct?

A.      I did not see anything to the Chinese gun.

Q.      It appeared to be unloaded at the time of the fire?

A.      To me, there was no damage.  It could have been unloaded.

(Vol. V p. 146 L.20-p.147 L. 20).

Mr. Stubits explained that the chamber of a firearm is the place where the cartridge is placed.  When the explosion occurs, the shell casing, brass, copper or steel, expands in according with specified tolerances, and chambering impressions could assist him in conducting an investigation, the fourth factor.  (Vol. VI p.15 L.3-24).  He explained that the bolt face or breech face is the very front of the bolt.  The firing pin passes through it to strike the primer.  In the explosion, the shell casing comes in contact with the bolt face or breech face leaving more markings.  Most of the time the bolt face or breech face leaves unique or individual scars or marks upon the butt or rear end of the shell casing.  He identified this as the fifth characteristic.  He said this is one of the more important characteristics.  (Vol. VI p.16- L.1-23).

The sixth factor is the identification marks left from the magazine.  The magazine has a steel part that comes over and holds the cartridge in the magazine.  The bolt strips a cartridge from the magazine leaving identifying marks that can sometimes be used to identify the casing to particular magazine clips.  (Vol. VI p.17 L.2-18).  Mr. Stubits said he could make a positive examination from one, two, or three characteristics.  If other marks are present he will look at them.  (Vol. VI p.17 L.23-p.18 L.7).

12

Following the bank robbery, Petitioner and Allen fled the bank in a van that had been previously stolen.   William Green was an assistant prosecuting attorney, and on March 17, 1997, he drove his Jeep to a drive-up lane at the Lindell Bank &Trust Company, to cash a check.  (Vol. III p.171 L.2-7).  He noticed a blue van parked by the pedestrian exit on the side of the Bank with both doors open and no occupants.  (Vol. III p.171 L.24-p.172 L.3).  He saw two individuals coming out of the Bank dressed in dark clothing; one went around the front of the van and got in on the passenger side and the other get in on the driver's side.  Each person held a rifle and the driver was carrying "what looked to be some type of a bag . . ."  The driver was more stocky than the person who ran around the front of the van to get in the van on the passenger side.  (Vol. III p.173 L.5-24).  At trial, it was established that Petitioner was heavier than Allen.  Mr. Green "sent" a call as soon as they departed, and he followed them all the way until the van stopped in Forest Park.  (Vol. III p.174 L.12-14, p.178 L.10-22).

Alma Gillium was a prospective bank customer about 10:35 a.m. on March 17, 1997, when she approached the Bank and saw the van with license number WIN-900, the plate later identified as coming from the stolen van used as a get-away vehicle from the Bank.  As the robbers were leaving, the man in the passenger seat removed his mask, and Ms. Gillium saw his face.  In a police line-up, she told the police that she was sure the man she identified, number 3 in the photograph, Government's Exhibit 33, was the man she saw get in the passenger side of the van.  (Vol. III p.47 L.12-23,54 L.8-25).    Allen is number 3 in Exhibit 33.  Petitioner confessed that he was driving the Chevrolet Astro van from the Bank to the intended destination in Forest Park where the second stolen car was parked.  The plan, he said, was to ignite the gasoline in the van at the location of the second car and escape in the stolen car to his mother's car located at the

Barnes' Hospital parking garage.  On the way to the second car, Petitioner flicked his lighter and the van became engulfed in flames.

Albert Thompson testified as a bomb and arson specialist with the Metropolitan St. Louis Police Department.  He examined the burned van in Forest Park.  He discovered more than 80 shell casings in the van.  (Vol. IV p.143 L.10,14-15;p.143 L.23-25; p.145 L.11-15).  Detective Thompson testified that ammunition subjected to intense heat will explode and he confirmed that the lead projectiles "can get out of the van," and could be a harm to people in the community. (Vol. IV p.145 L.17-25).  Government's Exhibit 36c is a photograph of a bullet hole on the driver's side of the van portraying the path of the projectile from the inside of the van going out. (Vol. IV p.146 L.1-17).  He opined that this particular hole was caused by a projectile from one of the firearms in the van.  (Vol. IV p.149 L.1-3).  He testified that if 85 shell casings and 79 lead projectiles were found inside the van, six projectiles got out of the van.  (Vol. IV p.154 L.18-21).

Margaret Owens is a forensic chemist who examined the clothing of Richard Heflin.  She testified that there were 20 holes and rips in Mr. Heflin's clothing, all caused by bullets or bullet fragments.  (Vol. IV p.180 L.10-20).

Petitioner confessed to participation in the robbery on the night of the robbery, always stating he did not intend for anyone to get hurt.  Thomas Carroll testified as a homicide detective with the Metropolitan St. Louis Police Department.  He observed burn blisters on Petitioner's right ear, on his wrist and on his right nostril when he talked to Petitioner on March 17, 1997. (Vol. IV p.91 L. 9-p.192 L.1, p.93 L.5-7).  Detective Carroll advised Petitioner of his *Miranda* rights, and Petitioner acknowledged that he understood his rights.  (Vol. IV p.99 L.3-7,22-24). When asked about the robbery at the Lindell Bank &Trust Company, Petitioner first said he knew nothing about it.  (Vol. IV p.100 L.3-8).  At about 9:15 p.m., Special Federal Bureau of

14

Investigation Agent Jan Hartman again advised Petitioner of his *Miranda* rights.  (Vol. IV p.100 L.21-p.101 L.12).  Petitioner identified the second subject of the investigation by first name.  He said that he had planned the bank robbery a week before at the Northwoods Bowling Alley, describing how he and Allen were going to rob the Bank and how "they were going to get away." (Vol. IV p.104 L.7-22).  He also said that he had discussed the robbery at a nightclub in East St. Louis called Cloud 9.  He said they had loaded weapons and walkie-talkies.  (Vol. IV p.105 L.5-22).  He told Agent Hartman that they had a vehicle positioned in Forest Park and that his mother's vehicle was parked at the Barnes' Plaza parking garage.  (Vol. IV p.106 L.15-22).  There were two stolen vehicles, the second was placed at Faulkner and Clayton, inside Forest Park, and the first, a Chevrolet van, was used in the robbery.  His mother's vehicle was the third vehicle.  The Chevrolet van had been doused with gasoline, with the intention of igniting the gasoline to burn the van to create a diversion and to "get rid of the evidence." (Vol. IV p.107 L.1-19).  Petitioner told Detective Carroll that the van was located on the east side of the Bank, the van was not turned off, both doors remained open, and both ran inside the Bank "with assault rifles," Petitioner said he had the rifle with the bayonet; that Petitioner entered the Bank secondly, that when he entered the Bank he heard shooting; was confused because there was to be no shooting; that he "leaped the counter with the assault rifle, and went through the teller drawers." Petitioner told Detective Carroll that he retrieved the money and put it in a green laundry bag that he had taken from his house.  (Vol. IV p. 108 L.2-p.109 L.1).  He said he was wearing blue coveralls, a bulletproof vest, black flannel shirt, a ski mask, sunglasses and black leather gloves like "O.J. had."  (Vol. IV p.109 L.2-9).  He told the detective that after he got the money, he jumped over the counter, Bill was yelling it was time to go, and he ran out of the Bank.  (Vol. IV p.109 L.21-p.109 L.3).  He said that he was driving the van.  (Vol. IV p.110 L.18-20).  Petitioner

15

told Detective Carroll that as they were headed into the Park, he flicked his lighter and the inside of the van caught on fire as they were driving. Because the van was completely engulfed in flames, he lost control and crashed into a tree off Hampton and Wells Drive. He said that he was on fire, he jumped out of the van, some city workers yelled at him to get down, and before he could get up, police were there and handcuffed him. (Vol. IV p. 111 L.19-p.112 L.11). Petitioner told Detective Carroll that he robbed the Bank because he needed the money for a lawyer. (Vol. IV p.112 L.13-17). Early the next morning, Petitioner identified Billie Allen from a photo spread. (Government's Exhibit 77). (Vol. IV p.113 L.3-12,19-21). Government's Exhibit 73 is Petitioner's written confession. (Vol. IV p.114 L.10-P.116 L.22). In the written statement, he said "Bill was driving." (Vol. IV p.116 L.5-7). The shoes Petitioner wore in the robbery were introduced in evidence. They were black with "clear" soles with mud on them. (Government's Exhibit 66d). (Vol. IV p.123 L.17-25).

On cross-examination, Mr. Shaw emphasized that Petitioner took officers to Billie Allen's location. (Vol. IV p.127 L.7-16). Detective Carroll testified, "[t]hat's correct," to a question of Mr. Shaw, "didn't he tell you time after time that he did not know that this man was going to be shot, and that he did not want any shooting." (Vol. IV p.131 L.14-16). Counsel Shaw emphasized in his cross-examination that part of the confession given by Petitioner to agent Hartman. In response to counsel Shaw's request, Detective Carroll read to the jury these words dictated by Petitioner to agent Hartman. "Bill walked through the door first, then I came behind him. Then I heard gunshots. I was totally shocked and stunned, literally, by what was happening. I couldn't believe it. I couldn't believe the shooting was going on. . ." (Vol. IV p.136 L.4-10). Detective testified that Petitioner said he did not fire his weapon. (Vol. IV p.137 L.24-p.138 L.1).

16

When Jan Hartman was re-called as a witness to testify to similarities in the movies, *Heat* and *Set It Off*, Mr. Shaw asked that the movies be played for the jury, rather than having Ms. Hartman testify, for a very sound reason which he articulated to the Court. "Well, my objection is that we should then see the movie, because nowhere has, so far in this file, has Defendant - - in this case, defendant Norris Holder said that he admired anybody. That was your witness, Wayne Ross, I believe his name was . . . he said that he admired them, or they admired them, or something like that." (Vol. IV p.198 L.3-11). Mr. Shaw then was permitted to voir dire Ms. Hartman outside the hearing of the jury about her observations after watching the movies. Thereafter, Mr. Shaw asked that the movies be shown to the jury, rather than having Ms. Hartman testify as to similarities between the movies and the Petitioner's case. The movies were shown to the jury. (Vol. IV p.201 L.9-p.204 L.6).

In the penalty phase of Petitioner's trial, the jury heard testimony of many witnesses including family members, jailers who observed Petitioner in custody, school officials, and two expert witnesses. The Court now reexamines pertinent direct testimony which shows the broad scope of mitigation evidence presented to the jury for their consideration. Ms. Brewer skillfully presented, in her opening statement, what she believed the Petitioner's evidence would be in the Penalty Phase of the trial. She began by explaining that the evidence would take the jury back to the birth of Petitioner through the date of the trial, because of the importance of the life or death decision the jury would be making in the case. (Vol. X p.2 L.5-24). In her methodical approach in her opening statement which covers nine pages of the transcript, she informed the jury that they would be hearing from many witnesses presenting information from many perspectives on the quality of the character of Norris Holder. She then proceeded to present voluminous evidence in support of her representations to the jury. The following is a list of witnesses presented in

17

mitigation by Petitioner during the Penalty Phase of the trial, and a brief recitation of the subject matter of each witness.

Kimberly Holder is the mother of Petitioner.  (Vol. X p.11 L.9-12).  Petitioner's father had not lived with them for 12 years preceding the trial.  (Vol. X p.12 L.12-14).  Ms. Holder is employed at Federal Express as a carrier.  (Vol. X p.12 L.19-24).  She became pregnant at 16. (Vol. X p.15 L.3-4).  When Petitioner was nine years old, his father stopped paying attention to her, and both found other relationships.  (Vol. X p.17 L.11-12,16-18) .  When Petitioner's father moved out of the house, Petitioner's role in the family changed.  He was responsible and protective of the family.  (Vol. X p.19 L.6-10).   He would try to discipline his younger brother, Norrim, making sure things were locked up, and making sure they got home right, and he looked after his mother.  (Vol. X p.19 L.14-22).  After their third child was born, Petitioner's father and mother got back together.  (Vol. X p.20 L.15-20).  Shortly after he returned, Mrs. Holder discovered Petitioner 's father was using drugs.  (Vol. X p.22 L.1-12).  Thereafter, Mrs. Holder began using cocaine supplied by Petitioner's father.  (Vol. X p.23 L.1-8).  Petitioner confronted his mother about her use of crack cocaine.  Mrs. Holder confesses that because of her drug use, she was not a very good mother.  Norris "looked after everybody while I screwed up."  (Vol. IX p. 24L. 19-p.25 L.12).  During the time she was using cocaine, the family lived in the Blumeyer housing projects, which she described as "like a pile of poor people stacked into the place." There were crack heads up and down the street.  (Vol. X p.27 L.23-p.28 L.5).  She stopped using crack cocaine six years before the trial.  She lived in the Blumeyer projects for ten years.  During that time, she learned that the  Petitioner was selling drugs.  (Vol. X p.31 L.22-P.32 L.10). Petitioner's Exhibit K was received as a photograph of the Holder family: Mrs. Holder, Norris Holder, Sr., Norris, Norrim and Norrel, when Petitioner was ten years old.  (Vol. X p. L. 34

18

L.24-P.35 L.6).   Petitioner's photographic Exhibits I (Norris as a baby), H (Norris in school at age 12), G (Norris, Norrim and Norrel), D (Norris and Norrim), E (Norris and Norrim at Easter) and F (Norris, Sr., Norris, Jr. and Norrim) were received and published.  (Vol. X p. 36 L.1-23).

Mrs. Holder testified that Petitioner had received 15 or 20 trophies for his participation in baseball.  She identified Petitioner's Exhibits L (best defensive player  - 1989), M (most valuable player - 1987), and O (most valuable player - 1986) as trophies Petitioner had received as baseball trophies.  (Vol. X p.37 L.10-p.38 L.22).   In the sixth grade, Petitioner made two wooden ducks for his mother.  (Defendant Exhibit N) (Vol. X p.39 L.5-17).

She testified that Petitioner was very close to his grandfather, Willie Holder, with whom Mrs. Holder and the children had lived for awhile.  Willie Holder would take Petitioner riding.  Petitioner was ten years old when Willie Holder died.  Petitioner "would talk about him all the time . . . [h]e missed him."  (Vol. X p.40 L.7-p.21).

She said that Petitioner began his education at Carver Elementary where there were forty people in the class, the children were stacked-up; sometimes first and second graders or first graders and kindergarten children were in the same class with one teacher on both sides.  (Vol. X p.42  L.10-23).  Mrs. Holder enrolled him in the desegregation program where he went to Bowles Elementary School in Fenton, Missouri.  (Vol. X p.43 L.14-19).  He finished elementary school there, then enrolled in the Rockwood School District Middle and Junior High School.  (Vol. X p.43 L.21-p.44 L.4).  "After his accident," Petitioner dropped out of school.  (Vol. X p.44 L12-14).  After he left school, he received his G.E.D.

Petitioner was 15 years old (1991) when he was "hopping a train, and slipped up underneath it . . . and his leg . . . got shredded up."  (Vol. X p.46 L.16-25).  After the accident, the Petitioner was quiet and very sad.  (Vol. X p.47 L.19-23).  Mrs. Holder testified that at that

19

time she thought about getting the Petitioner some counseling, but she was too "cracked up." After the loss of his leg, the Petitioner could not play basketball, baseball, and football (Vol. X p.49 L.11-25). After the accident, kids came from school and showered him with gifts, banners and cards. (Vol. X p.50 L.17-22.). There was an insurance settlement after the accident. "[T]here was a $50,000.00 check, the lawyers got $30,000.00, and the other twenty me and him split." Additionally, Petitioner received a structured settlement of $500.00 monthly until the year 2000. (Vol. X p.51 L.9-25). From the $500.00, Petitioner gave Mrs. Holder $200.00 each month "like clockwork." (Vol. X p.52 L.11-15).

Mrs. Holder testified that the Petitioner did some "peddling work, selling those plastic containers and notebooks and watches and stuff." (Vol. X p.53 L.18-20). When he came home, the Petitioner would remove his wooden leg because it would hurt. "He wouldn't even try to get out of the house or do nothing." (Vol. X p.53 L.23-p.54 L.3). When the Petitioner worked, he gave her his money for his jobs. He always tried to help, "he always wanted to help me and his sisters and brothers, always. He was always there for me. Always. Even when I was all messed up, he was there for me and them." (Vol. X p.54 L.6-13).

The Holder family was able to leave the Blumeyer housing project when Mrs. Holder got a descent job with Federal Express. She bought a house with some of the $10,000.00 sum she received from Petitioner's settlement and from "working hard." She testified that she straightened up her credit, paid off a lot of bills, and while she was doing that, Petitioner was there, "watching the kids while I worked, worked, worked." (Vol. X p.54 L.14-20, p.55 L.22-56 L.6). The Petitioner would make sure the kids got off to school in the morning, that they took their homework and make sure they got home. "He would be there for them." The Petitioner would cook for the family, help them with their homework and make sure they cleaned their room before

they went outside.  (Vol. X p.56 L.13-24).   The Petitioner took Normeka and Norrel to school functions.  He took his brother to football practice.  The only time the Petitioner would go out was when Mrs. Holder was off work.  (Vol. X p.56 L.25-p.58 L.6).  She said that the Petitioner influenced Norrim's life by correcting him when he did something wrong and to get into the Job Corps "and make something out of himself, you know."  He gave his brother $1,000.00 to buy a car.  (Vol. X p.58 L.1-5; 10-15, 19-21).   She testified that she was aware that the Petitioner was "wearing down" before the bank robbery.  (Vol. X p.59 L.18-21).  She testified she tried to encourage him to save some money to get help with the leg, but "if he tried to do that he would have spent all of his money on that."  (Vol. X p.60 L.8-13).  In the Spring of 1995, Petitioner got the $50,000.00 settlement.  He received $10,000.00 and his mother received $10,000.00, two years before the bank robbery.  (Vol. X p.74 L.8-24).  Mrs. Holder corrected her testimony acknowledging that Petitioner received $500.00 monthly to 2005, instead of 2000, and at the end he is to get another $15,000.00.  (Vol. X p.74 L.25-p.75 L.24).

Mrs. Holder learned that her son had been arrested by watching television.  (Vol. X p.60 L.22-24).  She testified that she visits him in jail "mostly every Sunday."  (Vol. X p.61 L.24).  As for the death of Mr. Heflin, Mrs. Holder testified that the Petitioner told her, "Mama, that guard wasn't supposed to get killed, Mama, it was like - - it was like he was just there trying to do a job. It wasn't his money.  It wasn't his money, Mama."  (Vol. X p.62 L.21-25).   He told her that he prays for the family, "and just how bad he feels."  (Vol. X p.63 L.4-5).  Mrs. Holder identified Petitioner's Exhibits A, B and C as letters and a card the Petitioner sent to her since he has been in jail.  They were received in evidence.  (Vol. X p.63 L.10-24).  He made drawings on the envelopes to help her keep her head up.  In one he wrote, "[t]oday is your special day.  I just wrote this to say I owe you my whole life long, that's why I wrote this poem.  Keep your head

21

up, and smile and stay strong.  Happy Mother's Day, Love always, Norris." (Vol. X p.64 L.14-p.65 L.5).  Mrs. Holder read Petitioner's Exhibit J, a poem written by Petitioner to his mother:

> (Counsel Jennifer Brewer for Defendant and Defendant's mother - Kim Holder)
>
> A.    It's like a poem he wanted to help me be strong.
>
> Q.    Can you read what he wrote to you?
>
> A.    Rest in Him.  When life, with all its pressures make you feel distressed, seek the Gentle Shepard, for he offers peace and rest. He will guide you in each trouble, and give you strength to stand. All you have to do is clench to His dear hand.  He cares about the trials, but even much for you.  However dark the way, his love and mercy will see you through.  Keep faith.  Live not in yesterday, for looking back, you may sorrow.  Live specifically for today.  Look forward to tomorrow.

