IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

No. 10-1304

NORRIS G. HOLDER,

Appellant,

v.

UNITED STATES OF AMERICA,

Appellee.

Appeal from the United States District Court
for the Eastern District of Missouri, Eastern Division,
The Honorable E. Richard Webber, District Judge

SUBSTITUTE BRIEF OF APPELLANT

Michael J. Gorla
720 Olive Street, Suite 1630
St. Louis, Missouri 63101
(314) 621-1617
(314) 621-7448 - Facsimile
E-mail: mjgorla@msn.com

Joseph W. Luby
Death Penalty Litigation Clinic
6155 Oak Street, Suite C
Kansas City, Missouri 64113
(816) 363-2765
(816) 363-2799 - Facsimile
E-mail: jluby@dplclinic.com

*Counsel for Appellant*

**SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT**

Based on his role in a fatal bank robbery in St. Louis, appellant Norris G. Holder was sentenced to death on convictions of armed robbery by force or violence in which a killing occurred, as well as carrying a firearm during a crime of violence which resulted in murder. After his convictions and sentences were affirmed on direct appeal, Mr. Holder filed a motion under 28 U.S.C. § 2255 to vacate, set aside, and correct his convictions and sentences. United States District Judge E. Richard Webber denied relief and issued a certificate of appealability on six issues. Oral argument of thirty (30) minutes per side should be permitted, in light of the number and complexity of the issues involved.

**TABLE OF CONTENTS**

**Page**

SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT. . . . . i

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

JURISDICTIONAL STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.    Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    B.    Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        1.    The bank robbery. . . . . . . . . . . . . . . . . . . . . . . . . . . 8
        2.    Pretrial developments. . . . . . . . . . . . . . . . . . . . . . . . 10
        3.    The guilt phase. . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
        4.    The penalty phase. . . . . . . . . . . . . . . . . . . . . . . . . . 13

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    Guilt Phase Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    Penalty Phase Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

PART I:  GUILT PHASE CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

I.       Based on his ignorance of the law, counsel failed to assure adversarial
         testing of the government's case by conceding that Mr. Holder
         participated in an armed robbery resulting in a killing, and prejudicially
         advising his client to testify in support of counsel's non-defense to the
         charges.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

         A.     The uncontradicted testimony at the post-conviction hearing
                proved that lead counsel was ignorant of the law. . . . . . . . . . . . . . 24

         B.     Attorney Shaw's conduct at trial further demonstrates his
                misunderstanding of the criminal charges. . . . . . . . . . . . . . . . . . . 28

         C.     The relevant statutes and instructions conflicted with counsel's
                understanding of the law.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

         D.     Trial counsel Shaw's trial strategy of advising Mr. Holder to
                testify was based on a misunderstanding of the law, and reflects
                deficient performance.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

                1.     Counsel's error led him to concede the prosecution's case,
                       leaving the trial without meaningful adversarial testing. . . . 35

                2.     Mr. Holder was prejudiced by counsel's deficient
                       understanding of the governing law.. . . . . . . . . . . . . . . . . . 36

         E.     The district court's ruling is based on supposition and is
                unsupported by the facts in the record below.. . . . . . . . . . . . . . . . 37

II. The district court misread the record and the governing law in rejecting Mr. Holder's claim that counsel ineffectively failed to consult an independent ballistics expert before choosing a doomed theory that his client fired no shots. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

    A.    Factual background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

        1.    The government's ballistics evidence. . . . . . . . . . . . . . . . 41
        2.    Counsel formulates his theory of defense and rejects advice to seek more evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . 42
        3.    Counsel's theory at trial, and the prosecution's response. . . . 42

    B.    The district court's rulings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

    C.    Contrary to the district court's ruling, Mr. Holder preserved his claim well before his motion to alter or amend the judgment. . . . . . 44

        1.    Section 2255 counsel asserted Mr. Holder's current argument during the evidentiary hearing on appellant's related claim that trial counsel erred in advising his client to testify. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

        2.    Mr. Holder permissibly asserts on appeal the same fundamental point he pleaded in his section 2255 motion, which is that counsel chose his strategy without fully investigating the ballistics evidence. . . . . . . . . . . . . . . . . . . . 46

    D.    Trial counsel, who acknowledged the need to retain an independent expert, performed ineffectively by failing to do so before committing to a defense theory that was flatly contradicted by the government's physical and expert evidence. . . . . . . . . . . . . . 46

    E.    In finding no *Strickland* prejudice, the court ignored the credibility-destroying effect of trial counsel's ill-informed strategy, and thus, the reasonable probability that the sentencing jury would have otherwise found that the fatal shots were fired by Billie Allen rather than Norris Holder. . . . . . . . . . . . . . . . . . . . . 48

PART II: PENALTY PHASE CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

III.  Resolving the disputable facts on its own, the district court wrongly
      refused a hearing on appellant's claim that counsel failed to develop
      evidence of Mr. Holder's impaired judgment.. . . . . . . . . . . . . . . . . . . . . . . 51

      A.    Factual and procedural history. . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

      B.    Section 2255 precludes a district court from resolving disputable
            factual questions without an evidentiary hearing.. . . . . . . . . . . . . 53

      C.    In the course of denying a hearing and rejecting Mr. Holder's
            claim, the district court drew numerous factual inferences that
            were not supported or compelled by the record, and whose proper
            resolution requires a hearing.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

            1.    The district court imputed to trial counsel the "reasonable"
                  strategy of relying on two pretrial neuropsychological
                  reports, even though counsel never articulated such a
                  strategy or any other strategy, even though counsel sought
                  and received authorization for a third evaluation, and even
                  though counsel has not been heard on what shortcomings
                  she perceived in the two earlier reports. . . . . . . . . . . . . . . . 54

            2.    The record contradicts the district court's inference that
                  Drs. Rothke and Wetzel performed adequate and complete
                  neuropsychological evaluations as a matter of law, so that
                  counsel's imputed reliance on them was professionally
                  reasonable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
                  a.    Enlarging the scope of information considered by
                        the experts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
                  b.    The specific details of Mr. Holder's traumatic
                        experiences. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
                        (i)    The railroad accident. . . . . . . . . . . . . . . . . . . . 61
                        (ii)   The seizures during infancy.. . . . . . . . . . . . . 62
                        (iii)  The drug addiction of Mr. Holder's parents. . . 62
                        (iv)   The violent and crime-ridden neighborhood
                               of Mr. Holder's youth. . . . . . . . . . . . . . . . . . . 63
                  c.    Experts' reliance on Mr. Holder's self-assessments. . 64

3. The purportedly "adequate" *neuropsychological* assessments from Drs. Rothke and Wetzel do not cure trial counsel's failure to consult a *trauma* expert under the known circumstances. . . . . . . .  66

4. Mr. Holder makes a sufficient showing of *Strickland* prejudice to justify further proceedings on his claim. . . . . . . . . . . . . . . . . . . . . . .  71

IV. Trial counsel performed ineffectively by failing to object to the court's submission of the pecuniary gain aggravator where the submitted instruction failed to specify that the money-generating "offense" referred to the murder and not the underlying robbery. . . . . . . . . . . . . . . . . . . . . .  78

A. Counsel performed deficiently by not knowing the law that would alert any reasonable attorney to object to the instruction's error . .  79

B. Counsel's deficient oversight prejudiced the defense. . . . . . . . . . .  83

V. The indictment is structurally defective because it fails to allege at least one statutory aggravating factor from 18 U.S.C. § 3592(c)  . . . . . . .  86

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  89

**TABLE OF AUTHORITIES**

**Cases**                                                                       **Page**

*Amrine v. Bowersox*, 238 F.3d 1023 (8th Cir. 2001). . . . . . . . . . . . . . . . . . . . 77

*Blackburn v. Foltz*, 828 F.2d 1177 (6th Cir. 1987).. . . . . . . . . . . . . . . . . . . . . 34

*Bundy v. Dugger*, 816 F.2d 564 (11th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . 64

*Caro v. Calderon*, 165 F.3d 1223 (9th Cir. 1999). . . . . . . . . . . . . . . . 58, 61, 67

*Caro v. Woodford*, 280 F.3d 1247 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . 73

*Colby v. United States*, 377 F.3 903 (8th Cir. 2004).. . . . . . . . . . . . . . . . . . . 21

*Douglas v. Woodford*, 316 F.3d 1079 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . 64

*Draughton v. Dretke*, 427 F.3d 286 (5th Cir. 2005). . . . . . . . . . . . . . . . . . . 3, 47

*Eldridge v. Atkins*, 665 F.2d 228 (8th Cir.1981).. . . . . . . . . . . . . . . . . . . . . . 47

*Florida v. Nixon*, 543 U.S. 175 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 38

*Frierson v. Woodford*, 463 F.3d 982 (9th Cir. 2006). . . . . . . . . . . . . . . . . 67, 68

*Gardner v. State*, 96 S.W.3d 120 (Mo. App. 2003). . . . . . . . . . . . . . . . . . . . 23

*Gideon v. Wainwright*, 372 U.S. 335 (1963). . . . . . . . . . . . . . . . . . . . . . . . . 33

*Ex parte Gonzales*, 204 S.W.3d 391 (Tex. Crim. App. 2006). . . . . . . . . . . 68, 69

*Goodwin v. Balkom*, 684 F.2d 794 (11th Cir. 1982).. . . . . . . . . . . . . . . . . . . 35

*Grady v. United States*, 269 F.3d 913 (8th Cir. 2001). . . . . . . . . . . . . . . . . . 54

*Hardwick v. Crosby*, 320 F.3d 1127 (11th Cir. 2003). . . . . . . . . . . . . . . . . . 23

*Harris v. Reed*, 894 F.2d 871 (7th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . .  38

*Henderson v. Sargent*, 926 F.2d 706 (8th Cir. 1991). . . . . . . . . . . . . . . . . . .  47

*Johnson v. Arkansas State Police*, 10 F.3d 547 (8th Cir. 1993). . . . . . . . . . . . .  40

*Jones v. United States*, 526 U.S. 227 (1999).. . . . . . . . . . . . . . . . . . . . . . .  6, 86

*Kenley v. Armontrout*, 937 F.2d 1298 (8th Cir. 1991). . . . . . . . . . . . . .  47, 48, 57

*Kimmelman v. Morris*, 477 U.S. 365 (1986).. . . . . . . . . . . . . . . . . . . . .  34, 40

*Kubat v. Thieret*, 867 F.2d 351 (7th Cir. 1989). . . . . . . . . . . . . . . . . . . .  34, 35

*Lawhorn v. Allen*, 519  F.3d 1272 (11th Cir. 2008). . . . . . . . . . . . . . . . . . . .  23

*Marshall v. Hendricks*, 307 F.3d 36 (3rd Cir. 2003). . . . . . . . . . . . . . . . . . .  56

*Neder v. United States*, 527 U.S. 1 (1999). . . . . . . . . . . . . . . . . . . . . . . . .  88

*Nelson v. United States*, 297 Fed. Appx. 563 (8th Cir. 2008). . . . . . . . 4, 18, 19, 54

*Noe v. United States*, 601 F.3d 784 (8th Cir. 2010). . . . . . . . . . . . . . . . . . . .  21

*Porter v. McCollum*, 130 S. Ct. 447 (2009). . . . . . . . . . . . . . . . . . . . . . . . .  69

*Prowell v. State*, 741 N.E.2d 704 (Ind. 2001).. . . . . . . . . . . . . . . . . . . . . . .  67

*Reagan v. Norris*, 365 F.3d 616 (8th Cir. 2004).. . . . . . . . . . . . . . . . . . . .  34, 79

*Ring v. Arizona*, 536 U.S. 584 (2002).. . . . . . . . . . . . . . . . . . . . . . . . . .  6, 86

*Saunders v. United States*, 236 F.3d 950 (8th Cir. 2001).. . . . . . . . . . . . . . . . .  53

*Sheppard v. Bagley*, 604 F. Supp. 2d 1003 (S.D. Ohio 2009). . . . . . . . . . . . . .  73

*Simmons v. Luebbers*, 299 F.3d 929 (8th Cir. 2002). . . . . . . . . . . . . . . . . . . .  85

*Sinisterra v. United States*, 600 F.3d 900
    (8th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . 4, 20, 54, 55, 56, 71, 72, 75

*Smith v. Singletary*, 170 F.3d 1051 (11th Cir. 1999). . . . . . . . . . . . . . . . . . 23

*Spinden v. GS Roofing Prods.*, 94 F.3d 421 (1996). . . . . . . . . . . . . . . . . . . 39

*Starr v. Lockhart*, 23 F.3d 1280 (8th Cir. 1993). . . . . . . . . . . . . . . . . . 81, 83

*State v. Carter*, 559 So.2d 539 (La. Ct. App. 1990). . . . . . . . . . . . . . . . . 23

*State v. Ferguson*, 887 S.W.2d 585 (Mo. 1994). . . . . . . . . . . . . . . . . . . . 30

*State v. Harrington*, 708 A.2d 731 (N.J. 1998). . . . . . . . . . . . . . . . . . . 2, 35

*State v. Johnson*, 968 S.W.2d 686 (Mo. 1998). . . . . . . . . . . . . . . . . . . . 67

*State v. O'Brien*, 857 S.W.2d 212 (Mo. 1993). . . . . . . . . . . . . . . . . . . . 30

*Stirone v. United States*, 361 U.S. 212, 218-19 (1960). . . . . . . . . . . . . . . 6, 87

*Strickland v. Washington*, 466 U.S. 668 (1984). . . . . . . . . . . . . . . . . *passim*

*Stringer v. Black*, 503 U.S. 222 (1992). . . . . . . . . . . . . . . . . . . . . . . 83

*United States v. Allen*, 247 F.3d 741 (8th Cir. 2001). . . . . . 7, 8, 17, 41, 50, 76, 82

*United States v. Allen*, 357 F.3d 745 (8th Cir. 2004). . . . . . . . . . . . . . . . 82

*United States v. Allen*, 406 F.3d 940 (8th Cir 2005) (en banc). . . 20, 82, 86, 87, 88

*United States v. Bain*, 586 F.3d 634 (8th Cir. 2009). . . . . . . . . . . . . . . . 83

*United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002). . . . . . . . . . . . 5, 78, 83

*United States v. Bolden*, 545 F.3d 609 (8th Cir. 2008). . . . . . . . . 5, 78, 79, 80, 83

*United States v. Chanthadara*, 230 F.3d 1237 (10th Cir. 2001). . 5, 78, 79, 80, 83

*United States v. Cronic*, 466 U.S. 648 (1984).. . . . . . . . . . . . . . . .  2, 16, 33, 35, 36

*United States v. Cuff*, 38 F. Supp. 2d 282 (S.D.N.Y. 1999). . . . . . . . . . . . . . .  78

*United States v. Davis*, 407 F.3d 505 (8th Cir. 2004).. . . . . . . . . . . . . . . . . . . . 21

*United States v. Davis*, 904 F. Supp. 554 (E.D. La. 1995). . . . . . . . . . . . . . .  81

*United States v. Dubray*, 727 F.2d 771 (8th Cir.1984).. . . . . . . . . . . . . . . . .  54

*United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006). . . . . . . . . . . . . . . . . .  88

*United States v. Harth*, 61 F.2d 541 (8th Cir. 1932).. . . . . . . . . . . . . . . .  49

*United States v. Lalley*, 257 F.3d 751 (8th Cir. 2001). . . . . . . . . . . . . . . . . . .  83

*United States v. Reese*, 92 U.S. 214 (1975). . . . . . . . . . . . . . . . . . . . . . . . .  6, 86

*United States v. Resendiz-Ponce*, 549 U.S. 102 (2007). . . . . . . . . . . . . . . . . 87, 88

*United States v. Sanders*, 424 F.3d 768 (8th Cir. 2005). . . . . . . . . . . . . . . . . . .  39

*United States v. Swanson*, 943 F.2d 1070 (9th Cir. 1991). . . . . . . . . . . . . . .  2, 35

*Wiggins v. Smith*,
     539 U.S. 510 (2003). . . .  3, 4, 16, 18, 38, 39, 48, 49, 56, 58, 67, 70, 71, 77

*Williams v. Norris*, 576 F.3d 850 (8th Cir. 2009).. . . . . . . . . . . . . . . . . . . . . .  46

*Williams v. Taylor*, 529 U.S. 362 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

*Wolfe v. State*, 96 S.W.3d 90 (Mo. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . .  47

*Wong v. Belmontes*, 130 S. Ct. 383 (2009). . . . . . . . . . . . . . . . . . . . . . . . . .  48, 49

**Statutes**

18 U.S.C. § 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7, 30

18 U.S.C. § 924(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 7, 30

18 U.S.C. § 924(j)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 7, 30

18 U.S.C. § 2113(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 7, 30

18 U.S.C. § 2113(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 7, 30

18 U.S.C. § 3592(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 80, 81, 86

18 U.S.C. § 3592(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

18 U.S.C. § 3592(c)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

18 U.S.C. § 3592(c)(7). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

18 U.S.C. § 3592(c)(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78, 80

18 U.S.C. § 3592(c)(9). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 80

18 U.S.C. § 3592(c)(13). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

18 U.S.C. § 3592(c)(14). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 2253(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 2255. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

28 U.S.C. § 2255(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

## Other Authorities

U.S. CONST. amend. V. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

Fed. R. Civ. Pro. 59(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 8, 44

**JURISDICTIONAL STATEMENT**

Norris G. Holder, a federal prisoner under sentence of death, filed a motion under 28 U.S.C. § 2255 to vacate, set aside or correct his convictions for bank robbery by force or violence in which a killing occurred in violation of 18 U.S.C. § 2113(a) & (e), and carrying a firearm during a crime of violence that resulted in murder in violation 18 U.S.C. § 924(c)(1) & (j)(1), and resulting sentences of death. On July 30, 2008, District Judge E. Richard Webber denied Mr. Holder's motion. Add. 1-100; App. 391-490. Judge Webber issued a certificate of appealability on six of Mr. Holder's claims. Add. 102-03; App. 491-92. Thereafter, on August 13, 2008, Mr. Holder filed a timely motion to alter or amend judgment pursuant to Fed. R. Civ. Pro. 59(e). App. 494. Judge Webber denied the Rule 59(e) motion on December 14, 2009. Add. 104-42; App. 665-701. Appellant timely filed a notice of appeal on February 8, 2010. App. 702-03. This Court has jurisdiction under 28 U.S.C. §§ 1291 and 2253(c).