(Vol. X p. 66 L.2-14).

Mrs. Holder testified if the jury sentenced her son to prison, "I would always be there for my son, always, just like he has always been there for me." (Vol. X p.66 L.15-19).    Petitioner's father was involved in his life at least three years before the bank robbery, because he helped Petitioner purchase a car.  (Vol. X p.77 L.4-21).

Lawrence Calvin Gwinn is a Community Education Coordinator with the St. Louis Public Schools assigned to the Carver Community Education Center, an after-school program for youth and citizens residing in the Blumeyer community, offering basketball, driver education, Boy Scouts, Girl Scouts, and other activities.  (Vol. X p.106 L.13-p.107 L.3).  He remembers the Petitioner coming to the Center to play basketball and working for the Center one summer in the "State Program."  He testified that the Petitioner worked as a tutor where the "kids looked up to him because, of course, he was an older guy."  Mr. Gwinn had a very good relationship with the Petitioner, seeing him as someone who was always respectful to Mr. Gwinn.  (Vol. X p.108 L.9-25).  Mr. Gwinn described the run-down condition of the Blumeyer complex which had gang

22

activity when the Petitioner lived there.  (Vol. X p.110 L.13-21).  Mr. Gwinn testified that he had been caught in several "cross-fires" where gangs were shooting at each other.  "It was easy to hear 45, 50 shots a night, you know, within the community."  (Vol. X p.111 L.3-5,16-17).   He remembers when the Petitioner lost his leg in a train accident.  He said the Petitioner did not return to the Center for awhile, but then he came back to play basketball.  He said that the Petitioner was deeply hurt because he did not have the same kind of ability, because he was a very aggressive basketball player.  (Vol. X p.113 L.3-18).  When the Petitioner came to the Center to play basketball, he would bring his sister and brother.  He said that the Petitioner did a lot of babysitting.  (Vol. X p.114 L.1-12).

John Ruch testified as a former deputy sheriff and jailer at the Ste. Genevieve County Jail. (Vol. X p.119 L.7,23-25).  He said he had no problems with the Petitioner when he was housed at the jail.  He described the Petitioner as "the quiet one.  He got along exceptionally well with everybody.  Never caused me no personal problems whatsoever.  When anything would be expected, Norris would jump to the occasion, such as, you know, when we serve them dinner, he would hand his tray to me, or we would get him cleaning supplies to clean within the block, or each individual cell."  (Vol. X p.120 L.15-17, 22-p.121 L.4).

Tony Chrisshawn Sanders, 18 years old, testified as a Senior at University City High School and as a friend of the Holder family.  (Vol. X p.130 L.5-7,11,23-24).  He said that the Petitioner gave him advice not to cheat himself.  He told the Petitioner that he had been in trouble with his family since he was 12.  The Petitioner advised Mr. Sanders to "get your education." (Vol. X p.132 L.16-p.133 L.2).  The Petitioner told him to respect his mother.  (Vol. X p.132 L.23-25).  The Petitioner encouraged Mr. Sanders to stay in high school when he wanted to drop out.  He did not "have the guts to tell Norris that I was going to drop out of high school . . ."  He

23

decided to stay in school, and at the time of trial, he was only one-half credit away from graduating. (Vol. X p.134 L.L.3-15). He gives credit to the Petitioner for keeping him from getting a criminal record. (Vol. X p.136 L.3-p.13 L.1).

Thomas Joseph Reidy, Ph.D., is a forensic psychologist, one of about 175 or so board certified forensic psychologists in the country. (Vol. X p.139 L.11-18, p.141 L.6-7). He performs "risk management" taking into account all factors that go into a particular individual's probability for acting out in some fashion over some period of time. He has performed over one thousand risk management assessments in his twenty year career. (Vol. X p.143 L.16-19, p.144 L.13-14). Concerning the Petitioner's case, Dr. Reidy reviewed F.B.I. and police reports, medical records, school records, jail records, interviewed family members, friends, acquaintances, school personnel, and correctional officers. (Vol. X p.147 L.1-8). Dr. Reidy explained that individuals are not violent all the time in all situations, and in prison, people act differently where there are restraints on behavior. (Vol. X p.153 L.10-11, 14-23). Dr. Reidy explained, in detail, his analytical procedure in arriving at his conclusions in this case. He also reviewed the report of Dr. Rothke, neuropsychologist and "secondary loss expert," and the report of Dr. Wetzel, the Government's neuropsychologist. (Vol. X p.153-156, p.156 L.21-p.157 L.4). He concluded that there was nothing in their "very similar" reports to indicate that Petitioner might have a mental illness. Dr. Reidy "had no complaint about these reports, or no disagreement." (Vol. X p.157 L.5-11).

Dr. Reidy discussed the "post-Furman studies" which arose after the United States Supreme Court decided *Furman v. Georgia*, the case that concluded the death penalty, as applied in thirty states and the District of Columbia, was unconstitutional, so death row inmates were either given life sentences, or were in a limited number of cases, released. This presented a unique

24

opportunity, he explained, for scientists to observe how persons sentenced to life imprisonment do in prison. (Vol. X p.166 L.1-22). A conclusion reached, among others, was that the "vast majority of these death row inmates that had their sentences commuted committed one or no offenses." (Vol. X p.172 L.24-P.173 L.3). Dr. Reidy, in referring to another study concluded that 25 to 30 per cent of inmates are responsible for all of the serious rule violations that occur. (Vol. X p.174 L.1-4). He discussed a Missouri study and other studies in significant detail. As to the Petitioner, because of his age, Dr. Reidy testified that the Petitioner presents a greater probability of some acting out. He said the potential for acting out starts to drop off after age 27. (Vol. X p.182 L.2-17). Dr. Reidy concluded that "there is nothing about those incidents [related to Petitioner] or his behavior in the jail that would indicate to me that he falls outside the parameters of the average inmate who is in prison for these type of offenses." (Vol. X p.186 L.20-24).

Theron Burse testified as an employee at the Ste. Genevieve County Sheriff's Department as a jailer. (Vol. X p.203 L.19-25). He stated that he never had a problem with the Petitioner. (Vol. X p.205 L.16-17). None of the other guards complained to Mr. Burse about the Petitioner. (Vol. X p.206 L.5-6). He related that the Petitioner "does do Bible study a lot. They have that, like I say, once a week." (Vol. X p.207 L.23-24). He said the Petitioner told him the bank robbery was not supposed to have happened that way. (Vol. X p.211 L.13-15).

Tynisha Jones, a licensed practical nurse, is the cousin of Petitioner. (Vol. X p.214 L.9,22, p.215 L.4). She described the Petitioner as "a very happy, joking - - he loves to play, crack joke [*sic*], play box fighting, you know, that type of thing." (Vol. X p.216 L.16-18). She said that Petitioner assumed the role of father of his other brothers and sister. Petitioner was very close to Norrel and Normeka. Norrim did not like it when the Petitioner exerted control over him. (Vol. X p.217 L.21-24, P.218 L.12-18). She encouraged the Petitioner to go back to

25

school after he lost his leg in the train incident, but she assumed he was experiencing peer pressure. (Vol. X p.224 L.9-25).

Jack Uellendahl is a prosthetist-orthotist, serving as Director of the Prosthetics-Orthotics Department at the Rehabilitation Institute of Chicago. (Vol. X p.231 L.4-11). A person certified in prosthetics and orthotics evaluates amputees for their needs, working in consultation with a physician to design and fabricate the prosthetic device. (Vol. X p.232 L.12-16). He examined Petitioner in the Ste. Genevieve County Jail to evaluate him, determine the condition of his leg, and his prosthetic leg and make recommendations for an appropriate prosthesis. (Vol. X p.233 L.14-24). He discovered that Petitioner's artificial foot was broken at the point the bolt is in the ankle section. (Vol. X p.235 L.20-24). He concluded that the prosthesis, because of Petitioner's weight gain, 230 from 165 pounds when the prosthesis was manufactured, and the shape and contour of his limb, no longer fit the Petitioner well. (Vol. X p.236 L.2-6, p.237 L.17-21). He concluded that the broken foot was broken one year before the examination, when the bank robbery occurred. (Vol. X p.237 L.9-14). Mr. Uellendahl recommended a new prosthesis estimated to cost $9,768.00. (Vol. X p.242 L.23-p.243 L.3).

Tyra Collins is a cousin of Petitioner. (Vol. X p.263 L.17, p.264 L. 5). She was older and was not around the Petitioner very much because she moved away. (Vol. X p.264 L.15-24). She said the amputation did not seem to bother the Petitioner very much. (Vol. X p.266 L.8-10).

Barbara Harris became acquainted with the Petitioner through her grandson. (Vol. X p.272 L.13, 23-25). The Petitioner was very respectful to Ms. Harris, "loving and joking and playing all of the time," he loved to eat and he treated her very well. (Vol. X p.273 L.20-p.274 L.22). Her daughter died August 13, 1992, and the Petitioner was at her house after the funeral

26

and touched her when he said, "[w]ell, she is all right and don't worry, God needed her more than you did." (Vol. X p.274 L.7-24).

Cortez Harris testified as a working college student who knows Petitioner as a brother since the fourth grade. (Vol. XI p.7 L.17-25, p.8 L.1-8). They were on the same football team, played softball together, were in Boy Scouts together, "everything." (Vol. XI p.8 L.20-24). He described the Petitioner as being "the coolest dude you'd ever want to be around . . . he is so cool and collective [*sic*], and he ain't no trouble starter I love that dude." (Vol. XI p.9 L1-9). Mr. Harris described a time when he wanted to seek revenge against someone who had previously harmed him, and the Petitioner interceded to avert an altercation. (Vol. XI p.9 L.13-p.10 L.1). He saw the Petitioner one day after the train accident and the Petitioner was "calm, cool and everything." (Vol. XI p.10 L.10-18). He described the Petitioner and his father as having a good relationship, then it changed dramatically when his father went his own way. After a time, "Norris was the father." (Vol. XI p.12 L.1-12). Petitioner, according to Mr. Harris, tried to tell and show his brother, Rem, the right thing. (Vol. XI p.12 L.13-19). He said the Petitioner encouraged her brother Rem to stay in school and to go into the Job Corps and get a welding degree. (Vol. XI p.13 L.1-3). He testified that the Petitioner helped his family financially as best he could. (Vol. XI p.13 L.6-10). Mr. Harris said he had never seen the Petitioner hostile around anyone. (Vol. XI p.13 L.15-17).

Tysha Jones is a cousin of Petitioner. (Vol. XI p.31 L13,23). She testified that the Petitioner was sad when his parents separated. (Vol. XI p.32 L.21-p.33 L.8). She described the Petitioner as "outgoing, kind, nice, friendly, athletic." (Vol. XI p.33 L.11). She remembers that the Petitioner was sad when his grandfather died. (Vol. XI p.33 L.18-p.34 L.5). After the train accident, she said that the Petitioner was not as happy, more withdrawn and did not talk as much.

(Vol. XI p.34 L.6-14). She said that the Petitioner was good to Normeka and Norrel, helped them with their homework, fed them and took care of them while their mother was at work. She observed that he was the father figure to Normeka, Norrel and Norrim. (Vol. XI p.35 L.215). She never saw the Petitioner lose his temper. (Vol. XI p.35 L.21-23).

Tiffani Jones is a cousin of Petitioner, who described him as being a good person, loving, caring, concerned, understanding, and somebody to talk to. (Vol. XI p.36 L.21, p.37 L.6, 17-21). When she went to Petitioner's house, she observed that he "would be there with the kids; taking care of them; see to it that they get to school; get home; and chores and make sure they eat." (Vol. XI p.38 L.14-20). The Petitioner always encouraged his sister and brothers to achieve. She said he was a "lovable person . . . easy to get along with . . . [l]oving, caring." She only saw him in conflict with one person, Norrim, telling him not to smoke or drink, "[y]ou're just frying your brains," he would say. (Vol. XI p.38 L.24-p.39 L.2, p.39 L.3-6,p.39 L.7-14).

Arnetta Kelley testified as an employee of the youth center at the Blumeyer housing development. The Center is a recreational facility for kids within Blumeyer offering after school programs such as tutoring, Boy Scouts, Girl Scouts and field trips. (Vol. XI p.41 L.17-p.42 L.4). She concluded that "you have to be a strong person to live in public housing." (Vol. XI p.45 L.10-11). There were two to four gangs there, trying to entice "my kids." There were a lot of drugs. (Vol. XI p.45 L.13-23). She remembers the Petitioner being in the Boy Scouts. (Vol. XI p.47 L.3-4). Several pages of the transcript are filled with descriptions of rampant drug involvement in the community where the Petitioner lived.

Norrim Holder is the brother of Petitioner. (Vol. XI p.56 L.16,22). He describes his relationship with the Petitioner as "pretty close," noting that they played on the same baseball team. (Vol. XI p.57 L.12-15). He remembers that the family had financial problems when his

28

father left the family.  He said that the Petitioner wanted to be the father figure and he took too much responsibility.  Norrim said he could not handle it, but he had to deal with it.  The Petitioner wanted to tell him how to live his life; what was best for him.  (Vol. XI p. 58 L.2,10-11, 19-20, 22-24).  The Petitioner helper Norrim get into the Job Corps.  As a result, he received his high school diploma and welding skills as a trade.  (Vol. XI p.60 L.2-4,7-10,18-25).  As a result of the Petitioner's influence, Norrim changed his association crowd; the former associates ended up in jail; he stopped smoking marijuana; and he realizes that the Petitioner was right in his assessment of Norrim's choice of female companions.  (Vol. XI p.61 L.1-p.62 L.19).

Corey Harris knows Petitioner through her nephew, Wayne Ross.  (Vol. XI p.67 L.12, P.68 L.12-13).  Petitioner appeared at her sister's house where she observed that the Petitioner laughed and joked with everyone, "so everybody thought good of him."  He was always positive when she was around him.  (Vol. XI p.69 L.6-p.70 L.1).

Gina Tocco is an attorney who was approached by Petitioner who explained that he needed legal help for minor traffic violations.  (Vol. XI p.72 L.23, p.73 L.6, p.74 L.1-5).  She was able to get outstanding warrants recalled and "Norris had to come up with $680 of his fines almost immediately within 30 days . . ."  He was able to go into court every four weeks and make payments to defer the expenses which amounted to $1,180.00 for twenty-one charges.  (Vol. XI p.78 L.2-13).  On the day the Petitioner approached Ms. Tocco, he paid her $100.00 on an agreed fee of $500.00 (Vol. XI p.79 L.17-25).  Petitioner made the payments to Ms. Tocco.  When he said he was going to do something, either he did it or called her.  (Vol. XI p.80 L.1-9).  "And the week before the robbery, I called and said you know, 'Norris, we're almost home.  We've got all this done, but you need to get the rest of these fines paid, and you need to pay me the balance of the retainer,' because we were ready to go to trial."  (Vol. XI p.80 L.20-25).  She had a meeting

29

scheduled with him on March 19, 1997, when he was supposed to bring her the rest of the money. She called the Petitioner's mother when she heard about the robbery.  Ms. Tocco was shocked. (Vol. XI p.81 L.1-23).  Her fee was $2,500 of which he had paid $700.00.  (Vol. XI p.83 L.8-11).  He owed $415.00 in court costs in Ferguson.  (Vol. XI p.83 L.18-23).  He had earlier paid the $680 docket fee.  (Vol. XI p.85 L.1931). There remained $1,800.00 due on her fees.  (Vol. XI p.86 L.1-6).  Her testimony strongly supports Petitioner's statement that he needed money for a lawyer.

Lonzetta Curry, Petitioner's maternal grandmother, describes Petitioner as "a very caring person."  (Vol. XI p.87 L.15, p.88 L.25).  She said he has been very helpful to her, assisting her because of her arthritic condition, by going to the store, fixing her something to eat and cleaning. (Vol. XI p.89 L.20-p.90 L.3).  When "somebody had just threw a brick through my window, and he came over and stayed with me until I could repair it, you know.  He just - -he's just there, you know.  He's there, you know.  He's there for all of us." (Vol. XI p.90 L.9-13).  She said, "I could always depend on him.  I could always depend on him." (Vol. XI p.90 L.16-17).  She testified that the family suffered financially when Norris, Sr. left the family.  (Vol. XI p.90 L.18-p.91 L.2). She said that Mrs. Holder worked two jobs to try to get out of where they lived.  She described it as terrible; cabs would not venture there and even police would not come there; it was not a good place to raise children.  (Vol. XI p.91 L.3-13).  When the Petitioner lost his leg, she thinks he saw how bad it was hurting his family that if he fussed about it, it might hurt them.  "He tried to be strong.  That's what he is.  He tried to be strong, you know, for his mother, you know, and his brothers and his - - you know and things . . ." (Vol. XI p.92 L.10-20).  She recalls instances when he had trouble with his prosthesis.  (Vol. XI p.92 L.21-p.93 L.6).  She testified that the Petitioner

always worried about whether he was going to hurt other peoples' feelings.  (Vol. XI p.93 L.17-21).

Mattie Jones Cheers is an Aunt of Petitioner (Vol. XI p.94 L.21-25).  She recited that Petitioner was very good at baseball.  (Vol. XI p.95 L.23).  She said the Petitioner was "fun-loving, caring, and sharing individual . . . he loves his people. . . [h]e's trying to give encouraging words and things like that."  (Vol. XI p.96 L.3-8).  After the accident, the Petitioner could not participate in those things the same as he had previously.  When playing football, he broke his good foot and that was quite traumatic.  He only complained to her one time; he said, "[i]t was a little sore." (Vol. XI p.96 L.15-p.97 L.5).  She testified that after her brother left the family, the Petitioner felt like he had to play the father image.  "He was support for his mother." (Vol. XI p.97 L.19-23).  She said she had never seen him violent. (Vol. XI p.99 L.10-13).

Colette Howard attended school with the Petitioner.  (Vol. XI p.100 L.25, p.101 L.10).  At first, she and Petitioner were friends, then they started dating, and that lasted six months.  They became and continue to be best friends.  (Vol. XI p.102 L.10-22).  She described the Petitioner as "wonderful, kind, sweet, loving and an excellent person."  (Vol. XI p.102 L.23-25).  He gave her a ride when she was in need, he loaned her money, and he was a role model to her and others.  (Vol. XI p.103 L.8-15).  She described the Petitioner as the "man of the house . . . like a father figure to his brothers and sisters . . . he was a best friend to his mother." (Vol. XI p.104 L.15-24).