## STATEMENT OF THE ISSUES

### I.

**Mr. Holder was charged in a two count indictment with the capital offenses of bank robbery by force or violence in which a killing occurred, and using or carrying a firearm during a crime of violence which resulted in a murder.  Counsel mistakenly believed that Count I did not charge a capital offense and that Count II required a showing of premeditated murder.  Was counsel ineffective when, based on his mistaken beliefs, he failed to assure adversarial testing of the government's case by conceding that Mr. Holder participated in and planned the bank robbery, and prejudicially advised his client to testify in support of counsel's non-defense to the charges?**

*State v. Harrington*, 708 A.2d 731 (N.J. 1998);

*United States v. Swanson*, 943 F.2d 1070 (9th Cir. 1991);

*Strickland v. Washington*, 466 U.S. 668 (1984);

*United States v. Cronic*, 466 U.S. 648 (1984).

## II.

**Contrary to the government's unrefuted ballistics testimony and the physical evidence, trial counsel pursued the implausible theory that Mr. Holder never fired his weapon inside the bank. Counsel was urged, and agreed, to seek an independent ballistics expert, but he never did so. Was counsel ineffective for committing to his strategy without consulting an independent expert, and was the defense prejudiced by this credibility-destroying strategy that was flatly contradicted by the evidence?**

*Draughton v. Dretke*, 427 F.3d 286 (5th Cir. 2005);

*Wiggins v. Smith*, 539 U.S. 510 (2003);

*Strickland v. Washington*, 466 U.S. 668 (1984).

**III.**

**Following negative findings by a defense neuropsychologist as well as a neuropsychologist retained by the government, counsel obtained court authorization for a third evaluation of her client, but then failed to obtain the evaluation before trial. In denying Mr. Holder's ineffectiveness claim without a hearing, did the district court draw factual inferences that were not compelled by the record, including counsel's imputed "reliance" on the first two evaluations, the completeness of those evaluations, and the district court's conclusion that no mental health diagnosis could lessen the jury's assessment of Mr. Holder's moral culpability in light of his extensive planning of the bank robbery?**

*Sinisterra v. United States*, 600 F.3d 900 (8th Cir. 2010);

*Nelson v. United States*, 297 Fed. Appx. 563 (8th Cir. 2008);

*Wiggins v. Smith*, 539 U.S. 510 (2003);

*Strickland v. Washington*, 466 U.S. 668 (1984).

**IV.**

**In returning a sentence of death, Mr. Holder's jury considered, found, and weighed the pecuniary gain statutory aggravator - that Mr. Holder committed the offense in expectation of anything of pecuniary value. The application of the pecuniary gain aggravator is limited to situations where pecuniary gain is expected as a result of the victim's death and follows directly from the actual killing. Was counsel ineffective in failing to object to the submission of the pecuniary gain aggravating circumstance instruction, where the instruction did not specify that "the offense" committed in expectation of pecuniary gain was the murder rather than the bank robbery?**

*United States v. Bolden*, 545 F.3d 609 (8th Cir. 2008);

*United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002);

*United States v. Chanthadara*, 230 F.3d 1237 (10th Cir. 2000);

*Strickland v. Washington*, 466 U.S. 668 (1984).

5

**V.**

**Norris Holder and Billie Allen were charged by a defective indictment that failed to allege any statutory aggravating factors. Is the defect a structural error which entitles Mr. Holder to relief from his sentence of death?**

*Ring v. Arizona*, 536 U.S. 589 (2003);

*Jones v. United States*, 526 U.S. 227 (1999);

*United States v. Reese*, 92 U.S. 214 (1975);

*Stirone v. United States*, 361 U.S. 212 (1960).

**STATEMENT OF THE CASE**

**A.     Procedural History**

Appellant Norris G. Holder and Billie Allen were charged in the United States District Court for the Eastern District of Missouri, with the offenses of bank robbery by force or violence in which a killing occurred in violation of 18 U.S.C. §§ 2, 2113(a) & (e), and carrying or using a firearm during a crime of violence which resulted in a murder in violation of 18 U.S.C. §§ 2, 924(c)(1) & (j)(1).

The cases were severed for trial with Mr. Holder's trial commencing on March 10, 1998.  The jury found Mr. Holder guilty on both counts, and recommended that he be sentenced to death.  On July 23, 1998, Judge E. Richard Webber formally sentenced Mr. Holder to death in accordance with the jury verdicts.  Mr. Holder's convictions and sentences were affirmed on appeal.  *United States v. Allen*, 247 F.3d 741 (8th Cir. 2001), *cert. denied*, 539 U.S. 916 (2003).  Counsel were appointed, and on June 8, 2004, filed a motion under 28 U.S.C. § 2255 to vacate, set aside, or correct Mr. Holder's convictions and sentences.  App. 16.  The district court granted an evidentiary hearing as to six issues raised in the motion, and said hearing was held on July 18, 19 and 20, 2005.  App. 266-70.  Following briefing by the parties, Judge Webber issued a Memorandum and Order denying Holder post-conviction relief, a judgment, and a certificate of appealability on six issues. Add. 1-142; App. 391-490, 491-93.  A timely motion

7

under Fed. R. Civ. P. 59(e) to alter or amend the judgment was overruled by the court, App. 665-701, and this appeal follows.

### B. Statement of Facts

### 1. The bank robbery

On March 17, 1997, two men wearing ski masks and armed with semi-automatic rifles burst into the Lindell Bank & Trust Company in St. Louis, Missouri. The first man to enter the bank - later determined to be Billie Allen - immediately began firing shots at Richard Heflin, the bank security guard, eventually killing him. The second man - Norris Holder - jumped over the bank counter and retrieved money from the tellers' drawers. After a short time, the robbers left the bank, entered a van parked outside the doors, and fled the scene. *See United States v. Allen*, 247 F.3d 741, 756 (8th Cir. 2001).

William Green, a bank customer, was in one of the drive-thru lanes at the times the robbers exited the bank. He dialed 911 and followed the van into Forest Park where it eventually burst into flames. *Id*. Allen jumped out of the burning van, ran into the woods, and fled the scene. Mr. Holder exited the van on fire and was subsequently arrested by the arriving police officers. *Id*.

The prosecution's evidence showed extensive, if misguided, preparations for the offense by Mr. Holder. The van that burned was the first of three getaway vehicles that the pair planned to use that day; the plan, of course, was to burn the

gasoline-soaked vehicle after abandoning it rather than while driving it away from the bank. Tr. I 266-69, 280, 287-95; III 277; IV 160-64; V 17-18. Further evidence showed that Mr. Holder purchased his own SKS rifle, and also provided one for Mr. Allen. Tr. I 131-35, 191-92; V 19-20. The two brought with them some 200 rounds of lethal "hollow point" ammunition, and Mr. Holder bought and wore a bullet-proof vest after asking what types of bullets the vest would stop. Tr. II 14-17; IV 13-16; V 111-12; VII 56-61.

More broadly, though, the evidence was that Mr. Holder hatched the plan for the robbery based on two movies featuring similarly violent "takeover"-style bank robberies: *Heat* and *Set It Off*. Tr. I 30 (opening statement), 151-53, 181-84, 209-10; IV 201-04; V 2-9, 47, 56-58; VI 82-83; VII 41-43 (closing). The government called an FBI agent to describe the similarities between the robbery at issue and those in the two movies. Tr. IV 195-99. *Heat* and *Set It Off* indeed portrayed similar crimes: one robber jumps over the counter with a money bag while the other holds the customers at bay; both wear masks and wield high-powered rifles; they use multiple stolen getaway cars (including the use of the robber's personal vehicle as the third and last getaway car); they douse the getaway vehicles with gasoline and burn them; and they use walkie-talkies to communicate with each other. Tr. IV 201-04. Defense counsel objected that the movies themselves were the "best evidence" of their content, and therefore, both

9

movies were shown to appellant's jury in their entirety. Tr. IV 195-99, 207; V 2-9.

Mr. Holder was interviewed by the police after his arrest. He asked if Heflin had died. Upon being informed that he had, he stated that no one was supposed to get hurt. Tr. IV 131-34. Mr. Holder eventually confessed that he and Allen planned and committed the bank robbery to FBI Special Agent Jan Hartman. Tr. IV, 101; V, 13. Mr. Holder stated Allen first went into the bank and Mr. Holder followed. When Mr. Holder entered the first of doors and stepped into the vestibule, he was confused because he heard shooting, despite his agreement with Allen that there was to be no shooting. Mr. Holder repeatedly told Hartman that he was totally shocked by the shooting and that he never intended to hurt anyone. Tr. IV, 104, 116; V, 13-24, 27-39, 46-51; VI, 71-76. At trial, Mr. Holder testified that Allen had previously talked about shooting in the bank, but that Mr. Holder vigorously objected, telling Allen that the bank employees were his friends and no one was to be harmed. According to Mr. Holder, the two agreed that there would be no shooting. Mr. Holder explained that he only intended to intimidate the employees by showing the weapons so that no one would be shot. Tr. VI, 70, 83-84, 113-14, 120, 127-29, 135-36, 144, 171.

### 2. Pretrial developments

Charles Shaw entered his appearance on Mr. Holder's behalf in the district

court on March 25, 1997. Sometime thereafter, Mr. Richard Burr of the Federal Death Penalty Resource Counsel, an organization which assists attorneys nationwide in the defense of federal capital cases, contacted counsel Shaw and offered his assistance. At Burr's recommendation, counsel Shaw retained Caryn Tatelli, a mitigation specialist, in December of 1997 to perform the mitigation investigation. Shortly thereafter, Tatelli met with counsel Shaw to discuss the penalty phase investigation. She determined that counsel Shaw was resistant to developing a mitigation case and ill-prepared to handle the case. Tatelli contacted Burr, and asked him to intervene with Shaw, convince him to accept her help, and obtain another attorney in order to develop and manage mitigation. Burr subsequently was able to contact Shaw and convince him to seek the appointment of a second lawyer to handle the penalty phase portion of the trial. Hrg. Tr. II 150-52, 157-61, 178, 212.

In February of 1998, approximately thirty days before trial, Jennifer Herndon, f/k/a Brewer, was appointed pursuant to the Criminal Justice Act. Shortly thereafter, she met with Shaw to discuss trial strategy. Herndon learned that Shaw was under the mistaken belief that the law required the government to prove that Mr. Holder specifically deliberated on the killing of the guard in order to be convicted of a capital offense. Hrg. Tr. I 112. Shaw believed that Mr. Holder was charged with two offenses, bank robbery in Count I and murder in

Count II. His trial strategy was centered around his belief that Count I was not a capital offense, and that Mr. Holder could admit participating in the armed bank robbery as charged in Count I without making himself eligible for the death penalty on either count. Hrg. Tr. I 112; II 166-67; Holder Depo. 49, 52-53, 55.

Burr and Herndon met with Shaw prior to trial in an attempt to convince him that his trial strategy was flawed, and that what he perceived as a defense, was really no defense at all; however, Burr and Herndon were unable to convince Shaw that his interpretation was incorrect. Hrg. Tr. I 113-14; II 167.

### 3. The guilt phase

Trial commenced March 10, 1998 in the United States District Court for the Eastern District of Missouri. In his opening statement, Shaw conceded that Mr. Holder participated in the bank robbery, but argued that he was not guilty of murder because the plan was that no shots were to be fired inside the bank, and that the co-defendant, Billie Allen, purposely shot Heflin on his own. Tr. I 64-69.

Shaw cross-examined the government witnesses during the guilt phase in an attempt to convince the jury that Mr. Holder did not fire his weapon during the robbery, and that said fact rendered him not guilty of murder. On Shaw's advice, Mr. Holder testified to his planning and participation in the bank robbery. Tr. VI 69-70, 78-93. He also denied firing his weapon inside the bank. Tr. VI 85-86, 101-02, 171-73.

In closing argument, Shaw stressed his theory that, while Mr. Holder was guilty of an armed bank robbery, he was not guilty of murder because he had no intention or knowledge that Billie Allen was going to shoot and kill Heflin. Tr. VI 77, 80, 86-87. The jury convicted Mr. Holder on both charges.

**4.      The penalty phase**

Jennifer Herndon got into the case in February of 1998, approximately five weeks before trial. She and Caryn Tatelli worked around the clock to develop the mitigation case. During the course of developing the mitigation strategy, there never was a meeting with Charles Shaw in which a consistent guilt/penalty phase strategy was discussed. Hrg. Tr. I 17.

Counsel Herndon handled all the penalty phase witnesses. The mitigation strategy, as developed by her and Ms. Tatelli, was to give the jury a reason for the robbery. The mitigation theory revolved around the fact that Mr. Holder was, in effect, the man of the house. His father had left and his mother was on drugs. He had to provide for his family. But, when he lost his leg in a train accident, it impacted his ability to do so. His solution was to rob a bank in order to obtain the money to purchase a more suitable prosthesis for his leg. *Id*. at 116-17.

In the penalty phase, the government presented impact testimony from friends and relatives of Mr. Heflin. Tr. IX 40-230. The prosecution also relied on the statutory aggravating circumstances that Mr. Holder knowingly created a grave

risk to multiple people and committed the offense for the purpose of pecuniary gain, as well as non-statutory aggravators that the crime involved unusually extensive criminality, that Mr. Holder had committed other crimes in the past, and that he is likely to commit further violent offenses in the future. Tr. XII 243-44.

The defense, for its part, presented a number of friends and relatives of Mr. Holder as mitigation witnesses. Tr. X 2-7. The witnesses described Mr. Holder's difficult upbringing, including the fact that his parents were largely absent, and that he acted in their place in caring for his siblings. Tr. X 11-138, 203-75; XI 31-122; XII 46-71, 107-26. The defense also presented evidence about Mr. Holder's leg amputation and its effect upon him, Tr. X 46-52, 112-13, 136, 220-22; XI 34, 114; XII 31-33, as well as evidence of his favorable conduct while awaiting trial in jail and the low likelihood that he would be a violent prisoner in the future. Tr. X 139-202, XII 2-28 Nevertheless, counsel's primary theory, carried over from the guilt phase, was that Mr. Holder did not fire the fatal shots, did not fire his weapon at all, and did not intend for anyone to be harmed – propositions already rejected by the jury's guilt phase findings that Mr. Holder was aware of a "serious risk of death attending his conduct." Tr. XII 198-204, 208-11, 245.