China Coleman is a cousin of Petitioner and a minister in training.  (Vol. XI p.105 L.12, p.106 L.18-9).  They first started going to church at ages six or seven.  (Vol. XI p.107 L.2-5).  When the Petitioner's father left the family, she said, "Norris had began to kick in and start taking

31

over the role as a father figure in the household and also encouraging his mother." (Vol. XI p. 111L. 2-4).

Tykita Jones is a cousin of the Petitioner who attended school with the Petitioner. (Vol. XI p.112 L.23, p.113 L.11). She described the Petitioner as " a very outgoing person; nice; friendly . . . likes to have fun . . . joking and stuff like that." (Vol. XI p.113 L.20-21). She said the train accident had a big impact on the Petitioner. After the accident, he was not able to play sports as he had before the accident. Before he "got his leg," he was at home a lot; he stayed in his room watching T.V. and playing video games, and taking care of his sister and brother. (Vol. XI p.114 L.9-21). She said the Petitioner felt bad for the man that got killed. (Vol. XI p.116 L.10).

Bradley Klagis is a teacher at Rockwood School District teaching at Summit High School. (Vol. XI p.117 L.21- 24). He taught the Petitioner pre-algebra when he was in the 9th grade. He said "it was fun to have Norris in class." (Vol. XI p.118 L.19). He said the Petitioner did whatever asked of him, he was respectful, he had many friends, and he fit in with other kids. (Vol. XI p.119 L.3,8,15,23). When he heard about the robbery, he was shocked and in disbelief. (Vol. XI p.121 L.2).

Johanna Schloss is a teacher at Rockwood Summit High School. (Vol. XI p.123 L11-14). She taught the Petitioner English for an entire ninth grade year and "he was also my stage crew for your [*sic*] spring musical." (Vol. XI p.124 L.7-14). She remembers him as being "very likeable; smiled a lot . . . at first he was impulsive, active squirming in his seat, leaping back in his chair . . . sometimes talking out of turn . . . loved to volunteer." (Vol. XI p. L. 125 L.21). She said she did not need to yell at him. (Vol. XI p.126  L.21). She observed that he was liked by

other kids.  People would work with him.  (Vol. XI p.127 L.11,18).  After the train accident, she sent him a book.  (Vol. XI p.132 L.8).

Randy Grass, a Sergeant with the Ste. Genevieve County Sheriff's Department, transports prisoners, and maintains law and order inside the jail.  (Vol. XII p.2 L.8,10-11,17-21).  He testified that the Petitioner had been an inmate at the Jail for about a year, and like all inmates, he had problems adjusting.  (Vol. XII p.5 L.6-17).  The Sergeant thinks that the Petitioner "is doing just fine."  (Vol. XII p.6 L.14).  Sometimes he runs his mouth when he is doing what he is told, but he is better than most.  He plays sports, basketball in particular, and is one of the best ones out there.  "He runs, he jumps faster than most.  He does very well."  (Vol. XII p.7 L.25-p.8 L.6,19-24).

Susan Bleckler is a deputy sheriff with the Ste. Genevieve County Jail who hands out linens, takes inmates for medical care, hands out medication, hands out food and makes daily headcounts; basically supervises all the inmates.  (Vol. XII p.22 L.6, 8-9,16-19).  She has never had any problems with the Petitioner.  (Vol. XII p.23 L.11-12).  The Petitioner, in her experience, gets along with the other inmates.  (Vol. XII p.26 L.1-4).

Wayne Anthony Ross, Jr., is a football athlete on scholarship at Southern Illinois University.  (Vol. XII p.28 L.7,23-p.29 L.4).  He also testified in the guilt or innocense phase of the trial.  He is very close to the Petitioner, having known him since the fifth grade, and since that time they have spent a lot of time together.  (Vol. XII p.29 L.16-22).  They attended rival schools and competed in sports.  He describes the Petitioner as "one of the top athletes."  (Vol. XII p.30 L.2-13).  Mr. Ross testified that before the train accident, the Petitioner was one of the top athletes, and thereafter, he started to hang out with guys from Rockwood school rather than guys back in the neighborhood, which Mr. Ross saw as a positive change.  (Vol. XII p.32 L.14-17,

33

p.33 L.2-5).  He testified that the Petitioner gave him money to go to Detroit to visit friends, and when his aunt died, he told Mr. Ross "just to give her to the Lord . . . just stay positive, that things would be all right." (Vol. XII p.33 L.11-18).  He told Mr. Ross concerning the robbery, he "hated that it happened, he was sorry, and that he wished it didn't happen, and he wished he could take back what did happen." (Vol. XII p.34 L.16-21).

Norrel Holder testified as the 12-year old brother of the Petitioner.  (Vol. XII p.46 L. 20, p.47 L.1).  Norrel said that the Petitioner took him skating, took the family out to eat, took him to the park and took him to a parade and generally did a lot of things.  He said that he does not get to see his dad very much since he was four or five, when his dad lived with them. (Vol. XII p.47 L.25-p.48 L.8, 20-21).  When his mom worked, the Petitioner "took care of us. . . [h]e cooked for us, and made sure we did our homework, and made sure our room was clean." (Vol. XII p.49 L.5-10).  Since the Petitioner has been in jail, his brother Rim takes care of them.  (Vol. XII p.49 L.17-21).   He said that when he did not understand homework, the Petitioner would make sure he understood it.  (Vol. XII p.50 L.16-18).  "He wanted us to be good, and he wanted us to be - - not hanging around bad people."  (Vol. XII p.52 L.10-12).  He said that the Petitioner writes him letters.  Some were introduced in evidence. (Vol. XII p.53 L.21) (Defendant's Exhibits U,V,W).

Normeka Holder is the eight-year old sister of the Petitioner. (Vol. XII p.59 L.17,20). She testified that the Petitioner took her skating, to McDonalds, Rally's and Chuck E. Cheese. (Vol. XII p.61 L.13-18).  She testified that the Petitioner took care of them.  He fed them, played with them, and helped her with homework.  (Vol. XII p.62 L.17, p.63 L.1-9).  Since he has been in jail he tells her that "[h]e loves me, and he wants me to stay away from bad people."  (Vol. XII p.64 L.18-19).  He sent her an envelope with cartoon drawings and a letter on her birthday which she stuck on her wall.  (Vol. XII p.66 L.22-p.66 L.21)(Defendant Exhibit CC, Z).

34

Steven Elliott Rothke, Ph.D. has been a licensed clinical psychologist for fifteen years, currently in private practice within the areas of rehabilitation psychology and clinical neuropsychology. He is board certified in both areas. (Vol. XII p.72 L.4,9,12,P.74 L.6-14). He examined the Petitioner on March 19, 1998, first for the purpose of evaluating the Petitioner concerning "the impact of Mr. Holder's amputation injury in 1991 and to look at what if any relationship there was between that injury and the crime for which Mr. Holder is charged and being tried for today." (Vol. XII p.75 L.11-24). The "second question was: [d]id he have any lasting brain injury from a head injury he suffered in 1992, and if so, does that brain injury have a bearing on his ability to control his behavior or leave him more dangerous than he would have been without a brain injury." (Vol. XII p.76 L.25-p.77 L.6). The examination lasted thee hours. (Vol. XII p.77 L.10). Dr. Rothke reviewed many records including an evaluation by a Government expert, Dr. Wetzel. He administered tests to the Petitioner. (Vol. XII p.77 L.11-p.78 L.25). He found no deficits of any type in the Petitioner that he typically sees in his patients who had a brain injury. "[H]e is no more impulsive now than he would have been before that head injury." (Vol. XII p.80 L.4-13). He concluded that Dr. Wetzel's findings matched-up very well with his findings. (Vol. XII p.80 L.17-25). Next, Dr. Rothke discussed his findings concerning the amputation. He concluded that "Norris displayed very little outward signs of any type of emotional reaction to his injury." (Vol. XII p.86 L.23-25). Dr. Rothke testified that the Petitioner had learned of the market availability of a prosthetic foot called a "flexi-foot" that was expensive and that he no longer had insurance coverage. Petitioner told Dr. Rothke that he had no other means to acquire this expensive device, and he proceeded with his involvement in the bank robbery. (Vol. XII p.88 L.14-p.89 L.15). He concluded that Petitioner's amputation was a

35

motivation for his involvement in this crime.  (Vol. XII p.91 L.9-14).  Evidence presented by Petitioner is consistent with his stated need for a new prosthetic foot and to pay a lawyer.

Norris Holder, Sr., testified as the father of the Petitioner.  (Vol. XII p.107 L.6,16).  He said that the Petitioner was "pretty strong" as a little kid."  (Vol. XII p.109 L.22).  He tried to introduce Norris and Norrim to sports.  They went to the park a lot, attended movies, he took them to "little practices, little softball games," they had barbecues, visited different people and they did family oriented things.  He got Petitioner involved in organized sports.  (Vol. XII p.110 L.6-21).  He said that he and Mrs. Holder "started out with problems," did not get along well at home the argued and fought; he started neglecting her and she had an affair, and he could not deal with it.  (Vol. XII p.111 L.5-14).  He admits that he seldomly contacted his children, "not as much as I really should have. . . I regret that every day, the absence that I had with my sons, you know." (Vol. XII p.112  L.2-8).   When the family got back together, he and Mrs. Holder were using crack cocaine.  (Vol. XII p.114 L.12-p.115 L. 3).  After he left the home the second time, he provided little financial support.  He was also supporting another family.  (Vol. XII p.117 L.1-15).  When he left the home, he observed that the Petitioner was "pretty responsible in the household. . . He . . . tried to provide for them or whatever." (Vol. XII p.118 L.3-10).  He would see they got to school, fed them, whatever was necessary, try to make contact, filling in where I was absent; he was the man of the house.  (Vol. XII p.118 L.14-20).  He has only visited the Petitioner one time sine he has been in jail. (Vol. XII p.121 L.12-15).

The penalty phase evidence was masterfully presented.  Many witnesses supported the claims that Petitioner was forced to adopt a parent role at an early age, that he believed he needed money to pay a lawyer and acquire a new prosthetic foot, that he was a caring compassionate person who helped other people make meaningful changes in their lives, that he loved other

people and others loved him, that he did not intend harm to anyone in the course of the robbery, that he would not be a danger to guards if imprisoned for life, that he had strong family support and that people would continue to visit him in prison if he would serve a life sentence.

## II.  PROCEDURAL HISTORY

The Petitioner was charged by indictment with one count of bank robbery by force or violence in which a killing occurred, and one count of carrying or using a firearm during a crime of violence which resulted in a murder.  Petitioner pled not guilty to both counts.  A jury trial was held, beginning on February 9, 1998.  The guilt phase of the trial was separated from the penalty phase.  The guilt or innocence phase of the trial concluded on March 26, 1998, when the jury returned a verdict of guilty on both counts.  The penalty phase was then scheduled to begin on March 27, 1998, and on April 3, 1998 the jury recommended the death penalty.  On July 23, 1998, this Court formally sentenced the movant to death on both counts, in accordance with the jury's verdict.

Although Petitioner was tried separately from Allen, the two cases were combined for purposes of direct appeal.  The Eighth Circuit upheld the jury verdicts in both cases, rejecting all of the arguments proffered by the Petitioner and his co-conspirator, Allen.  Both Petitioner and Allen appealed to the United States Supreme Court.  The United States Supreme Court subsequently decided the case of *Ring v. Arizona*.  536 U.S. 584 (2002).  In *Ring*, the Supreme Court held that the statutory aggravating factors, which make a defendant eligible for the death sentence, must be found by a jury, and not a judge, in accordance with the Sixth Amendment.  *Id.* at 609.  Following the Supreme Court's decision in *Ring*, the Supreme Court granted Allen's petition for writ of certiorari, vacated the judgment of the Eighth Circuit, and ordered the "case remanded to the United States Court of Appeals for the Eighth Circuit for further consideration in

light of *Ring v. Arizona*, 536 U.S. 584 (2002)." *Allen v. United States*, 536 U.S. 953, 953 (2002).

The Eighth Circuit then considered Allen's claim of a violation of the Fifth Amendment indictment clause in light of the *Ring* decision. *United States v. Allen*, 406 F.3d 940, 942 (8th Cir. 2005). Although Mr. Allen's case was similar to the facts of *Ring*, Mr. Allen's appeal involved the question of whether an aggravating factor must be found by the grand jury under the Fifth Amendment; *Ring* required the petit jury, under the Sixth Amendment, to find the presence of a statutory aggravating factor, rather than the judge. In its decision on remand, the Eighth Circuit addressed four questions:

> (1) Does the Fifth Amendment require that at least one statutory aggravating factor and the mens rea requirement be found by the grand jury and charged in the indictment? (2) If Allen's indictment was defective, was the error structural or subject to review for harmless error? (3) If our review is for harmless error, was the error harmless beyond a reasonable doubt? (4) Is the FDPA [Federal Death Penalty Act] unconstitutional because it directs the government to charge aggravating factors in a notice of intent to seek the death penalty rather than in an indictment?

*Allen*, 406 F.3d at 942.

The Eighth Circuit concluded that "the Fifth Amendment requires at least one statutory aggravating factor and the mens rea requirement to be found by the grand jury and charged in the indictment." *Id.* at 944. Having answered the first question in the affirmative, that the indictment was defective, the Eighth Circuit turned to the second question, and concluded that "the defect in Allen's indictment was not structural error[,]" and was therefore subject to review under the harmless error standard. *Id.* at 945. Thirdly, the Eighth Circuit held that "any rational grand jury, including Allen's grand jury, would have found probable cause to charge that Allen knowingly created a gave risk of death to persons, other than Mr. Heflin, while committing the bank robbery, or in escaping apprehension. The failure to charge this statutory aggravating factor in the

indictment was therefore harmless error." *Id.* at 948. The Court similarly concluded that a rational grand jury would have found that Mr. Allen possessed the requisite mental state sufficient to satisfy the *mens rea* requirement for imposition of the death penalty. Lastly, the Eighth Circuit concluded that "*Ring* did not render the FDPA unconstitutional." *Id.* at 949.

Following the conclusion of his direct appeal, Petitioner filed a motion in this court to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255. Petitioner raised three main grounds for relief: (1) violation of the Fifth Amendment indictment clause; (2) the jury's improper consideration of the pecuniary gain statutory aggravator; and (3) ineffective assistance of counsel, with enumeration of a number of separate bases for his ineffective assistance claim. The Court ruled that an evidentiary hearing would be held, but that it would be limited to the following grounds for relief:

- Violation of the fifth amendment indictment clause;

- The jury's improper consideration of the pecuniary gain statutory aggravator;

- Counsel's unreasonable and prejudicial failure to challenge the indictment;

- Counsel's unreasonable and prejudicial advice that Petitioner testify;

- Counsel's unreasonable and prejudicial concession of guilt during opening statement and closing argument; and

- Counsel's prejudicial sleeping during critical stages of the proceedings.

A hearing was held on July 18, 2005, and was concluded on July 20, 2005. Following the evidentiary hearing, the Court allowed post-hearing briefs to be filed. However, the time for filing these briefs was extended, due to the Supreme Court granting Allen's petition for writ of certiorari, and subsequent remand to the Eighth Circuit. All briefs have now been filed, and the Court will address Petitioner's motion.

39

## III.  LEGAL STANDARD

Pursuant to 28 U.S.C. §2255, a federal prisoner may seek relief from a sentence imposed against him on the ground that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  28 U.S.C. § 2255.  For § 2255 petitions, "the question in each case must be . . .  whether the kind of violation alleged demonstrates either 'a fundamental defect which inherently results in a complete miscarriage of justice' or 'an omission inconsistent with the rudimentary demands of fair procedure.'"  *Poor Thunder v. United States*, 810 F.2d 817, 822 (8th Cir. 1987) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)).

The Court must hold an evidentiary hearing to consider claims in a §2255 motion "unless the motion and files and records of the case conclusively show that the prisoner is entitled to no relief."  *Shaw v. United States*, 24 F.3d 1040, 1043 (8th Cir. 1994), *see also Furnish v. United States*, 215 F.Supp.2d 1020, 1023 (E.D. Mo. 2000); 28 U.S.C. § 2255.  Thus, a petitioner is entitled to an evidentiary hearing "'when the facts alleged, if true, would entitle [the petitioner] to relief.'"  *Payne v. United States*, 78 F.3d 343, 347 (8th Cir. 1996) (*quoting Wade v. Armontrout*, 798 F.2d 304, 306 (8th Cir. 1986)).  The Court may dismiss a claim "without an evidentiary hearing if the claim is inadequate on its face or if the record affirmatively refutes the factual assertions upon which it is based."  *Shaw*, 24 F.3d at 1043.

A §2255 petition may be based upon a violation of the Sixth Amendment right to effective assistance of counsel.  To be successful on this basis, the petitioner must demonstrate: (1) counsel's performance was deficient in that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment[,]" and (2) "counsel's deficient

40

performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Auman v. United States*, 67 F.3d 157, 162 (8th Cir. 1995).

To prove ineffective assistance under the first prong, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. The recent Eighth Circuit case of *Marcrum v. Luebbers*, 509 F.3d 489, 503 (8th Cir. 2007), is instructive in resolving the issue of "deficiency of performance" in the *Strickland* context:

> The test we apply for deficiency of performance is an objective standard of reasonableness. [*Strickland,* 466 U.S. at 688.] In *Strickland*, when the Supreme Court pronounced this standard, it expressly declined to dictate detailed rules for deciding reasonableness: "More specific guidelines are not appropriate." *Id*. However, *Strickland* gave us several guides to decision: we must assess reasonableness on all the facts of the particular case, we must view the facts as they existed at the time of counsel's conduct, and we must evaluate counsel's performance with a view to whether counsel functioned to assure adversarial testing of the state's case. *Id*. at 690.

*Marcrum*, 509 F.3d at 502.

Additionally, the second prong of the *Strickland* test requires a determination of whether counsel's deficient performance effected the result.

> If viewed with appropriate deference, counsel's performance was in fact deficient, the convicted defendant will only be entitled to relief if he shows there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* The reviewing court must not consider the attorney error in isolation, but instead must assess how the error fits into the big picture of what happened at trial. *Id.* at 696. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.*

*Id*. at 503. The Court may address the two prongs of the *Strickland* test in any order, and if a petitioner fails to make a sufficient showing on one prong, the Court need not address the other. *Strickland*, 466 U.S. at 697; *Matthews v. United States*, 114 F.3d 112, 113-14 (8th Cir. 1997).

41

## IV.  DISCUSSION

As stated previously, the Petitioner raises three separate grounds for relief: (1) violation of the fifth amendment indictment clause; (2) Jury's improper consideration of the pecuniary gain statutory aggravator; and (3) ineffective assistance of counsel.  Petitioner's third claim relies on a number of alleged legal inadequacies by Petitioner's trial and appellate counsel.  The Court will address each of Petitioner's claims, in turn.

### A.  Fifth Amendment Indictment Clause

Petitioner argues that he is entitled to relief because the indictment failed to allege at least one statutory aggravating factor and the requisite mental state, which is an essential element for the imposition of the death sentence.  The Government, in reliance on the Eighth Circuit's decision in *Allen*, argues that this was not a structural error but a procedural one, and therefore subject to harmless error review.  Under this deferential standard, the Government asserts that the error was harmless.