After deliberating approximately five and one-half hours, the jury returned verdicts of death on both counts. Tr. XII 232, 242. Further facts, as necessary, will be developed during the arguments portions of the brief.

The district court certified six separate post-conviction claims, which are grouped into five arguments in this appeal.

**<u>Guilt Phase Claims</u>**

•First, the district court all but ignored the uncontradicted testimony from the evidentiary hearing, showing that lead counsel Charles Shaw fundamentally misunderstood the crimes with which his client was charged.  Shaw erroneously believed that the charge of bank robbery resulting in death was a non-capital offense; that the charge of murder and using a firearm during the bank robbery required a showing of intentional and premeditated murder by the defendant; and that Mr. Holder would be acquitted of both charges if the jury believed his testimony that he never fired his weapon.  Hrg. Tr. I 9, 12-13, 64-69, 112-13, 115; II 11, 15, 80, 130, 138, 140, 149, 167; Holder Depo. 52-53, 69-70, 134-35. Counsel's theory of defense led to his disastrous decision to call Mr. Holder to testify and deny that he fired his weapon – Hrg. Tr. I 50-51; Holder Depo. 52-55 – a credibility-destroying proposition disproven by the otherwise unrefuted forensic evidence.

The district court ruled that Mr. Shaw was "reasonably" contesting an element of both offenses, namely, the question of whether Mr. Holder was aware of a "serious risk of death attending his conduct" so as to be guilty of aiding and

abetting the killing.  Add. 52-55, 60-61, 110, 113-14; App. 442-45, 450-51, 671, 674-75.  According to the district court, Mr. Shaw's supposed "strategy" during the guilt phase allowed him to maintain a consistent penalty-phase theory that Mr. Holder did not intend for anyone to be harmed.  *Id.*  But there is no evidence that Mr. Shaw engaged in such a thought process.  The district court simply imputed to Mr. Shaw a strategy that he *might* have entertained if he had known the law – in direct contradiction of what Mr. Shaw told his client, his co-counsel, his mitigation specialist, and Federal Resource Counsel.  The district court, then, relied on "a post hoc rationalization of counsel's conduct [rather] than an accurate description of their deliberations." *Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003).  The court's method of divining counsel's strategy is erroneous as a matter of law, and the "strategy" it found is not supported by substantial evidence.  The court compounded its error by failing to grasp that Mr. Holder's claim is governed by *United States v. Cronic*, 466 U.S. 648, 655-657 (1984).  On opening statement and through his client's testimony, attorney Shaw made a legally ignorant decision that effectively conceded the government's case.  The resulting defense was bereft of meaningful adversarial testing.

Alternatively, Mr. Holder was prejudiced by counsel's ignorance of the law.  Counsel set up his client to appear like a liar, effectively giving the prosecution ammunition to argue that Mr. Holder lacked remorse for the offense and is an

especially dangerous, incorrigible criminal. Tr. XII 178-179, 186-193, 215-218. With the defendant's credibility destroyed, the jury unanimously declined even to find what this Court believes is clear: that it was Billy Allen, and not Norris Holder, who fired the fatal shots. *See United States v. Allen*, 247 F.3d 741, 777 (8th Cir. 2001) ("[T]he evidence is essentially overwhelming that Allen fired the shots from the Chinese SKS that killed Richard Heflin."). Mr. Holder is entitled to a new sentencing proceeding, if not an entirely new trial.

●Second, lead trial counsel compounded his ignorance of the law by not investigating the facts underlying his doomed theory that Mr. Holder never fired his weapon inside the bank. That core theory was doomed because the government's physical and expert evidence all but proved that three shell casings from the crime scene came from the Russian-made SKS rifle wielded by Mr. Holder, rather than the Chinese-made rifle used by co-defendant Billie Allen to kill the bank guard. Tr. V 127, 138-43. Counsel even *knew* that his investigation was incomplete. He told the rest of the defense team that he would follow their advice and obtain an independent ballistics report, but he never did so. Hrg. Tr. I 120, 123-24. If an independent expert had confirmed the government's ballistics analysis, a reasonable attorney would not argue that Mr. Holder's weapon was never fired, and would not present the defendant's credibility-destroying testimony to that effect.

17

The district court erred by crediting counsel's unexamined strategy as "reasonable." Add. 65, 118; App. 455, 679. It is professionally unreasonable for a lawyer not to investigate his own theory of defense. Counsel's "incomplete investigation was the result of inattention, not reasoned strategic judgment." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). The district court also erred in finding that Mr. Holder was not prejudiced. Add. 118; App. 679. But for counsel's choice of an inherently incredible defense, Mr. Holder would not have been called to testify as he did, the government would not have so easily attacked the defense's credibility and urged his "non-remorseful" testimony as a further reason to impose death, and the jury would have credited the mitigating circumstance that, in accordance with the overwhelming evidence, the fatal shots were fired by Billie Allen rather than Norris Holder.

**Penalty Phase Claims**

●Third, the district court erred by denying a hearing on appellant's claim that counsel failed to develop evidence of Mr. Holder's impaired judgment or mental illness, resulting from the traumatic events in his history, including a grotesque accident with a train as well as a skull fracture and subdural hematoma caused by an assault with a brick. This Court's authorities "teach that issues regarding the ineffectiveness of counsel often require a hearing to consider evidence not disclosed on the face of the trial record." *Nelson v. United States*,

18

297 Fed. Appx. 563, 565 (8th Cir. 2008).

The district court impermissibly resolved for itself numerous disputable issue of material fact. The court ruled that counsel "reasonably" relied on two reports from neuropsychologists – even though counsel sought and received court authorization for a *third* report but failed to obtain it before trial, even though counsel has not been heard on precisely what "strategy" led her to seek a third report or later to abandon that effort, and even though the two earlier reports have been criticized for their scope and methods. Add. 79, 125-27; App. 469, 686-88. The court indulged similar extra-record assumptions in concluding that the initial neuropsychological reports were "full" or "adequate" so as to justify counsel's imputed reliance. Among other problems, the court simply assumed that the experts relied on information beyond that disclosed in their reports and beyond Mr. Holder's minimizing self-diagnosis. Add. 125-28; App. 686-89.

The court also assumed, for purposes of *Strickland* prejudice – and notwithstanding the "crushing and overwhelming psychological and biological assault" that is Mr. Holder's background, App. 642 – that no jury would possibly believe any expert's testimony that Mr. Holder's planning and judgment was impaired, considering the extensive planning that preceded the bank robbery. Add. 79, 129-30; App. 469, 690-91. That conclusion, too, depends upon the content and credibility of an expert's assessment, and Mr. Holder is entitled to a

19

hearing.  *Sinisterra v. United States*, 600 F.3d 900, 907 (8th Cir. 2010) ("***If deemed credible and supported by evidence***, these factual assertions might present the kind of troubled history the Supreme Court has declared relevant to assessing a defendant's moral culpability.") (emphasis added).

●Fourth, trial counsel ineffectively failed to object to the court's instruction on the pecuniary gain aggravating circumstance.  The instruction asked the jury to decide whether Mr. Holder committed "the offense" for the purpose of monetary gain.  Tr. XII 149.  But the instruction did not specify whether "the offense" referred to the murder of Richard Heflin (an act ultimately consummated by Billie Allen), rather than the underlying bank robbery.  *Id*.  That ambiguity is error, which is readily noticeable from 18 U.S.C. § 3592(c)(1)-(14), whose many references to "the offense" make clear that the term describes the homicide and not the otherwise non-capital underlying offense of robbery.  Trial counsel, then, were prejudicially ineffective for not knowing the governing law, and for thereby inviting the jury to find an aggravator that did not exist.

●Fifth, the indictment failed to allege aggravating circumstances.  Circuit precedent effectively bars Mr. Holder's claim, *see United States v. States v. Allen*, 406 F.3d 940, 944 (8th Cir. 2005) (en banc) (defect may be harmless), but appellant wishes to preserve the issue for Supreme Court review.

## STANDARD OF REVIEW

This Court reviews the legal issues raised by the district court's denial of a §

2255 motion de novo. *United States v. Davis*, 407 F.3d 505, 508 (8th Cir. 2004).

Factual findings are reviewed for clear error. *Colby v. United States*, 377 F.3d

903, 906 (8th Cir. 2004). The Court reviews a district court's denial of an

evidentiary hearing for an abuse of discretion, but any merits rulings underlying

the denial are reviewed de novo. *Noe v. United States*, 601 F.3d 784, 792 (8th Cir.

2010).

# ARGUMENT

## PART I: GUILT PHASE CLAIMS

**I.** **Based on his ignorance of the law, counsel failed to assure adversarial testing of the government's case by conceding that Mr. Holder participated in an armed robbery resulting in a killing, and prejudicially advising his client to testify in support of counsel's non-defense to the charges.**

Defense counsel was constitutionally ineffective when, based on a mistaken belief in the law, he conceded that petitioner was guilty of a capital offense in his opening statement and closing argument, advised petitioner to testify when his testimony confirmed his guilt of a capital offense, and alienated the jury with the defense's denial that Mr. Holder fired his weapon. In denying this claim, the district court, without the support of any facts, assumed that trial counsel's action was part of a sound trial strategy. In doing so, the Court ignored all the evidence adduced at petitioner's hearing.

The hearing evidence, as detailed below, creates an inescapable conclusion that Mr. Shaw's trial strategy was based on a misunderstanding of the law. The district court *assumes* that trial counsel's strategy was to focus the jury's attention on Mr. Holder's belief that no one would get hurt; thereby, attacking the existence of mental element that Mr. Holder's action created a serious risk of death. Add. 54-54, 110; App. 442-44, 671. The district court fails to consider that Shaw never mentioned the essential element, "serious risk of death," in either his opening

22

statement or his closing argument. The evidence at hearing clearly sets out why –

Shaw was not only confused and harbored a misbelief as to the charges and the

requisite mens rea, but also showed an inability and a recalcitrance to form a

sound trial strategy in accordance with the law. The notion that Shaw's trial

strategy was to negate the mental element of "serious risk of death" strains logic

because he actually assisted the government in introducing those facts which

support this mental element. Further, the facts solicited by Shaw from Mr. Holder

regarding his actions prior, during and after the robbery were all used by the

government to support the element of mens rea. Tr. VII 38-42, 64.

Tactical or strategic decisions based on a misunderstanding of the law are

unreasonable. *Hardwick v. Crosby*, 320 F.3d 1127, 1163 (11th Cir. 2003). Trial

counsel is ineffective when he makes strategic decisions based on an incomplete

understanding of the law. *Lawhorn v. Allen*, 519 F.3d 1272, 1295-96 (11th Cir.

2008); *accord Smith v. Singletary*, 170 F.3d 1051, 1054 (11th Cir. 1999)

("Ignorance of well-defined legal principles is nearly inexcusable"); *State v.

Carter*, 559 So.2d 539, 541 (La. App. 1990) ("Knowledge of the elements of the

crime for which counsel's client is charged is essential if counsel is to provide

competent assistance to his client."); *Gardner v. State*, 96 S.W.3d 120, 123-27

(Mo. App. 2003) (counsel's strategy was based upon ignorance of law governing

scope of cross-examination).

23

**A.** **The uncontradicted testimony at the post-conviction hearing proved that lead counsel was ignorant of the law.**

Witnesses who testified at the hearing were unequivocal and consistent that Shaw's trial strategy was based on his belief that the bank robbery count was a non-capital offense, and Mr. Holder could avoid the death penalty by admitting the robbery and denying that he intended for anyone to get hurt; however, the district court failed to address this evidence. Caryn Platt Tatelli testified that she was recruited by Richard Burr, resource counsel for the Federal Death Penalty Resource, a project funded by the Administrative Office of the United States Courts, the Defender Services Division. Hrg. Tr. I 9, II 130, 140. There was a concern that Shaw was treating the case as a routine criminal matter and that Mr. Holder was in trouble. Hrg. Tr. II 138. At Mr. Burr's urging, Ms. Tatelli was retained as a mitigation specialist. Hrg. Tr. II 149.

Tatelli determined that no mitigation investigation had been undertaken. Hrg. Tr. I 11. It was not until Ms. Herndon was eventually appointed, some five weeks before trial, that a penalty phase strategy was even considered. Hrg. Tr. I 152, 116. Tatelli stated that Shaw was uninterested in developing a mitigation case because he believed that this was not a capital case:

Q: Was there any discussion with Mr. Shaw as to what the guilt phase strategy would be in the case?

A: I know that he didn't believe that Norris – that this would be a capital

case. He didn't believe they would get to a death penalty sentencing hearing because he didn't think that the facts supported being a capital case.

Q: Okay. Why do you say that?

A: Because he would say things like, "We're not going to get to a death penalty sentencing hearing. This isn't a capital case. Norris isn't guilty of murder, first degree murder." I don't remember exactly, but that's the gist of the kinds things he was saying.

Hrg. Tr. I 12-13.

Herndon was appointed shortly before trial. She participated in meetings with Shaw to discuss trial strategy. Shaw believed that Mr. Holder would be found not guilty of the murder charge. Hrg. Tr. I 115, II 11. Herndon testified that Shaw did not understand the charges leveled against Mr. Holder. Particularly, Herndon described a meeting between herself and Burr, where defense strategy was discussed:

Q: Okay, and did Mr. Shaw have a defense strategy at that point?

A: Yes. At that point, it was his strategy to argue that Norris wasn't guilty of the murder; he was only guilty of the robbery because he had not – not only had he not fired the shot that killed the victim, but he had not even fired his weapon at all.

Q: Okay, and did that give you concern?

A: Well, it did, yes. Once Dick got out the statute and you know, I was still brand new to this, but once Dick got out the statute and we all looked at it there at Charlie's office and then it was clear that that wasn't going to be a viable strategy.

Q: And why is that?

A: Well, because of the way the statute reads, it doesn't matter whether Norris pulled the trigger or whether he fired a shot or killed the victim, you know the fact that he participated in the robbery is sufficient to make him eligible for the death penalty, guilty of the crimes that were charged.

Q: Was this expressed to Mr. Shaw?

A: Yes. At that time Dick Burr, you know, pulled out the statute and showed him and expressed to him that that wasn't going to work as a strategy for Charlie.

Q: What was his reaction once that was discussed?

A: Well, what was Charlie's reaction?

Q: Yes, ma'am.

A: He – he didn't seem too, I mean, he didn't agree with it. He didn't agree, and I'm not sure exactly how that was working because we were looking at the statute, but Charlie still seemed to think – you know, it got – it was sort of – I remember it being sort of an aggressive back and forth between Dick and Charlie because Charlie was pretty entrenched that his position was correct and Dick was equally entrenched that it was not correct.

Hrg. Tr. I 112-13.

Shaw's conduct during the instructions conference further illustrated his misunderstanding of the law. Herndon testified as follows:

Q: Well let me see if I can phrase it for you this way. Did he believe that there was – in the bank robbery charge, there was a capital count there and a non-capital count?

A: What he told me was there was a bank robbery charge and a murder

26

charge. During the instruction conference or at some point when we were talking outside of the instruction conference, he said, "What happened to the murder charge?"

Hrg. Tr. II 15.

Consistent with the testimony of Tatelli and Herndon, Burr testified that he was also concerned about the way Shaw was handling Mr. Holder's case. To that end, he took it upon himself to assist Shaw in hiring a mitigation specialist, and retaining co-counsel to handle the penalty phase aspect of the case. Burr also participated in trial strategy discussions with Shaw and Herndon. These discussions further evidenced Shaw's error:

Q:     Was there any discussion as to what the guilty phase defense strategy would be?

A:     Yes.

Q:     Okay. And who participated in discussion of the guilt phase strategy?

A:     Mr. Shaw, Ms. Herndon and me.

Q:     Okay, can you tell us was the substance of that conversation was?

A:     The substance – well, the thing that was the most striking was that Mr. Shaw misunderstood the charges against Mr. Holder.

Q:     How so?