Before the Court can address the substance of this claim, the Court must address the question of procedural default.  Petitioner did not raise this ground for relief before the trial court, nor did he raise it in his brief before the Eighth Circuit, however, Petitioner's counsel, during oral argument before the court of appeals, did request that the court allow him to adopt the arguments presented by Allen, including the Fifth Amendment indictment claim.[2]  A claim is procedurally barred if it is not first raised before the trial court or on direct appeal.  *See Swedzinski v. United*

---

[2]This ground for relief was raised by Petitioner's co-defendant, Allen, before the trial court, and again before the Eighth Circuit court of appeals.  Petitioner's counsel did not adopt Allen's motion before the trial court.  As stated by the Government in their post-hearing brief, it is unclear whether the Eighth Circuit granted Petitioner's request to review this claim under the plain error standard, however, it is clear that the Eighth Circuit rejected the claim as it related to Allen.

*States*, 160 F.3d 498, 500 (8th Cir. 1998).   The Court assumes for purposes of the following analysis that Petitioner's claim is not procedurally defaulted.  Although it is unclear from the Eighth Circuit's opinion whether they adopted Petitioner's counsel's request to incorporate Allen's arguments, they did discuss the Fifth Amendment question in detail.  Furthermore, due to the subsequent Supreme Court and Eighth Circuit decisions in Allen's case, which addressed the exact question presented in this motion, it is easier to address the merits of Petitioner's claim.[3]

The Supreme Court in *Ring* held that when an aggravating circumstance is necessary to make a defendant eligible for the death penalty, as was the case under Arizona state law, then "the Sixth Amendment requires that [the aggravating factors] be found by a jury."  536 U.S. at 609.  In light of this conclusion, the Supreme Court granted certiorari in Allen's case, reversed the Eighth Circuit's opinion, and remanded for further analysis in light of *Ring*.  As detailed above in the procedural history section, the Eighth Circuit concluded that the failure to present the aggravating factors and *mens rea* requirement necessary for imposition of the death penalty to the grand jury was harmless error.  The facts of Allen's case are almost identical to the facts of Petitioner's case, and therefore the Court reaches the same conclusion as that held by the Eighth Circuit.  Petitioner's Fifth Amendment right to have all elements of the crime found by the grand jury was violated, but this error was not structural, and Petitioner has failed to show that he was prejudiced by the error.[4]

---

[3]The Court notes that Petitioner raises the same claim in his ineffective assistance of counsel section, on the basis that any procedural default is excused due to counsel's unreasonable failure to raise the issue before this Court and on direct appeal.  As the Court finds no procedural default, the issue of cause for the procedural default is mooted.

[4]A structural error mandates granting relief regardless of a showing of prejudice. *Chapman v. California*, 386 U.S. 18, 20 (1967).

Petitioner argues that the defect in the indictment was structural, and cites to *Stirone v. United States* in support of this proposition.  361 U.S. 212 (1960).  *Stirone* held that "a court cannot permit a defendant to be tried on charges that are not made in the indictment against him." 361 U.S. at 217.  In *Stirone*, the defendant was indicted for interfering with the interstate importation of sand, however, the trial judge also charged the petit jury that the defendant could be found guilty for interfering with the movements of steel.  The Supreme Court articulated that "the addition charging interference with steel exports here is neither trivial, useless, nor innocuous," and held that Stirone was found guilty of a crime not charged in the indictment.  *Id.* The Court recognizes that this case clearly articulates the Fifth Amendment requirement that a charged crime must be found by indictment of a grand jury.  *Id.*  However, this conclusion by the Supreme Court is not contrary to the Eighth Circuit's holding in *Allen*.  406 F.3d at 944.  The Eighth Circuit recognized that it was a violation of the Fifth Amendment not to include the statutory aggravating factor and the *mens rea* requirement in the indictment.  *Id.* at 943. Furthermore, the Eighth Circuit specifically cited the Supreme Court decision in *Stirone*, and addressed the exact argument that is now being proffered by Petitioner.  *Id.* at 944 ("Allen rightly directs our attention to the strongest case in his favor, *Stirone v. United States . . .*.").  "At the time of *Sitrone* and [*Ex parte*] *Bain* [121 U.S. 1 (1887)], the Supreme Court had not yet grappled with the question whether constitutional error can be harmless." *Allen*, 406 F.3d at 944.  As articulated by the Eighth Circuit, when the Supreme Court did address this question, "it rejected the view that all constitutional errors automatically call for reversal and held that-with few exceptions-federal courts may not grant relief when a constitutional error is shown to be harmless beyond a reasonable doubt." *Id*.  Finally, the Court concluded that the error at issue was not the type of error that has been found to be structural, and was therefore subject to the harmless error

44

review. *Id.* The Court is not in a position to question the Eighth Circuit's interpretation of *Stirone* as applied to the facts of the present case.

Furthermore, the Court cannot find that the facts of Petitioner's case are sufficiently distinguishable from the facts of Allen's case, to warrant a different finding on the question of prejudice. The harmless error standard requires the Court to address the inquiry, "whether any rational grand jury . . . would have found the existence of the requisite mental state and one or more of the statutory aggravating factors found by the petit jury if the grand jury had been asked to do so." *Id.* at 945. Allen and the Petitioner were indicted jointly and charged with the same offenses. However, this alone does not mean that the Eighth Circuit's conclusion in *Allen*, that the error was harmless, automatically holds true for Petitioner. The evidence presented to the grand jury must be reviewed, and a determination must be made by this Court, whether that evidence was sufficient to support a conclusion that a reasonable grand jury would have indicted Petitioner for death penalty eligibility. The Court will discuss the aggravating factor requirement first, and then the mental state requirement.[5]

In *Allen*, the Eighth Circuit concluded that the evidence of the aggravating factor of posing a grave risk of death to others was so overwhelming that no reasonable grand jury could have failed to indict on this basis. *Id.* at 947 ("The grand jury testimony persuades us beyond a reasonable doubt that, if the grand jury had been asked to charge the grave-risk-of-death-to-others statutory aggravating factor, it would have done so.").[6] The facts relating to this

---

[5]The Federal Death Penalty Act requires these two elements to be proven in order to make a defendant eligible for the death penalty. 18 U.S.C. § 3591.

[6]The Eighth Circuit limited its review "to the evidence presented to Allen's grand jury[,]" in determining whether the grand jury would have found the aggravating factor and *mens rea* requirement. *Allen*, 406 F.3d at 947.

45

aggravating factor are the same for Petitioner as for Allen, and clearly support a finding of this aggravating factor.  Petitioner and co-defendant Allen entered a bank with loaded automatic weapons, discharged those weapons inside the bank during the course of a bank robbery, and subsequently fled the scene of the crime in a stolen vehicle.  The Court is entirely persuaded, consistent with the conclusion of the Eighth Circuit, that a reasonable grand jury would have found that the evidence before them supported a finding that Petitioner's action "created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life . . . ."  18 U.S.C. § 3591.  Petitioner's actions in planning and participating in an armed bank robbery, and fleeing the scene in a vehicle soaked in gasoline, satisfy this requirement.  The evidence before the grand jury was sufficient to support Petitioner's involvement in these events, and therefore was sufficient to support an indictment.

The Eighth Circuit reached the same conclusion about the *mens rea* requirement.  *Id*. at 948.  However, the facts related to the *mens rea* requirement are slightly different for Petitioner, than for Allen, and therefore will be addressed more extensively.  The Eighth Circuit discussed, in detail, the evidence which identified Allen as the first robber to enter the bank, and the evidence which showed that he was the first robber who fired shots at Heflin.  *Id.* at 949.  The Eighth Circuit further discussed how the only bullets that were identified from Heflin's body came from the Chinese manufactured assault rifle, believed to have been used by Allen.  *Id.* at 948-949.  The Eighth Circuit stated that this evidence "left the grand jury logically to infer that the first robber-the one who had fired three shots in Mr. Heflin's direction-was Allen."  *Id.* at 948.  The Eighth Circuit concluded that this satisfied the *mens rea* requirement found in the Federal Death Penalty

46

Act, that Allen "intentionally inflicted serious bodily injury that resulted in the death of the victim."  18 U.S.C. § 3591(a)(2)(B).

The evidence presented to the grand jury, as found by the Eighth Circuit, supported the conclusion that Allen fired shots at Heflin, satisfying the second *mens rea* requirement articulated under 18 U.S.C. § 3591(a)(2).  However, the same evidence does not necessarily support a finding that Petitioner intentionally inflicted serious bodily injury that resulted in the death of the victim.  18 U.S.C. § 3591(a)(2)(B).  The federal statute that permits the death penalty requires a certain mental state.  18 U.S.C. § 3591(a)(2) states that the death penalty is appropriate for:

> A defendant who has been found guilty of--. . . (2) any other offense for which a sentence of death is provided, if the defendant, as determined beyond a reasonable doubt . . .(A) intentionally killed the victim; (B) intentionally inflicted serious bodily injury that resulted in the death of the victim; (C) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim dies as a direct result of the act; or (D) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act, shall be sentenced to death if, after consideration of the factors set forth in section 3592 . . . it is determined that the imposition of a sentence of death is justified . . ..

18 U.S.C. § 3591(a)(2).

The last *mens rea* element listed in the statute is clearly applicable to Petitioner considering all of the facts of the case.  Petitioner "intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a result of the act . . . ."  18 U.S.C. § 3591(a)(2)(D).  The evidence presented to the grand jury would have supported a finding that Petitioner satisfied this fourth *mens rea* element.  Petitioner entered the bank with a fully loaded semi-automatic weapon

wearing a bullet proof vest.  He was aware of the presence of an armed guard inside the bank, and the need to deal with his presence in some way.  Petitioner had preseviously been in the bank many times.  Numerous witnesses testified that the first robber fired multiple shots in the direction of security guard, Heflin, and that the second robber went behind the counter.  One of the tellers testified that the second robber fired at least one shot after yelling at her to stay down.  Even assuming that Allen was the first robber, and Petitioner was the second, the evidence would have supported a conclusion by the grand jury that Petitioner fired his weapon while inside the bank. The *mens rea* requirement is further evidenced by the fact that the Petitioner and Allen doused the getaway vehicle in gasoline, intending to ignite the gasolene after abandoning the vehicle in Forest Park.  However, Petitioner ignited the gasoline before the vehicle reached Forest Park causing live rounds of ammunition to leave the van during the fire.  Such acts would create a grave risk of death to others on the way to, and in Forest Park.  These facts, the firing of his weapon, the fleeing from the Bank, and the setting fire to the getaway vehicle, alone or in combination, would support a conclusion by the grand jury that there was probable cause to believe that Petitioner possessed the requisite mental state for the imposition of the death penalty.  Petitioner engaged in an act of violence by firing his weapon inside the bank in a threatening manner, and setting fire to an automobile that was then driven into Forest Park, knowing that such actions created a grave risk of death.  This conclusion is further supported by the petit jury's finding that Petitioner recklessly disregarded a serious risk of death resulting from his actions.

The Court concludes that while the failure of the Government to include a statutory aggravating factor and mental state in the indictment for which Petitioner was convicted violated the Petitioner's Fifth Amendment right to indictment by a grand jury, but such error was harmless.

The Court concludes that had the Government presented the required elements, the grand jury would have returned an indictment against the Petitioner with the required elements.

## B.  Jury's Consideration of the Pecuniary Gain Aggravating Factor

The next basis for habeas relief asserted by Petitioner is that the Court improperly instructed the jury on the pecuniary gain aggravating factor.  The Government responded to Petitioner's motion by arguing that because this claim is procedurally defaulted, it may only be brought under the rubric of ineffective assistance of counsel.  In Petitioner's response, he does not dispute that this claim is properly raised under ineffective assistance of counsel.  Therefore, the Court will address this claim in detail in the following section.

## C.  Ineffective Assistance of Counsel

Petitioner raises numerous arguments under the general claim of ineffective assistance of both trial counsel, and appellate counsel.  The Court will address each claim raised in Petitioner's motion for relief, however, the Court notes that the evidentiary hearing only addressed Petitioner's claim of ineffective assistance based on failure to challenge the indictment, testimony elicited from the Petitioner at trial, counsel's statements in opening statements and closing arguments, and trial counsel sleeping during portions of Petitioner's trial.

As stated above, in order to succeed on an ineffective assistance claim, Petitioner must show that: (1) counsel's performance was deficient in that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment[,]" and (2) "counsel's deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687; *see also Auman v. United States*, 67 F.3d 157, 162 (8th Cir. 1995).

> Representation of a criminal defendant entails certain basic duties. Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest. From counsel's function as assistant to the defendant derive the overarching duty to advocate the defendant's cause and the more particular

> duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution. Counsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process.

*Strickland*, 466 U.S. at 688. The Supreme Court further emphasized that no set of rules can take into account all potential situations faced by counsel representing a criminal defendant, and therefore review of counsel's decision is to be highly deferential. *Id.* at 688-89. "[T]he purpose of the effective assistance guarantee of the Sixth Amendment . . . is simply to ensure that criminal defendants receive a fair trial." *Id.* at 689. The Court will address each individual claim raised in detail below, however, it is important to note that "[t]he reviewing court must not consider the attorney error in isolation, but instead must assess how the error fits into the big picture of what happened." *Marcrum*, 509 F.3d at 503 Throughout Petitioner's trial and sentencing he was represented by counsel Shaw and counsel Herndon, each of whom vigorously and skillfully fought to save the Petitioner's life.

### 1.  Failure to challenge the indictment (12(C)(a))[7]

The first claim based on ineffective assistance of counsel, raised in Petitioner's habeas motion, is that Petitioner's trial counsel unreasonably and prejudicially failed to challenge the indictment on the ground that it was insufficient to charge a capital offense in violation of the Fifth Amendment indictment clause. The Court found above, that there was no procedural default on this issue, as it was sufficiently raised before the Eighth Circuit court of appeals. Therefore, this claim is easily disposed, as the Court has already thoroughly addressed Petitioner's claim that the failure to include a statutory aggravating factor and mental state in the indictment violated the

---

[7]The Parties refer to each of the bases for ineffective assistance of counsel using the outline in Petitioner's original motion. The Court will go through each basis, however, the Petitioner's outline is not compatible with the outline used in this opinion, and therefore the Court will number each basis. For example, where Petitioner identifies the first basis as 12C.(a), the Court will refer to it as "1," placing the Parties outlining scheme in parentheses.

Fifth Amendment, but was harmless error.  In accordance with the Eighth Circuit's decision in *Allen*, this Court concluded that although there was a Fifth Amendment violation, such violation was harmless error.  *Allen*, 406 F.3d at 945.

### 2.  Petitioner's Testimony at Trial and Counsel's Opening and Closing Statements (12(C)(b)&(c))

Petitioner argues that his trial counsel unreasonably and prejudicially advised movant to testify when Petitioner's testimony made him eligible for the death penalty, and that his counsel was ineffective for admitting Petitioner's guilt during his opening statement and closing argument. The Government disputes that this is the case, and argues that the Petitioner's trial counsel adopted a sound trial strategy in order to spare the Petitioner's life.  The Court will address both of the claimed errors in this section, as they raise the same issue concerning counsel Shaw's understanding of the elements of the crime charged.  The Court will begin by discussing the first prong of *Strickland*, whether Petitioner's trial counsel's actions were objectively unreasonable, in that they amounted to an admission of guilt.

The defense team faced a daunting task in preparing and presenting a defense for Petitioner.  Independent credible witnesses were available to testify that Petitioner, over a period of several months, planned to rob a bank.  Witnesses saw Petitioner plan to purchase or have purchased for him a shotgun and an assault rifle with an attached bayonet and banana clip, described as used in the robbery by a person in the location of the Bank where the robber took money from the teller drawers.  In the course of the robbery, where there were numerous rounds fired and the bank guard was killed.  The two robbers fled in a van followed by a lawyer to the location where the van exploded in flames and Petitioner was observed as being on fire. Petitioner confessed to the robbery, identified the other robber who was arrested, and always

consistently stated he planned for no one to get hurt and he was sorry for the death of the guard. These facts, known going into the trial, limited the options in defending Petitioner. The defense team was trying to save his life. It is clear that the best strategy adopted, to be credible with the jury, was not to argue facts which were not defendable. Petitioner planned the bank robbery, entered the Bank with a loaded assault rifle, money was taken from the Bank, a guard was shot and died, and the Petitioner was arrested with the getaway vehicle, and then confessed. Counsel skillfully and consistently presented evidence and cross-examined witnesses, to show Petitioner was looking to solve his need for money, that the evidence was weak that he fired shots at Heflin and counsel continuously focused the jury's attention on the undisputed evidence that Petitioner believed no one would be injured.

The issue raised in these two grounds requires a discussion of the jury instructions given at the end of the guilt phase of the trial, and the *mens rea* requirement attendant to each crime charged. Instruction 15 is a statement of the law for Count One which was charged under 18 U.S.C. §2113(e). There is no element of intent in this instruction, and no element of intent is required by this statute. See *Allen*, 247 F.3d at 741 (citing *U.S. v. Poindexter*, 44 F.3d 406, 409 (6th Cir. 1995)). However, element Four states, "in committing the offense, the defendant, or a person aided and abetted by defendant, killed Richard Heflin." Instruction 16 defines aided and abetted, and in element no. 4, states, "In order to have aided and abetted the commission of this crime defendant must (3) have been aware of a serious risk of death attending his conduct."

Mr. Shaw presented Petitioner's case in the only reasonable manner possible. From the beginning, he honestly told the jury that Petitioner was a participant in the robbery, but that he did not kill Mr. Heflin and he never intended for anyone to be harmed, and the plan in place, he believed, would result in no one being harmed. Petitioner's state of mind, it was always argued,

was that there was no risk of death because Petitioner believed and has always maintained that no one was to be injured.

Instruction 18 defines the offense charged in Count Two. It provides, in part, that the "killing" must be "murder" to be punishable by death. In Instruction 19, "murder" is defined as the "unlawful killing of a human being with malice aforethought." The Instruction then states that killing is done with 'malice aforethought' if it results from the perpetration of a bank robbery in which the defendant was aware of a serious risk of death attending his conduct." Petitioner always maintained before the robbery, and after, that he never believed anyone would be injured. Counsel's strategy embraced a logical, defensible and reasonable plan to save Petitioner's life. Under all of the circumstances of this case, a defense of acquittal was never realistic.