A:     This case, obviously, everybody knows, involved a bank robbery in which a security officer was killed. Mr. Shaw believed that he could defend in the guilt phase of this case against the capital charge by proving that Holder did not intend to kill anyone. In other words, he – he thought that the capital aspect of the case required a specific intent

27

murder, not simply a felony murder, and my reading of the statute and my understanding of the charge was to the contrary, and as was Ms. Herndon's, that the government did not have to prove – prove a specific homicidal mens rea. It was certainly a mens rea as to the robbery but not a homicidal mens rea.

Q:     And what was the response by Mr. Shaw in relationship?

A:     I remember we got the statute out and read it together, and he still – notwithstanding what I thought was the plain meaning of the statute, he continued to take the view that – that he could defend against the capital charge by showing that there was no specific intent to kill.

Hrg. Tr. II 167.

## B.     Attorney Shaw's conduct at trial further demonstrates his misunderstanding of the criminal charges.

This post-conviction testimony and evidence is consistent with Shaw's comments during both his opening statement and his closing argument. Beginning with his opening statement, he conceded the government's case with the following comments:

- Now, jurors the evidence is going to show, and with candor you will hear the defendant rob the bank. Tr. I 64.

- The judge will explain to you later on what malice aforethought means, but you've got to find that he intended the death of Heflin. Now, the evidence is going to show this Mr. Heflin was purposely shot by this person known as Billy Allen. Tr. I 65.

- The evidence is going to be that when he entered the bank, he thought no guns would be fired and they were not to be fired. There would be no evidence that this defendant at anytime fired his Russian made weapon. Tr. I 67.

- Defendant fired no shots. The defendant's back was to the shooting when the shooting started…from then on, of course, the defendant was caught. The defendant committed a robbery. Tr. I 68.

- We will at the end of this case ask that he be found not guilty of murder, as murder will be explained to you by the judge. As for the robbery, with candor and forthrightness you will hear that he committed that robbery. Tr. I 169.

On closing argument, counsel again stressed, that, although Mr. Holder was guilty of armed bank robbery, he was not guilty of murder.

- There is no doubt – we have never denied that since this trial started – that this defendant committed the extreme folly, the material act that seizes society by the throat, committing a bank robbery, armed, which he was, to get himself out of his problems, which was utterly wrong and for which he will pay. Tr. VII 77.

- You will have to leapfrog. In order to convict him of murder, you have to leapfrog over what these people had told us, the people in the bank and just, convict him of murder, because tragically, manically and completely without justification, Billie Allen shot and killed Mr. Heflin. Tr. VII 77.

- That is the reason he is here. He has admitted to robbery, but the murder, any intention even knowledge that he was shot when Heflin was shot, he wasn't in the bank. Tr. VII 80.

- We admitted and I told you at the beginning that defendant was involved in this robbery; and that what he did was, of course, punishable, and what he did was inexcusable. We offer no excuses for his part in this. We are not asking to be excused for it. But we reject totally the charge of murder. Now, you can say what you want, but murder takes intention for somebody to be killed. Tr. VII 86-87.

Perhaps most tellingly from the closing arguments, Mr. Shaw argued a quintessentially Missourian understanding of death-eligible first-degree murder.

Under Missouri law, a murderer's premeditation cannot be transferred to an accomplice; in order to be convicted of first degree murder, the accomplice must personally deliberate on the victim's death and intend for it to happen. *State v. Ferguson*, 887 S.W.2d 585, 587 (Mo. 1994); *State v. O'Brien*, 857 S.W.2d 212, 217-19 (Mo. 1993). Shaw argued that "murder takes an intention for somebody to be killed" – even though neither federal count required any such thing. Tr. VII 87. He went on to urge his state-law understanding of things:

> You cannot transfer the individual crazy act of Allen, when Allen shoots somebody in the leg, and then Allen walks over and fires some more shots into him, you can't transfer that to somebody who wasn't even there at the time. He was still coming through the double doors, or outside . . .

*Id.*

## C.     The relevant statutes and instructions conflicted with counsel's understanding of the law.

Lest there be any doubt on the point, counsel's understanding of his client's charges was grievously wrong. Mr. Holder was charged, in a two count indictment, with committing the crime of bank robbery by force or violence in which a killing occurs in violation of 18 U.S.C. §§ 2, 2113(a) & (e), and in Count II with carrying or using a firearm during a crime of violence which resulted in murder in violation of 18 U.S.C. §§ 924(c)(1) and (j)(1). In order to find Mr. Holder guilty on Count I, the jury had to unanimously find the following elements

30

beyond a reasonable doubt: "One, that defendant took money from the person in the presence of another while that money was in the care and custody of the Lindell Bank & Trust Company; Two, such taking was by force and violence or intimidation; Three, the deposits of Lindell Bank & Trust Company were then insured by the Federal Deposit Insurance Corporation; and Four, in committing this offense, the defendant, or a person aided and abetted by the defendant, killed Richard Heflin." Tr. VII 25-26 (Instruction 15).

In order to find that Mr. Holder aided and abetted the commission of either Count I or II, the jury had to find that Mr. Holder "(1) must have known that either the bank robbery or the offense of using or carrying a firearm during and in relation to a bank robbery was being committed or going to be committed; (2) intentionally acted in some way for the purpose of causing, encouraging or aiding the commission of either offense and, in the course of either offense, Richard Heflin was killed; and (3) must have been aware of a serious risk of death attending his conduct." Tr. VII 26-27 (Instruction 16). Count I, then, was *not* merely a non-capital bank-robbery charge. It charged the death-eligible offense of bank robbery resulting in a killing by either the defendant or the defendant's accomplice; the defendant need not have intended the killing or premeditated, so long as he assisted Billie Allen and was "aware of a serious risk of death attending his conduct."

31

Likewise, to return a guilty verdict on Count II, the jury had to find: "One, the defendant willfully and intentionally committed the crime of bank robbery as charged in Count I; Two, during and in relation to the commission of that crime, the defendant knowingly used or carried a firearm; Three, that in the course of committing the crime of bank robbery as charged in Count I, while knowingly using or carrying a firearm, the defendant, or a person aided or abetted by the defendant, killed Richard Heflin by the use of a firearm; and Four, the killing of Richard Heflin was murder in the perpetration of a robbery." Tr. VII 29-30 (Instruction 19). Count II featured the same "aiding and abetting" language as Count I ("aware of a serious risk of death attending his conduct"). Tr. VII 31-32 (Instruction 20). As a result, Count II allowed Mr. Holder to be convicted and sentenced to death for a killing in which his accomplice fired the fatal shots, or even all the shots.

**D. Trial counsel Shaw's trial strategy of advising Mr. Holder to testify was based on a misunderstanding of the law, and reflects deficient performance.**

Tatelli testified that she discussed with Mr. Holder the possibility of testifying in his own defense. Hrg Tr. I 49-50. In these discussions, Mr. Holder advised Tatelli that Shaw told him that if he told the jury what happened, he would get to go home. Hrg. Tr. I 50-51. Mr. Holder testified that he believed, as counsel Shaw explained, that he was charged with two different offenses: bank robbery

32

and murder.  Holder Depo. 52-55.  He testified that Shaw advised him that, because he did not intend to hurt anyone and did not shoot the victim, he might be found guilty of the bank robbery, but not the murder.  Holder Depo. 52-53.

Counsel Herndon did not agree with Shaw's advice that Mr. Holder testify:

A: [A]s terrible as Norris feels about what happened, I never felt like he took responsibility for it, and I think that was because it was difficult for him.  This was not supposed to happen.  No one was supposed to die, and so the responsibility that he was able to – to live with was, "I didn't do this.  This isn't my fault," and that's a real problem, you know, when your client is on the witness stand because we know under the law it is his fault even though he didn't pull the trigger and so I thought that he was going to be a bad witness on the stand . . . I thought that it was a real problem that he was going to say he never fired his gun because the jury – you know, at that point they were believing that he fired his gun.  I was believing it based on the government's evidence, you know, because that's what the ballistics said.  So to put him up there to contradict unconverted government evidence was a bad idea, you know the jury was not going to give anything he said any credibility because of that one little piece of, "I didn't fire my weapon."

Hrg. Tr. I 130-31.

The right to counsel is a fundamental right of a criminal defendant; it assures the fairness and thus the legitimacy of our adversary process.  *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963).  The essence of an ineffective assistance of counsel claim is that counsel's unprofessional errors so upset the adversarial balance between the defense and prosecution so as to render a defendant's trial unfair.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *United States v. Cronic*, 466 U.S. 648, 655-657 (1984).  Access to counsel's skill and knowledge is

33

necessary to accord defendant the ample opportunity to meet the government's case. *Strickland*, 466 U.S. at 685. Counsel has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial process. *Id*. at 688.

*Strickland's* reference to counsel's "thorough investigation of law," 466 U.S. at 690, indicates that reasonably competent defense counsel must be aware of applicable legal principles. Failure to be aware of the applicable legal principles constitutes ineffective assistance of counsel. *See Williams v. Taylor*, 529 U.S. 362, 395 (2000) (counsel ineffective for failing to "conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to records"); *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) (trial counsel's failure to make obvious and meritorious objections to tainted evidence was ineffective and "betray[ed] a startling ignorance of the law"); *Reagan v. Norris*, 365 F.3d 616, 621-22 (8th Cir. 2004) (trial counsel unreasonably failed to object to jury instruction that omitted essential mens rea element of charged offense); *Blackburn v. Foltz*, 828 F.2d 1177, 1182-83 (6th Cir. 1987) (counsel's lack of knowledge as to the admissibility of defendant's prior convictions was unreasonable), *cert denied,* 485 U.S. 970 (1988); *Kubat v. Thieret*, 867 F.2d 351, 370 (7th Cir. 1989) (counsel's failure to object to jury instructions that misstated applicable law was deficient performance

34

under *Strickland*); *Goodwin v. Balkom*, 684 F.2d 794, 819-20 (11th Cir. 1982) (counsel ineffective for not understanding the "fruit of the poisonous tree doctrine" and, as a result, not challenging the admissibility of defendant's confession).

### 1. *Counsel's error led him to concede the prosecution's case, leaving the trial without meaningful adversarial testing.*

The district court applied an improper standard, using that articulated in *Strickland*, in lieu of the standard established in *United States v. Cronic*, 466 U.S. 648 (1984). Prejudice should be presumed because given counsel Shaw's misunderstanding of the charges, there was a complete breakdown in the adversarial process during the guilt phase and penalty phase of Mr. Holder's trial. By conceding Mr. Holder's guilt in opening and closing statements and by putting him on the witness stand to admit that he participated in the bank robbery armed with military assault rifles, counsel Shaw failed to subject the government's case to a meaning adversarial testing. *See State v. Harrington*, 708 A.2d 731, 737 (N.J. 1998) (a lawyer who concedes that his client committed the predicate offense to felony murder fails to subject the prosecutor's case to meaningful adversarial testing); *United States v. Swanson*, 943 F.2d 1070, 1074 (9th Cir. 1991) (prejudice is presumed when counsel concedes in closing argument that his client robbed a bank). As a result, the *Cronic* standard applies and prejudice is presumed. *See*

*Cronic*, 466 U.S. at 656-59.

It is one thing for counsel, when facing a difficult death penalty case, to make an informed decision to concede the client's guilt in order to save credibility and enhance the prospects for a life sentence. *See Florida v. Nixon*, 543 U.S. 175, 192 (2004) (crediting counsel's strategy of "attempting to impress the jury with his candor and his unwillingness to engage in a useless charade"). But it is quite another for counsel to concede the client's guilt unknowingly, and under the mistaken and counter-statutory view that Mr. Holder could not be convicted of murder unless he fired the fatal shots.

### 2. *Mr. Holder was prejudiced by counsel's deficient understanding of the governing law.*

Alternatively, Mr. Holder suffered *Strickland* prejudice from counsel's performance. Mr. Holder was prejudiced during the penalty phase, as a result of counsel's decision – based on his erroneous view of the law – to call Mr. Holder as a witness to offer the counter-evidentiary non-defense that Mr. Holder did not subjectively intend for anyone to get hurt, and did not fire his weapon at all. The overarching "strategy" resulting from Shaw's misreading of the law all but *required* Mr. Holder to deny responsibility for the death of Richard Heflin. In the process, Mr. Holder came across as combative, remorseless, indifferent, and cold as he pointed the finger at Billie Allen and distinctly away from himself. Hrg. Tr.

I 130-35. In addition, given the uncontroverted ballistic evidence which showed that there was a number of spent shells that could have come not have come from co-defendant's gun but must have been fired from Mr. Holder's gun, counsel Shaw set his client up to be branded as a liar by eliciting his testimony that he did not fire his weapon in the bank. Hrg. Tr. VI 166-67. In fact, the government characterized Mr. Holder's testimony as aggravating evidence and used it to convince the jury to impose the death penalty. Tr. XII 178-179, 186-193, 215-218.

**E.    The district court's ruling is based on supposition and is unsupported by the facts in the record below.**

The district court's Memorandum and Order, opining that counsel Shaw's trial strategy was an attempt to negate the mental element of "serious risk of death" and to merge that into a consistent penalty phase theme that his life should be spared, is based on supposition. Add. 52-55, 60-61, 110, 114-15; App. 442-45, 450-51, 671, 674-75. The district court fails to cite any evidence adduced at the evidentiary hearing in support of this conclusion. *Id.* Mr. Holder introduced overwhelming and uncontradicted evidentiary that Shaw's entire trial strategy was founded on his misunderstanding of the law.

The district court's ruling reflects both legal and factual error. As a matter of law, the district court misapprehended the type of review undertaken when a

court assesses the reasonableness of trial counsel's conduct. A reviewing court must evaluate counsel's conduct "from counsel's perspective at the time." *Strickland v. Washington*, 466 U.S. 668, 689 (1984). It must attempt to "reconstruct the circumstances of counsel's challenged conduct." *Id.* That means a court must assess whatever strategy counsel actually followed; it does not suffice for a court to conjure up, retrospectively, some strategy that counsel *might* have been following. *Harris v. Reed*, 894 F.2d 871, 878 (7th Cir. 1990) ("Just as a reviewing court should not second guess the strategic decisions of counsel with the benefit of hindsight, it should also not construct strategic defenses which counsel does not offer."); *Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003) ("The 'strategic decision' the state courts and respondents all invoke to justify counsel's limited pursuit of mitigating evidence resembles more a *post hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing.").

It is true that reasonable counsel *might* choose to contest whether Mr. Holder was aware of the "serious risk of harm attending his conduct." Reasonable counsel might even essentially concede guilt in order to curry favor and credibility with the sentencer. *E.g.*, *Florida v. Nixon*, 543 U.S. 175, 192 (2004). But reasonable strategy presupposes knowledge of the law. The post-conviction evidence shows that Mr. Shaw did not understand the charges: he believed Count

38

I charged only a robbery, and that Count II required a showing of premeditated and intentional murder. It was *that* premise from which counsel sought to minimize his client's blameworthiness by arguing that Mr. Holder intended for no one to be hurt, and by steadfastly maintaining that Mr. Holder never fired his weapon. In the process, counsel offered testimony all but proving that the defendant must have understood the danger of his offense. All the while, counsel set up his client to appear like a liar for denying that he fired his rifle. Counsel thereby sacrificed the very credibility that the district court credited him with preserving. The district court's ruling rests on an erroneous "*post hoc* rationalization of counsel's conduct," *Wiggins*, 539 U.S. at 526-27, and must be reversed.

The district court also erred in fact. The court concluded that Mr. Shaw was aware of the law and "reasonably" pursued a strategy of minimizing his client's conduct by contesting the "serious risk of death" requirement and hoping for leniency at sentencing. Add. 52-55, 60-61, 110, 114-15; App. 442-45, 450-51, 671, 674-75. But that finding is unsupportable on the post-conviction record. A factual finding is "clearly erroneous" when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Spinden v. GS Roofing Prods.*, 94 F.3d 421, 426 (1996); *United States v. Sanders*, 424 F.3d 768, 777 (8th Cir. 2005).

Clear error also exists when a factual finding is not supported by "substantial evidence," or when the district court fails to draw factual inferences that are "inescapable from the record." *Johnson v. Arkansas State Police*, 10 F.3d 547, 552 (8th Cir. 1993).