On direct appeal, the Petitioner challenged the aforementioned jury instructions, arguing that they failed to require a finding of the specific intent to kill. In the *Allen* appeal, the Eighth Circuit, in a lengthy discussion, held that the two statutes under which the Petitioner was convicted, did not require a finding of the specific intent to kill, and that in the alternative, the jury instructions required a finding by the jury of specific intent, such that any error was harmless. *Allen*, 257 F.3d at 782-784.[8]

_____

[8]It is beneficial to quote at length the Eighth Circuit opinion, as it clearly states the intent requirement for each crime, as well as what intent was actually instructed by the Court and found by the jury. In discussing the instruction number 15, which instructed the jury of the elements of armed robbery in which a killing occurs under 18 U.S.C. § 2113(e), the Court concluded that: "a conviction under § 2113(e) for armed robbery in which a killing occurs does not require an additional finding of specific intent to kill. Instead, the statute is like common law felony murder, and we find no error in the district court's instructions to the jury." *Allen*, 247 F.3d at 782-783. In considering the jury instructions for the charge of using a firearm to cause another's death during a crime of violence, under 18 U.S.C. § 924(j), the Court held as follows:

Malice does not require proof of a subjective intent to kill. Malice may be established by evidence of conduct which is reckless and wanton, and a gross deviation from a reasonable standard of care, of such a nature that a jury is warranted in inferring that

53

Petitioner's argument that trial counsel's performance was unreasonable because he failed to provide any defense for the crimes charged, as he admitted involvement in the robbery, which satisfied the intent requirement sufficient to be found guilty of the capital offences, is flawed.  As noted, counsel chose a strategy that focused on Petitioner's mental state, under the instruction, that required him to be aware of a serious risk of death.  Additionally, in admitting involvement, but denying that Petitioner believed his actions posed a serious risk of death, counsel Shaw was denying that Petitioner had the mental state required for imposition of the death penalty. Petitioner has failed to satisfy the first prong of *Strickland* as he has failed to show that counsel's trial strategy was unreasonable.

This conclusion is supported by looking at the specific actions challenged by the Petitioner.  First, the Court will address Petitioner's challenge to counsel Shaw's opening statement.  Counsel stated that the evidence would show, and that the defense would not refute, Petitioner's involvement in the robbery.  However, counsel Shaw disputed any malice on the part of Petitioner, and specifically stated that in order to find the Petitioner guilty of murder, the jury must find malice, and counsel Shaw explained that the judge will explain later.  These statements were clearly consistent with counsel Shaw's determination that honesty regarding involvement was the best approach to save Petitioner's life.  He said ,"[n]ow, jurors, the evidence is going to show, and with candor, you will hear that the defendant robbed the bank."  (Vol. I p. 64, L.608).

---

*defendant was aware of a serious risk of death* or serious bodily harm.  Finally, assuming specific intent is required for a conviction under either § 2113(e) or § 924(j) or both, we find that any error in the district court's instructions was harmless. . .. We find any error to be harmless because the court's aiding and abetting instructions on each count of conviction supply the necessary specific intent as a matter of law, and in any case the instructions require an explicit finding of specific intent.

*Id.* at 784 (internal citations omitted) (emphasis in original).

Following the strategy from his opening statement, counsel Shaw recommended that Petitioner testify in his own defense.  This was clearly a reasonable strategic decision.  *See Bell v. Cone*, 535 U.S. 685, 698 (2002) ([W]hen a court is presented with an ineffective-assistance claim . . . a defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (internal citations omitted)).  The effect of Petitioner's testimony, his stated reason for committing the bank robbery, and most importantly his testimony that he never intended harm to anyone, all supported counsel Shaw's strategy, that absent intent, Petitioner's life would be spared.  Petitioner consistently testified that he did not believe that anybody would get hurt.  Petitioner now asserts that counsel Shaw should have been aware that Petitioner's testimony would only harm the defense.  Assuming for the purpose of this discussion that Petitioner's testimony did harm the defense[9] this alone is insufficient to support a claim of ineffective assistance of counsel.  *See Bell*, 535 U.S. at 698 ("[E]very effort must be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." (quoting *Strickland*, 466 U.S. at 689) (alterations omitted)).  At the time, counsel Shaw stated on the record, outside the presence of the jury, that he believed it was in the Petitioner's best interest to testify at trial, in an effort to humanize the Petitioner in the eyes of the jury.

The Court inquired extensively of the Petitioner as to whether he wanted to testify.  The record reflects the following:

MR. SHAW:          You want me to bring him up there?

(The defendant was sworn.)

---

[9]The Parties dispute whether Petitioner's testimony was helpful.

THE COURT:          I have been told that at this moment it is Mr. Shaw's belief that you will be called as a witness in your case in chief.  Is that your understanding also?

THE DEFENDANT:  Yes, sir.

THE COURT:          All right, okay.  Have you and Mr. Shaw and Ms. Brewer discussed the possibilities of you either testifying or not testifying in this case?

THE DEFENDANT:  Yeah.

THE COURT:          Okay.  Do you understand that under the Fifth Amendment of the United States Constitution you have a right to remain silent?  You understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:          Do you understand it is the government's burden of proof to prove your guilt to the satisfaction of the jury beyond a reasonable doubt and that you have no duty to prove that you're either guilty or innocent?

THE DEFENDANT:  Yes.

THE COURT:          Do you understand that there's no one here including me who can force you to say or do anything which will in any way connect you with this offense?

THE DEFENDANT:  Yes, I understand.

THE COURT:          Now, if you decide at this moment that you want to testify you can change your mind any time up until the time you take the stand to testify, you understand that?

THE DEFENDANT:  Yes, I do.

THE COURT:          In fact, even after you get on the stand, with permission I might allow you to change your mind if you decide you don't want to testify.   You understand that?

THE DEFENDANT:  Yes.

THE COURT:          Now, if you are sworn before the jury and take the stand to testify in your own defense, do you understand that you will subject yourself to cross-examination by the government's attorney?

56

THE DEFENDANT:  Yes, that's fine.

THE COURT:  And the government attorney will ask you about perhaps your prior criminal record, if any, and whether you've been convicted of all offenses.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  Do you understand that you will be asked a lot of questions about the planning of this offense?  You understand that?

THE DEFENDANT:  Yes.

THE COURT:  You understand you will be asked about whether or not you were in the bank and what your role was in the robbery, if any, and the killing of Officer Heflin, if any?

THE DEFENDANT:  Yes.

THE COURT:  There is hardly anything I can imagine concerning this case that you will not be asked about on cross-examination.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  Now, knowing all those things is it your request that you be – that you testify in this case?

THE DEFENDANT:  Yes.

THE COURT:  Is it your intention to have one of your attorneys call you as a witness in this case?

THE DEFENDANT:  Yes.

THE COURT:  Are you doing that because that's what you want to do?

THE DEFENDANT:  Oh, yes.

THE COURT:  Has anyone made any threats against you or promises to you to cause you to – just a second, I'm having trouble hearing up here, Melanie. Is there anyone that has made any representations or promises or threats to you to get you to testify in this case?

THE DEFENDANT:  No.

THE COURT: Are you testifying because you want to testify in this case?

THE DEFENDANT: Yes, sir.

THE COURT: Now, first of all, Mr. Shaw, do you have any questions to supplement the record in this respect?

MR. SHAW: No – well, yes. Not really questions. The defendant and I discussed this. And I did suggest that he – I thought he ought to testify. I gave him my advice that because of the nature of the punishment that I thought the best thing he could to do would be testify on his own behalf. And that if he was telling the truth that he should bring that truth out and the let the jury hear it.

THE COURT: Do you care to supplement the record in any way?

MR. LANDOLT: Judge, I'd ask – the Court asked the question of Mr. Holder, but I'd ask the Court to inquire of Mr. Holder if there's anyone else he wishes to speak with before he decides to take the witness stand or if he has spoken to everyone he cares to speak with to seek their opinion and recommendation as to what he should do.

THE COURT: Are there some family members of yours here in the courtroom, Mr. Holder?

THE DEFENDANT: Yes, there is.

THE COURT: Would you care to talk to them or anyone else before you make your final decision as to whether or not you're going to testify in this case?

THE DEFENDANT: Yes.

THE COURT: All right. The marshals will escort you back and you will be permitted to speak across the bench to any family member you care to speak to. Mr. Mueller and others including the Court security officers, would you clear the area, please?

MR. MUELLER: Surely.

THE COURT: The marshals' instructions are to accompany him back there and permit him to speak to family members individually or collectively as he chooses to do.

THE DEFENDANT: Thank you, Your Honor.

58

(The defendant conferred with his family.)

THE COURT:  Mr. Holder, have you had an opportunity, sir, to speak with your family members since – it appears to me you were back there talking to someone.  Can you just tell me whether or not you have, in fact, talked to family members about whether or not you should testify?

THE DEFENDANT:  Yes, I have talked to them.

THE COURT:  Let me advise you of one other thing that I did not tell you.  If you are on the stand answering questions, whether it be by questions from your counsel or on cross-examination, if you make a statement which might be an admission of some of the events, the jury will be entitled to use that against you.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  All right.  Now, after talking to your family members, after talking to counsel, is there anyone else you want to talk to before your final decision is made as to whether or not you should testify in this case?

THE DEFENDANT:  Only my attorney.

THE COURT:  You want to talk to him and Mr. Brewer for just a few minutes?

THE DEFENDANT:  Yes.

THE COURT:  All right.

(The defendant conferred with his counsel.)

THE COURT:  I would prefer you take all the time you need rather than there being any impression or feeling that this decision is being rushed.  It's now quarter to 12 so I'm inclined to tell the jury to return here about 1:15, an hour and a half from now, unless there's some objection to that.

MR. DOWD:  That's fine, Your Honor.

THE COURT:  Would you tell the jury to return – they've already been instructed and just tell them they should be back here at 1:15.  That's an hour and a half from now.

59

MR. SHAW:           And what I'm going to do sometime in the examination is hand him that, ask him what that is, and he's going to tell you and that will eliminate all that other.

THE COURT:          Okay.  Court's in recess.

(Court in recess at 11:48 a.m.)

THE COURT:          During the lunch our, actually hour and a half, and I'm addressing this directly to counsel and then to Mr. Holder, have there been any different decisions made regarding whether or not the defendant will be testifying?

MR. SHAW:           No, Your Honor.

THE COURT:          All right.  Mr. Holder, you've had an opportunity now since we have last had you up here at the bench to consider this matter. Does your opinion remain the same?

THE DEFENDANT: Yes, Your Honor.

THE COURT:          All right.  Thank you, sir.

(Vol. VI p.62 L.1-p.68 L.15).  The Court must give deference to Mr. Shaw's view, and cannot

say, that at the time, calling Petitioner to testify was an unreasonable decision.  This is particularly

true, considering the overwhelming evidence of Petitioner's involvement with the bank robbery.

Finally, the Court looks at counsel's closing argument.  There is no question that the right

to effective assistance of counsel extends to closing arguments, however, "deference to counsel's

tactical decisions in his closing presentation is particularly important because of the broad range of

legitimate defense strategy at that stage." *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003).

"Judicial review of a defense attorney's summation is therefore highly deferential and doubly

deferential when it is conducted through the lens of federal habeas." *Id.* at 6.  Counsel Shaw

continued the same theme that he had begun during opening statements, that Petitioner, while

guilty of planning and participating in the robbery, did not intend any harm, and did not believe

60

that anybody would be hurt.  The jury's rejection of these arguments does not impact their reasonableness.

Even assuming that Petitioner's trial counsel did admit all of the elements of the crimes charged,[10] making the Petitioner eligible for the death penalty, counsel's trial strategy was still not unreasonable.  In the case of *Lingar v. Bowersox*, the Eighth Circuit has held that "trial attorney's decision to concede Lingar was guilty of second degree murder and to rely on the defense of voluntary intoxication to rebut the deliberation element of first-degree murder . . . was a reasonable tactical retreat rather than a complete surrender."  176 F.3d 453, 459 (8th Cir. 1999); *See also United States v. Tabares*, 951 F.2d 405, 409 (1st Cir. 1991) ("[C]ounsel's concession was a tactical decision, designed to lead the jury towards leniency on the other charges and to provide a basis for a later argument (to the judge) for a lighter sentence.  Such 'tactical retreats' are 'deemed effective assistance.'" (quoting *United States v. Simone*, 931 F.2d 1186, 1196 (7th Cir. 1991)).); *see also United States v. Holman*, 314 F.3d 837, 840 (7th Cir. 2002) ("[W]e have held that conceding guilt to one count of a multi-count indictment to bolster the case for innocence on the remaining counts is a valid trial strategy . . . .").

The Fifth Circuit, in a death penalty case, found counsel's admission of second degree murder in an effort to prevent a finding of first degree murder which was punishable by death, to be reasonable.  *Haynes v. Cain*, 298 F.3d 375, 381, 382 (5th Cir. 2002).  Specifically, the defendant's counsel admitted that the defendant raped and robbed the victim, but denied that the defendant intentionally pushed her off the roof.  *Id.* at 382.  The Fifth Circuit recognized that after

---

[10]This assumption is made for purposes of examining Petitioner's argument.  The Court has already concluded above that Counsel Shaw did not admit all of the elements of the crime charged.  Counsel admitted the elements of armed robbery, but did not admit the mental state or aggravating circumstances that are required in order for the death penalty to be imposed.

61

"acknowledging that the prosecution's evidence establishing that Haynes raped and robbed Yank was overwhelming, . . . Haynes' attorneys remained active at trial, probing weaknesses in the prosecution's case on the issue of intent." *Id.* at 381-382.  The Fifth Circuit concluded that: "this is not a situation in which Haynes' attorneys abandoned their client.  Instead, they continued to represent him throughout the course of the trial, adopting a strategy which in their judgment accorded Haynes the best opportunity for a favorable outcome." *Id.* at 382.  The same analysis is applicable in the present case.  Petitioner's trial counsel did admit Petitioner's involvement in the robbery.  There was indisputable evidence that Petitioner was one of the two men who robbed the Bank.  Counsel Shaw used the opportunity to present his client as one accountable for what was obvious, so he could make a credible, consistent challenge to the government's evidence that Petitioner was the one who shot Heflin.  Counsel's strategy was a reasonable one to acquire the best outcome for the Petitioner, namely the avoidance of the death penalty.  *See Parker v. Head*, 244 F.3d 831, 840 (11th Cir. 2001) (Using the deferential standard applicable to review of state habeas finding, the Eleventh Circuit upheld the state habeas court's finding that "the evidence failed to support Parker's claim of ineffective assistance of counsel, given counsel's testimony that the concession during opening statement and closing argument was a strategic decision made in consultation with Parker in light of Parker's admissible confession, in order to maintain credibility with the jury for sentencing purposes.").

The Court concludes that Petitioner has failed to show that his trial counsel was objectively unreasonable by his conduct in the opening statement, closing argument, and by recommending that Petitioner testify.  Petitioner's trial counsel challenged the government's case by cross-examining witnesses, presenting defense witnesses, and de-emphasizing Petitioner's role in planning the robbery, and emphasizing that he was not the one who fired the fatal shots at

Heflin.  Furthermore, Petitioner's trial counsel employed a sound trial strategy of admitting Petitioner's involvement in the crime in order to gain credibility in arguing Petitioner's lack of intent and his belief that no one would be harmed, to increase the chance of leniency during the penalty phase.

### 3.  Failure to Obtain Ballistic Expert (12(C)(d))

Petitioner's next argument is that his trial counsel was ineffective for failing to obtain a ballistic expert to dispute the Government's evidence that some of the rounds fired during the bank robbery could have come from the Petitioner's weapon.  The only unfavorable ballistic testimony to Petitioner by the Government's expert, Mr. Stubits, was that three of the sixteen shell casings could not have been fired from Mr. Allen's gun, but could have been fired from Petitioner's weapon, however, this identification was not certain.  As the Government correctly states in its response to Petitioner's Motion, "at most, he [a defense expert] would have testified that Holder did not fire the 3 rounds Mr. Stubits identified."  *Gov't's Resp. to Movant's Mot. Under 28 U.S.C. § 2255*, 64.  Based on this fact, the Government argues that even assuming that Petitioner's trial counsel was ineffective, there was no prejudice to the Petitioner as there was undisputed evidence that the second robber fired his firearm in the bank during the robbery.

"Defense counsel has 'the duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'"  *King v. Kemna*, 266 F.3d 816, 823 (8th Cir. 2001) (quoting *Strickland*, 466 U.S. at 691).  The Eighth Circuit case of *Wainwright v. Lockhart*, is instructive, and therefore the Court will discuss it in some detail.  80 F.3d 1226 (8th Cir. 1996).  In *Wainwright*, the petitioner challenged counsel's performance on

63

the basis that he was unreasonable in failing to call a defense expert at trial to testify regarding the gunpowder residue found on the back of the left hand of an accomplice. *Id.* at 1230. The government's theory at trial was that the defendant Wainwright was the sole robber and murderer, and this theory was supported by circumstantial evidence. *Id.* The government further argued that Wainwright had washed the gunpowder residue off his hands after the murder, and that an accomplice, Mr. Leeper, had subsequently handled the gun. *Id.* The government's expert testified that Mr. Leeper could have gotten gunpowder residue on his hand by handling the gun after the robbery. *Id.* Prior to trial, Wainwright's trial counsel had interviewed an expert, Dr. Stone, who would have testified that it was unlikely that an individual would get gunpowder residue on the back of his hand, other than by firing a weapon. *Id.* Dr. Stone would have testified consistently that it is possible to wash gunpowder residue off, and that it is possible to get gunpowder residue on your hands from handling a recently fired weapon. *Id.* Wainwright's trial counsel determined that Dr. Stone's testimony was unnecessary because it was consistent with the government's expert testimony. *Id.* Based on this testimony at the habeas proceeding, the district court concluded, and the Eighth Circuit affirmed, that it was unreasonable for Wainwright's trial counsel not to call Dr. Stone as an expert witness. *Id.* However, the district court and Eighth Circuit further found that it was not prejudicial, because "[i]n light of the circumstantial evidence indicating Wainwright was the lone robber and murderer, we do not believe the jury would have found otherwise had Dr. Stone testified that firing a gun was the most likely way for Leeper to get gunpowder residue on the back of his hand." *Id.*

There is no evidence presented to the Court as to what an expert for the Petitioner would have testified, and therefore the Court assumes for purposes of this motion that an expert for the Petitioner would have testified that the three bullets that were identified as not coming from Mr.

64

Allen's weapon, could not have been fired from Petitioner's weapon.  This evidence clearly would have been favorable to Petitioner.  However, this does not change the conclusion by the Government's expert that eleven of the spent casings could not have been fired from Petitioner's weapon, and furthermore that eight of those eleven were conclusively fired from Mr. Allen's weapon, and three could not be conclusively identified, but were ruled out as coming from Petitioner's weapon.  As the Government correctly states, the only issue was that there were three casings that the government's expert concluded could not have come from Mr. Allen's weapon.  Considering the other evidence that was introduced at trial, that Petitioner's weapon had empty cartridges, the bank teller's testimony that Petitioner was the second robber to enter the bank, and that he climbed behind the counter and fired at least one shot above her head, it was not unreasonable for Petitioner's trial counsel not to retain their own expert.  Therefore, the Court concludes that the first prong of *Strickland* has not been satisfied, as counsel's decision was not unreasonable.  Considering the limited favorable testimony that was possible from a defense ballistic expert, and the circumstantial evidence supporting the Government expert's testimony, the decision was reasonable.  The Court also notes that Petitioner's defense counsel cross-examined the government's expert, eliciting favorable testimony.