In this case, there is no evidence of record that Mr. Shaw correctly understood the law. To be sure, the trial record supports the notion that Mr. Shaw sought to minimize his client's conduct, and to show that Mr. Holder did not intend for anyone to be harmed. Tr. I 65-58; VII 66-68, 77-87; XII 198-202, 210-11. But that does not prove that Mr. Shaw arrived at his "strategy" reasonably. No evidence – substantial or otherwise – contradicts the testimony of Jennifer Herndon, Caryn Tatelli, Richard Burr, and Norris Holder himself that Mr. Shaw believed his client would be acquitted if he didn't fire his weapon. Hrg. Tr. I 12-13, 49-50, 53, 87, 111-15; II 15, 81-82, 166, 211-12, 218; Holder Depo. 52-53, 69-70, 134-35. Far from a clever ploy for credibility, counsel's "strategy" stemmed from a "startling ignorance of the law." *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986). The Court must reverse the district court's erroneous ruling, with instructions to vacate Mr. Holder's unconstitutional convictions and sentences.

**II.    The district court misread the record and the governing law in rejecting Mr. Holder's claim that counsel ineffectively failed to consult an independent ballistics expert before choosing a doomed theory that his client fired no shots.**

The prosecution's evidence all but proved that at least three shell casings from the bank came from Mr. Holder's Russian-made SKS rifle.  Nevertheless, trial counsel's central defense was that Mr. Holder never fired his weapon and never intended to hurt anyone.  Tr. I 68; VI 85, 86, 102; VII 69, 75-76, 92; XII 201, 202, 204, 208-09.  The problem is that counsel never troubled to investigate his chosen theory, through which counsel and client alike lost all credibility.  *That* loss led the jury to unanimously reject a mitigating circumstance that Mr. Holder did not fire the fatal shots – even though the district court and this Court both believe that the evidence strongly supports that proposition.  *See* Add. 52, 94; App. 442, 484; *United States v. Allen*, 247 F.3d 741, 777 (8th Cir. 2001).

**A.    Factual background**

**1.    *The government's ballistics evidence*** – Known beforehand to all attorneys in the case, the prosecution's evidence created a powerful inference that Mr. Holder fired his weapon inside the bank.  Police recovered a total of sixteen shell casings from the scene.  Tr. V 127.  According to ballistics expert Frank Stubits, three of these casings were definitively not  from the Chinese-made SKS rifle wielded by co-defendant Billie Allen.  *Id.* at 138.  These same three casings

41

were "inconclusive" as to the Russian-made rifle used by Mr. Holder, meaning that they may or may not have come from his weapon. *Id.* at 138-43. The proof that the casings were not from the Chinese gun, and the absence of evidence that any other weapons were used inside the bank, all but demonstrated that the casings were from the Russian gun. *Id.* at 143.

2. ***Counsel formulates his theory of defense and rejects advice to seek more evidence*** – From the inception of the case, lead counsel Charles Shaw relied on his client's insistence that he did not intend for anyone in the bank to be harmed, and that he did not fire his weapon. Hrg. Tr. I 129-31. In contrast, co-counsel Jennifer Brewer thought that no jury would believe such a claim, in light of the physical and expert evidence. *Id.*; *see also* Hrg. Tr. II 13, 27-28. She and federal resource counsel Richard Burr both advised Shaw to seek an independent ballistics report. Hrg. Tr. I 119; II 171-72, 205. Shaw was advised that the forensic evidence conflicted with his chosen theory. Hrg. Tr. I 123-24; II 205. Shaw told his colleagues that he would obtain an expert, but he never did so. Hrg. Tr. I 120, 123-24.

3. ***Counsel's theory at trial, and the prosecution's response*** – Unencumbered by investigation, counsel went full bore with his pre-determined strategy. He urged on opening statement that Mr. Holder never fired his weapon. Tr. I 68. He elicited evidence to that effect from his client, who, on cross, could

not explain the evidence that three bullets were fired from his Russian-made gun. Tr. VI 85-86, 101-02, 171-73. Counsel urged the same "no shots" theory on closing in both phases of the trial. Tr. VII 81-84; XII 198-202, 208-09.

The prosecution easily discredited the defense as well as the defendant. Officer Stubits explained that three particular casings, which were "inconclusive" as to Mr. Holder's weapon, were definitively *negative* with respect to Billie Allen's. Tr. V 127, 138-43; VI 33-34. The government explained its proof that appellant must have fired his gun. Tr. VII 49-50, 99-101. It argued that Mr. Holder had simply lied when denying it. Tr. VII 49-52, 55, 63-64; XII 217-18. The government carried over this same theme to the penalty phase, arguing that Mr. Holder's untruthful testimony meant that the defendant lacked remorse and was a future danger to society. Tr. XII 176-78, 187-93, 217-18, 226.

## B. The district court's rulings

The district court denied an evidentiary hearing, then denied relief on the merits. App. 266, 453; Add. 63. In doing so, the court simply assumed that a defense expert would have contradicted Officer Stubits' testimony. The court reasoned that counsel did not unreasonably fail to seek such a pro-defense expert under all the circumstances, and it found no reasonable probability that such evidence would have changed the result of either phase of trial. Add. 63-71; App. 453-61. The court's order did not consider the distinct likelihood that a defense

expert would have *confirmed* the government's case, and thus, led to a reasonable revision or withdrawal of the defense theory, elicited from the client's own testimony, that the Russian gun was never fired.  Mr. Holder therefore moved to alter or amend the judgment under Rule 59(e).  The district court denied that relief as well.  In doing so, it reasoned that Mr. Holder was advancing an impermissibly new argument in his post-judgment motion, and alternatively, that trial counsel would have faced the same difficult "options" even with the benefit of an expert's report.  Add. 115-18; App. 676-79.

**C.** **Contrary to the district court's ruling, Mr. Holder preserved his claim well before his motion to alter or amend the judgment.**

The district court was wrong to conclude that appellant first advanced his legal theory in his Rule 59(e) motion.  It was only then, the court concluded, that appellant argued he was prejudiced by counsel's failure to seek possible *confirmation* of the government's findings rather than solely to challenge them.  Add. 115-17; App. 676-78.  But the record disproves the district court's ruling, as does the governing law.

**1.** ***Section 2255 counsel asserted Mr. Holder's current argument during the evidentiary hearing on appellant's related claim that trial counsel erred in advising his client to testify.***

The evidentiary hearing encompassed appellant's related claim that counsel was ineffective for advising him to testify.  During that hearing, appellant

presented evidence that the trial team discussed the ballistics evidence, and that co-counsel Brewer and resource counsel Burr advised attorney Shaw to retain an independent expert. Hrg. Tr. I 120-24; II 171-72. The government objected, arguing that the evidence related to the ballistics claim, on which the court had denied a hearing.

Appellant's counsel then explained the significance of the evidence in the same manner that Mr. Holder explains it now. Hrg. Tr. I 120-21 . Post-conviction counsel argued that Mr. Shaw was aware of the government's ballistics evidence but did not "follow up" on the issue by retaining his own expert. *Id.*

> Judge, it's going to be our position that it's a "damned if you do and damned if you don't" proposition, that had he got an expert, an expert would have agreed with Mr. Stubits, then the Court has to examine the merits of putting his client on the stand to say, "I didn't fire the gun" when there was no evidence to contradict that.

Hrg. Tr. I 122; *see also id.* 89, 92, 205.

True, Mr. Holder did not specifically *plead* in his section 2255 motion that a confirming expert report would have assisted the defense by steering counsel away from his misguided theory that the defendant never fired his rifle. But there is no requirement that the entirety of a prisoner's legal theories must be pleaded or otherwise written, as opposed to being argued in open court.

**2.** *Mr. Holder permissibly asserts on appeal the same fundamental point he pleaded in his section 2255 motion, which is that counsel chose his strategy without fully investigating the ballistics evidence.*

Mr. Holder's argument would be proper even if appeared for the first time in this brief. Whether a ballistics expert would have *questioned* or *confirmed* the government's report, counsel's underlying failure is the same: failing to consult an expert before diving head-first into a theory that Mr. Holder never fired his weapon. Appellant, then, advances the same "fundamental" point as he pleaded. *See Williams v. Norris*, 576 F.3d 850, 860 (8th Cir. 2009) (holding that state's general and "fundamental" argument that a habeas court should not retry a state court conviction was sufficient to preserve state's argument, for the first time on appeal, that the district court erred by holding an evidentiary hearing), *cert. denied*, — S. Ct. —, No. 09-10382, 2010 WL 1685380 (U.S. Dec. 6, 2010), *but see* 2010 WL 1685380, at *2 (Sotomayor, J., dissenting from the denial of certiorari) ("[T]he Eighth Circuit's conclusion that the State objected in the District Court to the evidentiary hearing is patently wrong.").

**D. Trial counsel, who acknowledged the need to retain an independent expert, performed ineffectively by failing to do so before committing to a defense theory that was flatly contradicted by the government's physical and expert evidence.**

Defense counsel is obligated to "make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."

*Strickland v. Washington*, 466 U.S. 668, 691 (1984). He or she must "explore *all avenues* leading to facts relevant to guilt and degree of guilt or penalty." *Henderson v. Sargent*, 926 F.2d 706, 711 (8th Cir. 1991); *Eldridge v. Atkins*, 665 F.2d 228, 232 (8th Cir.1981) (emphasis added). It is therefore ineffective for defense counsel to commit to a trial strategy without first investigating pivotal evidence and witnesses, including forensic evidence. *Draughton v. Dretke*, 427 F.3d 286, 294-97 (5th Cir. 2005); *Wolfe v. State*, 96 S.W.3d 90, 93-94 (Mo. 2003) (failure to test hair samples was deficient performance). In this case, defense counsel committed to a predetermined strategy – that his client did not fire his weapon inside the bank – without first conducting a reasonable investigation into the ballistics evidence.

Counsel even realized the importance of obtaining a ballistics expert in order to confirm or challenge Officer Stubits' findings, but he never retained such an expert. Hrg. Tr. I 120, 123-24. The district court therefore erred by ruling that counsel's "strategy" for combating the government's evidence was reasonable as a matter of law, with or without an additional expert report. *See* Add. 118; App. 679. Counsel himself recognized the need for an expert report, and thus, that his investigation as it stood shortly before trial was insufficient. "Counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision

47

could be made." *Kenley v. Armontrout*, 937 F.2d 1298, 1308 (8th Cir. 1991).

Attorney Shaw himself acknowledged the need to obtain an independent ballistics analysis, but he never did so. Hrg. Tr. I 120, 123-24. The circumstances therefore show that counsel's "incomplete investigation was the result of inattention, not reasoned strategic judgment." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003).

> **E.** **In finding no *Strickland* prejudice, the court ignored the credibility-destroying effect of trial counsel's ill-informed strategy, and thus, the reasonable probability that the sentencing jury would have otherwise found that the fatal shots were fired by Billie Allen rather than Norris Holder.**

The district court alternatively rejected Mr. Holder's claim on the merits. The court reasoned that even if counsel had obtained and acted upon an independent ballistics analysis, attorney Shaw "would have the same challenges to overcome in persuading the jury to spare Petitioner's life." Add. 118; App. 679. The defense would have been "in the same situation that it was in without its own expert," and Mr. Shaw "would still be able to argue that it was not Petitioner who shot and killed Mr. Heflin." *Id.*

The district court is wrong. "Prejudice" depends not on what *Charlie Shaw* might have done with further investigation, but rather, what an objectively "reasonable" attorney would do if armed with the evidence that went unknown to trial counsel. *See Wong v. Belmontes*, 130 S. Ct. 383, 386 (2009) (requiring reasonable probability that a "competent attorney," aware of missing mitigating

evidence, "would have introduced it at sentencing"); *Wiggins v. Smith*, 539 U.S. 510, 535-36 (2003) (rejecting Justice Scalia's reliance on trial counsel's testimony that he wouldn't have presented the mitigating evidence that had he failed to discover). In this case, a "reasonable" attorney, informed by two ballistics experts and compelling forensic evidence, would not elicit the client's credibility-defeating testimony that he never fired his weapon. *Cf. United States v. Harth*, 61 F.2d 541, 544 (8th Cir. 1932) (Noting, in civil context, "Neither court nor jury may credit testimony positively contradicted by physical facts.").

As matters stood at the initial trial, the skilled prosecutor all but destroyed Mr. Holder's credibility on the stand:

BY MR. DOWD:

Q: And somehow magically three bullets got out of that Russian gun while you were in that bank, didn't they?

A: Those bullets didn't come out of the Russian gun.

Q: No bullets came out of there?

A: Not one bullet came out of there at all and you all know.

Q: Because that would look very bad for you if you shot your gun at Richard Heflin, wouldn't it?

A: It already looks bad.

MR. DOWD: I agree. I have no further questions.

Contrary to the district court's ruling, reasonable counsel would have faced

*different* "challenges" and a different "situation" than that faced by attorney Shaw: he or she could avoid the "challenge" faced by Shaw's choice of a credibility-destroying defense. In the absence of that self-inflicted "challenge," counsel could have forcefully argued, with credibility intact, that the fatal shots were fired by Billie Allen rather than Norris Holder. That proposition was accepted by *zero* of Mr. Holder's jurors, even though objectively compelling evidence supported it. *See United States v. Allen*, 247 F.3d 741, 777 (8th Cir. 2001) ("[T]he evidence is essentially overwhelming that Allen fired the shots from the Chinese SKS that killed Richard Heflin."); *id.* at 755 ("The first man to enter immediately began firing shots at security guard Heflin, and during the course of the robbery Holder jumped over the tellers' counter and retrieved money from the tellers' drawers.") ; Tr. XII 245. There is a reasonable probability that, but for counsel's error, the jury would have sentenced Mr. Holder in accordance with the actual evidence, and that at least one juror would have stricken a different balance of aggravating and mitigating circumstances. Mr. Holder must be granted a new sentencing trial, or, at the very least, an evidentiary hearing on his claim.

**III. Resolving the disputable facts on its own, the district court wrongly refused a hearing on appellant's claim that counsel failed to develop evidence of Mr. Holder's impaired judgment.**

**A. Factual and procedural history**

The events of Norris Holder's past have been described as a "crushing and overwhelming psychological and biological assault." App. 642. Counsel knew the basics, even if not all the clinically relevant details: Mr. Holder suffered a leg amputation when "jumping" a train at the age of fifteen; he fractured his skull when someone assaulted him with a brick; and his absent father and crack-addicted mother chronically neglected their son, who grew up in a crime-ridden housing project featuring open and notorious drug dealing, gang activity, and pervasive gun violence. Tr. X 23-29, 46-49, 112-13, 221; XI 34, 114, 131; XII 31-33, 79-82, 112-15, 119-20; *but see* App. 648-49 (declaration of Terry Jett) (train dragged Mr. Holder 100 yards before it severed his leg below the knee; top of Mr. Holder's other foot fell off as his friends were carrying him away and while he was still conscious; all "meat" had been ripped from the adjoining calf).

By the defense team's own admission, its investigation of appellant's mental health was incomplete. Hrg. Tr. I 93-94; II 50. Counsel Jennifer Herndon was appointed approximately one month before trial to represent Mr. Holder, and she took responsibility for preparing the penalty phase defense. App. 32, 594; Hrg. Tr.

I 8-11, 102-04, 115-16, 125; Vol. II 145. Counsel reasonably suspected that her client suffered lasting effects from his injuries. *Id.* She first obtained a "future dangerousness" assessment from forensic psychologist Stephen Reidy, who eventually testified that Mr. Holder would be a relatively low-risk inmate if sentenced to life imprisonment. App. 32, 414-15, 466; Tr. X 182-95.

Trial counsel next obtained the assistance of neuropsychologist Steven E. Rothke, who assessed the impacts of Mr. Holder's train accident and head injury based on the limited information that counsel provided to him (see part II.C.2, below), and who performed something less than a full neuropsychological examination. App. 32-33, 147-48, 150. Dr. Rothke described Mr. Holder as "cognitively intact" and found no "significant neurobehavioral signs of head injury or reduced capacity to control his actions and responses." App. 150. To similar effect was a report from the government's neuropsychologist, Richard D. Wetzel. Dr. Wetzel found that appellant had a brain dysfunction resulting from a skull fracture and subdural hematoma during the brick assault, but the dysfunction was limited to motor speed in his left hand, and that Mr. Holder had no cognitive dysfunction from brain injury, and no psychiatric disorders. App. 175-76.