Counsel Shaw skillfully cross-examined Mr. Stubits who admitted there were six different recognized characteristics an examiner could have "to make sure" it came out of a certain gun. (Vol. VI p.3 L.20-p.4 L.2).  The ejector hits the shell in the same location every time in conjunction with where the breech face and the extractor markings would.   (Vol. VI p.4 L.12-14).  This is the first characteristic, i.e. the mark the ejector will leave.  Mr. Stubits explained that the extractor grabs the spent shell casing with severity leaving a mark on the shell.  (Vol. VI p.6 L.15-25).  The mark the extractor leaves is the second characteristic.  While the extractor leaves a

65

mark on every shell, whether it is good enough to be identified individually with the firearm depends on the firearm (Vol. VI p.7 L.1-11).  The primer is an insert in the head of the shell casing which contains a small explosive charge, creating a spark that goes through the flask hole to light the powder. (Vol. VI p.8 L.1-10).  The firing pin on any rifle, because of individual tooling, may allow the firing pin to hit the primer somewhat off center.  The strike location of the firing pin on the primer could be a class characteristic, and depending on the gun, it could be an individual characteristic.  The firing pin imprint is the most important part of that primer strike. (Vol. VI p.10 L.2-11).  Counsel Shaw was also successful in getting Mr. Stubits to admit that in no place in his report of his tests, Petitioner's Exhibit B, did he use the words, "consistent with a firearm." (Vol. VI p.12 L.6-13).

Furthermore, counsel Shaw was able to get Mr. Stubits to admit, "I did not come up with any positive result on a bullet or a shell with the Russian." (Vol. VI p.18 L.19-20).  Mr. Stubits testified that as to two bullets taken from Mr. Heflin's body, "I could say positively with the Chinese gun, two bullets. (Vol. VI p.20 L.12-16).  Mr. Stubits' report identifies two shell casings differently than the trial exhibit numbers.  QF-17 is an identification number for the two spent shell casings that were positive for the Chinese rifle, it "had matching firing pin, breech face, and ejector impressions with my test shell casings that I fired in the Chinese firearm." (Vol. VI p.30 L.18-24).  QF- 18, Mr. Stubits testified, tested positive for the Chinese firearm with the same characteristics; QF- 19, with the same characteristics, tested positive to the Chinese firearm; QF- 20 and QF- 21, two shell casings, tested positive to the Chinese rifle with the same characteristics. (Vol. VI p.31 L.4-18).  Mr. Shaw asked Mr. Stubits whether he testified  in direct examination that any of the shell casings came from the Russian gun, and Mr. Stubits said, "I did not say any of them were positive." (Vol. VI p.33 L.2-6).  Mr. Shaw asked, "why didn't you say that they

came from that gun, that gun being the Russian gun?  Mr. Stubits answered, "[b]ecause there were not sufficient markings that I could definitely say Russian gun." (Vol. VI p.33 L.11-14).

The Court also finds that the second prong of the *Strickland* test has not been satisfied. This conclusion requires the Court to address two questions, first, whether the outcome of the guilt phase would have been different, and second, whether the outcome of the penalty phase would have been different, but for counsel's allegedly unreasonable conduct.  The first question requires only a small amount of discussion.  Assuming for the purposes of this analysis that the Government was required to show that Petitioner recklessly disregarded a substantial risk of death, the Court finds that there was no prejudice resulting from the lack of a defense expert witness.  The evidence clearly established that both Petitioner and Allen entered the bank with semi-automatic SKS rifles, and Petitioner was aware of an armed security guard on the premises of the bank, the Petitioner and Allen fled in a stolen vehicle that became engulfed in flames as they made their way into a public park, where they wanted to enter another vehicle to avoid arrest. Without any evidence that Petitioner fired his weapon inside the bank, the Government presented sufficient proof of a reckless disregard of a substantial risk of death to support the jury's verdict on this element.

The second question presented on the issue of prejudice requires a closer analysis of the penalty phase of the trial.  The jury was presented with a number of aggravating factors to consider, both statutory, and non-statutory.  The statutory aggravating factors were: 1) That Norris G. Holder, in the commission of the offense, or in escaping apprehension for the violation of the offense, knowingly created a grave risk of death to one or more persons in addition to Richard Heflin; and 2) That Norris G. Holder committed the offense in expectation of the receipt of anything of pecuniary value.  The non-statutory aggravating factors were: 1) That Norris G.

Holder's conduct in committing the offenses was substantially greater in degree than that described in the definition of the crime, apart from the statutory aggravating factors; 2) That Norris G. Holder has committed other criminal acts in addition to the capital offenses committed in this case; 3) That Norris G. Holder is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to society; and 4) That Richard Heflin's personal characteristics as an individual human being and the impact of the death of Richard Heflin upon his family make this crime more worthy of the death penalty than other murders. Additionally, the jury was presented with a number of mitigating factors. The statutory mitigating factors were: 1) That Horris G. Holder did not have a significant prior history of other criminal conduct; and 2) Other factors in Norris G. Holder's background, record, or character or any other circumstances of the offenses that mitigate against imposition of the death penalty. The jury was

68

presented with seventeen non-statutory mitigating factors.[11]  For purposes of this discussion, the

---

[11]  Those factors were:

1.  That in the killing for which Norris G. Holder was convicted, he did not fire the shots which resulted in the victim's death.

2.  That Norris G. Holder did not intend for any person to be killed during the course of the offenses which he committed.

3.  That Norris G. Holder suffered a series of losses in his life which he failed to process, despite recommendations that he receive counseling.  These losses include the desertion of his father at a young age, the loss of his leg, and the death of his grandfather.

4.  That Norris G. Holder's childhood was characterized by inconsistent parenting.

5.  That despite growing up in a rough neighborhood with economic instability, Norris G. Holder was continuously striving to improve his situation and that of his family.

6.  That in the absence of his father, Norris G. Holder assumed the role of the man of the house at a very young age.

7.  That Norris G. Holder lacked a positive male role model while growing up.

8.  That Norris G. Holder felt a sense of responsibility to provide emotional and finacial support to his mother, brothers and sister.

9.  That Norris G. Holder's motive for these offenses grew out of his attempt to reduce the impact of his disability, improve his life, and provide care for his family.

10.  That Norris G. Holder provided a positive role model to Norrim Hoder, Norrell Holder, Normeka Holder, Tony Sanders, and others.

11.  That Norris G. Holder has been a father figure to his brother Norrim.  Due to Norris' influences and efforts, Norrim has made many positive changes in his life.
12.  That Norris G. Holder is a likeable person who provides support and help to many of his extended family, friends, and associates.

13.  That Norris G. Holder does not have a history of violent behavior and the offenses for which he was convicted are inconsistent with his personality and usual behaviors.

14.  That Norris G. Holder has a large family who is very attentive to and supportive

first two are particularly significant, i.e. that in the killing for which Norris G. Holder was convicted, he did not fire the shots which resulted in the victim's death, and that Norris G. holder did not intend for any person to be killed during the course of the offenses which he committed. None of the jurors found either of these two mitigating factors to exist.  Furthermore, the jury unanimously found the existence of both statutory aggravating factors, and three of the four non-statutory aggravating factors.  The only mitigating factors that were found unanimously by the jury were factor 4, that Holder's childhood was characterized by inconsistent parenting, factor 7, that Holder lacked a positive male role model while growing up, and factor 11, that due to Holder's role as a father figure to his brother Norrim Holder, Norrim has made many positive changes in his life.

Had the Petitioner provided evidence of an expert witness to testify that the three casings, that could not have come from Mr. Allen's gun, also did not come from Petitioner's gun, this could have supported the first mitigating factor, i.e. that Petitioner did not fire the shot that killed Heflin.  However, the Court can only overturn the jury's verdict on a § 2255 motion if the outcome would have been different, but for counsel's conduct.  *Strickland*, 466 U.S. at 687.  Throughout the trial, Petitioner's counsel emphasized the facts which supported a conclusion that Petitioner's co-conspirator, Allen, shot and killed Heflin.  He emphasized: that Allen was the first

---

of him and will help him make an adequate adjustment to prison life.

15.  That Norris G. Holder has made an adequate adjustment to being confined in jail and is not a problem inmate.

16.  That Norris G. Holder does not present a substantial risk of being dangerous or violent if confined in prison for life without the possibility of release.

17.  That Norris G. Holder can continue to provide a positive influence in the lives of Norrim, Norrell, and Normeka Holder while incarcerated in prison.

70

to enter the bank, and that the first robber was the one to open fire on Heflin; that all of the bullets found in Mr. Heflin's body that could be conclusively identified were identified as coming from Allen's gun, not the Petitioner's weapon, as confirmed in the testimony of the Government's expert; and that the teller's testimony supported Petitioner's statement that he was not the one who shot Heflin.  No juror found that Petitioner was not the one who shot Heflin, nor did any juror credit Petitioner's testimony that he did not intend harm to anyone.  The government's evidence supported these findings by the jury, and the Court cannot conclude that an expert witness testifying regarding the three spent shell casings that did not come from Allen's weapon did not come from Petitioner's weapon, would have resulted in a different finding on these two mitigating factors.  Furthermore, the Court cannot conclude that a unanimous finding of one or both of these mitigating factors would have changed the balance of the jury's decision.  Therefore, the Court cannot conclude that even if Petitioner's counsel was unreasonable in failing to call a ballistics expert, the evidence that could have been presented by Petitioner's counsel would have changed this outcome.

### 4.  Failure to Interview Mitigation Witnesses (12(C)(e))

The Court next discusses Petitioner's allegation that his trial counsel was unreasonable in failing to call an unidentified witness, and that such action prejudiced the Petitioner.  Petitioner alleges that trial counsel should have sought the identity of an unknown witness, referenced in a report prepared by FBI Special Agent Jan Hartman, as a person who was incarcerated with Allen in the Franklin County Jail in Union, Missouri, and later with the Petitioner in a holding cell in the Federal Courthouse.  The report stated that the unknown individual and Allen became friends, and during the course of their friendship, Allen related the shooting at issue in this case, stating that "Man, that cop reached for his gun, and I had to spray him."  Special Agent Harman's report

71

further stated that the unknown witness was placed in a holding cell with Petitioner at the federal courthouse in St. Louis, Missouri, at which time Petitioner relayed portions of the bank robbery at issue to the unknown witness. Specifically, Petitioner states that the unknown witness would have testified that:

> He [the Petitioner] said that the robbery was Allen's idea. They were supposed to go in and out. No one was to get shot; no one was to get hurt. Holder told Allen "no bodies" no murders. Once in the bank Holder suddenly heard a shot. Holder panicked. He did not see the guard reach for his gun. He said that Allen shouldn't have shot the cop as a charge would have only been for bank robbery . . . . Holder also told [the witness] that he could not watch the guard's funeral on television. Holder appeared remorseful.

The Court recognizes the importance of all evidence that may have supported a contrary verdict or sentence. Petitioner asserts four areas in which the unknown witness's testimony would have supported his defense; first, that it would have corroborated Petitioner's statements that he was remorseful about the death of Heflin, second that Allen was the one who fired the fatal shots at Heflin, third, that Allen attempted to falsify a defense that further incriminated Petitioner, and fourth, that Allen did not appear remorseful.[12] The Court will again address the question of ineffective assistance of counsel as it relates to both the guilt and penalty phases of the trial. The Court again reiterates the prejudice standard required to succeed on an ineffective assistance of counsel claim; Petitioner must show that but for counsel's unreasonable conduct, the outcome would have been different. *Strickland*, 466 U.S. at 687. The Court will address the second prong of the *Strickland* test first.

---

[12]The final area of the unknown witness' testimony was not relevant to the remorse or lack of remorse shown by the Petitioner, and therefore need not be discussed in detail; Petitioner's remorse for his actions was presented by Petitioner's trial counsel through the abundance of testimony to that effect.

72

Petitioner's counsel provided evidence, during the guilt phase of the trial, that supported the proposed testimony of the unknown witness, such that his additional testimony would not have changed the outcome. Petitioner's trial counsel presented testimony that the unknown witness could have supported. Specifically, there was witness testimony presented stating that Allen repeatedly fired his weapon at Heflin, and the Government's expert witness Stubits testified that the only fatal shots found upon physical examination of Heflin's body and ballistic tests conclusively identified, came from Allen's weapon, refuting Allen's attempt to falsify a defense which incriminated the Petitioner. Furthermore, evidence was presented to support Petitioner's statements that he did not intend for anybody to be hurt. In *Amrine v. Bowersox*, the Eighth Circuit found that a claim of ineffective assistance of counsel, due to the failure of counsel to cross-examine a witness about prior inconsistent statements and failure to call an additional witness favorable to the petitioner, was without merit because the petitioner could not show prejudice. 238 F.3d 1023, 1031 (8th Cir. 2001). Specifically, the Court noted that "counsel called witnesses, put in exhibits, and cross examined the state's witnesses," and therefore the Eighth Circuit could not conclude "that a reasonable probability exists that the jury would not have found Amrine [petitioner there] guilty if his counsel had also undertaken the additional measures now advocated." *Id.* Considering the evidence presented by Petitioner's trial counsel regarding Petitioner's lack of intention that anybody be hurt, and the likelihood that he did not fire the fatal shots at Heflin, the Court cannot conclude that the outcome would have been different had the additional testimony been presented. The unknown witness' testimony regarding Holder's remorse for his actions, that Allen was the one who fired the fatal shots, and that he later denied these actions by incriminating the Petitioner, were all supported by the testimony presented at trial, such that the additional testimony would not have effected the outcome. The Court

concludes that the result would not have been different at the guilt phase of the trial, had trial counsel located the unknown witness, and therefore the second prong of the *Strickland* test has not been met.  466 U.S. at 687.

Although it is unnecessary to address the reasonableness of counsel's conduct, due to the Court's conclusion that such action did not prejudice the Petitioner, the Court will briefly address the reasonableness of counsel's conduct under the facts presented.  As a preliminary matter, the Court notes that trial counsel's strategic decisions regarding witness testimony are generally not subject to second-guessing by a federal court on a post-conviction motion.  *See United States v. Jourdain*, 2007 WL 628427, *3 (D. Minn. Feb. 28, 2007) (Finding counsel's decision not to call a witness reasonable trial strategy, when similar testimony had been elicited from other defense witnesses.); *See also Garrett v. Dormire*, 237 F.3d 946, 950 (8th Cir. 2001) (Upholding district court's denial of habeas relief on the basis that the state court correctly applied *Strickland* standard in denying ineffective assistance claim based on the argument that trial counsel should have called two inmate witnesses for the defense.).

The Government raises two arguments that the Court agrees support the reasonableness of counsel's decision not to present this witness to the jury.  First, the value of testimony from a fellow inmate is inherently limited.  Secondly, the timing of Petitioner's statements to the witness make its truthfulness unreliable.  *See United States v. Bagley*, 537 F.2d 162 (5th Cir. 1976) ("[T]he identity of the person to whom the statement was made, and the circumstances in which the disclosure was made are to be considered in assessing the trustworthiness of the statement.").  The statement was made after the Petitioner had been arrested and charged with the offense, and therefore it was in his best interest to show regret.  The Court recognizes that the credibility of the witness is uniquely the function of the jury, and therefore the Court cannot decide whether or

74

not the jury would have credited the unknown witness's testimony. However, the Court can analyze whether Petitioner's trial counsel was reasonable in concluding that such testimonial evidence would not help the defense's position. *See Laws v. Armontrout*, 863 F.2d 1377 (8th Cir. 1988) ("If . . . counsel did not produce the mitigating evidence because, after a reasonable investigation and exercise of professional judgment, he has determined that withholding such evidence is the most strategically sound course, then there has been no ineffectiveness."). Petitioner's trial counsel reviewed the testimony the unknown witness would provide, and determined, in the exercise of his professional judgment, that such evidence would not be beneficial to the Petitioner's defense. The Court finds that counsel's failure to locate the unknown witness and to call that witness at trial was a reasonable strategic decision, considering the credibility concerns of a fellow inmate, and therefore, there has been no ineffectiveness.

The Court next addresses whether trial counsel was reasonable in failing to call the unknown witness during the penalty phase of the trial. The unknown witness's testimony that Petitioner was remorseful, would have supported Petitioner's argument for life imprisonment rather than the death penalty. As discussed above, the credibility of the unknown witness would have been hindered due to the witness's status as an inmate, and the Court cannot say that the decision not to call the witness was unreasonable. Furthermore, as concluded above, the proposed testimony is duplicative of other testimony presented. Specifically during the penalty phase, as articulated in the background section above, the Petitioner presented numerous witnesses to support his good character and his remorse for the death of Heflin. The jury chose to disregard this evidence and sentenced the Petitioner to death. The Court is not persuaded that the additional testimony of an inmate would have affected the jury's verdict, and therefore the *Strickland* test has not been satisfied.

### 5.  Failure to Investigate Petitioner's Mental Condition (12(C)(f))

The Petitioner's next argument is that trial counsel was unreasonable in failing to adequately investigate the Petitioner's mental condition, and that counsel's failure prejudiced the Petitioner.  Specifically, Petitioner argues that trial counsel had knowledge of a number of incidents, medical records of seizures, a train accident in which Petitioner's leg was amputated in 1991, and a fractured skull requiring hospitalization in 1992, all of which could have caused Petitioner to have a mental condition effecting his culpability for the crimes charged.  Petitioner states in his petition that Dr. Anthony Semone would have testified that Petitioner's brain damage could have caused him to naively believe that no one would be hurt during the bank robbery, notwithstanding the large number of weapons and ammunition possessed by Petitioner, his wearing of an armored vest, and the presence of an armed guard in the bank.  The Court concluded that no evidentiary hearing was necessary on Petitioner's claim of ineffective assistance of counsel, on the basis that trial counsel should have called Dr. Semone as a witness, because even if Dr. Semone would have testified that Petitioner did not understand the risk of harm associated with his actions, there is no evidence that the outcome of the trial would have been different.  Furthermore, there is no evidence that trial counsel's decision not to use Dr. Semone as an expert witness was unreasonable.  *See Strickland*, 466 U.S. at 687.  The court will first address counsel's reasonableness in deciding not to have Petitioner examined by Dr. Semone.

A number of expert witnesses were retained in association with Petitioner's capital trial. Dr. Thomas Reidy performed an examination to determine the Petitioner's future dangerousness. Dr. Stephen Rothke, a clinical neuropsychologist retained by Petitioner's trial counsel performed a neurological examination on Petitioner and presented a report.  Dr. Richard Wetzel, a clinical neuropsychologist retained by the Government examined Petitioner and prepared a report.  In the

76

beginning of March, 1998, Petitioner's trial counsel, Ms. Herndon, contacted Dr. Semone, to review Dr. Wetzel's findings, and determine the necessity of further neurological testing; however, this review by Dr. Semone never took place. Dr. Semone did not examine Petitioner, or review Dr. Wetzel's report, until he was contacted a second time, in connection with the current post-conviction proceedings. Dr. Wetzel, the Government's expert, found that the Petitioner had a detectable brain condition as a result of a skull fracture that was caused by a brick hitting Petitioner's head, but that the brain condition did not effect his culpability in any way. Dr. Semone reviewed this report following Petitioner's trial and conviction, and concluded that Petitioner's brain damage could affect Petitioner's judgment, and his ability to assess danger.