Despite the conclusions of Drs. Rothke and Wetzel, counsel Herndon sought out a third evaluation, from neuropsychologist Anthony Semone. The trial court granted attorney Herndon's motion to authorize the evaluation, but the

evaluation never took place prior to trial.  App. 33-34, 467; Add. 77.  In the absence of a hearing, the record does not indicate why Ms. Herndon wanted a third examination, or why she declined to obtain it before trial.  Counsel's testimony on other claims suggests she may have simply run out of time.  Hrg. Tr. II 50 ("timing issue"); I 93-94 (per Caryn Tatelli, "wasn't enough time").

Dr. Semone has since examined Mr. Holder, has criticized the manner and completeness of the previous examinations, and suspects that Mr. Holder suffers from brain damage in the right hemisphere.  App. 33-34, 467.  Such objective brain damage could affect the soundness of Mr. Holder's judgment, including his ability to accurately gauge the dangerousness of his conduct.  App. 34, 467.

The district court denied appellant's claim without a hearing.  App. 266-27, 466-70, 686-91; Add. 76-80, 125-30.  Its ruling must be reversed for the reasons that follow.

**B.**      **Section 2255 precludes a district court from resolving disputable factual questions without an evidentiary hearing.**

Quite unlike habeas corpus proceedings that challenge a state court judgment, section 2255 cases presumptively require an evidentiary hearing.  *See* 28 U.S.C. § 2255(b).  A hearing "may be denied only if the motion and the files and the records of the case conclusively show that the prisoner is entitled to no relief."  *Saunders v. United States*, 236 F.3d 950, 952 (8th Cir. 2001);

*Sinisterra v. United States*, 600 F.3d 900, 906 (8th Cir. 2010).  This Court's authorities "teach that issues regarding the ineffectiveness of counsel often require a hearing to consider evidence not disclosed on the face of the trial record." *Nelson v. United States*, 297 Fed. Appx. 563, 565 (8th Cir. 2008); *United States v. Dubray*, 727 F.2d 771, 772 (8th Cir.1984).  A court cannot grant or deny section 2255 relief without conducting a hearing to resolve any disputable issues of material fact.  *Grady v. United States*, 269 F.3d 913, 918-19 (8th Cir. 2001).

**C.**  **In the course of denying a hearing and rejecting Mr. Holder's claim, the district court drew numerous factual inferences that were not supported or  compelled by the record, and whose proper resolution requires a hearing.**

Appellant's claim is governed by the familiar two-part test of *Strickland v. Washington*, 466 U.S. 668 (1984).  *Strickland* requires the prisoner to show that counsel performed deficiently under prevailing professional norms and that counsel's failures prejudiced the defense.  *Id.* at 687-88.  The district court's improper factual inferences infect both aspects of the *Strickland* test.

**1.**  ***The district court imputed to trial counsel the "reasonable" strategy of relying on two pretrial neuropsychological reports, even though counsel never articulated such a strategy or any other strategy, even though counsel sought and received authorization for a <u>third</u> evaluation, and even though counsel has not been heard on what shortcomings she perceived in the two earlier reports.***

The district court erred by crediting counsel with a "reasonable" strategy, but without a hearing to determine what counsel's strategy actually was.  *See* Add.

79, App. 469 ("Trial counsel made a decision not to pursue Dr. Semone's testimony, following review of the expert reports of Dr. Wetzel and Dr. Rothke."); Add. 125, App. 686 ("[T]his Court found that trial counsel was reasonable in deciding not to pursue the testimony of Dr. Semone.").

This Court's recent opinion in *Sinisterra v. United States*, 600 F.3d 900 (8th Cir. 2001), demonstrates the folly of the district court's approach. Sinisterra claimed that his attorneys – including Jennifer Herndon – were ineffective for not developing evidence about his troubled upbringing in Columbia, Missouri, including evidence of physical and sexual abuse, homelessness, extreme poverty, and head injuries. *Id.* at 905. An affidavit from lead counsel Fred Duchardt stated that he was "aware" of this evidence before trial. Nevertheless, it was only attorney Herndon who had traveled to Columbia, and she maintained that her limited interviews there did not reveal the evidence at issue.

This Court ruled that a hearing was required. *Id.* at 907. Notwithstanding attorney Duchardt's claimed "awareness," the record presented open questions about trial counsels' performance, specifically: (i) whether Duchardt, if he actually knew about the evidence, exercised "reasonable professional judgment" in not presenting it, and (ii) whether Herndon's mitigation investigation was constitutionally deficient for failing to uncover the evidence. *Id.* The Court also ordered a hearing on Sinisterra's related and "interwoven" claim that counsel

55

failed to develop evidence of his mental health and capacity. *Id.*

*Sinisterra* teaches that the reasonableness of counsel's strategy, including the adequacy of the investigation underlying it, must depend on "***an accurate description of [counsel's] deliberations***" rather than a "*post hoc* rationalization of counsel's conduct." *Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003) (emphasis added). Attorney Duchardt's purported "awareness" of the mitigating evidence did not reveal what strategy he entertained for excluding it at the trial, or whether that strategy was reasonable. A hearing was therefore required in order to determine whether counsel exercised "reasonable professional judgment." *Sinisterra*, 600 F.3d at 907. Counsel's effectiveness, after all, must be resolved "based on facts of record, rather than on assumptions." *Marshall v. Hendricks*, 307 F.3d 36, 115 (3rd Cir. 2003).

And so it is here. Just as attorney Duchardt's purported "awareness" of mitigating evidence did not disclose his strategy for withholding it from trial, attorney Herndon's actions in this case do not show why she forwent a court-authorized evaluation by Dr. Semone, or whether that decision was professionally reasonable. We simply do not know what deficiencies she perceived in the reports of Drs. Rothke and Wetzel, so as to seek authorization of Dr. Semone's services in the first instance. We *do* know that counsel had remarkably little time to conduct a mitigation investigation: she was appointed five weeks before trial, and a

mitigation specialist only two months before that. Hrg. Tr. I 8-11, 102-04, 149; II 145; App. 32, 594. We also know that mitigation specialist Caryn Tatelli did not believe that the defense's work was complete on neurological issues or otherwise. Hrg. Tr. I 45, 93-94. But there is no evidence in the record to support, much less compel, the district court's supposition that Ms. Herndon "made a *decision* not to pursue Dr. Semone's testimony, following review of the expert reports of Dr. Wetzel and Dr. Rothke." Add. 79; App. 469.

Furthermore, attorney Herndon's testimony on other claims suggests that an unspecified "timing issue" may have truncated her investigation. Hrg. Tr. II 50 ("[T]here was that one doctor who I had wanted to bring down that I didn't bring down because of the timing issue, but I don't know whether we would have presented his testimony or not."); *see also* Hrg. Tr. I 93-94 (per Tatelli, "The problem with the neurologic issue is that we – between the time that Jennifer Brewer was – became involved with the case and when we went to trial, there really wasn't enough time to pursue that."). The record suggests that counsel had a reasonable basis to investigate further, but failed to do so for lack of time. *See Kenley v. Armontrout*, 937 F.2d 1298, 1308 (8th Cir. 1991) ("Counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made."). From all appearances, counsel's failure to obtain an evaluation

57

from Dr. Semone "was the result of inattention, not reasoned strategic judgment." *Wiggins*, 539 U.S. at 534.

Without an evidentiary hearing, it certainly cannot be concluded, as a matter of law on the extant record, that counsel acted upon the strategy ascribed to her by the district court, or that such a strategy rested upon an adequate investigation. The case must be remanded for further proceedings.

**2.      *The record contradicts the district court's inference that Drs. Rothke and Wetzel performed adequate and complete neuro-psychological evaluations as a matter of law, so that counsel's imputed reliance on them was professionally reasonable.***

An expert cannot offer an accurate evaluation without knowing the salient details of the defendant's background. Counsel must "present th[e] experts with information relevant to the conclusion of the expert." *Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1999). In order to provide such information, counsel first has to discover it by seeking out "all reasonably available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 524 (2003). "Until the life history investigation is complete, the mental health expert can render only a preliminary diagnosis or a differential diagnosis based on the incomplete information available to him." Richard J. Dudley & Pamela Leonard Blume, *Getting It Right: Life History Investigation As The Foundation For A Reliable Mental Health Assessment*, 36 Hofstra L. Rev. 963, 984 (2008).

From the face of the documents themselves, it is evident that Drs. Rothke and Wetzel were unaware of the detailed and vivid accounts of Mr. Holder's traumatic experiences that were presented on post-conviction review. *Compare*, *e.g.*, App. 147-48, 162 (account of train accident by Drs. Rothke and Wetzel), *with* App. 590-91, 644-45, 648-49 (train accident as graphically described by Terry Jett, Jennifer Merrigan, and Leslie Lebowitz). Nevertheless, in crediting counsel's reliance upon the findings of Dr. Rothke and Dr. Wetzel, the district court reached a number of factual inferences – with little or no basis in the record – in order to conclude that the doctors' analyses were sufficiently informed. Here as elsewhere, the district court erred by denying a hearing:

a. ***Enlarging the scope of information considered by the experts***

Without citing any language in the reports, the district court speculated that both experts *must* have considered evidence beyond what the reports specified:

> [T]he information contained in each expert's report was merely a ***summary*** of the information that he reviewed; it is ***highly likely*** that the experts were informed of additional information about Petitioner that was not specifically included in the reports. Thus, the Court can conclude that the experts were, in fact, aware of the various instances of trauma that Petitioner alleges they were unaware of, as a result of ineffective assistance of counsel.

Add. 127; App. 688 (first emphasis in original).

But neither psychologist's report supports the district court's reading, and certainly, neither report compels it. Neither one states that the expert relied on

information beyond that specified, much less that the "missing" information concerned the details of Mr. Holder's traumatic experiences. *See* App. 147-85 (reports); App. 147, 152, 159 (sources considered). The court's surmise that the experts were "highly likely" to have considered additional information is just that: surmise. The record does not "conclusively" resolve the question for purposes of section 2255.

**b.** *The specific details of Mr. Holder's traumatic experiences*

The reports of Drs. Rothke and Wetzel omit clinically significant details that bear upon a trauma evaluation and diagnosis. Rejecting this argument, the district court relied on guesswork as to what the experts did or didn't know:

> [U]pon review of Dr. Wetzel's preliminary report [doc. #21-5, 21-6] and Dr. Rothke's consultation report [doc. #21-4], *it appears* that the experts were in fact aware of many, if not all, of the specific instances of trauma cited by Petitioner.

Add. 126; App. 687 (emphasis added). The district court then recited the fact that both experts discussed some of the same *topics* in their reports: a seizure history, the drug use of Mr. Holder's mother as well as her "general difficulties," the train accident, and the brick assault. Add. 126-27; App. 687-88. The problem is that the pretrial reports do not reflect an awareness of the specific and vivid details that are necessary for a reliable trauma assessment. The record does not conclusively establish such awareness, as shown below.

(i) *The railroad accident* – Dr. Rothke reported only that Mr. Holder "sustained a left foot and right fifth toe amputation" when "attempting to jump on a moving freight train." App. 147. Dr. Wetzel similarly noted that Mr. Holder "tried to jump on a freight train," that the train "ran over his left leg and right foot," and that some of the bones and deep tissue of his right foot had been exposed. App. 162. But neither expert noted that Mr. Holder had been dragged underneath the train for 100 yards, until the his leg was severed off. App. 590, 644, 648-49. Neither reported the fact that the top of Mr. Holder's foot fell off as his friends were carrying him away from the scene, and while he was conscious. App. 590, 648-49. And neither knew that the "meat" was ripped from the adjoining calf. App. 648-49.

From a clinical standpoint, the omitted details cast doubt upon the experts' benign assessment of the accident's after-effects. "It would be extremely unlikely for an accident such as this not to have a negative effect on nearly any child. It is even more difficult to imagine how it would not be especially devastating for a child in Mr. Holder's position." App. 644 (declaration of Leslie Lebowitz).

From a legal standpoint, the same details illustrate counsel's obligation to conduct a full investigation of the client's social history, and to convey that evidence so that the expert may arrive at a reliable and fully-informed diagnosis. *E.g.*, *Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1999). "In capital litigation,

61

an accurate and reliable life history investigation is the foundation for developing and presenting pivotal mental health issues. Research has shown repeatedly that well documented and effectively presented mental health evidence has a positive impact on capital jurors." Dudley & Blume, *supra*, at 975-76. In this case, counsel was aware of the train accident, but none of her trial witnesses actually saw the event. Tr. X 46-49, 73-74, 112-13, 220-24; XI 114, 130. Appellant's longtime friend, Terry Jett, was easily located by post-conviction counsel, was present at the scene, and described the event in graphic detail. App. 593-94, 648-49. Nevertheless, no one from the trial team even contacted Mr. Jett. App. 650.

(ii) *The seizures during infancy* – Dr. Rothke's report mentions no seizure history at all. App. 147-52. Dr. Wetzel's report mentions a *single* febrile seizure when Mr. Holder was two years old. App. 160, 174, 176. In fact, Mr. Holder experienced seizures during his infancy "on several different occasions." App. 589, 642 (affidavit of Jennifer Merrigan and declaration of Leslie Lebowitz). The pretrial reports, then, are at best incomplete. Dr. Wetzel mentioned a "seizure" in his report, but that doesn't mean he knew the relevant clinical history.

(iii) *The drug addiction of Mr. Holder's parents* – As with the seizures, Dr. Rothke's report does not mention that Mr. Holder's parents were addicted to drugs. App. 147-52. Dr. Wetzel noted only appellant's report that "his mother . . . had it hard," App. 167, and that "his mother used drugs in the past ***once***, but no

longer does." App. 174 (emphasis added). These statements reflect a lack of

awareness that Mr. Holder's parents were "addicted" to crack cocaine, App. 620,

687, Add. 126, Tr. X 23-29, or the suffering that resulted from Mr. Holder's

traumatic family life:

> Mr. Holder's own parents began using crack-cocaine after their move to the Blumeyers Housing Project. Parental drug use is, in and of itself, a traumatic event for a child. It constitutes a profound abandonment of the child and invariably initiates a cascade of other adverse events.

App. 643 (declaration of Leslie Lebotwitz).

(iv) *The violent and crime-ridden neighborhood of Mr. Holder's youth* –

The pretrial experts are similarly silent about the war zone otherwise known as the

Blumeyer Housing Project. The district court credited Dr. Wetzel for noting the

"general difficulties" faced by Mr. Holder's mother, as well as appellant's own

experience in selling drugs just before his nineteenth birthday. App. 167, 687;

Add. 126. Dr. Wetzel knew that Mr. Holder's mother "had it hard." App. 167.

But that does not show a grasp that Mr. Holder was raised in an atmosphere of

"extreme and pervasive violence, gangs, and drugs." *See* App. 589, 642-43, 651,

653-55, 663-64. The Bluemeyers featured the open and notorious selling and

abuse of drugs, as well as gun violence so dangerous that even the police

abandoned the area at night. App. 589, 651, 653-55 ("people were robbing their

own mothers"), 661, 664. Again, the omitted information is clinically significant:

Gun violence was an everyday event, and children lived in fear of being shot or hurt.  Mr. Holder personally knew people who were shot, and at 16 a close friend of his was killed.  It is important to understand that the violence and lack of safety to which Mr. Holder was exposed was chronic.  It is one thing to be frightened and then have the opportunity to achieve safety.  It is far more damaging to be constantly frightened, at risk for serious injury or death, and to live in circumstances in which genuine safety is unobtainable.

App. 643 (declaration of Leslie Lebowitz).

### c. *The experts' reliance on Mr. Holder's self-assessments*

It is unreasonable for capital counsel and experts alike to rely on the defendant's self-assessment of his mental health.  Mental illness is both disabling and stigmatizing, and "a person with a mental disorder may be reluctant to recognize his own problems."  *Douglas v. Woodford*, 316 F.3d 1079, 1090 n.4 (9th Cir. 2003); *Bundy v. Dugger*, 816 F.2d 564, 566-67 & n.2 (11th Cir. 1987).  That is particularly true of those who have suffered chronic trauma.  "Unlike physical injury, in instances of psychological trauma, the victim cannot be expected to know or accurately report their injuries in a straightforward way."  App. 640.