First the Court looks at counsel's reasonableness in deciding not to employ Dr. Semone. The Petitioner argues that Dr. Rothke was not retained to perform a full neuropsychological exam of the Petitioner, but rather examined Petitioner only on the question of future dangerousness, in order to testify during the mitigation phase of Petitioner's trial, and therefore, trial counsel was unreasonable in not retaining Dr. Semone to conduct a full neurophychological examination. However, Dr. Rothke's expert report states: "REASON FOR REFERRAL: This 22 year old, right handed, single, African-American male was referred by his defense counsel to determine if injuries he sustained several years ago are relevant to the criminal actions for which he is charged and to his future dangerousness." *Gov't's Response in Opp. to Pet. Mot. under 28 U.S.C. § 2255*, Ex. A, 1. Dr. Rothke concluded that Petitioner did not display "any psychiatric diagnosis, nor is he in need of any psychological treatment relating to his injury." *Id*. at 4. Dr. Rothke's report was corroborated by the report of the Government's expert, Dr. Wetzel. Dr. Wetzel opined that "[t]here is no psychological or neurological connection or causal relationship between the febrile seizure(s), traumatic amputation, and the head injury, and the crimes with which Mr.

77

Holder is charged." *Gov't's Response in Opp. to Pet. Mot. under 28 U.S.C. § 2255*, Ex. B, 19.

The Court concludes, based on the evidence presented, specifically the expert reports of Dr.

Rothke and Dr. Wetzel, that there is no showing by Petitioner that anything less than a full and

complete neuropsychological exam was performed on the Petitioner, and Petiioner's trial counsel

acted reasonably in not employing Dr. Semone.

The Petitioner cites the Court to the case of *Wiggins v. Smith*, in which the Supreme

Court emphasized the standard for finding ineffective assistance based on a failure to investigate.

539 U.S. 510, 521-522 (2003).  The Supreme Court in *Wiggins*, reversed the Fourth Circuit

Court of Appeals, holding that trial counsel's decision not to present any mitigation evidence at

the sentencing phase of the petitioner's death penalty trial constituted ineffective assistance.  *Id.* at

524.  Specifically, the court stated that "[c]ounsel's decision not to expand their investigation

beyond the PSI and DSS [Department of Social Service] records fell short of the professional

standards that prevailed in Maryland in 1989."  *Id.*  The Supreme Court framed the legal question,

not as whether counsel was unreasonable for failing to present mitigation evidence, which was a

tactical decision, but rather whether counsel was unreasonable in failing to further investigate

potential mitigation evidence.  *Id.* at 521.  The Supreme Court reiterated its holding in *Strickland*,

that:

> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigations.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments.

*Wiggins*, 539 U.S. at 521-522 (quoting *Strickland*, 466 U.S. at 690-691).

The facts of the *Wiggins* case are very different than those before the Court in Petitioner's case. Petitioner's trial counsel did not fail to investigate. Trial counsel made a decision not to pursue Dr. Semone's testimony, following review of the expert reports of Dr. Wetzel and Dr. Rothke. There was no evidence before Petitioner's trial counsel that further mental examination of the Petitioner would produce a favorable report. This is in contrast with *Wiggins* where the petitioner's trial counsel had evidence of an extremely troubled past, with repeated incidents of sexual and physical abuse, but chose not to conduct an investigation to determine whether that information could form the basis of a mitigation case. 539 U.S. at 524. The facts before the Court on Petitioner's challenge of lead counsel's decision not to pursue the testimony of Dr. Semone, do not support a finding of ineffective assistance of counsel. The Court finds that trial counsel was reasonable in this decision.[13]

Additionally, the Court notes that there is no evidence that had Dr. Semone been retained to conduct an examination of the Petitioenr, and had he testified favorably at trial, that his opinion would have changed the outcome of the trial, in either the guilt phase or in the penalty phase. The Government made a compelling argument during the guilt phase that Petitioner knew there was a risk of harm, supported by evidence of the amount of weapons and ammunition that were carried by Petitioner, his wearing an armored vest, the statements made prior to the robbery regarding the presence of the guard, and the decision to attempt to set fire to the getaway vehicle after abandoning it in Forest Park. There was evidence that Petitioner researched the safety provided to him in wearing body armor and that the weapons he used could shoot through police cars.

---

[13]Additionally, counsel's decision was reasonable because Petitioner's failure to present evidence of any mental impairment meant that Dr. Wetzel, the Government's expert, could not testify as a rebuttal witness. It was reasonable for counsel to believe that Dr. Wetzel's testimony would have been damaging to the defense, as Dr. Wetzel opined in his report that none of the traumatizing incidents had any impact on the Petitioner's culpability.

The Court's conclusion that even had Dr. Semone testified the outcome would not have changed, is strengthened by the jury's unanimous decision in failing to find that the first two mitigating factors presented, that in the killing for which Petitioner was convicted, he did not fire the shots which resulted in the victim's death, and that Petitioner did not intend for any person to be killed during the course of the offenses which he committed.  Petitioner presented numerous witnesses, as well as expert testimony, that supported these two mitigating factors, yet the jury concluded that neither of them were applicable.  Specifically, there was the testimony of a bank employee that the second robber fired his weapon inside the bank.  Therefore, Petitioner cannot show that Dr. Semone's testimony would have effected the outcome of the trial, thereby failing to satisfy the second prong of *Strickland*.  466 U.S. at 687.  Petitioner's claim of ineffective assistance based on trial counsel's failure to pursue Dr. Semone as an expert witness is without merit.

### 6.  Presenting Portions of the Movies *Set it Off* and *Heat* (12(C)(g))

Petitioner argues that trial counsel was unreasonable in arguing that the best evidence of the contents of the two movies was the movies themselves, and that presenting the movies to the jury prejudiced the Petitioner.  The Government intended to present Agent Hartman's testimony at Petitioner's trial, which would have compared elements from the movies *Set it Off* and *Heat* to the bank robbery for which Petitioner was charged.[14]  Petitioner's trial counsel moved this Court to exclude Agent Hartman's testimony, and in the alternative to present each of the movies in their entirety to the jury.  At a conference that was held before the Court, and outside the presence of the jury, the government attorney advised Petitioner's trial counsel that the contents of the movies was more prejudicial than the testimony that would be presented by Agent

---

[14]Other testimony proved that Petitioner and Allen had watched these two movies prior to the robbery.

Hartman.  Prior to the Court's ruling on Petitioner's request, Petitioner's trial counsel was permitted to voir dire Agent Hartman to preview her testimony, and Petitioner was given a recess to discuss the decision with his trial counsel.  Counsel Shaw repeated his advice that it was in Petitioner's best interest to have the jury see the movies in their entirety.  The Court granted Petitioner's request, and the movies where presented to the jury.  The Government responds to Petitioner's claim that counsel's decision was unreasonable, by stating that counsel Shaw's advice was a reasonable attempt to minimize the similarities between the robberies in the movies and the robbery committed by the Petitioner.

On the morning following the showing of the movie *Set It Off,* the Assistant United States Attorney, vociferously objected to the showing of th movie *Heat* to the jury because it was 171 minutes long, it would take a lot of the Court's and jury's time, and since the Government's case was being presented, the Assistant united States Attorney did not want the entire movie shown to the jury during the Government's case.  Counsel Shaw stated that the movie was relevant to Petitioner's mental situation that it was his intention that no one would get hurt, or shot or any guns would be fired.  Counsel Shaw's full statement follows.

> Mr. Shaw:    Your Honor, the defendant regrets that it's 171 minutes, but that is merely a conclusion on the part of the District Attorney that the other portions of the tape, or the movie, are not relevant.
>
> They are relevant as far as the mental situation with the defendant, of the intention of the defendant, of the fact that the defendant did not want anyone hurt or shot, or any guns to be fired.
>
> There is no doubt but that it will take up time, but the only way that you could determine whether or not part of it is relevant is to play the whole thing, out of the hearing of the jury, before you rule on it.
>
> The entire tape is relevant, because one of their charges, at least one of the statements made during the opening statement by the Government, was that the film "Heat" and the film "Set It Off" had

81

something to do with the defendant's intention in this holdup where Mr. Heflin was killed.

I think it's a shame, but that is 70 minutes when we are dealing with somebody's life.

The defendant – and I asked him this morning if he wanted this played again, and he said he did, and he said he wanted the whole matter played.

(Vol. V p.4 L.14-p.5 L.13).

The First Circuit addressed a factually similar situation in the case of *United States v. McGill*, in which the defendant was convicted of depriving another of his civil rights while acting under color of state law, with death resulting.  11 F.3d 223, 224 (1st Cir. 1993).  The petitioner in *McGill* was imitating a scene from the movie *The Deerhunter*, in which North Vietnamese soldiers abuse prisoners of war.  *Id*.  McGill was a prison guard in a Rhode Island state penitentiary, and in the course of his duties, he was conversing with an inmate in the in-take area. *Id*.  In accordance with prison procedures, a second guard, who was entering the prison facility, handed McGill his weapon.  *Id*.  McGill proceeded to empty the gun of all but one bullet, spin the chamber and fire two shots, one aimed at himself, the second at the inmate.  *Id*.  On the second shot, the gun discharged, resulting in the inmate's death.  *Id*.  During the trial, the government sought to introduce the clip from the movie which corresponded with McGill's actions.  *Id*. at 227.  Defense counsel determined that showing the jury the entire movie would dilute the detrimental effect of the single scene, and entered a stipulation with the government to that effect. *Id*.  The First Circuit found that "[b]ased on his judgments concerning relevance, probative value, unfairly prejudicial impact, and how the judge would likely rule, counsel calculated that he would not prevail on a motion to exclude the film clip.  In an effort to cut anticipated losses, he obtained a stipulation from the prosecution that the entire three hour movie would be shown, in the

82

expectation that the impact of the critical scene would be dissipated." *Id.* Finally, the Court concluded that "counsel made an unarguably reasonable choice." *Id.*

As in *McGill*, the Court cannot conclude that counsel's decision was unreasonable. *See Strickland*, 466 U.S. at 687. Petitioner's trial counsel wanted to de-emphasize the similarities between the robberies portrayed in the movies *Set it Off* and *Heat*, and the robbery committed by the Petitioner. By showing the two movies in there entirety, the jury was able to see the differences, and the focus on the similarities was limited. To the contrary, Agent Hartman's testimony would have only explained the similarities. As the First Circuit in *McGill* noted, whether Counsel Shaw's decision was right is irrelevant, so long as it was reasonable. 11 F.3d at 227 ("To avoid the shoals of ineffective assistance, an attorney's judgment need not necessarily be right, so long as it is reasonable."). The Court concludes that trial counsel's decision to show the two movies in their entirety was not unreasonable, and therefore Petitioner's claim of ineffective assistance of counsel on this basis fails.

Under the second prong of *Strickland*, the Court finds that Petitioner has not alleged any facts to show that he was prejudiced by counsel's decision. Had the two movies not been shown, Agent Hartman would have testified. It is impossible for this Court to conclude that the jury would have reached a different result had Agent Hartman testified. Both alternatives served to focus the jury on the pre-planning of the crime. The Court cannot conclude the result would have been different with the presentation of Agent Hartman's testimony in lieu of the movie presentation.

### 7. Trial Counsel Sleeping During Portions of the Trial (12(C)(h))

The Court held an evidentiary hearing on this claim to determine whether counsel Shaw was sleeping during portions of Petitioner's trial, and if so whether this amounted to a complete

absence of the counsel guaranteed by the Sixth Amendment.  Petitioner alleges that counsel Shaw slept on a number of occasions, during voir dire, during the government's presentation of its case-in-chief, and during the penalty phase of movant's trial.  Petitioner argues that prejudice is presumed when a defendant is denied the presence of counsel during a critical stage of the proceedings.

In *Powell v. State of Alabama*, the Supreme Court emphasized the importance of the "guiding hand of counsel at every step in the proceedings against him."  287 U.S. 45, 69 (1932).  "The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of the trial."  *United States v. Cronic*, 466 U.S. 648, 659 (1984).  "Applying this longstanding principle, we [the Fifth Circuit] conclude that a defendant's Sixth Amendment right to counsel is violated when that defendant's counsel is repeatedly unconscious through not insubstantial portions of the defendant's capital murder trial.  Under such circumstances, *Cronic* requires that we presume that the Sixth Amendment violation prejudiced the defendant."  *Burdine v. Johnson*, 262 F.3d 336, 341 (5th Cir. 2001).

During the hearing on this matter Petitioner's trial counsel, counsel Herndon, and mitigation specialist Ms. Tatelli both testified that counsel Shaw may have been, or appeared to be sleeping during portions of the trial.  The Court volunteered during the evidentiary hearing:

> We are on the record, and I will tell you I recall Mr. Shaw came to the hearings almost always before anyone.  He was frequently there before I arrived, and we passed the time of day, but nothing certainly about the case, and I have, because the issue arose, I have searched my memory and have no recollection whatsoever of ever seeing Mr. Shaw sleeping, or was there ever any, that I can recall, ever any time that I formed an impression that he was being less than attentive to the case, so that's my recollection about the case.

Evidentiary Hearing Transcript, 4-5.  The Court further stated that: "There were times when Ms. Brewer [Ms. Herndon] was actively pursuing the questioning and so forth, and during those

84

times, I had my attention focused upon her, but I have searched my memory, and that's my best recollection, as I recall." Evidentiary Hearing Transcript, 5.

Based on the evidence presented during the evidentiary hearing on this matter, the Court finds that counsel Shaw was not sleeping during periods of the trial. As an initial matter, the Court relies upon its own observations in support of this conclusion. *United States v. Bradley*, 173 F.3d 225, 230 (3rd Cir. 1999) ("The court could take judicial notice of the conduct of a juror in open court."). In addition to this Court's recollection, the evidence presented at the evidentiary hearing was unpersuasive. Ms. Tetelli testified during cross-examination that she observed counsel Shaw sleeping during portions of the presentation of the mitigation evidence, but that she could not say for how long, or during which witnesses' testimony. Evidentiary Hearing, Vol. I, 29-32. Ms. Tetelli could not say whether counsel Shaw was sleeping for as little as five minutes, or more than fifteen minutes. *Id*. at 31. Ms. Tetelli further testified that she advised counsel Herndon of her concerns, but did not take any further action; counsel Herndon apparently acknowledged Ms. Tetelli's concerns, that counsel Shaw appeared to be inattentive during some portions of the penalty phase. *Id*. Ms Herndon also testified that during the guilt phase of the trial, while the series of bank tellers were testifying, that counsel Shaw was sitting with his head in his hands, and his eyes closed. *Id.* at 172.

Counsel Herndon further testified that there was testimony by one of the bank tellers that was different from testimony given during her deposition that could have formed the basis of impeachment, but that counsel Shaw did not appear to have noticed the discrepancy, as he did not impeach the bank teller on the issue. *Id.* at 144. This conclusion is inconsistent with the transcript. When Lisa Moore testified, counsel Shaw was very attentive in his cross-examination,

85

challenging Ms. Moore's inconsistent testimony.   The following testimony is taken from the

transcript on cross-examination by Counsel Shaw:

> Q.   Well, do you remember testifying before the United States Grand Jury?
>
> A.   Yes.
>
> Q.   And do you remember telling them he said, "Bitch, get down"?
>
> A.   Yes.
>
> Q.   Did you tell them that he fired any weapon?
>
> A.   They didn't – I don't recall.
>
> Q.   But you told them exactly what happened, and you said nothing about him firing any weapon; did you?
>
> A.   I didn't recall it.
>
> Q.   It wasn't until they accused you of being involved in this that you said that; isn't that right?
>
> A.   No.
>
> Q.   Let me ask you this: If you testified before the grand jury, and you told them about him saying, "Bitch, get down," why would you have left out that he also fired a gun?
>
> A.   When I talked to Mr. Landolt and them, I did tell them then.
>
> Q.   Oh, after you talked with the government's attorneys, you –
>
> A.   That was before the trial.
>
> Q.   But when you went before the United States Grand Jury, you didn't tell them that he fired a shot?
>
> A.   I didn't recall it.

(Vol. II p. 150 L.19-p. 151 L.19).  Cross-examination continued for nine pages of the transcript.

The evidence presented by counsel Herndon and Ms. Tetelli is lacking in details sufficient

to support a finding that counsel Shaw slept through substantial portions of the trial proceedings.

86

Assuming that there were brief times when counsel Shaw had his eyes closed, there is no persuasive testimony that he was sleeping. The testimony does not support the conclusion that he appeared inattentive during substantial portions of the trial. The Court concludes that had counsel Herndon and Ms. Tetelli observed counsel Shaw being inattentive, they would have been able to recall the specific times this occurred; to the contrary, counsel Herndon and Ms. Tetelli could not recall when this took place, nor for how long. Furthermore, had counsel Shaw been sleeping for substantial periods of time, or if at all, it is likely that the Court would have noticed such behavior.

In addition, the Court notes that if counsel Herndon observed counsel Shaw sleeping through the trail she had a duty to call it to the attention of the Court at the time. *United States v. Carter*, 433 F.2d 874, 876 ( 10th Cir. 1970) ("In any event counsel made no point to the court of the juror's condition or attitude during the trial. If he saw any misconduct it was his duty to call it to the attention of the court at that time."). The Eighth Circuit, in the context of a sleeping juror, has held that counsel has an obligation to immediately appraise the trial court of any misconduct, and that counsel "should not be allowed to inject a defect into the trial, and later claim its benefit." *United States v. Hester*, 489 F.2d 48, 50 (8th Cir. 1973) (internal quotation omitted).

The government argues that even if counsel Shaw were sleeping, Petitioner cannot satisfy the second prong of *Strickland*, that such action prejudiced the Petitioner. However, the Petitioner does not have to satisfy the second prong of the *Strickland* test, as long as he can present evidence that counsel Shaw slept through substantial portions of the trial, because if that were true, prejudice is presumed. *Cronic*, 466 U.S. at 659. However, Petitioner cannot make this showing. As the Court concluded, the evidence adduced at the hearing does not show, as alleged, that counsel Shaw was sleeping through substantial portions of the trial. Furthermore, the Court notes that Petitioner was, at all times throughout both the guilt and penalty phases of

87

the trial, represented by both counsel Shaw and counsel Herndon.  Petitioner was never without

the representation of competent counsel.  *Burdine*, 262 F.3d at 341.

The Court concludes that Petitioner is unable to show that counsel Shaw slept through

substantial portions of the trial, such that he was denied the presence of counsel.  The Court notes

its own observations, that it never saw counsel Shaw sleeping in support of this conclusion.

Furthermore, the testimony of counsel Herndon and Ms. Tetelli does not support a finding that

counsel Shaw was sleeping for substantial portions of the trial, nor that he was sleeping at all, but

at most that he had his eyes closed for very short periods of time.  The Court finds that the

protections guaranteed under the Sixth Amendment were in place, and Petitioner was never

denied the presence of counsel during his trial.  At all times he was represented by both counsel

Shaw and counsel Herndon.  Petitioner's claim of ineffective assistance of counsel on this basis is

denied.