Mr. Holder's claim rests centrally upon the psychological after-effects of his physical traumas, especially the grotesque railroad accident and his skull fracture from an assault with a brick.  On that score, the pretrial experts relied largely, if not exclusively, on Mr. Holder's minimized self-assessment in order to conclude that these events had little or no lasting effect.  Dr. Wetzel, for example, described

Mr. Holder's "psychological history" solely in terms of a self-report:

> Mr. Holder denied a history of panic attacks, panic disorder, generalized anxiety disorder, simple phobias, social phobias and agoraphobia. Even with probing, he denied phobias of railroads. He admitted he is more careful around railroad tracks, but no more than that. He specifically denied post traumatic stress disorder. He has had no nightmares or flashbacks to either the traumatic amputation or the assault with a brick. He denies any intrusive memories about either occasion. He denies any change in nervousness, physiological reaction or startle response.

App. 170. Dr. Rothke's report is to similar effect, observing that Mr. Holder "reports being essentially the same person as he was before his amputation and head injuries in terms of how he feels about himself, interpersonal relationships, and internal emotional experience." App. 149.

The district court nevertheless made inferences of its own. It observed that both specialists considered documents beyond their clinical interviews with appellant, such as medical records, prison records, and interview reports. Add 127; App. 688. From that undisputed premise, the court leapt to the following conclusion: "Upon review of these professionals' reports, *it appears* that their conclusions were based on far more than Petitioner's self-reporting." *Id.*

As elsewhere, the district court's inference is inconsistent with the record, and is plainly not compelled by it. We know that the experts generally considered materials beyond their interviews with Mr. Holder. App. 147, 152, 159. But that does not prove whether, or how, such materials informed the experts' assessment

of the train and brick incidents' impact on Mr. Holder's functioning.  Mr. Holder's post-injury behavior was itself post-traumatic, with a pattern of "severe denial" and social withdrawal.  App. 594, 645, 649-50, 652, 657, 659-60.  A trauma victim is often "heavily invested in appearing normal and unaffected, and the overt symptoms of PTSD are less likely to be manifest."  App. 646 (declaration of Leslie Lebowitz).  The victim "may appear numb, in denial, and seem unresponsive to material that should be painful.  In most cases, this type of presentation is a part of the posttraumatic picture."  *Id.*

It cannot be concluded, as a matter of law, that the pretrial experts grasped the fullness of Mr. Holder's "posttraumatic picture," or its clinical implications.  Mr. Holder is entitled to a hearing rather than the district court's bare inference of what the experts "appear" to have considered.  *See* Add. 127, App. 688.

> **3.** ***The purportedly "adequate" <u>neuropsychological</u> assessments from Drs. Rothke and Wetzel do not cure trial counsel's failure to consult a <u>trauma</u> expert under the known circumstances.***

Without the benefit of a hearing, the district court ruled that the government would have rebutted any mental health diagnosis by calling Dr. Wetzel to testify that "none of the traumatizing incidents had any impact on the Petitioner's culpability."  Add. 79; App. 469.  Of course, Dr. Wetzel is a neuropsychologist rather than a trauma expert.  If Mr. Holder had been granted a hearing as the law requires, he could have presented the testimony of a trauma expert such as clinical

psychologist Leslie Lebowitz.  *See* App. 637-47.  Even assuming that Dr. Wetzel would stand by his views when fully informed of Mr. Holder's past as analyzed by a more appropriate professional, a trauma expert could have swayed the jury with professional insights more relevant to Mr. Holder's case, and beyond the objective "brain damage" that is typically assessed by neuropsychologists.  *See* App. 639 (noting that effects of unresolved trauma "are different from the kinds of damage typically assessed by standardized neurological testing").

Counsel's duty to seek out "all reasonably available mitigating evidence," *Wiggins v. Smith*, 539 U.S. 510, 524 (2003), extends to selecting experts who have the relevant skills, credentials, and professional experience to diagnose the particular client under the particular circumstances.  The failure to do so is widely recognized as ineffective.  In *State v. Johnson*, 968 S.W.2d 686, 697-99 (Mo. 1998), for example, counsel ineffectively relied on a pharmacist at trial, and failed to call a forensic psychiatrist in support of the mitigating theory that the defendant suffered from "cocaine intoxication delerium."  Similarly, *Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1999), counsel used four experts, but none was a neurologist or toxicologist who could explain the neurological effects of Caro's extensive exposure to pesticides.  *Accord Prowell v. State*, 741 N.E.2d 704, 714 (Ind. 2001) (expert unqualified to assess schizophrenia); *Frierson v. Woodford*, 463 F.3d 982, 992 (9th Cir. 2006) (forensic psychiatrist, as opposed to neurologist,

not qualified to assess organic brain damage from childhood head injuries).

"Trauma" broadly means "something that induces overwhelming feelings of horror, fear or hopelessness . . . at a level of intensity that precludes our normal, everyday way of coping with stress." App. 639. Experts recognize that repeated exposure to trauma may impede an individual's ability to make sound judgments – with or without physical or organic brain damage. App. 641; *see also* M. Michele Murburg, *The Psychobiology of Posttraumatic Stress Disorder: An Overview*, Annals New York Academy of Sciences, 1997, at 352-53; Robert S. Pynoos et al., *Issues in the Development Neurobiology of Traumatic Stress*, Annals New York Academy of Sciences, June 1997, at 178; Robert F. Anda et al., *The Enduring Effects of Abuse and Related Adverse Experiences in Childhood: A Convergence of Evidence From Neurobiology and Epidemiology*, European Archives of Psychiatry and Clinical Neuroscience, 2005, at 175. Among other problems, unresolved and untreated trauma may lead to undue risk-taking and, more generally, may distort the victim's ability to rationally experience and perceive objective events. App. 641-42.

In this case, the traumatic events in appellant's life "raise serious red flags, which should have prompted trial counsel for Mr. Holder to hire and consult with *a trauma expert*." App. 646 (declaration of Leslie Lebowitz); *see also Ex parte Gonzales*, 204 S.W.3d 391, 395-97 (Tex. Crim. App. 2006) (counsel ineffective

for not pursuing defendant's trauma from sexual abuse by father); *Porter v. McCollum*, 130 S. Ct. 447, 453-54 (2009) (same, PTSD from abuse in childhood and experiences in Korean War).  But the district court's rulings do not sufficiently resolve the claim.  Even if Mr. Holder received "a full and complete **neuropsychological exam**" as between Drs. Rothke and Wetzel*, see* Add. 125-26, App. 686-87, that exam is distinct from a trauma assessment, which is not limited to the physical or organic brain damage that a neuropsychological exam detects. App. 639 (noting that effects of unresolved trauma "are different from the kinds of damage typically assessed by standardized neurological testing").

Trauma specialist Leslie Lebowitz described the traumas in Mr. Holder's background as "a crushing and overwhelming psychological and biological assault."  App. 642.  These events include numerous seizures during infancy; an upbringing in an housing project marked with "extreme and pervasive violence," parental neglect, and drug addiction; a "grotesque" train accident that "intersected with a life that was singularly unprotected and unparented"; and his later brain injury when a brick was thrown at his head.  App. 642-46.  Contemporaneous medical records warned of post-traumatic stress disorder, and Mr. Holder was repeatedly referred – at least *seventeen* times – for mental health treatment after the train accident as well as the brick assault, only to get no such treatment at all. App. 645-47.  "This level of medical and emotional neglect would be expected to

greatly compound the psychological impact of the trauma itself." App. 645.

Moreover, Dr. Rothke's and Wetzel's reports scarcely obviate the need for a trauma assessment as a matter of law. Setting aside the fact that both individuals are neuropsychologists rather than trauma experts, neither analyst "engaged in the type of broad based inquiry and examination necessary to explore for the possible after-effects of chronic and severe trauma." App. 647. Such inquiry includes "open-ended and discursive questioning," with special recognition of the fact that childhood trauma features "a great likelihood of a disguised presentation." App. 646-47. Dr. Wetzel examined Mr. Holder for PTSD, but that is "only one of the many possible sequalae of trauma," whose effects are generally "more pervasive and far less obvious" when the trauma occurs during childhood. App. 646.

Far from resolving all mental health issues once and forever, both doctors' reports show the need for further assessment. Both doctors noted, for example, that Mr. Holder experienced significant denial after his leg amputation, while Dr. Wetzel noted that Mr. Holder experienced "paranoia." App. 647. Medical records note that Mr. Holder was experiencing "severe denial," App. 162, 645, which is itself "one of the hallmarks of the post-traumatic response." App. 641. Counsel's investigation, therefore, "was also unreasonable in light of what counsel actually discovered." *Wiggins*, 539 U.S. at 524-25.

**4.** *Mr. Holder makes a sufficient showing of <u>Strickland</u> prejudice to justify further proceedings on his claim.*

Mr. Holder's claim involves the type of evidence that capital jurors often credit. "[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse." *Wiggins v. Smith*, 539 U.S. 510, 535 (2003). The testimony in question is inherently mitigating. If Mr. Holder suffered a chronic series of traumatic events during his childhood and the years preceding the crime, these events may have impaired his mental health, including his ability to make rational judgments and to reasonably assess the risks associated with his conduct. App. 641-42, 467; Add. 77. Mr. Holder, then, may have been naive about the danger that his crime posed to other people – even if he was aware of the danger to himself, and protected against that danger by obtaining a bullet-proof vest. A reliable and fully-informed trauma diagnosis could have cast reasonable doubt upon the guilt-phase proposition, in Counts 1 and 2, that Mr. Holder was "aware of a serious risk of death attending his conduct." *See* Tr. VII 26, 32 (Instructions 16, 20).

For sentencing purposes, the evidence that Mr. Holder seeks to present at a hearing "differ[s] in kind and substance from the evidence . . . presented at trial."

*Sinisterra v. United States*, 600 F.3d 900, 907 (8th Cir. 2010). The jury knew that

Mr. Holder came from a deprived background, that he was largely neglected by his

parents, and of course, that he was hit by a train and injured by a brick. *E.g.* Tr. X

23-29, 46-49, 112-13, 221; XI 34, 114, 131; XII 31-33, 79-82, 112-15, 119-20.

Nevertheless, the jury heard no evidence that explained how Mr. Holder's

traumatic upbringing impaired his judgment or led to any mental illness at all. To

the contrary, the defense's "future dangerousness" expert opined that Mr. Holder

was *not* mentally ill – a conclusion that lacked the benefit of a professionally

reasonable trauma assessment. Tr. X 156. The similarly uninformed Dr. Rothke

testified to the same effect, although he opined that Mr. Holder's need for a new

leg prosthesis was a motive for the robbery. Tr. XII 79-81, 91-95.

A fully-informed trauma expert, then, could have placed the defense in an

entirely different light, and could have shown that Mr. Holder suffered lasting

harm from the traumatic events of his upbringing:

> [W]e can assume that no child would be unaffected by this collection of
> profoundly adverse events. Moreover, it is reasonable to assume that
> trauma this severe would have some consequences within each of the
> major systems of the self (emotions and emotional regulation, cognitions
> and characteristic ways of interpreting experience, [and] biology,
> including but not limited to physiological reactivity and alterations in
> the brain).

App. 642.

The district court erred in denying all prejudice as a matter of law.

According to the district court, Mr. Holder's planning for the crime was so elaborate as to disprove any testimony that Mr. Holder was naive or unable to assess the dangerousness of his conduct. Add. 79, 129-30;App. 469, 690-91. In support of its argument, the district court noted the type and quantities of weapons and ammunition involved, the bulletproof vest worn, the evidence that Mr. Holder discussed the presence of a bank guard during statements before the offense, and the fact that Mr. Holder set fire to the first of three getaway cars, which he abandoned in a public park adjoining the City Zoo. *Id.*

The evidence cited by the district court simply does not disprove Mr. Holder's claim as a matter of law. For one thing, elaborate planning of a crime is not inconsistent with mental illness, or with a jury reducing its sense of the defendant's culpability. *E.g.*, *Caro v. Woodford*, 280 F.3d 1247, 1257 (9th Cir. 2002) (life verdict reasonably probable if jurors had known of defendant's brain damage, despite "evidence that Caro stalked Hatcher before killing him, lured Donner and Lucchesi to come near him so that he could shoot them at close range, attempted an alibi, had previously kidnapped and sexually assaulted other victims, and had made two escape attempts"); *Sheppard v. Bagley*, 604 F. Supp. 2d 1003, 1088-89 (S.D. Ohio 2009) (expert noting that "logical planning" of offense was "not necessarily inconsistent with serious mental illness").

Capital juries routinely make such seemingly "inconsistent" findings, which

are actually not inconsistent at all.  Thus, even when a crime satisfies the aggravating circumstance of "substantial planning and premeditation" under 18 U.S.C. § 3592(c)(9), juries have nevertheless found the defendant to be materially impaired.  *E.g.*, *United States v. Byers*, No. 1:08-cr-00056 (D. Md. 2009) (special verdict form at docket 339) (low intelligence and cognitive functioning); *United States v. Cyrus*, No. 3:05-cr-00324 (N.D. Cal. 2009) (docket 1529) (impaired capacity due to substance abuse); *United States v. Green*, No. 5:06-cr-00019 (W.D. Ky. 2009) (docket 257) (impaired capacity, severe mental or emotional disturbance, brain dysfunction, and neurological and psychological impairments); *United States v. Moonda*, No. 1:06-cr-00395 (N.D. Ohio 2007) (docket 283) (dependant personality disorder).

Furthermore, the evidence cited by the district court in no way disproves that Mr. Holder was naive about the danger of his conduct *to other people*.  *See* Add. 79, App. 469 ("Petitioner researched the safety provided ***to him*** in wearing body armor . . .) (emphasis added).  Appellant himself testified that his plan was for no one to be injured.  Tr. VI 70, 105, 107.  The evidence cited by the district court certainly shows that the plan was ill-conceived; for example, it is extremely dangerous to set fire to a van, in a public park, when the van contains loaded weapons, shotgun shells, and eighty rounds of SKS ammunition.  *See* Tr. III 199 ("I hear the – the whizzing of the ammunition going past us over our heads all

around us."). One might also question the soundness of modeling a bank robbery after those depicted in the movies *Heat* and *Set It Off. See* Tr. I 30 ("[L]adies and gentlemen, it's significant he names those two movies after which to pattern the plan with which he eventually puts in motion to rob this bank, which leads to the death of Mr. Heflin."). These facts are entirely consistent with an expert's assessment that Mr. Holder either did not, or could not, fully and rationally analyze all risks of his elaborately planned offense.

At bottom, the district court's reasoning is that Mr. Holder's expert evidence is simply unbelievable. That type of assessment requires a hearing, so that the content and credibility of the evidence can be reliably determined. *See Sinisterra*, 600 F.3d at 907 ("***If deemed credible and supported by evidence***, these factual assertions might present the kind of troubled history the Supreme Court has declared relevant to assessing a defendant's moral culpability.") (emphasis added).

The district court also emphasized that the jury declined to find, as mitigating circumstances, that Mr. Holder did not fire the fatal shots, and that Mr. Holder did not intend for anyone to be killed. Add. 80, App. 470. But these findings scarcely disprove the prejudice underlying appellant's claim. *Strickland* prejudice does not depend on the idiosyncracies of a particular sentencer or factfinder, but rather, upon the reasonably probable behavior of an objective jury

75

presented with different evidence. *Strickland v. Washington*, 466 U.S. 668, 694-95, 670 (1984) (sentencing judge's statement that the additional evidence would not have changed his decision was "irrelevant to the prejudice inquiry"). Therefore, even if the *initial jury* declined to find that Mr. Holder did not fire the fatal shots, the fact remains that the evidence, objectively viewed, strongly supports that inference. *See United States v. Allen*, 247 F.3d 741, 777 (8th Cir. 2001) ("[T]he evidence is essentially overwhelming that Allen fired the shots from the Chinese SKS that killed Richard Heflin.").

It is also noteworthy that the jurors credited a number of additional mitigating circumstances. Multiple jurors found that Mr. Holder had suffered a "series of losses" in his life, "which he failed to process despite recommendations that he receive counseling," that he suffered inconsistent parenting and lacked a positive male role model, that he served as "man of the house" from a "very young age" and had a sense of responsibility toward his mother and siblings, that he lacks a history of violent behavior, that he has made an adequate adjustment to confinement, and that he does not present a substantial risk of being dangerous or violent if sentenced to life imprisonment. Tr. XII 245-48. The jury also rejected one of the government's non-statutory aggravators, which is that "Richard Heflin's personal characteristics as an individual human being, and the impact of the death of Richard Heflin upon his family, make this crime more worthy of the death

penalty than other murders." *Id.*

The point is that the jurors credited a robust set of mitigating circumstances, and that Mr. Holder's sentencing presented a close issue rather than an overwhelming case for death. Moreover, none of the defense's mitigators asked the jury to even consider mental illness or impairment. There is no sense in which the omitted evidence would have been "cumulative" to anything presented at trial. *Cf. Amrine v. Bowersox*, 238 F.3d 1023, 1031 (8th Cir. 2001). A mental health diagnosis, based upon objective events already credited and believed by the jury, would have placed Mr. Holder's offense in a less sinister light than was so forcefully urged by the skilled prosecutors. *See* Tr. XII 228 ("He is a bad man with a lot of weaponry, a lot of ammo, weapons in the second getaway van. A bad man with an urge to kill, and he used it.").

If the sentencer had been presented with evidence that Mr. Holder's capacities were impaired, there is "a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537. That question must at least be resolved at a hearing, in order for the evidence to be evaluated as the law requires.

**IV.** **Trial counsel performed ineffectively by failing to object to the court's submission of the pecuniary gain aggravator where the submitted instruction failed to specify that the money-generating "offense" referred to the murder and not the underlying robbery.**

The jury considered and found the existence of two statutory aggravators in this case: (1) that Mr. Holder knowingly created a grave risk of death to one or more persons in addition to the victim; and (2) that Mr. Holder committed "the offense" in expectation of the receipt of anything of pecuniary value. Tr. XII 243. The pecuniary gain statutory aggravator set out in 18 U.S.C. § 3592(c)(8) is limited to situations where pecuniary gain is expected to follow as a direct result of the murder. *See United States v. Bolden*, 545 F.3d 609, 615-16 (8th Cir. 2008) (aggravator applies when bank guard killed to remove obstacle to robbery); *United States v. Cuff*, 38 F. Supp. 2d 282, 288 (S.D.N.Y. 1999) (applies where pecuniary gain flows directly from the killing). It does not apply in situations where pecuniary gain was not the motive for the murder. *See United States v. Chanthadara*, 230 F.3d 1237, 1263-64 (10th Cir. 2001) (inapplicable where victim killed due to her failure to open safe); *United States v. Bernard*, 299 F.3d 467, 483-84 (5th Cir. 2002) (inapplicable where the defendants carjacked married couple, forced them to withdraw money from ATM, and later killed them).

The district court instructed Mr. Holder's jury as follows with respect to the pecuniary gain aggravator:

> To establish that a defendant committed an offense in the expectation of the receipt of anything of pecuniary value, the government must prove that the defendant committed ***the offense*** in the expectation of anything in the form of money, property, or anything else having some economic value, benefit, or advantage.

Tr. XII 149 (emphasis added). The instruction did not specify that the "offense" referenced therein was the actual killing or murder. The instruction is defective because it allowed the jury to find the existence of the pecuniary gain statutory aggravating factor based solely on Mr. Holder's motive for the underlying bank robbery. *See Bolden*, 545 F.3d at 616; *Chanthadara*, 230 F.3d at 1263-64.

## A. Counsel performed deficiently by not knowing the law that would alert any reasonable attorney to object to the instruction's error.

Trial counsel did not object to the district court's submission of the pecuniary gain aggravating circumstance instruction. Mr. Holder submits that counsels' failure to do so constitutes ineffective assistance of counsel under the familiar two-prong test set out in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a claimant to show that counsel performed deficiently under prevailing professional norms, and that counsel's performance prejudiced the defense. *Id*. at 687-88. *See e.g. Reagan v. Norris*, 365 F.3d 616, 620-21 (8th Cir. 2004) (counsel's failure to object to first degree murder instruction without an essential element constituted ineffective assistance of counsel).

Mr. Holder's jury should have been specifically instructed that, in order to

find the existence of a pecuniary gain aggravator, the government must prove that M:r. Holder committed "the offense of murder" in expectation of the receipt of pecuniary gain. *See Bolden*, 545 F.3d at 616. While the *Bolden* opinion was issued well after Mr. Holder's case was decided, the legal basis for this claim existed at the time of Mr. Holder's trial, and put counsel on notice that the jury should have been specifically instructed that the offense listed in the pecuniary gain instruction was the "killing or murder."

Title 18 U.S.C. § 3592(c) lists the aggravating factors that could lead to the imposition of a sentence of death. Section 3592(c)(1) lists twenty felony offenses which warrant automatic death qualification whenever a death occurs during their commission. Robbery is not included on the list. That exclusion should have led defense counsel to conclude that the offense referenced in the definition of a pecuniary gain aggravator is the actual killing or murder. *See* 18 U.S.C. § 3592(c)(8); *Chanthadara*, 230 F.3d at 1263-64. In addition, the placement of the pecuniary gain aggravator in § 3592(c) immediately following the procurement of offense by payment aggravator, § 3592(c)(7), is an obvious clue that the offense referenced in the definition of pecuniary gain was, in fact, the murder. So too is the fact that all of the other statutory aggravating circumstances listed in § 3592(c) that contained the word "offense" in their description clearly refer to the murder. *See* §§ 3592(c)(6), (9), (13), (14). Accordingly, trial counsel should have been

aware that pecuniary gain only applied to situations where the gain was the motive for the murder, and that the jury should have been so instructed. *See e.g. United States v. Davis*, 904 F. Supp. 554, 558 n. 3 (E.D. La. 1995) (pecuniary gain factor refers to murder-for-hire).

Failure to investigate any and all claims regarding "the aggravating circumstances under which one's client is to be put in jeopardy of the death penalty falls well below the standard of representation required for capital defendants." *Starr v. Lockhart*, 23 F.3d 1280, 1285 (8th Cir. 1993) (citation omitted). Given the statutory framework of § 3592(c), counsel's failure to object to the pecuniary gain aggravating instruction on the basis that it did not specify that the jury must find that Mr. Holder committed the "killing or murder" in expectation of the receipt of pecuniary gain constitutes deficient performance.

While acknowledging that the pecuniary gain referenced in the instruction must flow from the actual murder and not the underlying robbery, the district court nonetheless denied relief, finding that counsel's failure to object to the instruction was not deficient because the facts supported that the murder was in furtherance of the pecuniary gain and, given the context of the term as well as the arguments of counsel, it was clear that the "offense" referenced in the instruction was the murder, not the underlying robbery. Add. 90; App. 480. Contrary to the district court's findings, the "offense" referenced in the pecuniary gain instruction could

81

have easily been interpreted by the jury as referring to the underlying robbery, and allowed them to find the existence of the pecuniary gain aggravator based upon the commission of the robbery alone. This Court's subsequent decision in *United States v. Allen*, 357 F.3d 745 (8th Cir. 2004), *vacated*, 406 F.3d 940 (8th Cir. 2005) (en banc), supports Mr. Holder's position.

Following the denial of his initial appeal, *United States v. Allen*, 247 F.3d 741 (8th Cir. 2001), Billie Allen's petition for certiorari was granted, the judgment vacated, and the matter remanded for reconsideration to this Court on the issue of whether the indictment charged a statutory aggravator. In the course of determining this issue, this Court found that the indictment did not charge the pecuniary gain aggravator because nothing in the indictment "necessarily linked" the murder to the receipt of, or expectation of the receipt of pecuniary gain. *Id*. at 750-51.

The same rationale applies to the analysis of whether the pecuniary gain instruction given in Mr. Holder's case was properly submitted. The operative question is: Did the instruction necessarily link the murder of the security guard to the receipt of pecuniary gain? The clear answer is no. The term "offense" could just as easily be interpreted as referring to the robbery, and allowed the jury to find the pecuniary gain aggravator based solely on the commission of the bank robbery. As such, the jury was not properly instructed, and Mr. Holder was deprived of a

fair trial on the disputable issue of whether Mr. Heflin was killed for the purpose of Mr. Holder's pecuniary gain. *See Bolden*, 545 F.3d at 616; *Chanthadara*, 230 F.3d at 1264; *Bernard*, 299 F.3d at 483; *United States v. Lalley*, 257 F.3d 751, 755 (8th Cir. 2001) (instructions permissible when they "fairly and adequately submitted the issues to the jury").

## B.     Counsel's deficient oversight prejudiced the defense.

Mr. Holder was prejudiced by counsel's performance in that the jury improperly weighed the improper pecuniary gain aggravator in reaching its decision to impose a sentence of death. The weighing of an invalid aggravator skews the sentencing process, and is fatal to the reliability of a death sentence. *Starr*, 23 F.3d at 1286. This is true even where the jury has found other valid aggravators because the invalid factor operates as an impermissible "thumb on the death's side of the scale." *See Stringer v. Black*, 503 U.S. 222, 229-32 (1992). The Court must therefore presume that the district court would have sustained a timely objection by trial counsel, and that the word "offense" would have been properly defined. *See United States v. Bain*, 586 F.3d 634, 638 (8th Cir. 2009) (noting "presumption that a district court knows and applies the law").

Elimination of the pecuniary gain aggravator leaves one statutory aggravator - that Mr. Holder knowingly created a grave risk of death to one or more persons in addition to Mr. Heflin. Tr. XII 243. The jury also found three

83

non-statutory aggravators: (1) that Mr. Holder's conduct was substantially greater in degree than that described in the definition of the crime; (2) that Mr. Holder committed other crimes in addition to the capital offenses; and (3) that Mr. Holder is likely to commit future crimes. *Id*. at 243-44.

The jury found a number of mitigating circumstances. The jury unanimously found that Mr. Holder's childhood was characterized by inconsistent parenting; that Mr. Holder lacked a positive male role model while growing up; and that Mr. Holder has been a father figure to his brother, Norrim, and that due to his influence and efforts, Norrim has made many positive changes in his life. *Id*. at 246, 247. Eleven of the jurors found that Mr. Holder assumed the role of the man of the house at a very young age and that he felt a sense of responsibility to provide emotional and financial support to his mother, brothers and sisters. *Id*. at 246. Ten jurors found that Mr. Holder is a likeable person who provides support and help to many of his extended family, friends and associates and that Mr. Holder does not present a substantial risk of being dangerous or violent if confined to prison for life without the possibility of relief. *Id*. at 247, 248. Nine jurors found that Mr. Holder suffered a series of losses in his life which he failed to process, despite recommendations that he receive counseling; and that he does not have a history of violent behavior and the offenses for which he was convicted are inconsistent with his personality and usual behaviors. *Id*. at 245, 257. Six jurors

found that Mr. Holder has a large family who is very attentive to him, support him, and will help him make an adequate adjustment to prison life and that Mr. Holder has made an adequate adjustment to being confined in jail and has not been a problem inmate. *Id*. at 247. Finally, two jurors found that Mr. Holder provided a positive role model to Norrim, Norrell, and Normeka Holder, Tony Sanders, and others. *Id*.

The ultimate question is whether, given counsel's unprofessional error in failing to object to submission of the pecuniary gain aggravator without defining the money-generating offense as being the actual murder, a reasonable probability exists that the result of the proceeding would have been different. *See Simmons v. Luebbers*, 299 F.3d 929, 939 (8th Cir. 2002). Given the abundance of the mitigating circumstances found by the jury, a reasonable probability does exist that, had the pecuniary gain aggravator not been presented to the jury, at least one juror would have voted against the death penalty. The district court's judgment must be reversed, and the case remanded with instructions to vacate Mr. Holder's death sentences.

**V.     The indictment is structurally defective because it fails to allege at least one statutory aggravating factor from 18 U.S.C. § 3592(c).**

The Fifth Amendment Indictment Clause requires the government to obtain an indictment prior to commencing prosecution "for a capital or other infamous crime." U.S. Const. amend. V. An indictment must contain all of the essential elements of the offense including an allegation of every fact "legally essential to the punishment to be inflicted." *United States v. Reese*, 92 U.S. 214, 232-33 (1975). Any fact, other than a prior conviction, which increases the punishment is an essential element which must be included in the indictment. *See Jones v. United States*, 526 U.S. 227, 243 n. 6 (1999).

Norris Holder and Billie Allen were charged by indictment with Count I: bank robbery by force or violence in which a killing occurs, and Count II: carrying or using a firearm during a crime of violence which results in a murder. The indictment does not include a statutory aggravator listed in 18 U.S.C. § 3592(c), a factor required to elevate the available statutory maximum sentence from life imprisonment to death. *See Ring v. Arizona*, 536 U.S. 584, 609 (2002) (statutory aggravating factors are the functional equivalent of elements of a capital offense). Accordingly, and as specifically found by the Eighth Circuit, the Holder/Allen indictment is constitutionally defective. *See United States v. Allen*, 406 F.3d 940, 943 (8th Cir. 2005) (en banc).

Mr. Holder submits that the faulty indictment constitutes a structural defect entitling him to relief from his sentence of death. *See e.g. Stirone v. United States*, 361 U.S. 212, 218-19 (1960). But, this Court has held otherwise, specifically finding the defective indictment to be subject to harmless error analysis, and under said analysis, harmless beyond a reasonable doubt. *Allen*, 406 F.3d at 945-48. The district court, bound as it is by the decisions of this Court, denied relief based upon this Court's en banc decision in *Allen*, ruling the error harmless. Add. 43-49; App. 433-39. But, despite the *Allen* decision, the question of whether the omission of an element of a criminal offense from a federal indictment can constitute harmless error or is a structural defect is an unsettled issue - one that was sidestepped by the Supreme Court in *United States v. Resendiz-Ponce*, 549 U.S. 102, 103-04 (2007).

The Supreme Court granted certiorari in *Resendiz-Ponce* to answer the specific question of whether "the omission of an element of a criminal offense in a federal indictment was a structural error, or one subject to harmless error analysis." The court avoided the issue by deciding that the indictment was not defective, *id*. at 110-11; however, Justice Scalia dissented from that finding, and in a harbinger of things to come, stated as follows:

> My dissenting view that the indictment was faulty . . . puts me in the odd position of being the sole Justice who must decide the question on which we granted certiorari: whether a constitutionally deficient

indictment is structural error, as the Ninth Circuit held, or rather is amenable to harmless-error analysis. I cannot vote to affirm or to reverse the judgment without resolving that issue . . . It should come as no surprise, given my opinions in *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006), and *Neder v. United States*, 527 U.S. 1, 30 (1999) (opinion concurring in part and dissenting in part), that I would find the error to be structural.

*Id*. at 116-17 (Scalia, J., dissenting).

While Mr. Holder realizes that the panel is bound by the en banc decision in *Allen*, he believes that this issue will be eventually addressed by the Supreme Court and raises this claim in order to preserve his position that, as soundly recognized by Justice Scalia, the defective indictment constitutes a structural defect warranting relief from his sentence of death.

# CONCLUSION

WHEREFORE, for the foregoing reasons, appellant respectfully requests that the Court reverse the judgment of the district court, and remand with instructions to vacate appellant's convictions and sentences, or, alternatively, to with instructions to conduct an evidentiary hearing.

Respectfully submitted,


/s/ Michael J. Gorla
Michael J. Gorla
720 Olive Street, Suite 1630
St. Louis, Missouri 63101
(314) 621-1617
(314) 621-7448 - Facsimile
E-mail: mjgorla@msn.com

/s/ Joseph W. Luby
Joseph W. Luby
Death Penalty Litigation Clinic
6155 Oak Street, Suite C
Kansas City, Missouri 64113
(816) 363-2765
(816) 363-2799 - Facsimile
E-mail: jluby@dplclinic.com

*Counsel for Appellant*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rules of Appellate Procedure 32(a)(7)(C), the undersigned certifies that this brief complies with the applicable type-volume limitations of Federal Rules of Appellate Procedure 32(a). This brief was prepared using a proportionally spaced type (Times New Roman, 14 points). Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), this brief contains 20,882 words, according to the word count function of WordPerfect 10 word processing software.

/s/ Joseph W. Luby
*Counsel for Appellant*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 25, 2011, a copy of the foregoing Substitute/Corrected Brief was submitted to the Eighth Circuit Court of Appeals and served upon Messrs. Steven E. Holtshouser, Joseph M. Landolt, John M. Bodenhausen, and Roger Alan Keller, Jr., Assistant United States Attorneys, via the CM/ECF system.

/s/ Joseph W. Luby
*Counsel for Appellant*