### 8.  Failure to Object to Second Statutory Aggravator (12(C)(i))

This claim presents two related but distinct legal questions; first whether the facts of the

case properly supported instructing the jury on the pecuniary gain aggravating factor, and

secondly, whether the jury instruction properly conveyed the requirements of this factor to the

jury.  The Court will address each element of Petitioner's claim, under the *Strickland* framework.

The Petitioner must show that counsel was unreasonable by failing to object to the pecuniary gain

aggravating factor, and that the Petitioner was prejudiced.

18 U.S.C. § 3592 lists a number of statutory aggravating factors for homicide as well as

listing a number of crimes which, if death occurs during the commission of one of the enumerated

crimes, the defendant is eligible for the death penalty.  18 U.S.C. § 3592(c).  One statutory

aggravating factor, which was presented to the jury in Petitioner's trial, is the "pecuniary gain"

88

aggravating factor. 18 U.S.C. § 3592(c)(8). This provision states in full: "The defendant committed the offense as consideration for the receipt or in the expectation of the receipt, of anything of pecuniary value." 18 U.S.C. § 3592(c)(8).

Armed robbery, or armed criminal action, is not a crime listed in § 3592(c)(1) as automatically warranting the death penalty, and therefore the underlying crime itself is insufficient to support the imposition of the death penalty; the pecuniary gain inherent in a robbery is insufficient to satisfy this aggravator. The key question is whether the jury was instructed properly, that the pecuniary gain must have been expected to flow from the death of Heflin, and not simply from the underlying robbery. This distinction is significant, as "Congress clearly expressed, through § 3592(c)(1), a list of twenty felony offenses which automatically provide for the death penalty whenever a death occurs during their commission. Robbery is not listed among these felonies." *United States v. Chanthadara*, 230 F.3d 1237, 1263 (10th Cir. 2000) (citing 18 U.S.C. § 3592(c)(1)). If any death that occurred during the commission of a robbery created sufficient evidence to present the pecuniary gain aggravating factor to the jury, then robbery should be listed as one of the crimes in § 3592(c)(1); this is not the case. *See Chanthadara*, 230 F.3d at 1263 ("In instances of felony murder, if the jury were allowed to consider whether the underlying felony alone was committed in expectation of pecuniary gain, the pecuniary gain aggravator would be automatic where the underlying felony is robbery. This is because pecuniary gain is implicit in the offense of robbery."). The exclusion of robbery from the list of aggravating felonies, "suggests that the pecuniary gain aggravator applies when the murder itself was committed as consideration for, or in expectation of, anything of pecuniary value." *Chanthadara*, 230 F.3d at 1263.

89

Therefore, in order to determine whether counsel was unreasonable for failing to object to the inclusion of this aggravating factor, the Court must determine whether the facts of the case warrant such inclusion. Heflin was shot by either Allen or Petitioner, or both, upon entering the bank, due to Heflin reaching for his firearm. The District of Columbia addressed this subject in detail in *United States v. Cooper*, stating that "[t]he defendant's goal of pecuniary gain caused the murder and murder was in furtherance of his goal." 91 F.Supp.2d 90, 106 (D.D.C. 2000) (citing *LeGrand v. Stewart*, 133 F.3d 1253, 1260 (9th Cir. 1998)). In the present case the jury was properly instructed that they could sentence the Petitioner to death, if they believe that the death of Heflin was in furtherance of the Petitioner's goal of pecuniary gain. Heflin was shot as the Petitioner and Allen entered the bank, in order to further their goal. The instruction was clearly supported by the facts, and therefore, counsel's failure to object to this statutory aggravating factor was not unreasonable.

Having determined that the pecuniary gain statutory aggravator was appropriate, the Court next looks at whether the instruction was confusing, such that it warranted objection. The pecuniary gain aggravator stated: The defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value. The Court concludes that while the term "offense" could refer to either the robbery or the murder, the context of the term, as well as counsel's arguments at trial, made it clear that the receipt of something of pecuniary value must flow from the death, not the robbery. Furthermore, this is the language used in the FDPA, and was properly cited by the Court.

Under the second *Strickland* prong, the Court looks at whether counsel's allegedly unreasonable conduct prejudiced the Petitioner. The first argument, that the pecuniary gain aggravator was subject to objection as inapplicable, would not have been successful, because the

90

facts of the crime warranted such an instruction.  Heflin was shot while Allen and Petitioner were entering the bank, in order to prevent Heflin from prohibiting Petitioner and Allen from removing money from the bank.  Furthermore, even had the objection been successful, the Court cannot say that the outcome would have been different.  A court may look at whether an invalid aggravating factor had an effect on the jury by determining whether the same result would have been reached without that factor.  *Jones*, 537 U.S. at 402 (In the context of harmless error review by an appellate court, the Supreme Court held that "[a]n appellate court may choose to consider whether absent an invalid factor, the jury would have reached the same verdict or it may choose instead to consider whether the result would have been the same had the invalid aggravating factor been precisely defined.").  The jury found this statutory aggravator, as well as the statutory aggravator that Petitioner's actions posed a grave risk of harm to those other than the victim.  The jury also found all but one of the non-statutory aggravating factors.  In weighing the statutory aggravating factors against the mitigating factors, of which the jury only unanimously agreed on three non-statutory mitigating factors and neither of the statutory mitigating factors, the Court cannot conlcude that the jury would not have reached the same conclusion, even without the pecuniary gain aggravating factor.  Significantly, the jury did not find that the Petitioner did not fire the shots, nor did they find that the Petitioner did not intend for anybody to be harmed.

Finally, the Court looks at whether failure to object to the wording of the instruction prejudiced the Petitioner.  Having determined that the instruction was proper, the Court concludes that there was no prejudice resulting from any confusion over the wording.  As the instruction was properly given in this case, as supported by the case law and the facts, the Court finds that the jury would have found the existence of this factor if worded differently.  The facts supported a finding that Heflin was shot in order that Petitioner and Allen be able to successfully

91

obtain the funds from the bank without interference by Heflin.  The killing was directly related to the pecuniary gain.  Therefore Petitioner cannot prove either prong of the *Strickland* test.

### 9.  Failure to Object to Victim Impact Evidence (12(C)(j))

Petitioner's next argument is that counsel was ineffective for failing to object to the victim impact evidence, specifically that the Government acted improperly in arguing that the death penalty was warranted more in this case because Heflin was an asset to the community.  The Government responds that such evidence was appropriate, in accordance with what is permitted under Supreme Court case law, and further that regardless of the propriety of the evidence, there was no prejudice because the jury failed to unanimously find the existence of the victim impact aggravating factor.

The admission of victim impact evidence is specifically recognized by the Federal Death Penalty Act ("FDPA"), which states:

> The factors for which notice is provided under this subsection may include factors concerning the effect of the offense on the victim and the victim's family, may include oral testimony, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's family, and any other relevant information.

18 U.S.C. § 3593(a).  The Supreme Court in *Payne v. Tennessee* recognized the importance of allowing either the Court or the jury to consider a wide range of information in determining the appropriate punishment for a crime.  501 U.S. 808, 820-821 (1991) ("Whatever the prevailing sentencing philosophy, the sentencing authority has always been free to consider a wide range of relevant material.").  Specifically, the Court held that "[v]ictim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question . . .."  *Id.* at 825.  "The Eighth Amendment . . . permits capital sentencing juries to consider evidence relating to the victim's personal characteristics and the emotional impact of the

92

murder on the victim's family in deciding whether an eligible defendant should receive a death sentence." *Jones v. United States*, 527 U.S. 373, 395 (1999).

The evidence submitted by the Government in this case in support of the fourth non-statutory aggravating factor was admitted in accordance with the Supreme Court's holding in *Payne* and *Jones*, and is further supported by the Eighth Circuit's holding in *Allen*.  In *Allen*, the court found that "neither the amount nor the scope and nature of the victim-impact testimony was unduly prejudicial."  274 F.3d at 779.  While the Court recognizes that Petitioner and Allen were tried and sentenced separately, the victim impact evidence submitted in both cases was substantially the same.  The Court finds no error in the evidence that was admitted, and therefore cannot conclude that counsel was unreasonable in failing to object, as such objection would have been futile.

Under the second prong of *Strickland*, the Court finds that even if Petitioner's counsel was unreasonable in failing to object to the victim impact evidence, the conduct did not prejudice the Petitioner.  The jury unanimously found three of the four non-statutory aggravating factors, however, they did not unanimously find that Richard Heflin's personal characteristics as an individual human being and the impact of the death of Richard Heflin upon his family make this crime more worthy of the death penalty than other murders.  The FDPA prohibits the jury from considering any mitigating or aggravating factor that is not found unanimously by the jury.  18 U.S.C. § 3593(d) & (e).  Therefore, the admission of the disputed evidence had no effect on the outcome of the verdict, and did not prejudice Petitioner.

Petitioner has not alleged facts that meet either of the two requirements for relief under *Strickland*, and therefore Petitioner's motion on this basis is denied.

93

### 10.  Penalty Phase Closing Argument (12(C)(k))

Petitioner's final argument in support of his claim of ineffective assistance of counsel is that counsel Shaw was unreasonable in giving the penalty phase closing argument.  Counsel Herndon was largely responsible for developing the mitigation evidence during the sentencing phase of the trial, and therefore, Petitioner argues, that counsel Herndon should have given the closing argument, not counsel Shaw.  The government disputes that there was any error in counsel Shaw giving the closing argument.  Counsel Brewer did a masterful job of presenting the very thorough, credible, and persuasive evidence in the second phase of the trial.  The evidence was very extensive and emphasized the strong character of Petitioner.

According to the Petitioner, there was a fundamental difference of opinion between counsel Herndon and counsel Shaw regarding the most effective strategy to spare Petitioner's life.  Counsel Shaw sought to emphasize the weak evidence supporting the conclusion that Petitioner actually shot Heflin and to emphasize the remorse and lack of intent of Petitioner.  Ms. Herndon believed that it would be most effective to emphasize all of the struggles that Petitioner had experienced throughout his life, and to provide evidence that Petitioner would not be a danger to others while in custody.  She maintains that during the penalty phase closing argument, counsel Shaw focused on the idea of residual doubt, with only brief references to the mitigating evidence.[15]

On the second page of his recorded closing argument in the penalty phase of the trial, after warning the jurors that they, contrary to the Government's argument, were not required to sentence Petitioner to death, Mr. Shaw told the jurors, "[j]urors, my co-counsel for the last week

---

[15]The Court notes that Petitioner incorrectly states that counsel Shaw ignored the mitigation evidence, because, the record shows that counsel Shaw did reference the evidence presented by Ms. Herndon.

has painted for you, I think, an exemplary mosaic of the life of this defendant." (Vol.12 p.195 L.12-14).

> "[Y]ou heard what Ms. Brewer brought in here as to the birth and the rearing or the raising of this defendant. . . He was brought up in these projects, and you heard from these people. . . None of you were born wealthy, but we had hope, and we had a chance. . . We did not live in these crucibles of corruption that you have down here at Pruitt-Igoe, at Blumeyer, at any one of them. So the young man is brought up in a place where you can't even get in the elevator, they are either drenched with urine, or human feces, or they are traps where people get raped, killed, mugged and every other sort of thing. Gunshots going off all night long. . . And this boy was raised there until he was ten years old. And this is a time when you can see the expensive cars going by, the people with the jewelry. You notice that they are all getting by, nobody is bothering them. The police do not even answer calls to come to where they live."

(Vol.12 p.196 L.3-5, 11-12, 19-20, 24-p.197 L.7, 9-15).

Counsel Shaw continued to enforce his strategy in his argument that Petitioner was not the one who shot Heflin. "As a matter of fact, it was Mr. Landolt [Assistant United States Attorney], when picking the jurors, said that he did not shot the deceased, and that they did not have to prove that he shot the deceased." (Vol.12 p.198 L.24-p.199 L.2). He argued that the Government witnesses testified that Billie Allen did the shooting, the "Officer Torretta, who told us, jurors, that all of the shots came from the northeast, northeast to southwest. . . The Defendant was not up there." (Vol.12 p.200 L.14-16, 23). Counsel Shaw argued that Petitioner was remorseful, that Petitioner was always consistent in his belief that there would be no shooting. Counsel Shaw returned to emphasize the mitigating evidence that counsel Brewer had carefully fashioned. He argued,

> "[b]ut there is nothing, when you go through his background, that indicates that he is in any way violent.
>
> You've got to remember:
>
> None of us were brought up in one of these ghettos, I guess is the best word to call them, these brick monstrosities where crime is rampant, and all of the things that we

95

> consider values do not exist, where mothers, in order to keep their family together, have to do all sorts of things for money, to buy food. The better ones work two jobs, but while those two jobs are being worked, there is nobody with the children.
>
> And instead of having a grandfather or a father, who knows firearms for hunting purposes, who can teach them the proper use of it, they get their instruction from the drug dealers and the bums and the hoodlums who terrorize, and who are predators on all the people in these projects."

(Vol.12 p.205 L.22-p.206 L.15). "Remember what people Ms. Brewer brought in here. She brought in his entire family to show you that this is not a beast that is over there . . ." (Vol.12 p.211 L.2-4). "But through the efforts of Jennifer Brewer, you now know what kind of a family he came from. And you saw his father; up there saying yes, he, in the last several years, he has given him $200 to pay a lawyer." (Vol.12 p.214 L.18-22).

The record belies Petitioner's allegations that Mr. Shaw failed to argue mitigation evidence presented so well by Ms. Brewer. Just the opposite is true. The foundation of his argument was that Petitioner's life should be spared; that his early childhood in the slums was a mitigating factor; that Petitioner was remorseful; and that he did not shoot Mr. Heflin. Mr. Shaw embraced a sound trial strategy under practical impossible defense options and did not in any particular provide ineffective assistance of counsel

Determination of the most appropriate trial strategy is the responsibility of counsel. *Sloan v. Delo*, 54 F.3d 1371, 1384 (8th Cir. 1995) ("Although the closing apparently was not persuasive, a strategy need not be successful to be reasonable."). The Eleventh Circuit addressed a similar argument, that trial counsel was ineffective for failing to address the mitigating or aggravating evidence during closing argument, and concluded that such an argument was meritless. *Devier v. Zant*, 3 F.3d 1445, 1454 (11th Cir. 1993). "The fact that defense counsel chose to place primary emphasis on eliciting sympathy from the jury for his client, rather than

thoroughly dissecting the evidence presented in the penalty phase is a uniquely tactical decision that a reviewing court must treat with deference.  *Id.*

The Court cannot conclude that counsel's strategy was an unreasonable one.  Petitioner points to the lack of mitigating factors found by the jury as evidence of counsel Shaw's unreasonableness, however, the effectiveness of a strategy does not impact its reasonableness. The Court cannot say whether counsel Herndon's proposed closing argument would have been more or less effective, however, the Court can say that counsel Shaw's closing argument represented sound trial strategy.  Emphasizing the evidence in the actual shooting of Heflin was a sound strategy in sparing the Petitioner's life.  This was necessary to support the consistent theme of the defense throughout the trial that the evidence was weak that Petitioner fired his weapon at Heflin, that Petitioner intended no one would be injured, and that he was remorseful. Furthermore, the Court notes that counsel Shaw did reference the hardships that Petitioner faced while growing up, as well as the conditions in which he lived.  The Court concludes that counsel Shaw's trial strategy was a reasonable one.

Furthermore, the Court cannot conclude that had counsel Herndon given the closing argument, and focused less on residual doubt, and more on the mitigating factors developed through the evidence, the outcome would have been different.  All of the evidence regarding mitigation factors was prepared by counsel Herndon and presented to the jury for their consideration.  The Eighth Circuit, in *Griffin v. Delo*, held, in response to a claim of ineffective assistance based on counsel's brief closing argument, that "there is no reason to conclude that a longer or more passionate closing argument would have resulted in an alternative sentence or that the brief dispassionate argument undermined the reliability of the jury's sentence of death."  33 F.3d 895, 903 (8th Cir. 1994).  As the Petitioner has failed to present evidence of prejudice

97

resulting from counsel's allegedly unreasonable conduct, the Petitioner's claim cannot succeed. The Court denies Petitioner's claim for habeas relief on this basis.

## V.  CONCLUSION

The Court concludes that Petitioner has failed to provide the Court with a basis for granting the relief requested in his § 2255 motion.  The Court has not been presented with any evidence that shows Petitioner was denied a fundamental constitutional right, nor has the Court been presented with any evidence that supports a finding of actual innocence.  Petitioner's argument that his Fifth Amendment right to indictment by a grand jury was violated by the Government's failure to include in the indictment the same statutory aggravating factors required for the death penalty, was rejected by the Eighth Circuit in co-conspirator Allen's direct appeal. Finally, the Court has carefully reviewed each claim of ineffective assistance of Counsel, and finds that Petitioner was represented throughout this case by competent trial counsel that employed every opportunity to save Petitioner's life.  The fact that counsel's actions did not achieve the desired result does not form the basis of an ineffective assistance claim.

## VI.  CERTIFICATE OF APPEALABILITY

In order for the Petitioner to be permitted an appeal of this ruling, the Court must conclude that Petitioner has made a substantial showing on the issues presented to the Court. *Cox v. Norris*, 133 F.3d 565, 569 (8th Cir. 1997).  A substantial showing is a showing that "the issues are debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings." *Id*.  The Court finds that a number of the issues raised above, though not all, raise sufficient questions so that review by the Court of Appeals is warranted.  The Court will issue a certificate of appealability on the following claims:

- • Violation of the Fifth Amendment indictment clause;

98

- Ineffective assistance of counsel:

  - counsel advised Petitioner to testify, making Petitioner eligible for the death penalty (12(C)(b)),

  - counsel conceded in opening statement and closing argument Petitioner's role in the underlying robbery, making him eligible for the death penalty (12(C)(c)),

  - counsel failed to retain a ballistic expert (12(C)(d)),

  - counsel failed to investigate Petitioner's mental condition (12(C)(f)),

  - counsel's failure to object to second statutory aggravator (12(C)(i)).

Those claims listed above are appealable to the Eighth Circuit.  The Court does not issue a certificate of appealability on the following claims:

- Jury's Consideration of the Pecuniary Gain Aggravating Factor, other than as a claim for ineffective assistance of counsel,

- Ineffective assistance of counsel:

  - counsel's failure to challenge the indictment (12(C)(a))-this was not procedurally defaulted, and is appealable, but not as a claim for ineffective assistance of counsel,

  - counsel's failure to interview the unidentified mitigation witness (12(C)(e)),

  - counsel's decision to present the movies *Set it Off* and *Heat* (12(C)(g)),

  - counsel Shaw's alleged sleeping during portions of trial (12(C)(h)),

  - counsel's failure to object to victim impact evidence (12(C)(j)), and

  - counsel Shaw's decision to give the penalty phase closing argument (12(C)(k)).

Accordingly,

**IT IS HEREBY ORDERED** that Petitioner's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Conviction and Sentencing [doc. #12] is **DENIED**.

**IT IS FURTHER ORDERED** that a Certificate of Appealability is **GRANTED in part** and **DENIED in part**, in accordance with the terms of this order.

Dated this 22nd Day of July, 2008.

_____
E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE