**NO. 10-1304 EMSL**

*Criminal*

IN THE

# UNITED STATES COURT OF APPEALS

## FOR THE EIGHTH CIRCUIT

*UNITED STATES OF AMERICA*

*Appellee*

*v.*

*NORRIS G. HOLDER*

*Appellant*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

BRIEF OF APPELLEE

RICHARD G. CALLAHAN
United States Attorney

**STEVEN E. HOLTSHOUSER, #24277**
**JOSEPH M. LANDOLT, #6484**
**JOHN M. BODENHAUSEN, #94806**
Assistant United States Attorney
111 South 10th Street, Room 20.333
St. Louis, Missouri  63102

Attorneys for Appellee

## STATEMENT AS TO ORAL ARGUMENT

This is an appeal from denial of a §2255 motion in a capital case. Oral argument is warranted and the Government respectfully suggests that thirty minutes of argument is appropriate.

# TABLE OF CONTENTS

STATEMENT AS TO ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . x

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

ARGUMENTS:

I      THE DISTRICT COURT CORRECTLY APPLIED THE STRICKLAND
STANDARD OF REVIEW TO CONCLUDE THAT HOLDER'S LEAD
TRIAL ATTORNEY FOLLOWED A SOUND STRATEGY THAT
EFFECTIVELY TESTED THE CHARGES AGAINST HOLDER . . . . . 39

II.    THE DISTRICT COURT CORRECTLY CONCLUDED THAT HOLDER'S
TRIAL COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO
OBTAIN AN INDEPENDENT BALLISTICS EXPERT AND THIS
COURT CANNOT AND SHOULD NOT CONSIDER HOLDER'S
UNTIMELY REVISION OF THIS CLAIM. . . . . . . . . . . . . . . . . . . . . 66

III.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN
DENYING AN EVIDENTIARY HEARING ON HOLDER'S CLAIM OF
INEFFECTIVE ASSISTANCE IN THE MENTAL HEALTH
INVESTIGATION, BECAUSE THE RECORD CLEARLY
CONTRADICTED THE CLAIMS OF DEFICIENT PERFORMANCE
AND PREJUDICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

IV. THE DISTRICT COURT CORRECTLY DETERMINED THAT COUNSEL WAS NOT INEFFECTIVE IN FAILING TO OBJECT TO THE PECUNIARY GAIN INSTRUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

V. THE DISTRICT COURT CORRECTLY HELD THAT THE INDICTMENT ERROR WAS NON-STRUCTURAL AND HARMLESS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

ADDENDUM

# TABLE OF AUTHORITIES

**Cases**                                                                                  **Page No.**

*Alcala v. Woodford*, 334 F.3d 862 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . 82

*Allen v. United States*, No 05-6764 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Allen v. United States*, No. 4:07 -CV-27 ERW . . . . . . . . . . . . . . . . . . . . . . . . . . 122

*Anderson v. City of Bessemer City*, 470 U.S. 564 (1985) . . . . . . . . . . . . . . . . . 39

*Atwater v. Crosby*, 451 F.3d. 799 (11th Cir. 2006),
    *cert. denied*, 127 S. Ct. 951 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Bacon v. Lee*, 224 F.3d 470 (4th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*Becht v. United States*, 403 F.3d 541 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . 79

*Bell v. Cone*, 535 U.S. 685 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 58

*Berryhill v. Schriro*, 137 F.3d 1073 (8th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . 75

*Bobby v. Van Hook*, 130 S.Ct. 13 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

*Brown v. United States*, 311 F.3d 875 (8th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . 42

*Bucklew v. Luebbers*, 436 F.3d 1010 (8th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . 41

*Burger v. Kemp*, 483 U.S. 776, 794 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

*Buster v. United States*, 447 F.3d 1130 (8th Cir. 2006) . . . . . . . . . . . . . . . . . . 76, 79

*Byram v. Ozmint*, 339 F.3d 203 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . 122

*Capitol Indemnity Corp. v. Russellville Steel Co., Inc.*,
    367 F.3d 831 (8th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Chandler v. United States*, 218 F.3d 1305 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . 81

*Cole v Roper*, 623 F.3d 1183 (8th Cir. 2010) . . . . . . . . . . . . . . . . . . . . 103, 104, 121

*Day v. United States*, 428 F.2d 1193 (8th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . 79

*Dodd v. United States*, 614 F.3d 512 (8th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . 70

*Engelen v. United States*, 68 F.3d 238 (8th Cir. 1995),
    *cert. denied*, 540 U.S. 1199 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

*Evans v. United States*, 200 F.3d 549 (8th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . 42

*Fink v. Lockhart*, 823 F.2d 204 (8th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . 46

*Florida v. Nixon*, 543 U.S. 175 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . 60, 61, 63

*Forsyth v. Ault*, 537 F.3d 887, 892 (8th Cir. 2008),
    *cert. denied*, *Forsyth v. Burt*, 129 S.Ct. 1044 (2009) . . . . . . . . . . . . . . . . 121

*Foster v. Lockhart*, 9 F.3d 722 (8th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . 122

*FTC v. Neiswonger*, 580 F.3d 769 (8th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . 75

*Harris v. Vasquez*, 949 F.2d 1497 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . 120, 121

*Hedrick v. True*, 443 F.3d 342 (4th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . 81

*Hightower v. Schofield*, 365 F.3d 1008 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . 62

*Hodge v. United States*, 602 F.3d 935 (8th Cir. 2010) . . . . . . . . . . . . . . . . . . . . 39

*Honeycutt v. Roper*, 426 F.3d 957 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . 41

*Hood v. United States*, 342 F.3d 861 (8th Cir. 2003),
    *cert. denied*, 540 U.S. 1163 (2004) . . . . . . . . . . . . . . . . . . . . . 40, 58, 64, 74

*Howard v. United States*, 533 F.3d 472 (8th Cir. 2008) . . . . . . . . . . . . . . . . . . . 69

*Innovative Home Health Care, Inc. v. P.T.-O.T. Associates of the Black Hills,*
    141 F.3d 1284 (8th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*Jenkins v. Winter*, 540 F.3d 742 (8th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . 75

*Jones v. Roper*, 311 F.3d 923 (8th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . 41

*Lockley v. Deere & Company*, 933 F.2d 1378 (8th Cir. 1991) . . . . . . . . . . . . . . 75

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Neder v. United States,* 527 U.S. 1 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 140

*Parker v. Bowersox*, 188 F.3d 923 (8th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . 52

*Parkus v. Delo*, 33 F.3d 933 (8th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . 2, 105

*Poyner v. Murray*, 964 F.2d 1404 (4th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . 121

*Pruett v. Thompson,* 996 F.2d 1560 (4th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . 121

*Pruitt v. United States*, 233 F.3d 570 (8th Cir. 2000) . . . . . . . . . . . . . . . . . . . . 72

*Ring v. Arizona*, 536 U.S. 584 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

*Rompilla v. Beard*, 545 U.S. 374 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 82, 122

*Sanders v. United States*, 341 F.3d 720 (8th Cir. 2003) . . . . . . . . . . . . . . . . . 76, 80

*Schlup v. Delo*, 513 U.S. 298 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*Sears v. Upton*, 130 S.Ct. 3259 (2010) . . . . . . . . . . . . . . . . . . . . . 83, 123, 132, 138

*Silary v. Peters*, 905 F.2d 986 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . 120, 121

*Sinisterra v. United States*, 600 F.3d 900 (8th Cir. 2010) . . . . . . . . . . 104, 127-130

*Smith v. United States*, 348 F.3d 545 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . 42

*Strickland v. Washington*, 466 U.S. 668 (1984) . . 39-42, 46, 60-62, 64, 70, 71, 74, 81, 83, 135

*Stringer v.Black*, 503 U.S. 222 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

*Thomas v. Gilmore*, 144 F.3d 513 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . 81

*Tinajero-Ortiz v. United States*, 635 F.3d 1100 (8th Cir. 2011) . . . . . . . 39, 80, 133

*Trice v. Ward*, 196 F.3d 1151 (10th Cir. 1999), *cert. denied*, 531 U.S. 835 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*United States v Resendiz-Ponce*, 549 U.S. 102 (2007) . . . . . . . . . . . . . . . 141, 142

*United States v. Allen*, 247 F.3d 741 (8th Cir. 2001)(*Allen I*) . . . . . . . . . . . . . . . . 1

*United States v. Allen*, 357 F.3d 745 (8th Cir. 2001)(*Allen II*) . . . . . . . . . . . . . . 136

*United States v. Allen*, 406 F.3d 940 (8th Cir. 2005), *cert. denied*, 127 S.Ct. 826 (2006), (*Allen III*) . . . . . . . . . . 38, 136, 141, 142

*United States v. Beckman,* 222 F.3d 512 (8th Cir.2000) . . . . . . . . . . . . . . . . . . . 140

*United States v. Bolden*, 545 F.3d 609 (8th Cir. 2008) . . . . . . . . . . . . . . . . 134-137

*United States v. Cronic,* 466 U.S. 648 (1984) . . . . . . . . . . . . . . . . . . . . . . 40, 46, 48

*United States v. Davis*, 406 F.3d 505 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . 75

*United States v. Davis*, 904 F.Supp. 554 (E.D.La. 1995) . . . . . . . . . . . . . . 136, 137

*United States v. Delay,* 500 F.2d 1360 (8th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . 51

*United States v. Dvorak*, 617 F.3d 1017 (8th Cir. 2010) . . . . . . . . . . . . . . . . . . . 139

*United States v. Gill,* 513 F.3d 836 (8th Cir.2008) . . . . . . . . . . . . . . . . . . . . . . . 140

*United States v. Harden*, 846 F.2d 1229 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . 121

*United States v. Inman,* 558 F.3d 742 (8th Cir.2009) . . . . . . . . . . . . . . . . . . . . . . 140

*United States v. Jones*, 678 F.2d 102 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . 51

*United States v. Lambros*, 404 F.3d 1034 (8th Cir. 2005) . . . . . . . . . . . . . . . . . 72

*United States v. Metro St. Louis Sewer District*, 440 F.3d 930 (8th Cir. 2006) . . 105

*United States v. White*, 341 F.3d 673 (8th Cir. 2003) . . . . . . . . . . 41, 46, 47, 75, 79

*Wadlington v. United States*, 428 F.3d 779 (8th Cir. 2005) . . . . . . . . . . . . . . . . 42

*Wainwright v. Lockhart*, 80 F.3d 1226 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . 76

*Walters v. Thomas*, 46 F.3d 1506 (11th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . 81

*Walton v Arizona*, 497 U.S. 639 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

*Waye v. Murray*, 884 F.2d 765, 766-67 (4th Cir. 1989) (per curiam) . . . . . . . . . 121

*Wiggins v Smith*, 539 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . . . . . . 81, 90, 93, 132

*Williams v. Taylor*, 529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . . . . . . 82, 121, 122

*Williams v. United States*, 452 F.3d 1009 (8th Cir. 2006) . . . . . . . . . . . . . . . . 40, 41

*Wilson v. Greene*, 155 F.3d 396 (4th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . 121

*Yarborough v. Gentry*, 540 U.S. 1 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41

## **Guidelines**

Title 18 U.S.C. § 2113(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Title 18 U.S.C. § 2113(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 51

Title 18 U.S.C. § 3292(c)(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

Title 18 U.S.C. § 924(c)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Title 18 U.S.C. § 924(j) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Title 28 U.S.C. § 2253 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

Title 28 U.S.C. § 2253(c)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

Title 28 U.S.C. § 2255 . . . . . . . . . . 31, 32, 34, 39, 42, 44, 45, 49-51, 65-67, 69, 72,
                                 73, 75, 78-80, 84, 85, 89-91, 103, 106, 134, 141, 143

Title 28 U.S.C. § 2255(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 85

## **Rules**

Federal Rules of Civil Procedure 59(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

_____

**NO. 10-1304 EMSL**

*Criminal*

_____

*UNITED STATES OF AMERICA*

*Appellee*

*v.*

*NORRIS G. HOLDER*

*Appellant*

_____

*APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI*

_____

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

**I.**  **WHETHER THE DISTRICT COURT CORRECTLY APPLIED THE STRICKLAND STANDARD OF REVIEW TO CONCLUDE THAT HOLDER'S COUNSEL FOLLOWED A SOUND STRATEGY THAT EFFECTIVELY TESTED THE CHARGES AGAINST HOLDER.**

*Florida v. Nixon*, 543 U.S. 175 (2004)
*Parker v. Bowersox*, 188 F.3d 923 (8th Cir. 1999)
*Bell v. Cone*, 535 U.S. 685 (2002)

**II. WHETHER THE DISTRICT COURT CORRECTLY CONCLUDED THAT HOLDER'S TRIAL COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO OBTAIN AN INDEPENDENT BALLISTICS EXPERT AND WHETHER THIS COURT CAN OR SHOULD CONSIDER HOLDER'S UNTIMELY REVISION OF THIS CLAIM.**

*Wainwright v. Lockhart*, 80 F.3d 1226 (8th Cir. 1996)
*Howard v. United States*, 533 F.3d 472 (8th Cir. 2008)
*Pruitt v. United States*, 233 F.3d 570 (8th Cir. 2000)

**III. WHETHER THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING AN EVIDENTIARY HEARING ON HOLDER'S CLAIM OF INEFFECTIVE ASSISTANCE IN THE MENTAL HEALTH INVESTIGATION, WHERE THE RECORD CLEARLY CONTRADICTED TIMELY CLAIMS OF DEFICIENT PERFORMANCE AND PREJUDICE.**

*Cole v. Roper*, 623 F.3d 1183 (8th Cir. 2010)
*Forsyth v. Ault*, 537 F.3d 887, 892 (8th Cir. 2008),
       cert. denied, *Forsyth v. Burt*, 129 S.Ct. 1044 (2009)
*Williams v. Taylor*, 529 U.S. 362, 395 (2000)
*Sears v. Upton*, 130 S.Ct. 3259 (2010)
*Sinisterra v. United States*, 600 F.3d 900, 907-08 (8th Cir. 2010)

**IV. WHETHER THE DISTRICT COURT CORRECTLY DETERMINED THAT COUNSEL WAS NOT INEFFECTIVE IN FAILING TO OBJECT TO THE PECUNIARY GAIN INSTRUCTION.**

*United States v. Bolden*, 545 F.3d 609 (8th Cir. 2008)
*Neder v. United States,* 527 U.S. 1, 9, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)
*United States v. Gill,* 513 F.3d 836, 849 (8th Cir.2008)

**V. WHETHER THE DISTRICT COURT CORRECTLY HELD THAT THE INDICTMENT ERROR WAS NON-STRUCTURAL AND HARMLESS.**

*United States v. Allen*, 406 F.3d 940, 943 (8th Cir. 2005),
    *cert. denied*, 127 S.Ct. 826 (2006), (*Allen III*)
*United States v Resendiz-Ponce*, 549 U.S. 102, 103-04 (2007)

<u>**STATEMENT OF THE CASE**</u>

Norris Holder was tried and convicted of two capital offenses in 1998. The District Court, the Honorable Richard E. Webber, followed the jury's verdict and sentenced Holder to death. Holder's conviction and sentence were affirmed on direct appeal. *United States v. Allen*, 247 F.3d 741 (8th Cir. 2001)(*Allen I*). The Supreme Court denied certiorari on Holder's appeal in 2003. *Allen I*, *cert. denied*, 539 U.S. 916 (2003).

Holder's first 2255 motion was filed July 9, 2003, but the petition that the District Court reviewed was filed June 8, 2004. The District Court determined the scope of the evidentiary hearing on December 2, 2004, and the hearing spanned three days in July, 2005. The witnesses were Caryn Tatelli, Holder's trial mitigation investigator; Jennifer Herndon, one of Holder's trial counsel; and Richard Burr, a director of the Federal Death Penalty Resource Counsel, who injected himself into the defense trial team. Post-hearing briefing was stayed pending the Supreme Court's consideration of a petition for a writ of certiorari in Allen's case, *Allen v. United States*, No 05-6764. The District Court ruled on Holder's §2255 motion in a 100-page Memorandum and Order dated July 22, 2008. Holder filed a Rule 59(e) motion on August 13, 2008, and the District Court denied the motion in a 34-page Memorandum and Order dated December 14, 2009. Holder did not submit the declarations of Dr.

1

Leslie Lebowitz and seven others until November 21, 2008, when Holder replied to the Government's response to the Rule 59(e) motion. Thus, Holder waited <u>over 5 years</u> to present to the District Court the declarations on which Holder now relies in Argument III, *infra*. Holder cited *Parkus v. Delo*, 33 F.3d 933 (8th Cir. 1994), in support of his argument that he could introduce new evidence in a Rule 59(e) motion. As the District Court noted, *Parkus* does not support or allow such abuse of Rule 59(e). Because the District Court did not accept the documents submitted in support of the Rule 59(e) motion and reply, much of the material included in Holder's Brief Appendix is not part of the record on appeal.

**STATEMENT OF FACTS**

## I.     Introduction

The statement of facts in Holder's brief is essentially correct.  In addition, a detailed description of the evidence adduced at trial and the post-trial proceedings can be found in the District Court's Memorandum and Order denying Holder's §2255 motion.  *Holder App* 19 at 391-429.[1]  The Government has also included in the addendum to this brief an excerpt from the Government's description of the facts and evidence at trial submitted by the Government in its initial response to Holder's §2255 motion.  *See, Addendum.  See also, Holder App* 6 at 54-88.

In short, on March 17, 1997, Norris Holder and Billie Allen entered the Lindell Bank and Trust while a St. Patrick's Day celebration was under way in the City of St. Louis.  Much preparation had gone into the robbery and both were armed with military assault rifles and many magazines of extra hollow-point ammunition.  Holder was wearing a bullet-proof vest.  While the evidence established that Allen immediately murdered the armed guard, Richard Helfin, in a barrage of lethal gunfire, not all of the bullets that hit Mr. Heflin were positively

---

[1]For the convenience of the Court, the Government will refer to Holder's appendices where possible rather than submit duplicative appendices.  The Government has also submitted appendices containing additional pertinent materials.

linked to Allen's weapon and Holder the evidence established that Holder discharged his weapon in the bank. The bank had several customers and many employees working at the time of the robbery. A quantity of cash was obtained and Holder and Allen exited the bank in a stolen van that had been pre-doused with gasoline. En route to another getaway car, the gasoline in the van caught fire and the occupants had to exit the vehicle. Allen managed to get away, but Holder, who had a prosthetic leg, was captured. Allen was later arrested. Holder made a variety of post-arrest statements and witnesses identified Holder and the vehicle.

A combination of eyewitness, ballistics, fingerprint and other forensic evidence left little doubt that Holder committed the robbery. Holder's admissions and his own defense testimony were also heard by the jury. For the purpose of the issues in this appeal, the ballistics evidence and the evidence of planning by Holder warrant more detail, as do the penalty phase and habeas litigation.

## II. <u>Weaponry and Vehicles</u>

The getaway van was "fully involved" in fire when the fire department arrived and put it out. Two weapons were seized from the van after the fire was extinguished. Holder's weapon, the Russian-made SKS with a bayonet and an extended magazine known as a banana clip attached to it, Exhibit 38, was on the floor between the driver's and passenger's seats. The Russian SKS still had some

cartridges in the extended magazine at the time of the fire. *Trial Tr.* 3-20-98 at 251-252). Allen's weapon, the Chinese SKS, which did not have a clip, was on the floor in front of the passenger's seat. It was not loaded at the time of the fire. *Trial Tr.* 3-20-98 at 250-251, 257. Police also seized a burned magazine attached to the Russian SKS. *Trial Tr.* 3-20-98 at 253-54, and four other banana clips from the van. *Trial Tr.* 3-20-98 at 254. The four magazines were of the extended type usable only in the altered Russian SKS, *Trial Tr.* 3-24-98 at 99, and had been consumed in the fire; they had exploded areas within them, indicating that there had been a "cook-off" of live ammunition. *Trial Tr.* 3-24-98 at 98. Also seized from the van were 85 fire-damaged shells, caliber 7.62 by 39mm; 79 .30 caliber bullets; 8 burned 12 gauge shotgun shells, and one loaded round of 7.62 by 39mm ammunition. *Trial Tr.* 3-20-98 at 269. A Radio Shack transceiver and yet another (the sixth) banana clip were recovered from the street by the burning van. There were 18 live rounds of 7.62 by 39 millimeter ammunition in this banana clip. *Trial Tr.* 3-20-98 at 248.

The Russian SKS, Holder's weapon, the Chinese SKS and all of the cartridges, shell casings and bullets recovered during the investigation were taken to the St. Louis Metropolitan Police Department Laboratory for analysis and comparison. Firearms examiner Frank Stubits reached the following conclusions:

The Russian-made SKS was a 7.62 X 39 mm calibered semiautomatic rifle with a bayonet attached and a loaded extended magazine.  In the magazine were three spent shell casings, three "cooked-off" shell casings and one burnt bullet.   The "cooked-off" casings were a result of the fire; the live cartridges in the magazine exploded within it, erupting from the magazine and leaving remnants of ammunition.  *Trial Tr.* 3-24-98 at 91-95.   The Russian SKS, which was designed to hold only eleven rounds of ammunition, had been modified to accept the extended magazine or "banana clip," which held 37 rounds of ammunition.  The Russian SKS was reloaded by exchanging an empty "banana clip" for a full one.

A total of one hundred eighty-four (184) 7.62 by 39 millimeter rounds were recovered during the course of the investigation.  *Trial Tr.* 3-24-98 at 107-108.  All of this ammunition was high powered, Russian made, military-style ammunition of the hollow point design.  Hollow point ammunition is designed to mushroom open upon impact to create more damage. *Trial Tr.* 3-24-98 at 112.  Twenty-one (21) 12 gauge shotgun cartridges were also recovered.

Of the sixteen shell casings recovered from within the Bank, eight were positively identified as having been fired by Allen's Chinese SKS.  Another three

6

were consistent only with having been fired by the Chinese SKS.[2] Of the remaining five rounds, three could <u>only</u> have been fired by Holder's Russian SKS, and two could have been fired by either of the weapons. *Trial Tr.* 3-24-98 at 128, 134-37, 143.

The bullets recovered from Mr. Heflin's liver, right thigh, left thigh and bullet fragments from the knee could not be positively identified to either firearm due to mutilation of the bullets. These items could have been fired from <u>either</u> firearm. *Trial Tr.* 3-24-98 at 118, 124. The bullets recovered from the lethal wounds to Mr. Heflin's abdomen[3] and kidney were positively fired by Allen's Chinese SKS. *Trial Tr.* 3-24-98 at 119.

Near the corner of Clayton Avenue and Faulkner Drive in Forest Park, police found the second getaway vehicle, a Dodge van which had been stolen overnight. Inside the Dodge van, the police recovered a 12 gauge shotgun with pistol grips, owned by Norris Holder. It was fully loaded with eight (8) rounds of 12 gauge ammunition. Some of this ammunition was also "000" buckshot of the

---

[2]This total of eleven rounds accounts for all of the rounds that the Chinese SKS could have held without reloading. It also explains why the Chinese SKS was not loaded at the time of the fire in the getaway van. It had been fired in the bank until it was empty.

[3]The bullet from the abdomen appeared to have ricocheted off of a hard object before entering Mr. Heflin's body.

type found in the pocket of the jacket Allen discarded in Forest Park. The route Allen and Holder took from the Bank would have led directly to the Dodge van had the getaway van not caught fire and burned. *Trial Tr.* 3-20-98 at 283-285; 3-23-98 at 79-82.

About 10:00 p.m. on the 17th, police discovered the third getaway vehicle, Holder's Mercury Topaz, in the Barnes Hospital parking garage. The garage is only a short distance from the location where the second getaway van was recovered. Allen's left thumb print was found on the window of the passenger's door of the Topaz. Holder's palm print was found on the window of the driver's door. Inside the Topaz was Holder's driver's license. *Trial Tr.* 3-23-98 at 56-61, 87-89.

### III. <u>Planning</u>

The government introduced detailed evidence of the substantial amount of planning by Holder that preceded the bank robbery. Holder was a Bank customer and between January of 1996 and March of 1997 he made fifteen withdrawals of $500 from the Bank, including on March 13, 1997. *Trial Tr.* 3-19-98 at 109-111. Holder admitted during questioning after his apprehension that he had committed the robbery because he needed money; he wanted to "start from scratch and live right," and he needed money for a lawyer. *Trial Tr.* 3-24-98 at 22. Holder

8

admitted: 1) that he and Allen had chosen the Bank because he had an account there, and he knew the layout of the Bank and that it was near a highway; 2) that they stole two vehicles; 3) that they used one as the getaway vehicle and parked the second in Forest Park, where they planned to switch vehicles, set the first vehicle on fire, and drive to Holder's car parked in the Barnes Hospital parking garage; and 4) that prior to going to the Bank, they had poured gasoline into the van. *Trial Tr.* 3-24-98 at 17-19.

He further admitted that he had carried a loaded Russian SKS with a bayonet, and that Allen had carried a Chinese SKS without a bayonet. He then leaped over the counter with the assault rifle and went through the teller drawers. He put the money in a green laundry bag, jumped back over the counter, and ran out of the Bank. He drove the van onto Highway 40, running the electric signals; when he flicked his lighter the inside of the van caught on fire and burst into flames as they were driving. *Trial Tr.* 3-23-98 at109-111, 117. He repeatedly professed surprise that there was any shooting and denied firing his weapon, but admitted that he wore a bullet proof vest, and that they had ammunition in five or six clips. *Trial Tr.* 3-24-98 at18, 20, 23, 56.

Other witnesses and physical evidence corroborated Holder's admissions. The Russian SKS assault rifle, equipped with a bayonet and a curved clip was

purchased on November 19, 1996 and later sold to Norris Holder. *Trial Tr.* 3-18-98 at 125,135. Holder, accompanied by Billie Allen, purchased the bulletproof vest from a kiosk at the St. Louis Center shopping center in downtown St. Louis on March 13, 1997. The salesman testified that he informed Holder and Allen that the vest would stop bullets from the types of weapons carried by St. Louis police. *Trial Tr.* 3-19-98 at 12-15. A Winchester 12-gauge shotgun was purchased for Norris Holder by his cousin in 1995. *Trial Tr.* 3-18-98 at 114.

Holder had been thinking about committing a bank robbery for some time. Holder's acquaintance, Terry Gear, testified that, around New Year's Day of 1997, Holder asked him if he had ever thought about robbing a bank. Gear asked Holder if he had thought about the consequences involved, to which Holder replied that he wouldn't get caught. Gear also testified that Holder said that he needed some money. Holder also asked him if he had seen the movies "Heat" and "Set It Off." *Trial Tr.* 3-18-98 at 151-152. Gear described the movie "Heat" as about high-class bank robbers and as involving guns and violence. He described the movie "Set It Off" as involving female bank robbers engaging in shootouts. He observed to Holder that "the people in those movies died, and it really wasn't worth it." *Trial Tr.* 3-18-98 at 152-153.

Holder again responded that he had a plan, and described it for Gear. He stated that he had seen a bank on Grand and close by a highway. He planned that one person would get all the people down while the other person would collect the money, and someone else would watch the door. After they left, they would get on the highway, go down one exit, and change cars at an apartment complex. *Trial Tr.* 3-18-98 at 153-154. Again Gear responded that the risk was too high, whereupon Holder responded that no one would be crazy enough to try to stop them with the firepower they had, indicating that he had an assault rifle that could go through bulletproof vests and police cars. He also stated that if someone tried to stop him, he would just shoot at the cars and get rid of them, and that if someone got in his way, he would get rid of him. *Trial Tr.* 3-18-98 at 154-155, 172.

Wayne Ross, a childhood friend of Norris Holder's, *Trial Tr.* 3-18-98 at 175, testified that he observed Norris and Billie Allen talking together at a nightclub named "Cloud Nine" on March 7th or 8th of 1997. *Trial Tr.* 3-18-98 at 180-181, 224 and 238. During the following week, he watched the movie "Heat" at his uncle's house with some friends, including Norris. *Trial Tr.* 3-18-98 at181-182. All those present, including Norris, expressed admiration for the "hardness" of the bank robbers in the movie as they fought to the death in their gunfights with the police. *Trial Tr.* 3-18-98 at 183-184. Ross testified that he invited Norris to

accompany him back to college, but Norris declined, saying that he had to "pull a lick" because he needed money. *Trial Tr.* 3-18-98 at 200.

Holder and Allen cased the Bank together. Lisa Moore, a bank teller, testified that a man accompanied Holder on the March 13th visit; while she waited on Holder, the other man sat on the edge of a chair in the lobby looking around. *Trial Tr.* 3-19-98 at 114. Ms. Moore later identified Billie Allen in a lineup as the man who accompanied Holder to the Bank that day. *Trial Tr.* 3-19-98 at 119-120.

## IV.    **Holder's Testimony**

Holder testified on March 25, 1998, in his own defense during the guilt phase.[4] He admitted to robbing the Bank, but repeatedly testified that, not only did he not know there was to be any shooting, he instructed Allen that there was to be no shooting at all. He portrayed Allen as the instigator of the crime, testifying that Allen suggested robbing the Bank as a way for Holder to obtain money to buy a better prosthesis,[5] that Allen asked to accompany him to the Bank when he went to deposit his disability check, and that Allen paged him repeatedly the morning of the robbery. However, Holder admitted to supplying the Russian and Chinese SKS

---

[4]Specific transcript page citations are contained in the Addendum to Appellee's Brief.

[5]In contrast, Allen, during the sentencing phase of his trial, was repeatedly characterized as a follower. See Allen Tr. 17, pp. 23-85.

12

weapons, the walkie talkies, and to purchasing a bulletproof vest.  He denied

shooting his gun, and denied that he drove the car after the robbery.  He testified

that he set the van on fire to get Allen to stop the vehicle, and that once the van was

stopped, he jumped out on the passenger side.

Holder ended his direct testimony with the following explanation for his

participation in the robbery:

> I was in there trying to get some money to – what I thought I was doing the right thing trying to change my life for the better, just take some money that was insured, nobody get hurt, everybody is fine.  To change my life for the better, not to take somebody's life.  Not to hurt somebody, not to take somebody from their people, their family.

*Trial Tr.* 3/25/98 at 106.

On cross-examination, Holder admitted that he willfully and intentionally

robbed the Bank, that Richard Heflin was killed, and that his actions were reckless

and placed everyone in the bank at a grave risk of death.  *Trial Tr.* 3/25/98 at 130,

132, 170-71.  He admitted that he loaded his gun the evening before the robbery,

and that he went into the Bank with his weapon ready to be fired, with a bullet in

the chamber so that it could be fired by squeezing the trigger and that he wore a

bulletproof vest.  *Trial Tr.* 3/25/98 at 108-09. He admitted providing the Chinese

SKS to Billie Allen, and to providing the ammunition and the shotgun, even

though Allen had told him he was going to "go wild." *Trial Tr.* 3/25/98 at 122-23.

13

He denied firing the Russian SKS or dropping any live cartridges in the Bank. *Trial Tr.* 3/25/98 at124-26, 167.  He admitted that, even though he considered Mr. Heflin his friend and didn't want him to get hurt, he did not stop and try to help him as they left the bank. *Trial Tr.* 3/25/98 at 147.

He admitted to fully loading the pistol-gripped shotgun found hidden in the stolen Dodge van to be used as the second getaway van, but denied that he intended it to use it on anyone attempting to prevent his escape.  *Trial Tr.* 3/25/98 at 134-36.   He denied the truthfulness of the testimony of several other witnesses. *Trial Tr.* 3-25-98 at 110-19, 153-54.

## V.     The Charges and Guilt Phase

Holder  was charged by Indictment with the crimes of Count I, the robbery of Lindell Bank & Trust which resulted in a death, and Count II, using or carrying a firearm during and in relation to a crime of violence which results in a murder. The jury returned verdicts of guilty as to each count. *Trial Tr.* 3/25/98 at 119.

## VI. <u>The Penalty Phase</u>

### A. <u>The Aggravating Evidence</u>

As to each of Count I and Count II, the United States submitted two statutory aggravating factors and four non-statutory aggravating factors to the jury. The statutory aggravating factors were:

1. That Norris G. Holder, in the commission of the offense, or in escaping apprehension for the violation of the offense, knowingly created a grave risk of death to one or more persons in addition to Richard Heflin;
2. That Norris G. Holder committed the offense in the expectation of the receipt of anything of pecuniary value.

The Government relied on the evidence presented at the guilt phase of the trial to prove these statutory aggravating factors.

The non-statutory aggravating factors were:

1. That Norris G. Holder's conduct in committing the offenses was substantially greater in degree than that described in the definition of the crime, apart from the statutory aggravating factors;
2. That Norris G. Holder has committed other criminal acts in addition to the capital offenses committed in this case;
3. That Norris G. Holder is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to society;  and
4. That Richard Heflin's personal characteristics as an individual human being and the impact of the death of  Richard Heflin upon his family make this crime more worthy of the death penalty than other murders.

*Holder App* 6 at 84-88.

As to the first non-statutory aggravating factor, that Holder's conduct was substantially greater in degree, the Government relied upon the evidence submitted

15

at the guilt phase.  As to the second non-statutory aggravating factor, that Holder had committed other criminal acts, the Government introduced evidence that Holder pleaded guilty in 1995 to the crimes of carrying a concealed weapon and possession of controlled substances.  In connection with these offenses, the Government introduced evidence that Holder, while driving an automobile, refused to stop the vehicle for a period of time after being signaled by a police car to pull over, and when he finally did pull over, attempted to throw away a plastic bag containing 4-5 rocks of crack cocaine.  *Trial Tr.* 3/31/98 at 43-46.  A passenger in Holder's vehicle told police that Holder had hidden a pistol inside the door panel on the passenger side of the car.  *Trial Tr.* 3/31/98 at 48-49.  The pistol was loaded.  In addition, in May, 1995, Holder sold a stolen vehicle which had been altered to appear legitimate. The VIN on the dashboard had been replaced with the VIN from the vehicle Holder was driving when he was arrested for crack possession and carrying a concealed weapon.  *Trial Tr.* 3/31/98 at 65-67, 70, and 77-85.

As to the future dangerousness non-statutory aggravating factor, the Government presented evidence that Holder was on probation for the crack possession and carrying a concealed weapon charges when he robbed the Bank. He did not fulfill three conditions of the probation:

1) He did not attend the Turnaround Program, a kind of "scared straight" program for youthful offenders;

2) He did not maintain employment. He also failed to attend scheduled employment counseling, and indicated to his probation officer that he should not have to work for the minimum wage;

3) He failed to attend regularly scheduled meetings with his probation officer. He did so poorly that his probation was extended for an additional year. *Trial Tr.* 3/31/98 at 102-21).

As further evidence of future dangerousness, the Government introduced evidence that Holder failed to exhibit remorse for the robbery and murder. He showed no remorse when he was interviewed on the night of the crime by Detective Carol and by Special Agent Jan Hartman. Further, he failed to exhibit true remorse on the witness stand at trial.

As to the victim impact non-statutory aggravating factor, the United States presented testimony from Mr. Heflin's mother, his wife of six months, his three children, his ex-wife (the children's mother), two of his siblings, two co-workers and a former co-worker. This testimony established that Mr. Heflin, a decorated veteran who was forty-seven years old at the time of his death, was a hard working family man who was cheerful and well liked. The witnesses testified about their

last contacts with Mr. Heflin and the effect of his murder on their lives. *Trial Tr.* 3/31/98 at 144-227.

Bank employees spoke of emotional difficulties resulting from the robbery. Kelley Davis testified that Mr. Heflin was like a brother to her, and that a year after the robbery she still had nightmares every night and episodes of sleepwalking during which she attempted to climb out the window. She also testified that she couldn't go anywhere by herself. *Trial Tr.* 3/31/98 at 150-51. Janice Walton, a bank employee for twenty-five years, testified that she was looking for other employment, because she could not face the possibility of another robbery. *Trial Tr.* 3/31/98 at 158-59. Heflin's wife, who worked at the Bank, testified that she had not gone back into the Bank since the robbery. *Trial Tr.* 3/31/98 at 225.

## B. <u>The Mitigating Evidence</u>

Holder submitted two statutory mitigating factors and seventeen non-statutory mitigating factors for each count. *Holder App* 6 at 96-101. His statutory mitigating factors were "1) that Norris G. Holder did not have a significant prior history of other criminal conduct and 2) other factors in Norris G. Holder's background, record, or character or any other circumstances of the offenses that mitigate against imposition of the death sentence." His non-statutory mitigating factors were as follows:

1.  That in the killing for which Norris G. Holder was convicted, he did not fire the shots which resulted in the victim's death.
2.  That Norris G. Holder did not intend for any person to be killed during the course of the offenses which he committed.
3.  That Norris G. Holder suffered a series of losses in his life which he failed to process, despite recommendations that he receive counseling.  These losses include the desertion of his father at a young age, the loss of his leg, and the death of his grandfather.
4.  That Norris G. Holder's childhood was characterized by inconsistent parenting.
5.  That despite growing up in a rough neighborhood with economic instability, Norris G. Holder was continuously striving to improve his situation and that of his family.
6.  That in the absence of his father, Norris G. Holder assumed the role of the man of the house at a very young age.
7.  That Norris G. Holder lacked a positive male role model while growing up.
8.  That Norris G. Holder felt a sense of responsibility to provide emotional and financial support to his mother, brothers and sister.
9.  That Norris G. Holder's motive for these offenses grew out of his attempt to reduce the impact of his disability, improve his life, and provide care for his family.
10.  That Norris G. Holder provided a positive role model to Norrim Holder, Norrell Holder, Normeka Holder, Tony Sanders, and others.
11.  That Norris G. Holder has been a father figure to his brother Norrim.  Due to Norris' influences and efforts, Norrim has made many positive changes in his life.
12.  That Norris G. Holder is a likeable person who provides support and help to many of his extended family, friends, and associates.
13.  That Norris G. Holder does not have a history of violent behavior and the offenses for which he was convicted are inconsistent with his personality and usual behaviors.
14.  That Norris G. Holder has a large family who is very attentive to and supportive of him and will help him make an adequate adjustment to prison life.
15.  That Norris G. Holder has made an adequate adjustment to being confined in jail and is not a problem inmate.

16. That Norris G. Holder does not present a substantial risk of being dangerous or violent if confined in prison for life without the possibility of release.

17. That Norris G. Holder can continue to provide a positive influence in the lives of Norrim, Norrell, and Normeka Holder while incarcerated in prison.

Holder presented the testimony of thirty-one witnesses in the penalty phase, who testified in support of the two statutory and seventeen non-statutory mitigating factors. Thirteen of the witnesses were family members, six were family friends or neighbors, two were teachers from the Rockwood School District, and two were from youth service groups Holder had attended. Generally, these witnesses testified that Holder came from a disadvantaged background, acted as a parent figure to his siblings and was likeable and non-violent. Holder's mother, Kimberly Holder, testified <u>inter alia</u> that she and Norris's father split up when he was nine, that his grandfather with whom he was close died when Holder was ten, that after he lost his leg in the train accident he could no longer play sports as well as he had before, and that she worked two and sometimes three jobs to support herself and her family. She testified that during part of Holder's childhood she used crack cocaine, and that during that period she was not a good mother; that the family lived in the Blumeyer housing project, where Holder was exposed to a lot of crack users and drug dealers, and that he began dealing drugs; that Holder participated in the school desegregation program, attending schools in the Rockwood School

District, but dropped out of high school; and that after Holder's train accident, there was a settlement with the insurance company, as a result of which she received $10,000, and Holder received $10,000, plus $500 a month until the year 2000. She also testified that Holder told her how sorry he was that Mr. Heflin had died. *Trial Tr.* 4/1/98 at 11-67, 95-96.

On cross-examination, Kimberly Holder testified that under the insurance settlement, Holder would receive $500 a month until 2005, instead of 2000, and that in 2005 he would receive an additional $15,000. *Trial Tr.* 4/1/98 at 75. She testified that, after seventh grade, Holder's rate of absenteesim went up, from 25 days in eighth grade to 61 days in ninth grade. *Trial Tr.* 4/1/98 at 84-86. She also testified that Holder was involved in three incidents of sexually assaulting female students, in May, 1990, in March, 1991, and in December, 1993, for which he was suspended. He never returned to school after the 1993 suspension. *Trial Tr.* 4/1/98 at 89-90, 96-97.

Holder's friend, Cortez Harris, testified that Holder was a good friend and not a "trouble-starter." *Trial Tr.* 4/2/98 at 9. On re-direct examination, he testified that Holder had discussed the plans for the bank robbery before it occurred, and had made clear that part of the plan was that no one was going to get hurt. He testified that Holder had shown him a stun gun that was supposed to be

used to stun the guard, but that Allen had shot the guard instead.  *Trial Tr.* 4/2/98 at 28.   On re-cross, he testified that Holder had told him that the stun gun would stun the guard for a minute, and that all they needed was a minute or a minute-and-a-half to do the robbery.  *Trial Tr.* 4/2/98 at 29-30.  Holder's friend, Wayne Ross, testified on cross-examination that he had seen the stun gun on the side of Holder's bed the day before the robbery.  *Trial Tr.* 4/3/98 at 38.  (No stun gun was found in Holder's arsenal the day of the robbery.)

In addition to the testimony of family and friends, four employees of the Ste. Genevieve County Sheriff's Department testified that Holder had made a good adjustment to confinement.   *Trial Tr.* 4/1/98 at 119-121; 203-212; 4/3/98 at 2-11, 22-28.  One witness, Dr. Thomas Reidy, a forensic psychologist offered as an expert on risk assessment and future dangerousness, testified that Holder was not a disproportionate risk to prison society.  *Trial Tr.* 4/1/98 at 146, 182-187.  Holder's attorney testified that Holder owed a substantial amount of money in attorney fees and fines to various municipalities, and that he was supposed to meet her at 1:00 p.m. the day of the robbery with the money he owed her.  *Trial Tr.* 4/2/98 at 72-82. An expert in the area of orthotics and prosthetics testified that the foot on Holder's prosthesis was broken, and probably was broken at the time of the robbery.  *Trial Tr.* 4/1/98 at 232, 235-237.  Finally, an expert in clinical neuropsychology and

22

rehabilitation psychology, Dr. Stephen Rothke, testified that Holder did not suffer from any psychiatric or mental disorder.  However, Holder did not deal with the emotional impact of the amputation of his leg, and his psychological "denial" caused him to focus only on what he needed to do to return to being a whole individual.  It therefore caused him to get involved in the crime, because in his eyes, it was the only way he could get a better prosthesis.  *Trial Tr.* 4/3/98 at 91-93.

## VII.   The Jury's Findings

The jury's findings regarding the aggravating and mitigating factors were identical for each count.  *Holder App* 6 at 94-101, 109-119.  The jury unanimously found the existence of both statutory aggravating factors and the first three of the four non-statutory aggravating factors.  The jury did not unanimously find the fourth non-statutory aggravating factor which involved victim impact.  Id.   No juror found either statutory mitigating factor submitted by Holder. No juror found non-statutory mitigating factors 1, 2, 5, 9, and 17.  Nine jurors found statutory mitigating factor 3, that Holder suffered a series of losses in his life which he failed to process, despite recommendations that he receive counseling; twelve found factor 4, that Holder's childhood was characterized by inconsistent parenting; eleven found factor 6, that in the absence of his father, Holder assumed the role of

the man of the house at a very young age; twelve found factor 7, that Holder lacked a positive male role model while growing up; eleven found factor 8, that Holder felt a sense of responsibility to provide emotional and financial support to his mother, brothers and sister; two found factor 10, that Holder provided a positive role model to his siblings and others; twelve found factor 11, that due to Holder's role as a father figure to his brother, Norrim Holder, Norrim has made many positive changes in his life; ten found factor twelve, that Holder is a likeable person who provides support and help to many of his extended family, friends, and associates; nine found factor 13, that Holder does not have a history of violent behavior and the offenses for which he was convicted are inconsistent with his personality and usual behaviors; six found factor 14, that Holder has a large family that is very attentive to and supportive of him and will help him make an adequate adjustment to prison life; six found factor 15, the Holder has made an adequate adjustment to being confined in jail and is not a problem inmate; and ten found factor 16, that Holder does not present a substantial risk of being dangerous or violent if confined in prison for life without the possibility of release. The jury found no additional mitigating factors not submitted by Holder. Id. The jury returned a sentence of death as to Count I and death as to Count II. *Holder App* 6 at 102, 120.

**VIII**. <u>**The §2255 Litigation**</u>

Following the Supreme Court's denial of his petition for certiorari, Holder filed a motion under 28 U.S.C. §2255 to vacate, correct or set aside his sentence ("the petition"). The petition raised three main grounds for relief: (1) violation of the Fifth Amendment indictment clause; (2) the jury's improper consideration of the pecuniary gain statutory aggravator; and (3) eleven separate claims of ineffective assistance of counsel, including: (a) counsel's failure to challenge the indictment; (b) counsel's advice that Holder testify; ( c) counsel's concession of guilt in opening statement and closing argument; (d) counsel's failure to retain a ballistics expert to dispute the government's evidence; (e) counsel's failure to interview a mitigation witness; (f) counsel's failure to investigate Holder's mental condition; (g) counsel showed the jury the movies <u>Set</u> <u>It</u> <u>Off</u> and <u>Heat</u>; (h) defense counsel slept during parts of the trial ("sleeping counsel claim"); (i ) counsel's failure to move to strike the pecuniary gain statutory aggravating factor; (j) counsel's failure to object to victim impact evidence; and (k) counsel's failure to allow mitigation counsel to give the penalty phase closing argument. The district court granted Holder an evidentiary hearing on the first two claimed grounds for relief, and allegations of ineffective assistance of counsel (a), (b), ( c) and (h).

Collectively, grounds (b) and ( c) will be referred to as the "flawed defense strategy claim."

## A.     The Evidentiary Hearing

The district court held an evidentiary hearing on July 18-20, 2005 ("the hearing").  Holder presented the testimony of Caryn Platt Tatelli ("Tatelli"), Jennifer Brewer Herndon ("Herndon") and Richard Burr ("Burr").  Tatelli was a "mitigation specialist" engaged to develop mitigation evidence to be presented in Holder's behalf at the penalty phase of trial.  *Hrg. Tr.* I at 5-10.  Herndon was Mr. Shaw's co-counsel at trial and was responsible for presenting mitigation evidence at the penalty phase.  *Hrg. Tr.* I at 100-102, 114.  Burr was associated with the Federal Death Penalty Resource Center and was instrumental in arranging for the participation of both Tatelli and Herndon on Holder's defense team. *Hrg. Tr.* I at 7-9; *Hrg. Tr.* II at 131, 150-52, 157-61.  Holder  did not testify at the hearing, but his deposition, taken on July 5, 2005, was admitted in lieu of his testimony.  The following sections reflect the aspects of the hearing that now remain pertinent on appeal.

## B.     The Flawed Defense Strategy Claim

At the hearing, Holder attempted to prove that Mr .Shaw's theory of defense was flawed, in that Mr. Shaw believed the bank robbery count was a non-capital

offense.   Tatelli, Herndon and Burr each offered testimony to that effect.  *Hrg. Tr. I* at 12-13 (Tatelli); *Hrg Tr. I* at 112-13 (Herndon); *Hrg. Tr. II* at 167, 197 (Burr). Substantial evidence, however, refuted that claim.  Nearly one year before trial commenced, in an effort to dissuade the Government from seeking the death penalty against Holder, Mr. Shaw sent a letter to Government counsel which outlined a variety of mitigating facts regarding Holder.  *Hrg. Tr. II* at 34-39;  *Gov. App* 10 (Government's Exhibit Q).  A fair reading of this letter reveals that Mr. Shaw was aware that the bank robbery count was a capital offense.

As a corollary to the claim that Mr. Shaw did not realize that bank robbery was a capital offense, Holder proffered evidence that  this alleged misconception, led  Mr. Shaw to "believe[] he could defend in the guilt phase of this case against the capital charge by proving that Mr. Holder did not intend to kill anyone."  *Hrg. Tr.* II at 167 (Burr); *see also*, *Hrg. Tr.* I at 112-115 and *Hrg. Tr.* II at 11-14 (Herndon).  To that end, Mr. Shaw's strategy was to show that although Holder was guilty of the robbery, he did not intend to kill Mr. Heflin.  "[Mr. Shaw] thought that if [Holder] was convicted of the robbery that was fine because it didn't - - you know, obviously, he was going to be convicted and that didn't expose him to the death penalty, so that was the best we could do."  *Hrg. Tr.* II at 12 (Herndon).  Although both Herndon and Burr considered this strategy to be

contrary to law, id., they worked together on jury instructions which would require "not a specific intent to kill, but a - - you know, at least a kind of malice type intent with respect to the killing." *Hrg. Tr.* II at 174 (Burr). Specifically, Herndon - with the help of Burr - prepared a memorandum, which both she and Mr. Shaw signed and filed with the district court. The memorandum argued that "a certain mens rea beyond simple felony murder should be required in connection with a finding of guilt" on the crimes charged. *Hrg. Tr.* II at 218 (Burr); *Hrg. Tr. II* at 16, 20 (Herndon); *Gov App* 8 (Ex. T). This memo bore fruit; as a result, the jury instructions included language that in order for the jury to find Holder guilty of the crimes charged, they had to find that Holder was "aware of a serious risk of death attending his conduct." *Hrg. Tr.* II at 199-201 (Burr); *Hrg. Tr.* II, at 16-17 (Herndon); *Gov App* 9 (Exhibit U). Burr acknowledged that the memo "had the serendipitous result of being consistent with part of [Mr. Shaw's] views. *Hrg. Tr* II at 218. Herndon admitted that neither Holder in his testimony, nor Mr. Shaw, ever conceded that element of the offenses. *Hrg. Tr.* II at 17-18.

Burr and Herndon believed that the evidence against Holder made the possibility of an acquittal remote. *Hrg. Tr.* II at 211 (Burr) ; *Tr. II* at 13 (Herndon). They both, however, also agreed that a consistent strategy between the guilt and penalty phases of trial is necessary to maintain credibility with the jury.

28

*Hrg. Tr.* II at 192, 202 (Burr); *Hrg. Tr.* II at 10 (Herndon). While both were quite

critical of Mr. Shaw's strategy, *see, e.g.*, *Hrg. Tr.* II at 167 (Burr) and *Hrg. Tr.* II at

12-13 (Herndon), Burr agreed - at least in principle - that Mr. Shaw's strategy led

to consistency between the guilt and penalty phases of trial. *Hrg. Tr* II at 202-203.

### C. <u>The District Court's Ruling</u>

The district court denied Holder relief. As to ground (1), violation of the

Fifth Amendment Indictment Clause, the district court held that while the

Government failed to include a statutory aggravator and mental state in the

indictment for which Holder was convicted, the error was harmless. *Holder App*

19 at 438-39. The district court held that ground (2), the jury's improper

consideration of the pecuniary gain aggravating factor, was properly considered as

one of the ineffective assistance of counsel claims (Claim (3)(i)). The district court

decided the relevant claims retaining the original claim subsection designation of

ineffective assistance of counsel, as follows:

(a) Counsel's failure to challenge the indictment. As with ground (1), above,

the district court found counsel's failure to challenge the indictment on Fifth

Amendment grounds was harmless error. *Id*. at 440-41.

(b) Counsel's advice that Holder testify and ( c) counsel's concession of

guilt at opening statement and closing argument. The district court held that

Holder failed to show that Mr. Shaw was objectively unreasonable by his conduct in opening statement, closing argument, or in recommending that Holder testify. Id. at 452

(d) Counsel's failure to retain a ballistics expert. The district court found that it was reasonable for Mr. Shaw not to retain an expert, and that no prejudice resulted from the lack of a defense expert. *Id*. at 455-57.

(f) Counsel's failure to investigate Holder's mental condition. The district court found that counsel's decision not to pursue the testimony of Dr. Anthony Semone was reasonable, and that the testimony of Dr. Semone would not have affected the outcome of the trial. *Id*. at 469-70.

(i) Counsel's failure to strike the pecuniary gain aggravating factor. The district court held that the pecuniary gain statutory aggravator was appropriate and that Holder was not prejudiced by the wording of the instruction. *Id*. at 480-81.

**E.     The Rule 59(e) Motion**

Following the district court's denial of Holder's §2255 petition, Holder sought additional relief under the umbrella of Fed. R. Civ. P. 59(e) which - in certain circumstances - permits a district court to alter or amend its judgment. *Holder App* 22. The Rule 59(e) Motion alleged that the district court made material mistakes in law or fact in it's rulings on the following grounds for relief raised in

30

the petition, including: (3)(b) and ( c), counsel's advice that Holder testify and counsel's concession of guilt in opening and closing statements; (3)(d), failure to obtain a ballistics expert; (3)(f), failure to investigate Holder's mental condition; and (3)(h), defense counsel slept through parts of trial. In a Memorandum and Order dated December 14, 2009, *Holder App* 25, the district court denied each of these. Briefly, the district court determined that as to claims:

(3)(b) and (c) Counsel's advice that Holder testify and counsel's concession of guilt at opening statement and closing argument. The district court rejected Holder's allegations that: (i ) Mr. Shaw did not understand the charges or the applicable law; (ii) that Mr. Shaw's trial strategy failed to subject the Government's case to meaningful adversarial testing; and, (iii) that the district court's denial of Holder's ineffective assistance claim based on Mr. Shaw's concession of guilt and advice to testify was based on supposition and was unsupported by the facts in the record below. Holder App 25 at 671-675.

(3)(d) Counsel's failure to obtain a ballistics expert. While in his petition, Holder complained that Mr. Shaw failed to obtain a ballistics expert to challenge the Government's evidence, in his Rule 59(e) Motion Holder did an about-face and claimed that "he was prejudiced by his counsel's failure to <u>confirm</u> [the Government expert's] opinion." *Id*. at 676. The district court, first noting that this

new argument was not appropriate for consideration in a Rule 59(e) Motion, held that an additional expert would not change its conclusion that Mr. Shaw's strategy to combat the Government's evidence was reasonable.  Id. at 676-679.

(3)(f) Counsel's failure to investigate Holder's mental condition.  The district court found that many of Holder's arguments presented in support of this claim were previously rejected in the §2255 Order.  Additionally, the district court determined that new affidavits submitted with the Rule 59(e) Motion were unpersuasive as they qualified as new evidence and could not be introduced in a Rule 59(e) motion.  The district court reaffirmed its decision that Holder suffered no prejudice and that he was not entitled to an evidentiary hearing on the claim.  *Id*. at 686-91.

(3)(h) Sleeping counsel claim.  The district court again rejected this argument.  The district court  held that it had properly considered its own recollections in addition to the testimony presented at the evidentiary hearing to find that Mr. Shaw was not sleeping during periods of the trial.  It also held that it had given Holder the opportunity to challenge it's observations in this regard.  The district court found that there was no credible evidence that Mr. Shaw slept through "substantial portions" of Holder's trial, nor was there credible evidence that he slept through "not insubstantial portions" of the trial.  The district court concluded that

Holder was not prejudiced and no grounds exists for altering or amending its decision to reject the claim. *Id.* at 691-99.

Accordingly, the district court denied Holder's Rule 59(e) Motion. This appeal followed.

## SUMMARY OF THE ARGUMENT

**I.     THE DISTRICT COURT CORRECTLY APPLIED THE STRICKLAND STANDARD OF REVIEW TO CONCLUDE THAT HOLDER'S LEAD TRIAL ATTORNEY FOLLOWED A SOUND STRATEGY THAT EFFECTIVELY TESTED THE CHARGES AGAINST HOLDER.**

Given the overwhelming evidence against Holder, the District Court correctly found that Mr. Shaw did not abandon Holder's defense by acknowledging Holder's involvement in the bank robbery, and by advising Holder to testify in his defense during the guilt-phase. The record is clear that Mr. Shaw's strategy was to attack any evidence or inference suggesting that Holder expected, planned, knew, or had reason to know that anyone might be harmed. Similarly, Mr. Shaw emphasized that it was Allen, not Holder, who fired the shots in the bank. Contrary to Holder's arguments before this Court, the record shows that Mr. Shaw's decisions were not made out of an ignorance of the law. Rather, Mr. Shaw's strategy was calculated to provide some hope of escaping a death sentence and was consistent with the instructions as actually given. At no point did Mr. Shaw concede a capital-eligible offense. Although Holder's own witnesses in this § 2255 matter believed that there was a likelihood that Holder would be convicted of such an offense no matter what. Finally, the record shows that Holder was advised of the risks of testifying, and was given ample time to discuss his decision with counsel and family members, before

34

he chose to testify in his defense. Only through improper hindsight analysis can one reasonably criticize Mr. Shaw's strategy.

## II. THE DISTRICT COURT CORRECTLY CONCLUDED THAT HOLDER'S TRIAL COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO OBTAIN AN INDEPENDENT BALLISTICS EXPERT AND THIS COURT CANNOT AND SHOULD NOT CONSIDER HOLDER'S UNTIMELY REVISION OF THIS CLAIM.

The District Court correctly found that Mr. Shaw was not ineffective for allegedly failing to obtain a ballistics expert to refute the government's evidence at trial. At a minimum, Holder can show no prejudice because he has proffered no evidence suggesting that such an expert even existed.

Faced with a significant flaw in his ballistics argument, Holder attempted to recast the issue as a failure to obtain an expert to confirm the government's ballistics evidence. The District Court correctly dismissed Holder's one-hundred-eighty degree revision of his ballistics argument as tardy because it was presented for the first time in his Rule 59(e) motion for reconsideration. This Court has held that a Rule 59(e) motion is not a proper vehicle for raising arguments or new arguments that could have been raised before judgment. Moreover, Holder was not granted a certificate of appealability on his reformulated ballistics claim. As such, the issue is not properly before the Court. Even if this Court were to consider Holder's revised ballistics argument, it fails on the merits.

**III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING AN EVIDENTIARY HEARING ON HOLDER'S CLAIM OF INEFFECTIVE ASSISTANCE IN THE MENTAL HEALTH INVESTIGATION, BECAUSE THE RECORD CLEARLY CONTRADICTED THE TIMELY CLAIMS OF DEFICIENT PERFORMANCE AND PREJUDICE.**

Holder's actual claim, that a neuro-psychological examination was not conducted as part of the mitigation investigation, was clearly contradicted by the record. Dr. Rothke performed an adequate neuro-psychology examination and his results were essentially corroborated by the equally adequate rebuttal examination by Dr. Wetzel. Although Holder's belated claims concerning a trauma expert and discovery of more "vivid" detail about Holder's life were not timely presented to the District Court or preserved for review, the record clearly contradicted said claims as well. Dr. Rothke was as much of a trauma expert as Dr. Lebowitz and the additional detail was either discovered, insignificant or not accurate. Accordingly, the District Court did not abuse its discretion in denying a hearing on the question whether trial counsel were deficient.

The District Court also properly determined the prejudice prong without a hearing. The case for guilt and for death was overwhelming, when weighed against the speculative, non-specific potential opinions of Drs. Semone and Lebowitz, both of whom have never examined Holder. Even if favorable opinions had been obtained from Dr. Semone or Dr. Lebowitz, they would not have had any impact on

36

the jury because the opinions would have been neutralized and overcome by: other expert opinions; the facts of the crime, particularly the planning and execution of the robbery; the testimony of Holder himself; and other, more credible evidence which contradicted the claim that Holder had any mental deficits. Any claim that Holder had mental deficits and was "naive" about the risk of harm to other's from his conduct was too far outweighed by other evidence which conclusively established that Holder was mentally above average, knew the risks, committed the offense for money, and planned that the only effective and safe solution to the armed guard's presence in the bank was to kill him immediately upon entering.

## IV. THE DISTRICT COURT CORRECTLY DETERMINED THAT COUNSEL WAS NOT INEFFECTIVE IN FAILING TO OBJECT TO THE PECUNIARY GAIN INSTRUCTION.

Counsel could not have had notice of the basis for an objection to the failure of the pecuniary gain instruction to add "of murder" after the term "offense." No decision prior to 1998 held that the language of the statute should be expounded to remove any ambiguity. In addition, Holder was not prejudiced by his counsel's failure to object because there was no likelihood that the jury was confused about the meaning of the term "offense" and the Government argued the instruction under the belief that it referred to the murder. Any objection would have resulted in a modified instruction and the same result.

**V. THE DISTRICT COURT CORRECTLY HELD THAT THE INDICTMENT ERROR WAS NON-STRUCTURAL AND HARMLESS.**

This issue is controlled by *United States v. Allen*, 406 F.3d 940, 943 (8th Cir. 2005), *cert. denied*, 127 S.Ct. 826 (2006), (*Allen III*). Indictment error, such as the failure to include statutory aggravators in the indictment, is not structural and is subject to harmless error analysis. Here, any error was harmless, because Holder had written notice of the statutory aggravators, any grand juror would have returned an indictment containing the aggravators if asked and the petit jury found the aggaravators beyond a reasonable doubt.

# ARGUMENT

## I. THE DISTRICT COURT CORRECTLY APPLIED THE STRICKLAND STANDARD OF REVIEW TO CONCLUDE THAT HOLDER'S LEAD TRIAL ATTORNEY FOLLOWED A SOUND STRATEGY THAT EFFECTIVELY TESTED THE CHARGES AGAINST HOLDER.

### STANDARD OF REVIEW AND ANALYTICAL FRAMEWORK

This Court reviews a district court's denial of a § 2255 motion *de novo* and "the underlying findings of fact for clear error." *Tinajero-Ortiz v. United States*, 635 F.3d 1100, 1103 (8th Cir. 2011); *see also Hodge v. United States*, 602 F.3d 935, 937 (8th Cir. 2010). The Supreme Court has explained that "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (internal quotations omitted).

In order to establish ineffective assistance of counsel, Holder must prove that his counsel's performance was constitutionally deficient and that he suffered prejudice as a result of that deficiency. *See Strickland v. Washington*, 466 U.S. 668,

687-92 (1984).  *See also Williams v. United States*, 452 F.3d 1009, 1012 (8th Cir. 2006).[6]

To be constitutionally deficient, counsel's alleged errors must have been "so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  *See Strickland*, 466 U.S. at 687.  Any judicial review of counsel's performance is "highly deferential," and Holder must overcome the "strong presumption that counsel's conduct [fell] within the wide range of professionally reasonable assistance."  *Id.* at 689.  *See also Williams*, 452 F.3d at 1013 (citations omitted).  The Court is to "consider [counsel's] 'conduct at the time of his representation . . . and [to] avoid making judgment based on hindsight.'"  *Hood v. United States*, 342 F.3d 861, 863 (8th Cir. 2003), *cert. denied*, 540 U.S. 1163 (2004) (quoting *Fields v. United States*, 201 F.3d 1025, 1027 (8th Cir. 2000)); *see also Strickland*, 466 U.S. at 689.  Further, the Court should give additional deference to counsel when addressing closing argument.  *See Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003).  "Judicial review of a defense attorney's summation is . . .

---

[6] Holder contends that *Strickland* does not apply and that this Court may use the abbreviated framework set out in *United States v. Cronic,* 466 U.S. 648 (1984).  As explained below, *Cronic* presents a narrow exception to *Strickland* that does not apply in this case.

highly deferential and <u>doubly deferential</u> when it is conducted through the lens of federal habeas." *Id.* at 6.

To establish prejudice, Holder must demonstrate a reasonable probability that, but for counsel's constitutionally deficient performance, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Id.*; *see also Honeycutt v. Roper*, 426 F.3d 957, 961 (8th Cir. 2005). Prejudice in the context of an ineffective assistance of counsel claim requires a showing that counsel's errors were so serious that the errors rendered the proceedings fundamentally unfair or the result unreliable. *See Bucklew v. Luebbers*, 436 F.3d 1010, 1016 (8th Cir. 2006). Prejudice under the *Strickland* standard is not made in the abstract. Rather, prejudice is viewed in the context of a particular record, and only after carefully weighing the entire record. *See Jones v. Roper*, 311 F.3d 923, 926 (8th Cir. 2002).

Holder, as the movant herein, bears the burden of proving ineffective assistance of counsel. *See United States v. White*, 341 F.3d 673, 678 (8th Cir. 2003). It also has been firmly established that, in order for his grounds to succeed, Holder must prevail on both prongs of the *Strickland* standard. *See Williams*, 452 F.3d at 1012. Thus, if the Court finds counsel's conduct was not deficient, it need

not assess whether Holder suffered any prejudice.  Similarly, if the Court finds no prejudice, it need not determine whether counsel's conduct was deficient.  *See Hill*, 474 U.S. at 60; *Brown v. United States*, 311 F.3d 875, 878 (8th Cir. 2002); *Evans v. United States*, 200 F.3d 549, 551 (8th Cir. 2000).

Finally, the District Judge in the present § 2255 matter presided over Holder's trial and sentencing.  The District Court was entitled to rely on its own recollections in deciding this case.  *See, e.g., Wadlington v. United States*, 428 F.3d 779, 784 n.2 (8th Cir. 2005); *Smith v. United States*, 348 F.3d 545, 551 (6th Cir. 2003).  In the present case, the District Court's recollections are important because Mr. Shaw passed away after Holder's trial.

Holder has failed to satisfy either prong of the *Strickland* analysis with respect to each of his ineffective assistance of counsel claims.  Those claims must be denied.

## ARGUMENT

### A.    Introduction

Holder contends that his lead trial counsel, Mr. Shaw, essentially abandoned his defense.  In particular, Holder argues that Mr. Shaw's strategy amounted to a failure to assure adversarial testing of the government's case.  *See, e.g., Holder Brief* at 35.  Holder's first argument on appeal focuses on two strategic decisions by Mr.

42

Shaw.  First, from the outset of the guilt phase, and through summation, Mr. Shaw

conceded that Holder participated in the bank robbery, but consistently denied and

refuted any evidence or inference that Holder expected, planned, knew, or had

reason to know that anyone might be harmed, let alone killed, during the robbery.

Likewise, Mr. Shaw emphasized that Allen, not Holder fired the shots in the bank,

specifically the shots that killed Mr. Heflin.  Second, as an adjunct to his strategy,

Mr. Shaw advised Holder to testify in his own defense during the guilt phase.

Holder was granted a certificate of appealability regarding each of the two

foregoing strategic decisions.  *See Holder App.* 18 at 491.  In his brief, Holder chose

to join those two issues into a single claim.  Holder argues on appeal that, because

of an alleged "ignorance of the law, counsel failed to assure adversarial testing of

the government's case by conceding that Mr. Holder participated in an armed

robbery resulting in a killing, and prejudicially advising [Holder] to testify in

support of counsel's non-defense to the charges."  *Holder Brief* at 22.

As explained below, and as any fair reading of the basic facts of this case

dictates, Mr. Shaw's strategy was anything but ignorant or flawed.  It was a

carefully crafted to concede that which could not reasonably be disputed, while

retaining credibility and some hope of escaping a death sentence.  Indeed, even

witnesses Holder produced for his § 2255 evidentiary hearing conceded the high

likelihood of a conviction of a capital offense in this case. As shown below, Mr.

Shaw's strategy was consistent with the instructions as given and never conceded a

capital eligible offense. Only through the most cynical and jaundiced lens of

hindsight could one criticize Mr. Shaw's strategy. Yet such criticism, even with the

benefit of full hindsight analysis, does not hold up.

## B.    Merits

### 1.    Overwhelming Evidence Against Holder

The context of Holder's first issue is important. As explained in the factual

overview above, there was overwhelming evidence against Holder. A brief review

is provided for context.

The government's evidence produced a virtual "chain of custody" of Holder

from the time he planned the robbery until he was apprehended shortly thereafter

and confessed. In its Memorandum and Order denying relief, the District Court

correctly summarized the circumstances as follows:

> Independent credible witnesses were available to testify that [Holder],
> over a period of several months, planned to rob a bank. Witnesses saw
> [Holder] plan to purchase or to have purchased for him a shotgun and an
> assault rifle with an attached bayonet and banana clip, described as used
> in the robbery by a person in the location of the Bank where the robber
> took money from the teller drawers. In the course of the robbery, . . .
> there were numerous rounds fired and the bank guard was killed. The
> two robbers fled in a van followed by a lawyer to the location where the
> van exploded in flames and [Holder] was observed being on fire. [Holder]
> confessed to the robbery, identified the other robber who was arrested,

44

> and always consistently stated he planned for no one to get hurt and he was sorry for the death of the guard. These facts, known going into trial, limited the options in defending [Holder]. The defense team was trying to save his life.

*Holder App.* 19 at 441-42. The District Court concluded that Mr. Shaw pursued Holder's defense "in the only reasonable manner possible," *id.* at 442, and that an "acquittal was never realistic" in view of the circumstances of Holder's case. Those findings are not clearly erroneous.

Not surprisingly, in view of the overwhelming evidence against Holder, the two attorneys who testified for Mr. Holder in the § 2255 evidentiary hearing -- Ms. Herndon and Mr. Burr -- both conceded that there was essentially no chance that Holder would be acquitted. *See, e.g*, *Hrg. Tr.* Vol. II at 13, 47, 201-02.[7] In fact, there was agreement that Holder had little hope of escaping a conviction for a capital-eligible offense. *See id.* at 13, 203. Yet Holder contends that Mr. Shaw was ineffective because he conceded Holder's involvement in the bank robbery. The District Court disagreed, explaining in its Memorandum and Order that "[i]t is clear that the best strategy adopted, to be credible with the jury, was not to argue facts which were not defendable." *Holder App.* 18 at 442. Also not surprisingly, Holder offers no specific alternative strategy, probably because he cannot articulate one.

---

[7] "[I]n this case the best we could ever hope for was going to be a life verdict." *Hrg. Tr.* Vol. II at 13 (Ms. Herndon).

## 2. Cronic Standard Does Not Apply

Rather than directly confront the enormous hurdle the undisputed facts of his case present, Holder creates a strawman in an attempt to short circuit the *Strickland* standard and convince this Court to apply the abbreviated standard set out in *United States v. Cronic*, 466 U.S. 648 (1984). *Cronic* and its progeny provide that, "[t]here are instances when counsel's errors are so great or the denial of counsel so complete as to create a presumption of prejudice, eliminating a need to prove *Strickland* prejudice." *United States v. White*, 341 F.3d 673, 677 (8th Cir. 2003) (citing *Cronic*, 466 U.S. at 659). One of those instances is "when counsel completely fails to subject the prosecution's case to meaningful adversarial testing, . . . making the adversary process presumptively unreliable." *Id.* at 678. This Court has "applied *Cronic* 'very narrowly and rarely [has] found a situation that justified application of the presumption of prejudice.'" *Id.* at 679 (quoting *Fink v. Lockhart*, 823 F.2d 204, 206 (8th Cir. 1987)).

In *White*, the defendant was facing a life sentence. The district court granted § 2255 relief, finding, among other facts, that trial counsel (1) "failed to conduct any independent investigation" and (2) conducted only "an eleven-hour review of more than 500 pages of discovery material." *Id.* at 678. Even accepting the district court's findings as true, this Court reversed and dismissed the petition. *Id.* at 681.

The Court explained that, "[w]hen the Supreme Court 'spoke in *Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, [it] indicated that the attorney's failure must be complete.'" *Id.* at 678 (quoting *Bell v. Cone*, 535 U.S. 685, 696-97 (2002)). "The failure to oppose the prosecutor's case must involve the entire proceeding, not just isolated portions." *Id.*

Holder contends that Mr. Shaw's alleged ignorance of the law amounted to a total failure to test the government's case. *See Holder Brief* at 35. This conclusion is totally refuted on the record. The District Court found, among other things, that Mr. Shaw "skillfully and consistently presented evidence and cross-examined witnesses, to show [Holder] was looking to solve his need for money, that the evidence was weak that [Holder] fired shots at [the guard] and counsel continuously focused the jury's attention on the undisputed evidence that [Holder] believed no one would be injured." *Holder App.* 19 at 442. Those fact determinations are not clearly erroneous. Accordingly, Mr. Shaw did indeed test those aspects of the government's case which could reasonably be challenged. Holder has failed in his burden of showing that the narrow exception and circumstances of *Cronic* apply in this case.

     **3.**     **Mr. Shaw's Strategy Was Not "Ignorant" Of The Law**

Holder's first issue on appeal hinges on his contention that Mr. Shaw was ignorant of the law. That contention is flawed and is not supported by the objective record in this case.

Holder suggests that Mr. Shaw's strategy flowed from a mistaken belief that the bank robbery count (Count I) was a non-capital offense. *See Holder Brief* at 24. Holder's position, however, rests largely on alleged out-of-court statements and conduct which have been attributed to the now-deceased Mr. Shaw. Holder's position further suggests that Mr. Shaw's alleged ignorance impacted Holder's mitigation strategy in the penalty phase. *See Holder Brief* at 36. The District Court wisely considered the entire record in denying relief based on an alleged ignorance of the law. *See, e.g.*, *Memorandum and Order Denying Rule 59(e) Motion*, *Holder App.* 25 at 671.

The District Court found that Mr. Shaw's trial strategy of admitting Holder's involvement in the robbery and arguing a lack of intent or knowledge that anyone would be harmed was reasonable, and that the guilt-phase strategy was consistent with the elements of the charges against Holder. *Id.* at 670-71. The District Court further found that such decisions "were made with a view toward obtaining leniency . . . during the penalty phase." *Id.* at 671. As explained below, these conclusions are not clearly erroneous and ample record evidence supports them.

a.     <u>The pretrial evidence refutes Holder's claim that Mr. Shaw was ignorant of the law</u>.

Count I charged Holder with bank robbery by force or violence, resulting in the killing of Mr. Heflin, pursuant to 18 U.S.C. §§ 2113(a) and 2113(e). Count II charged Holder with carrying a firearm during a crime of violence, and murder resulting from a crime of violence, pursuant to 18 U.S.C. §§ 924(c)(1)(A) and 924(j). On May 30, 1997, almost a year before trial, Mr. Shaw sent a letter to government counsel in which he clearly articulated a mitigation strategy and an understanding of the differences between state and federal law. This letter was presented in the § 2255 evidentiary hearing as Government's Exhibit Q. *See Gov. App.* 10. In that letter, Mr. Shaw identified numerous mitigating facts regarding Holder, including his childhood and family difficulties, his lack of significant criminal history, his immediate cooperation with authorities, and his lower culpability relative to Allen.

Directly on the point of Mr. Shaw's understanding of the law, Mr. Shaw's letter: "It is significant to note that in the State Court, Mr. Holder could not get the death penalty if he were convicted of killing a person while committing a felony, *i.e.*, robbery as felony murder is second degree murder which does not demand the death penalty." The only fair reading of this letter indicates that Mr. Shaw sufficiently understood that the charges, including the bank robbery charges, were

potential death penalty charges. This letter alone fully refutes a claim that Mr.

Shaw's strategy was unreasonable and rested on an ignorance of the law.

> b. <u>Evidence during the trial refutes Holder's claim that Mr. Shaw's strategy was based on an ignorance of the law.</u>

Apart from Mr. Shaw's letter, this Court should also consider that, at the time

of the trial, a reasonable legal debate existed as to the specific elements the

government was required to prove in the capital context. Therefore, Mr. Shaw had

to craft his defense strategy while facing a moving legal target.

Faced with this moving target, Mr. Shaw and co-counsel Ms. Herndon filed a

legal memorandum with the District Court on March 26, 1998, in support of

Holder's proposed instructions.[8] *See Gov. App.* 8. This memorandum was filed

with the Court <u>after the guilt-phase</u> of the trial had already started. Ms. Herndon,

consistent with Mr. Shaw's strategy, supplied legal authority and arguments to

support a position that Count I required proof of a specific *mens rea* as to both the

robbery and the killing of Mr. Heflin. This position was entirely consistent with

Mr. Shaw's strategy of seeking to avoid the death penalty by distancing Holder from

any knowledge or intent that anyone would be harmed or killed. Holder's witnesses

at the § 2255 motion hearing acknowledged that the memorandum was prepared

---

[8] Ms. Herndon testified at the § 2255 hearing that she and Mr. Burr prepared the memorandum which she and Mr. Shaw filed. *See Hrg. Tr.* Vol. II at 110.

and filed in good faith regarding its legal content. *See Hrg. Tr.* Vol. II at 112. The memorandum cited, for example, *United States v. Delay,* 500 F.2d 1360 (8th Cir. 1974). At the time, *Delay* was the best Eighth Circuit precedent regarding the *mens rea* requirement for bank robbery under § 2113(e). Based on *Delay*, Ms. Herndon and Mr. Shaw urged the District Court to interpret § 2113(e) to require specific intent to kill. *See Delay* 500 F.2d at 1363-64. The instruction memorandum also cited *United States v. Jones*, 678 F.2d 102 (9th Cir. 1982) for the proposition that the government must prove more than intent to commit robbery to sustain a § 2113(e) conviction.

Thus, even during the trial itself, the level of *mens rea* or intent for Holder to be convicted of a capital offense remained, in part, legally debatable. Mr. Shaw's strategy embraced a side of the debate that would require a heightened *mens rea* to convict Holder of a death-eligible offense. Therefore, the only way one could say Mr. Shaw was "ignorant of the law" and find fault with his strategy would be by using some twisted form of hindsight analysis. Again, that is forbidden and failure of counsel to anticipate a change in the law is not ineffective assistance of counsel. *See Parker v. Bowersox*, 188 F.3d 923, 928-29 (8th Cir. 1999).

        c.       <u>The Jury Instructions were consistent with Mr. Shaw's strategy</u>.

The instructions as actually given to the jury were entirely consistent with Mr. Shaw's strategy of admitting the robbery but denying any intent to harm.[9] Stated differently, any review of the instructions demonstrates that admission of the bank robbery was not a concession of a capital offense. Rather, it was part of a sound and necessary strategy, dictated by the overwhelming evidence of Holder's participation in the robbery and that Allen, not Holder, most likely shot and killed Mr. Heflin.

Instruction No. 15 identified the elements for Count I, which charged the bank robbery in which a killing occurred. Instruction No. 15 related to a death-eligible offense. The elements of Count I were given as follows:

> *One,* the defendant took money from the person and presence of another while that money was in the care or custody of the Lindell Bank & Trust Company;
> *Two*, such taking was by force and violence or intimidation;
> *Three*, the deposits of the Lindell Bank & Trust Company were then insured by the Federal Deposit Insurance Corporation; and
> *Four*, in committing this offense, the defendant, or a person aided and abetted by the defendant, killed Richard Heflin.

Instruction No. 16 provided the "aiding and abetting" instruction. Instruction 16 stated:

> Defendant may also be found guilty of the crime of bank robbery in which a killing occurs as charged in Count I even if he personally did

---

[9] *See Gov. App.* 9 for the jury instructions.

not do every act constituting the offense charged, if he aided and abetted the commission of the bank robbery in which a killing occurred.

In order to have aided and abetted the commission of this crime defendant must:

(1) have known the bank robbery was being committed or going to be committed; and

(2) have knowingly and intentionally acted in some way for the purpose of causing, encouraging, or aiding the commission of the bank robbery and in the course of such bank robbery, Richard Heflin was killed; and

(3) have been aware of a serious risk of death attending his conduct.

(emphasis supplied). Instruction No. 17 provided a lesser included offense instruction for Count I, which did not include the death eligible element of the killing of Mr. Heflin.

The instructions for Count I required the government to prove that Holder either killed Mr. Heflin or aided and abetted Allen's killing of Mr. Heflin. From the outset, Mr. Shaw consistently and thoroughly challenged any claim, suggestion, or inference that Holder fired any shots, let alone any shots that harmed Mr. Heflin. Frankly, the evidence supported Mr. Shaw's position in this regard. Thus, a pivotal issue was whether the government could prove that Holder aided or abetted Allen's killing of Mr. Heflin. Mr. Shaw correctly focused on the most difficult issue facing the government's death penalty case -- whether Holder was aware of a risk of the killing of Mr. Heflin. Again, on any reading of the record, it is clear that Mr. Shaw challenged all evidence and testimony which suggested that Holder had any

53

knowledge, belief, or specific intent that anyone would be killed or harmed during the robbery. Mr. Shaw's strategy, if successful, might have negated a possible death penalty. That was Holder's best hope.

A similar analysis applies to Count II. In particular, Instruction No. 19 provided the elements of the crime of using or carrying a firearm during and in relation to a crime of violence which results in a murder. Instruction No. 19 required, among other elements, proof that "while knowingly using or carrying a firearm, the defendant, or a person aided or abetted by the defendant, killed Richard Heflin by the use of a firearm." Instruction No. 19 further required proof that "the killing of Richard Heflin was murder in the perpetuation of a robbery." Instruction No. 19 defined murder as "the unlawful killing of a human being with 'malice aforethought.'" The instruction explained that "[k]illing is done with 'malice aforethought' if it results from the perpetuation of a robbery in which the defendant was aware of a serious risk of death attending his conduct." (emphasis supplied). Like Count I above, Count II included an aiding and abetting instruction. In particular, Instruction No. 20 required the government to prove that Holder was "aware of a serious risk of death attending to his conduct." (emphasis supplied). Instruction Nos. 19 and 20 provided the elements for Count II -- a death eligible

offense. Instruction No. 21 provided a lesser included offense instruction for Count II, which was not a death eligible offense.

Like Count I above, Mr. Shaw's strategy of conceding the robbery conduct (which was undeniable) and contesting any notion that Holder believed or intended any violence or harm, was entirely consistent with the instructions given for Count II. A conviction on Count II required the jury to unanimously agree that Holder was aware of a serious risk of death attending his conduct. At every turn in this case, Mr. Shaw took reasonable and calculated steps to refute any claim that Holder was so aware. Nothing more could reasonably be asked of Mr. Shaw, given the overwhelming evidence against his client.[10]

In the context of hearing Allen's direct appeal, this Court addressed the *mens rea* issue at length. *See Allen I*, 247 F.3d at 782-85. A review of *Allen I* shows that Mr. Shaw's focus on Holder's knowledge and intent was not misplaced. As a part of a complete analysis of the issue, this Court reviewed the *mens rea* issue as if a specific intent to kill were required for a conviction under either count. The Court concluded that any error was harmless in view of the aiding and abetting instruction

---

[10] For example, in closing argument Mr. Shaw reminded the jurors that it only took one of them to save a life, (*Trial Tr.* 4-3-98, p. 214), and that the jury should not take Holder's life if he did not intend to kill Richard Heflin, or did not fire any shot that hurt Richard Heflin, or did not fire any shot in the bank.

actually given by the District Court because that instruction required a finding of specific intent. *See id.* at 784.

In the present § 2255 matter, the District Court similarly concluded that the instructions, as given, supported Mr. Shaw's strategy. For example, the District Court found that Mr. Shaw "skillfully and consistently presented evidence and cross-examined witnesses, to show [Holder] was looking to solve his need for money, that the evidence was weak that he fired shots at Heflin and counsel continuously focused the jury's attention on the undisputed evidence that [Holder] believed no one would be injured." *Holder App.* 19 at 442. The Court rejected Holder's claim that Mr. Shaw's strategy failed to provide a defense; it found that Mr. Shaw's focus on evidence of Holder's mental state was consistent with the instructions. *See id.* at 444. The District Court specifically found there was no flaw in admitting Holder's involvement in the robbery because Mr. Shaw's strategy also refuted any claim that Holder acted with "the mental state required for imposition of the death penalty." *Id. See also Memorandum and Order Denying Rule 59(e) Motion*, *Holder App.* 25 at 671.

In view of the overwhelming evidence that Holder was heavily involved in the robbery, and in view the instructions as actually given and the state of the law at

the time of trial, the District Court's findings and conclusions that Mr. Shaw's strategy was not unreasonable must be affirmed in their entirety.

Thus, Holder's present claim that Mr. Shaw's strategy reflected an ignorance of the law does not hold water when compared to what actually transpired at trial -- in terms of tactics, arguments, and the instructions as actually given. The District Court's conclusions in this regard, therefore, are supported by the record and are not clearly erroneous.

**4.      No Error In Advising Holder To Testify**

Once it is shown that Mr. Shaw's strategy was not the product of legal ignorance, there is no need to tarry long on the question of advising Holder to testify. For the sake of completeness, however, some discussion may be helpful to the Court.

The record on Holder's decision to testify is very clear. Independent of any advice from Mr. Shaw, the District Court advised Holder of the many pros and cons of testifying. The District Court recounted the inquiry extensively in its Memorandum and Order. *See Holder App.* 19 at 445-50. For example, the Court confirmed that Holder had discussed this decision with both Mr. Shaw and Ms. Herndon. The Court advised Holder that he would be questioned extensively, including about his role, if any, in the killing of Mr. Heflin. *Id.* at 447. The Court

57

advised Holder that the jury could use any admissions he might make against him. *Id.* at 449. Even after this extensive inquiry and advice from the District Court, Holder was given additional time (approximately ninety minutes) to confer privately with his family and with counsel before making any final decision regarding testifying. *Id.* In view of the extensive record that Holder's decision to testify was knowing and voluntary, this Court should not now entertain his claim that such decision was the product of bad advice.

It would seem that Holder's real complaint is that his testimony did not result in a favorable outcome. The Court, of course, is forbidden from assessing this matter on the basis of the outcome. *See Bell v. Cone*, 535 U.S. 685, 698 (2002); *Hood*, 342 F.3d at 863. Rather, this Court should look at the issue in the same manner as the District Court -- at the time Holder decided to testify. The massive quantum of evidence which the jury heard from Government witnesses before Holder testified did more to assure his death eligibility than the jury's supposed rejection of Holder's testimony. Rather than hurt his cause, Holder's testimony served to humanize him and offered hope of creating reasonable doubt as to his intent and role in the death of Mr. Heflin. *See Memorandum and Order, Holder App.* 19 at 445. Holder's testimony was consistent with the instructions as given. A brief review of Holder's testimony reveals that it was calculated to contest the

critical issue of the case -- whether Holder had an knowledge or intention that anyone would be killed or hurt during the robbery. On no fewer than nineteen occasions, Holder stated that nobody was to get hurt. *See Trial Tr.* 3-25.98, at 83-84, 88, 92, 98-99, 104-06, 106, 107, 109, 114, 120, 122, 130, 131, 132, 136, 139, 143, 144, 172.

Holder's testimony also helped to deliver what Mr. Shaw had promised the jury the evidence would show, while at the same time providing a temporal buffer, in the event the testimony did not go well, between testifying and penalty phase deliberations. In other words, it was arguably better for Holder to testify in the guilt phase than in the penalty phase. This strategic decision by Mr. Shaw was reasonable and cannot be characterized as the product of accident or poor planning. Thus, while Holder's testimony did not yield the desired results, one cannot say his testimony *per se* confessed a capital offense.

**5.     Mr. Shaw's Strategy Was Consistent With *Florida v. Nixon*.**

As demonstrated above, the record shows that Mr. Shaw's strategy was not the product of an ignorance of the law. Rather, it was calculated to negate a crucial element of the government's capital case. Mr. Shaw did not concede guilt to a capital offense. To be sure, Mr. Shaw conceded Holder's guilt of the bank robbery. In any event, there is no *Strickland* deficiency due to such a concession.

In *Florida v. Nixon*, 543 U.S. 175 (2004), the Supreme Court held that an attorney who, in the guilt phase of a capital murder trial conceded his client's guilt of a capital offense[11] without the client's express consent, was not ineffective where the concession was a strategic decision aimed at sparing the client's life in the penalty phase. *See id.* at 182-83, 190-93. Faced with overwhelming evidence of Nixon's guilt, including a graphically detailed description of the kidnaping and brutal murder of the victim Nixon gave to police, his trial counsel concluded that the best strategy to avoid the death penalty was to concede guilt, thereby preserving his credibility in urging leniency in the penalty phase. *See id.* at 181. As Nixon was unresponsive to his counsel's attempts to explain the strategy to him, counsel embarked upon the strategy without receiving Nixon's explicit approval. The trial court lauded counsel's choice of tactic:

> '[T]he tactic employed by trial counsel . . . was an excellent analysis of [the] reality of the case' . . . The evidence of guilt 'would have persuaded any jury . . . beyond all doubt,' and '[f]or trial counsel to have inferred Mr. Nixon was not guilty . . . would have deprived [counsel] of any credibility during the penalty phase.'

*Id.* at 184. The Supreme Court agreed that the strategy was appropriate:

---

[11]As discussed *supra*, Mr. Shaw did not at any time concede Holder's guilt of a capital offense. Mr. Shaw conceded Holder's conduct, but not the mental state required by the guilt phase instructions to find Holder guilty of either capital offense or required by the penalty phase instructions to find him death eligible in the penalty phase.

Although such a concession in a run-of-the-mine trial might present a closer question, the gravity of the potential sentence in a capital trial and the proceeding's two-phase structure vitally affects counsel's strategic calculus. Attorneys representing capital defendants face daunting challenges in developing trial strategies, not least because defendant's guilt is often clear. Prosecutors are more likely to seek the death penalty, and to refuse to accept a plea to a life sentence, when the evidence is overwhelming . . . . In such cases, 'avoiding execution may be the best and only realistic result possible." (quoting ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases §10.9.1, Commentary (rev'd ed. 2003), reprinted in 31 Hoffstra L.Rev. 913, 1040 (2003)).

*Id.* at 190-91. The Court recounted that Clarence Darrow was able to spare "youthful, cold blooded killers" Richard Loeb and Nathan Leopold from the death penalty by employing a similar stratagem, and concluded that "if counsel's strategy, given the evidence bearing on defendant's guilt, satisfies the *Strickland* standard, that is the end of the matter . . ." even absent the defendant's affirmative approval. *Id.* at 192.

More than being an accepted practice in capital litigation, it has been suggested that conceding a defendant's guilt in the situation presented by the Nixon case was ethically required. *See*, Andrew J. Epstein, *Conceding the Guilt of an Unresponsive Client in a Capital Case: Constitutional and Ethical Requirements*, 19 GEO. J. LEGAL ETHICS 695 (2006). Courts have routinely affirmed the reasonableness of concessions of guilt in the first phase of capital murder trials where the strategy was intended to save the defendant's life. *See, e.g., Atwater v.*

*Crosby*, 451 F.3d. 799, 807-809 (11th Cir. 2006), *cert. denied*, 127 S. Ct. 951 (2007) (defense counsel performance not deficient where counsel argued in first phase closing that evidence supported finding of second degree murder and experienced defense counsel testified he did not believe defendant had a chance of acquittal and strategy was to save defendant's life); *Hightower v. Schofield*, 365 F.3d 1008, 1038-39 (11th Cir. 2004), vacated on other grounds and remanded, 545 U.S. 1124 (2005) (defense counsel were not ineffective for failing to object to "guilty but mentally ill" instruction where counsel testified in state habeas hearing that strategy was to save defendant's life rather than seeking acquittal, which was a reasonable strategic choice given that defendant had confessed to murders on same day they occurred); *Trice v. Ward*, 196 F.3d 1151, 1161-62 (10th Cir. 1999), *cert. denied*, 531 U.S. 835 (2000) (defense counsel's performance did not violate *Strickland* where counsel argued in guilt phase that defendant was "guilty of all counts in the information;" it was uncontroverted that defendant was responsible for beating victim and causing her death and all but conceded that he also raped her; it was an entirely reasonable strategy for defense counsel to concede this point and focus on efforts at persuading jury that defendant did not have intent to commit first degree murder and/or persuading the jury to spare defendant's life).

When faced – as Mr. Shaw was – with overwhelming evidence of a client's

guilt, *Nixon* teaches that experienced counsel may make the reasoned strategic

decision to concede first phase guilt to preserve the requisite second phase

credibility needed to avoid a verdict of death, even without the client's specific

approval. *Nixon*, 543 U.S. at 190-93. In contrast to the petitioner in *Nixon,* Holder

was specifically advised of Mr. Shaw's similar strategy and approved it. *See*

*Holder Deposition, Gov. App.* 7 at 49-50, 53-57, 70-71, 76-77. In fact, Holder

understood this strategy would result in his conviction for the bank robbery. *See id.*

at 105. Further, unlike the situation in *Nixon*, Mr. Shaw's strategy did not, in fact,

concede a capital offense. Accordingly, Holder's claim of ineffectiveness is much

less compelling than that rejected by the Supreme Court in *Nixon*.

### 6. <u>Holder Cannot Show Prejudice</u>

The District Court did not assess *Strickland* prejudice, having found that Mr.

Shaw was not ineffective. *See Memorandum and Order Denying Rule 59(e)*

*Motion, Holder App.* 25 at 635 n.5. Even assuming, however, that Mr. Shaw's

representation was somehow deficient, Holder can show no prejudice. First, Holder

offers no meaningful alternative strategy other than conceding that Holder was

involved in the bank robbery. In reality, what Holder argues is that this Court

should find fault with Mr. Shaw's strategy, even though it was otherwise

satisfactory, because he came to that strategy through an alleged ignorance of the law. *See Holder Brief* at 38. As shown above, that strategy was only the reasonable strategy in this case.

Holder does not articulate any sort of true *Strickland* prejudice. Rather, Holder relies on an outcome-based analysis -- focusing on the outcome of his testimony. For example, Holder states that Mr. Shaw's strategy "all but *required* Mr. Holder to deny responsibility for the death of Richard Heflin. In the process, Mr. Holder came across as combative, remorseless, indifferent, and cold as he pointed the finger at Billie Allen and distinctly away from himself." *Holder Brief* at 36. As stated repeatedly herein, hindsight analysis is forbidden. *See Hood*, 342 F.3d at 863. Rather, to establish prejudice, Holder must demonstrate a reasonable probability that, but for counsel's constitutionally deficient performance, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694.

Holder does not explain to this Court how, exactly, the outcome of his case would have been different if Mr. Shaw had not conceded the bank robbery or had not advised him to testify. He cannot do so. Holder was faced with overwhelming evidence of his involvement in the robbery. Mr. Shaw's strategy was calculated to give Holder a chance at avoiding the death penalty. Even Holder's witnesses in the § 2255 case conceded that there was little chance of avoiding a conviction of a

capital-eligible offense.  *See, e.g., Hrg. Tr.* Vol. II at 13, 47, 201-03.  Thus, Holder

has not and cannot show any prejudice attending to Mr. Shaw's strategic decision

to concede guilt to the lesser-included offenses.

**II. THE DISTRICT COURT CORRECTLY CONCLUDED THAT HOLDER'S TRIAL COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO OBTAIN AN INDEPENDENT BALLISTICS EXPERT AND THIS COURT CANNOT AND SHOULD NOT CONSIDER HOLDER'S UNTIMELY REVISION OF THIS CLAIM.**

<u>**STANDARD OF REVIEW AND ANALYTICAL FRAMEWORK**</u>

The standard of review outlined above with regard to Issue I applies to the present issue.

<u>**ARGUMENT**</u>

**A.** <u>**Introduction**</u>

In his § 2255 motion, Holder claimed that his "[t]rial counsel unreasonably and prejudicially failed to retain and present a ballistics expert to dispute the government's evidence that some of the rounds fired during the bank robbery could have come from the weapon carried by movant." *Holder App.* 3 at 28. That was the issue filed, the issue addressed by the government, and the issue decided by the District Court. After the District Court denied Holder's claim on this ground, he tried to recast the issue in a totally different light. Holder now claims that his attorney was ineffective for failing to consult a ballistics expert before advancing Holder's allegedly inconsistent claim that he fired no shots in the bank. In particular, Holder now claims that his attorney was ineffective for failing to consult

66

an expert to <u>confirm</u> the government's evidence, rather than for failing to present an expert to <u>refute</u> the government's evidence.

Holder's claim, as originally filed, fails because he cannot show that such an expert exists. Holder's claim, as reconstructed, fails because it is out of time and defaulted. Further, Holder can show no legally cognizable deficiency and prejudice in his attorney's alleged failure to consult an expert to confirm the government's evidence.

**B.** **<u>The Court Lacks Jurisdiction To Consider The Ballistics Issue, As Raised Before This Court.</u>**

As an initial matter, Holder's brief on appeal is directed to an issue that was not timely raised below. Holder's claim, <u>as actually raised and preserved below,</u> was that his attorney was ineffective for failing to present an expert in ballistics to dispute the government's evidence. In particular, Holder claimed that Mr. Shaw "unreasonably and prejudicially failed to retain and present a ballistics expert to <u>dispute the government's evidence</u> that some of the rounds fired during the robbery could have come from the weapon carried by [Holder]." *Holder App.* 3 at 28 (emphasis supplied). Holder's position before the District Court focused entirely and solely on the fact that Mr. Shaw did not present a competing ballistics expert. The following excerpt from his § 2255 motion fully illustrates this point:

67

> The only way to break the government's chain of circumstances would have been to hire a ballistics expert to review Stubits' work and to challenge his findings that some of the spent shells could have come from [Holder's] weapon. Had counsel Shaw properly consulted with and retained the ballistics expert, he could have established that none of the markings on the spent shells found inside the bank were consistent with having been fired from [Holder's] weapon. Thus, he could have disproved the government's theory that [Holder] fired his weapon during the course of the bank robbery.

*Id.* at 29 (emphasis supplied).

The ballistics claim was not one of the claims selected for inclusion in the evidentiary hearing. The District Court denied a hearing on Holder's ballistics claim on the basis of the existing record. The District Court, however, issued a certificate of appealability as to the claim. *See Holder App.* 20 at 491. Thereafter, Holder filed a motion to alter or amend the judgment, pursuant to Fed. R. Civ. P. 59(e). In that motion, for the first time, Holder claimed that the error was not counsel's failure to present an expert to dispute the government's ballistics evidence, but rather that counsel should have consulted with an expert to confirm the government's ballistics. *See Memorandum and Order Denying Rule 59(e) Motion, Holder App.* 25 at 12.

The District Court correctly concluded that Holder's new theory regarding ballistics was untimely and not properly raised by the Rule 59(e) motion. *See id*. at 12 (citing *Innovative Home Health Care, Inc. v. P.T.-O.T. Associates of the Black*

*Hills,* 141 F.3d 1284, 1286 (8th Cir. 1998)).  Rule 59(e) motions are not proper

vehicles for raising new arguments and arguments that could have been raised prior

to judgment.  *See Howard v. United States*, 533 F.3d 472, 475 (8th Cir. 2008);

*Capitol Indemnity Corp. v. Russellville Steel Co., Inc.*, 367 F.3d 831, 834 (8th Cir.

2004).  The District Court identified several instances in Holder's § 2255 motion in

which he clearly stated that his gripe with counsel centered on a failure to dispute

the government's ballistics, and that he "never even suggested that Mr. Shaw should

have retained an expert to <u>confirm</u> Mr. Stubits' opinion."  *Holder App.* 25 at 677.

Holder admits that he did not plead this claim with his § 2255 motion.  *See*

*Holder Brief* at 45.  Holder does not identify any place where he sought to expand

the issue prior to the evidentiary hearing.  Yet Holder argues he preserved this claim

by raising it during the § 2255 evidentiary hearing.  *See id.*  That argument fails

because the ballistics issue was not selected by the District Court for inclusion in

the evidentiary hearing.  *See Memorandum and Order Denying Rule 59(e) Motion,*

*Holder App.* 25 at 678.  If the issue was not on the table at the hearing, it could not

have been subject to revision during that hearing.  To conclude otherwise would

open wide a trap door that may never be shut and would likely lead to deliberate

sandbagging or worse.  Even if the ballistics issue were selected for inclusion in the

evidentiary hearing, Holder's one hundred and eighty degree revision of that issue

would have been a new ground and, therefore, barred by the one-year limitations period imposed by AEDPA. *See* 28 U.S.C. § 2255(f); *Dodd v. United States*, 614 F.3d 512, 515 (8th Cir. 2010). Further, as Holder's revision of the ballistics issue is at odds with his issue as filed, and he never sought to amend his petition, he cannot now claim that the revised issue relates back to his original petition. *See id.* at 515-16.

Holder suggests that he was free to alter his legal theory essentially *ad hoc* during the proceedings, stating "there is no requirement that the entirety of a prisoner's legal theories must be pleaded or otherwise written, as opposed to being argued in open court." *Holder Brief* at 45. Holder cites no authority for that position. As a legal matter, Holder did not, in fact, have free reign to alter his legal position. Section 2255(f) places specific limitations on what a prisoner can and cannot raise. Moreover, as explained above, Holder's ballistics claim was not selected for inclusion in the evidentiary hearing in which he claims he preserved this theory. Thus, the District Court placed a valid evidentiary limitation on his ability to alter his theory.

More importantly, *Strickland* itself places limits on a prisoner's ability to concoct and pursue theories. Counsel is held to a highly deferential standard of conduct, not a strict, or in this case conflicting standard of conduct. *See Strickland*,

466 U.S. at 689; *Williams*, 452 F.3d at 1013.  Holder's position, if accepted, places Mr. Shaw in a straightjacket.  On the one hand, Holder argued that Mr. Shaw was ineffective for failing to obtain and present evidence from an expert to refute the government's ballistics evidence.  On the other hand, Holder now argues that Mr. Shaw was ineffective for failing to consult with an expert who would have confirmed the government's evidence.  Thus, according to Holder, Mr. Shaw was ineffective for not simultaneously refuting and confirming the government's ballistics.

Moreover, this Court should not entertain Holder's claim, as formulated on appeal.  To do so would be akin to rewarding him even though he chose to lie at trial.  "[H]abeas corpus is, at its core, an equitable remedy."  *Schlup v. Delo*, 513 U.S. 298, 319 (1995).  As an equitable matter, Holder should be barred from pursuing a claim for which he has unclean hands.  On appeal, Holder's position is that, had Mr. Shaw obtained an expert that confirmed the government's evidence, he should have convinced Holder not to testify that he did not fire his weapon in the bank.  Holder claims he was prejudiced because the government was able to argue that his testimony was untruthful, which showed a lack of remorse and dangerousness.  In other words, Holder now claims that, but for his counsel's allegedly deficient performance regarding the ballistics evidence, he would not have

testified falsely. Holder should not receive the benefit of habeas review of a claim that rests ultimately on his decision to testify falsely.

Finally, even if Holder's claim were not time-barred, he was not granted a certificate of appealability on the issue as he presently argues it. Thus, it is not properly before this Court and should be denied. *See* 28 U.S.C. § 2253. *See also Pruitt v. United States*, 233 F.3d 570, 572-73 (8th Cir. 2000) (explaining that appellate review is limited to issues specified in a certificate of appealability). *Cf. United States v. Lambros*, 404 F.3d 1034, 1036-37 (8th Cir. 2005) (explaining that denial of a prisoner's Rule 59(e) motion, which sought to resurrect denial of prior § 2255 motion, required a certificate of appealability). The District Court concluded that Holder's ballistics claim, as formulated in the Rule 59(e) motion, was untimely. Thus, the court could not have included that claim in the previously issued certificate of appealability. Holder did not include this issue in his unsuccessful motion to expand the certificate of appealability. A certificate of appealability "is a jurisdictional prerequisite." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (interpreting 28 U.S.C. § 2253(c)(1)). *See also United States v. Lambros*, 404 F.3d 1034, 1036 (8th Cir. 2005) ("[O]f course, a certificate is required to appeal from 'the final order in a proceeding under section 2255.'") (quoting 28 U.S.C.

2253(c)(1)(B)).  Accordingly, the Court lacks jurisdiction to consider Holder's

ballistics issue, as reformulated and presented herein.

**C.      <u>Holder's Reconstituted Ballistics Claim Fails On Its Merits</u>**

Faced with the fact that his ballistics claim, as originally filed, lacked any

basis in fact, Holder attempted to recast that claim using a motion under Rule 59(e)

to alter or amend the judgment denying his § 2255 motion.  As stated above, that

claim was not properly preserved and presented for review and must be denied.  If

this Court chooses to consider Holder's ballistics claim, as briefed herein, that claim

also fails.

Before the District Court, Holder advanced the argument that, had Mr. Shaw

obtained an independent expert to confirm that three shell casings could not have

come from Allen's gun, he would not have pursued a strategy that included Holder's

denial that he fired his weapon in the bank.  The problem with Holder's position

before the District Court is that he does not offer a viable alternative strategy.  With

or without a second expert opinion, Holder still faced a government expert in Mr.

Stubits who was less than certain in his findings regarding the three shell casings

that did not come from Allen's weapon.  At the time Mr. Shaw tried this case, the

jury was not required to believe Mr. Stubits, or the bank teller.  The jury could have

credited Holder.  In fact, Mr. Stubits was impeached by the fact that this portion of

his opinion was not in his written report. As such, far from being flawed, Mr. Shaw's strategy provided an additional opportunity to inject doubt into the guilt phase -- doubt that might have been resolved in favor of a life sentence. Thus, using the highly deferential standard mandated by *Strickland*, one must conclude that Mr. Shaw's handling of the ballistics evidence was not unreasonable.

The fact that Holder's testimony did not produce the desired result is not sufficient to claim that Mr. Shaw's strategy was unreasonable in any way. Hindsight is not the standard. *See Hood*, 342 F.3d at 863. At best Holder offers the argument that, if his attorney had gotten the opinion of a second expert, he would not have decided to testify (falsely) in the manner in which he did, which he now claims destroyed his credibility. Certainly such conclusory and self-serving arguments cannot serve to show prejudice in the *Strickland* sense. Thus, even if this Court were to somehow consider Holder's new and untimely ballistics argument, that argument would fail.

**D.** **If Considered By This Court, Holder's Ballistics Claim As Originally Filed Fails On Its Merits.**

Holder does not argue before this Court the ballistics claim that he timely filed and for which he actually received a certificate of appealability. This Court should treat that claim as waived for failing to pursue it on appeal. *See FTC v. Neiswonger*, 580 F.3d 769, 775 (8th Cir. 2009) ("Claims not raised in opening brief

74

are deemed waived," *Jenkins v. Winter*, 540 F.3d 742, 751 (8th Cir. 2008));

*Berryhill v. Schriro*, 137 F.3d 1073, 1075 n.2 (8th Cir. 1998) (finding no reason to deviate from "general rule" that issues not briefed are waived); *Lockley v. Deere & Company*, 933 F.2d 1378, 1386 (8th Cir. 1991) (finding a specific issue abandoned on appeal because party did not argue it). In any event, Holder's ballistics claim as originally filed was fatally flawed and the District Court had no choice but to deny it.

Holder argued that Mr. Shaw was deficient for failing to present a ballistics expert to contest the government's evidence showing that there were three shell casings that were inconclusive as to Holder's rifle, but excluded from Allen's rifle. The fatal flaw is that Holder has not and apparently cannot produce an expert to support his claim. Thus, his claim is entirely speculative and he failed to carry his burden. *See United States v. Davis*, 406 F.3d 505, 509 (8th Cir. 2005) (counsel not ineffective for failing to present rebuttal expert whose opinion was not available at the time of trial). *See also United States v. White*, 341 F.3d 673, 678 (8th Cir. 2003) (burden of proof). "A § 2255 motion 'can be dismissed without a hearing if (1) the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.'"

75

*Sanders v. United States*, 341 F.3d 720, 722 (8th Cir. 2003) (quoting *Engelen v. United States*, 68 F.3d 238, 240 (8th Cir. 1995)), *cert. denied*, 540 U.S. 1199 (2004). *See also Buster v. United States*, 447 F.3d 1130, 1132 (8th Cir. 2006) (quoting *Sanders*). Holder's ballistics claim, as originally filed, was entirely conclusory and without any meaningful factual support. The District Court had no choice but to dismiss it without a hearing.

Perhaps the closest precedent to Holder's situation is found in *Wainwright v. Lockhart*, 80 F.3d 1226 (8th Cir. 1996). *Wainwright* involved a capital habeas defendant who claimed "his trial attorney was ineffective in failing to offer the testimony of . . . a ballistics expert." *Id.* at 1230. In that case, the issue was who fired the weapon that killed an attendant at a convenience store. The evidence in *Wainwright* showed that the shooter fired using his left hand. *Id.* Three suspects were tested for gunpowder residue within hours of the shooting. *Id.* Although Wainwright was left-handed, no residue was found. *Id.* Residue was found on the left hand of another suspect, Leeper, who happened to be right-handed. *Id.* The State argued that Wainwright cleaned his hands and that Leeper handled the gun after the shooting. *Id.* In *Wainwright*, unlike the present case, trial counsel consulted with an expert who concluded that the most likely way for Leeper to get gunpowder residue on the back of his hand is from actually firing the weapon. *Id.*

Despite having knowledge of this arguably favorable testimony, Wainwright's attorney did not call the expert at trial. *Id.* The district court concluded that trial counsel's decision not to call the defense's ballistics expert was "professionally deficient." *Id.* Nonetheless, the district court and this Court agreed that there was no prejudice because, in light of the other evidence regarding Wainwright's guilt, there was no reason to conclude that the jury would have found in favor of Wainwright, even if the defense expert had testified. *Id.*

Holder's ballistics claim is even weaker than that rejected in *Wainwright*. At least Wainwright produced an expert opinion for the courts to evaluate. In the present case, Holder offered nothing other than rank speculation.

Because Holder's claim was speculative, the District Court was correct in denying an evidentiary hearing for this claim. Yet the District Court gave Holder a benefit of the doubt to which he was not entitled. The District Court assumed that such an expert existed but concluded Mr. Shaw was nonetheless not ineffective for failing to locate and use the hypothetical expert. The District Court made this conclusion on the basis of Mr. Shaw's "skillful cross-examination of the Government's ballistics expert, Mr. Stubits, and on the existence of the other overwhelming evidence of [Holder's] guilt." *Memorandum and Order Denying Rule 59(e) Motion, Holder App.* 25 at 676; *See also Holder App.* 19 at 455-56.

There is no basis to conclude that the District Court clearly erred in finding that Mr. Shaw did, in fact, skillfully cross-examine the government's expert.

The District Court also concluded that there was no prejudice. The Court noted this was a closer question because of certain mitigating factors that Holder presented during the penalty phase and which the jury rejected. *See Memorandum and Order Denying § 2255 Motion, Holder App.* 19 at 459-60. The first factor rejected by the jury was that Holder did not fire the shot that killed Mr. Heflin. The second factor rejected by the jury was that Holder did not intend for any person to be killed during the course of the robbery. *See id.* The District Court found that it could not say "that an expert witness testifying regarding the three spent shell casings that did not come from Allen's weapon did not come from [Holder's] weapon, would have resulted in a different finding on these two mitigating factors." *Id.* at 461. Indeed, there is no basis to conclude that even if the jury had found these factors in Holder's favor, it would have altered the balance of the jury's decision. *See id.* To conclude otherwise would depend largely on speculation, which is not the standard to be applied.

Of course all of the District Court's analysis regarding the possible outcome of Holder's case had a hypothetical ballistics expert actually existed is purely academic. In reality, Holder failed to present any expert to back up his theory. It is

well and firmly established that a § 2255 movant bears the burden of proof for each and every claim he raises. Holder's ballistics claim is an empty criticism, devoid of substance and entirely speculative. Thus, Holder failed to carry his burden and his claim was properly denied without a hearing. *See Buster*, 447 F.3d at 1132; *United States v. White*, 341 F.3d 673, 678 (8th Cir. 2003); *see also Becht v. United States*, 403 F.3d 541, 549 (8th Cir. 2005) (explaining that movant failed his burden of establishing prejudice); *Day v. United States*, 428 F.2d 1193, 1195-96 (8th Cir. 1970) (affirming denial of § 2255 motion and finding movant failed to meet his burden of proof due to a lack of evidence presented).

**III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING AN EVIDENTIARY HEARING ON HOLDER'S CLAIM OF INEFFECTIVE ASSISTANCE IN THE MENTAL HEALTH INVESTIGATION, BECAUSE THE RECORD CLEARLY CONTRADICTED THE CLAIMS OF DEFICIENT PERFORMANCE AND PREJUDICE.**

**STANDARD OF REVIEW AND ANALYTICAL FRAMEWORK**

A district court's denial of an evidentiary hearing is reviewed for abuse of discretion. *Tinajero-Ortiz vs. United States*, 635 F.3d 1100, 1105 (8th Cir. 2011); *Sanders v. United States*, 341 F.3d 720,722 (8th Cir. 2003), *cert. denied*, 124 S.Ct. 1460 (2004). In *Tinajero-Ortiz*, the Court stated:

A §2255 motion can be dismissed without a hearing if "(1) the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the records, inherently incredible, or conclusions rather than statements of fact."

635 F.3d at 1105 (citation omitted). The Court determined that both prongs supported the district court's decision to deny a hearing and credited the fact that the District Court presided over the underlying proceedings. *Id.* at 1106.

The standard of review governing the denial of Holder's ineffective assistance of counsel argument is outlined above with regard to Issue I and fully applies to the present issue. Findings of fact are reviewed for clear error and conclusions of law are reviewed *de novo*. Specifically, as to capital mitigation investigation claims, trial counsel has a duty to conduct a reasonable mitigation

investigation. *Strickland*, 466 U.S. at 691. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id. at 691*.

A showing that counsel could have conducted a more thorough investigation that might have borne fruit does not establish ineffectiveness. *See Burger v. Kemp*, 483 U.S. 776, 794 (1987). "A reasonable investigation is not . . . the investigation that the best criminal defense lawyer in the world, blessed not only with unlimited time and resources but also with the inestimable benefit of hindsight, would conduct." *Thomas v. Gilmore*, 144 F.3d 513, 515 (7th Cir. 1998)(citing *Walters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995)). The duty to investigate depends on facts known to the attorney. *Wiggins v Smith*, 539 U.S. 510, 527 (2003); *see Hedrick v. True*, 443 F.3d 342, 350 (4th Cir. 2006). The reasonableness of the investigation is determined by the information conveyed to counsel by his client, as well as other information in his possession, recognizing "the reality that lawyers do not enjoy the benefit of endless time, energy or financial resources." *Chandler v. United States*, 218 F.3d 1305, 1318 & n.22 (11th Cir. 2000)(internal quotation omitted). Where counsel did not know of facts that would signal a need to conduct a particular investigation, a failure to investigate does not amount to deficient

performance. *Alcala v. Woodford*, 334 F.3d 862, 893 (9th Cir. 2003); *see Bacon v. Lee*, 224 F.3d 470, 481 (4th Cir. 2000).

The Supreme Court has issued several opinions on the topic of effective assistance in mitigation investigations. In *Williams v. Taylor*, 529 U.S. 362, 395 (2000), the Court found that counsel failed to meet its duty to "conduct a thorough investigation of the defendant's background." In *Williams*, trial counsel had essentially failed to conduct any investigation of negative and positive information in defendant's background. Another example of sub-par performance was evaluated in *Wiggins v. Smith*, 539 U.S. 510 (2003). In *Wiggins*, counsel failed to investigate the defendant's social history and find reasonably available mitigation evidence and aggravation rebuttal evidence. *Id.* at 524. In *Rompilla v. Beard*, 545 U.S. 374 (2005), the defective performance involved failing to even review the file on a piece of aggravation evidence which the defense knew the government was going to use. The Court elaborated on how its view of trial counsel's duty applied in mitigation investigations: "[q]uestioning a few more family members and searching for old records can promise less than looking for a needle in a haystack, when a lawyer truly has reason to doubt there is any needle there. [citation omitted]." *Id. at 389.*

If the deficient performance prong is established, the Supreme Court has also given specific guidance on how to apply the *Strickland* prejudice analysis in the context of a sub-par mitigation investigation. Recently, in *Sears v. Upton*, 130 S.Ct. 3259 (2010), the Court required a "probing and fact-specific" inquiry. *Id.* at 3266. The standard requires a District Court to "assess the probability of a different outcome" viewing "the totality" of the trial and alleged habeas mitigation evidence and then to "reweigh it against the" aggravation evidence. *Id.* This analysis necessitates that a District Court "'speculate' as to the effect of the new evidence." *Id.*

## ARGUMENT

### A.    Introduction

The District Court did not abuse its discretion by denying Holder a hearing on his claim that counsel's mental health investigation was both deficient and prejudicial. The claim[12] presented to the District Court is not the claim asserted on appeal, but the Government will discuss both. In short, Holder's sparse §2255 factual allegations, even in reply to the Government's initial response, did not entitle him to relief, even if true, and could not be accepted as true because they

---

[12]The claim was designated "12(C)(f)" in Holder's original petition. *Holder App 3*.

were clearly contradicted by the record. Holder had the burden of establishing his entitlement to a hearing and failed. The primary flaw of Holder's arguments on appeal, aside from relying on belated claims not timely presented to the District Court, is his reliance on hindsight rather than circumstances reasonably known to counsel in 1998.

**B.     This Court Lacks Jurisdiction To Consider Belated Claims**

Holder's claim as timely filed was that his counsel allegedly failed to obtain a neuro-psychologist's opinion on the issue of brain damage. *Holder App. 3 at 32.* Even in reply to the Government's response to Holder's §2255 motion, Holder referenced few facts supporting the claim. *Holder App 7 at 250-52.* The District Court denied Holder's mental health investigation claim without a hearing. *Holder App 19 at 466-70.* Holder then filed a motion under Rule 59(e) and for the first time asserted that counsel was ineffective for failing to find witness Terry Jett and to obtain a "trauma expert's" opinion regarding the effects of various traumas on Holder's mental condition. *Holder App 22 at 519-22.*[13]

Holder should not be permitted to attack the District Court for not granting a hearing on belated claims it was never given the opportunity to consider prior to

---

[13]Holder actually waited until replying to the Government's response to the Rule 59(e) motion to present most of the "declarations." *Holder App 24.*

holding on other claims. Holder did not even raise his new theories during post-hearing briefing. Because Holder could not introduce new legal theories and factual allegations in a Rule 59(e) motion, the District Court refused to consider not only the new ineffective mental health investigation claim, but also the voluminous documents submitted for the first time in support of the Rule 59(e) motion. *Holder App* 25 at 689. Thus, the documents referred to extensively in Appellant's Brief were not received into evidence by the District Court and are not properly part of the record before this Court. Holder simply ignores this fact and takes liberties by placing rejected documents before this Court.

To permit Holder to attack the District Court on issues never timely presented to it, supported by documents the District Court refused to consider as untimely, without even addressing whether this Court has jurisdiction to consider the claims or the documents, is wrong and violates procedures for handling §2255 claims. Belated claims also violate the statute of limitations in the AEDPA, 28 U.S.C. §2255(f) and Holder did not seek leave to amend his claim.

The belated claims were asserted only when it became clear the trial record refuted Holder's timely claims: i.e., that the mental health investigation was not robust, that defense counsel did not get a complete neuro-psychological examination and that counsel failed to pursue a sequentially third neuro-

psychologist.  This Court should limit its review to these timely claims and find that

it lacks jurisdiction to consider other claims not timely presented to the District

Court and for which a certificate of appealability was not issued.[14]

## C.    Holder's Timely Mental Health Claims, Relevant Facts and The District Court's Determination

The trial record before the District Court included medical and other relevant

documents obtained by the defense as a result of both their investigation and the

Government's investigation.  Witnesses called by both the Government and the

defense in both the guilt phase and the penalty phase gave testimony relevant to

mental health.  The defense called two mental health experts, Drs. Thomas J. Reidy

and Stephen Rothke, and placed before the jury the results of the examination by

the Government's mental health expert, Dr. Richard Wetzel.  Holder presented 31

mitigation witnesses in total: thirteen family members, six friends or neighbors, two

teachers and two youth service group members.  A detailed review of the evidence

was supplied to the District Court in the Government's response to Holder's §2255

motion.  *Holder App.* 6 at 55-86.

---

[14]*See* Issue II, Argument B, *supra*.

Holder's §2255 petition alleged that two experienced capital trial counsel, supported by a professional mitigation specialist[15] and a nationally-recognized federal death penalty legal expert[16], were deficient in failing to establish that he was "brain damage[sic] at the time of the offense." *Holder App.* 3 at 32. Two defense mental health experts, Dr. Thomas Reidy[17] and Dr. Stephen Rothke[18], examined Holder, reviewed relevant documents, prepared reports and testified at trial. Holder

[15]Caryn Tatelli was an experienced capital "forensic social worker." *Hearing Tr.* I at 5-7. She assisted trial counsel in an investigation of Holder's life and family, gathered records, recommended and located experts, communicated with said experts as to their findings and collaborated with trial counsel on mitigation and defense strategy. Among other duties, she prepared a time-line of Holder's life and submitted memoranda of interviews of Holder family members and acquaintances to the mental health experts and counsel. *Gov. App* 1 (Hearing Exhibit R, "Norris Holder Sentencing Outline"*).*

[16]Richard Burr was an attorney who had spent his career in capital litigation, first with the Southern Prisoners Defense Committee and then with the Federal Death Penalty Resource Counsel. *Hearing Tr.* II at 129-134. His role was to provide consulting and assistance to counsel in this case. He recommended both Ms. Tatelli, who joined the team in December, 1997, and Jennifer (Brewer) Herndon to work on behalf of Holder. *Id.* at 141. He played a role in formulating the mitigation strategy and also involved a second FDPRC attorney, Kevin McNally. *Id.* at 183.

[17]Dr. Thomas J. Reidy was a forensic psychologist who examined Holder and testified at trial that Holder was not a future danger in the structured environment of prison. A copy of his report of evaluation of Holder is *Gov. App* 2.

[18]Dr. Stephen Rothke was a psychologist who specialized in neuro-psychology and rehabilitation psychology. He was sometimes referred to as a "secondary loss" expert, because of his experience treating the psychological effects of amputation. *Holder App* 6(a)(Dr. Rothke report, addendum and curriculum vitae) and (d)(Dr. Rothke Direct Examination).

was also examined by a Government mental expert, Dr. Richard Wetzel[19], who did not testify at trial but whose findings were endorsed by Dr. Rothke. *Trial Tr.* 4-3-98 at 80-81. Both Drs. Rothke and Wetzel were qualified neuro-psychologists.[20]

Holder's precise allegation was that his experts had limited their inquiries to future dangerousness and the impact of the train accident.[21] He claimed his attorneys were "aware that [Holder] suffered numerous incidents of seizures at the time of his birth" and had a "history of head injuries,"[22] and were therefore deficient in failing to "hire an expert to perform a <u>neuropsychological</u> examination." *Holder App.* 3 at 33 (emphasis added).

---

[19]Dr. Richard Wetzel was a Neuropsychologist and Professor of Neurology and Neurological Surgery at the Washington University School of Medicine. *Holder App* 6(b)(Dr. Wetzel report) and (c)(Dr. Wetzel curriculum vitae). Dr. Wetzel did not issue a report of his findings until March 23, 1998. *Holder App* 6(b).

[20]*Gov. App* 3 is a list of cases in which Dr. Rothke served as an expert. It was provided by Holder's counsel to the Government.

[21]Ironically, the argument on appeal is that his trial attorneys were deficient for not <u>sufficiently</u> exploring the impact of a significant trauma in Holder's life, to wit: an amputated leg resulting from a train accident. *Appellant's Brief* at 70. Holder's mental health investigation claims are moving targets.

[22]Habeas counsel claimed that one of these head injuries was the result of the train accident in 1991. *Holder App.* 3 at 33. However, there was and is no evidence of a head injury during the train accident or of any head injury other than the brick incident in 1992.

Holder also claimed that on <u>March 12, 1998</u>, counsel contacted Dr. H. Anthony Semone, allegedly to review the findings of the Government's neuro-psychologist and to "determine the necessity for <u>further</u> neurological testing." *Holder App,* 3 at 33 (emphasis added). It was further alleged that said counsel obtained a court order for Dr. Semone to evaluate Holder, but did not follow through on the order. *Id.* at 33-34. It was further alleged that a post-conviction evaluation of Holder by Dr. Semone resulted in "<u>suspecting</u> the possibility of brain damage to the right hemisphere of [Holder's] brain" which "<u>could</u> affect [Holder's] judgment and ability to assess danger such that [Holder] would . . . totally expect that no one would be harmed or that he would place anyone at great risk of injury or death." *Holder App.* 3 at 34 (emphasis added).[23] Finally, Holder's §2255 motion claimed that his attorneys were ineffective for allegedly not discovering that "he had <u>brain damage</u>." *Holder App.* 3 at 35 (emphasis added). Holder's motion was not supported by <u>any</u> affidavits, attachments, exhibits or other evidence.[24] In

---

[23]Thus, even viewing Holder's allegations in the light most favorable to him, there was no claim that Dr. Semone or any new neuro-psychologist would have opined that Holder <u>actually</u> had significant brain damage or that the brain damage <u>actually</u> impact Holder's perception of danger to others. Similarly, there was no claim that Holder's counsel had any reason to believe that an additional expert would have produced a favorable diagnosis.

[24]Holder still has not proffered to any Court a report of Dr. Semone's alleged findings regarding Holder nor has Holder proffered a declaration or affidavit of his

addition, Holder's petition made no mention of failing to consult a "trauma expert."

Thus, the District Court had before it a claim that boiled down to the failure to get a

third neuro-psychological evaluation that would have developed evidence of brain

damage.

The Government responded to Holder's 2255 motion detailing the evidence

bearing on Holder's mental health, including the testimony of Dr. Rothke, as well as

the reports and curriculum vitae of the experts. *Holder App. 6*. Holder's reply

essentially ignored the Government's response and simply reasserted his alleged

right to a hearing on all of his claims. *Holder App.* 7. Holder again failed to

provide the District Court with <u>any</u> supporting documentation to rebut the

Government's response that the record conclusively contradicted Holder's claim.[25]

The following was the extent of the support offered by Holder:

> Movant expects that counsel Herndon will testify at an evidentiary hearing
> that she suspected movant had brain damage and other neurological
> deficiencies. The fact that she retained Dr. Semone <u>prior to trial</u>
> corroborates that counsel Herndon's harbored these suspicions. Apparently,

---

surviving trial counsel as to why she did not pursue an evaluation by Dr. Semone. If
Holder's allegations were anything more than a diversion, both of these would have
been provided.

[25]Holder merely cited *Wiggins v. Smith*, 539 U.S. 510 (2003), and the post-
trialABA standards for capital counsel which Holder claimed the Supreme Court had
accepted as the standard of ineffective assistance for mental health investigations.
*Holder App.* 7 at 251.

counsel Herndon must have realized the lack of adequate investigation into movant's neurological condition and thus, retained Dr. Semone to do <u>further</u> testing. If counsel Herndon has been presented with Dr. Semone's finding that movant's brain damage would have caused him to form a belief that his actions would not have caused a grave risk of death to others at the bank, she would have presented his testimony. Said evidence would have negated the grave risk of death statutory aggravator submitted by the government.

*Holder App.* 7 at 251 (emphasis added)[26].

The District Court's denial of Holder's claim was supported by a lengthy analysis of the record which clearly contradicted Holder's claim. *Holder App.* 19 at 466-70. The District Court held that in the face of the record regarding the extent of the mental health evaluation and evidence, and Holder's failure to present any support for his claim that the decision not to follow up with Dr. Semone was unreasonable, counsel had not acted unreasonably. *Id. at 466-67.* It found that the record conclusively contradicted the claim that a "full neuro-psychological exam"

---

[26]The record reflected that counsel had <u>not</u> retained Dr. Semone <u>prior</u> to trial. Trial began on March 10, 1998. Both Holder and the Government were continuing to investigate Holder's life history. Holder's Section 2255 motion claimed that Ms. Herndon contacted Dr. Semone on March 12, 1998. However, defense counsel faxed Dr. Semone's CV to Government "firewall" counsel on March 3, 1998. *Gov. App* 4. The docket indicated that a Court order for Dr. Semone to meet Holder was entered on March 12, 1998, well <u>after</u> the trial began and almost 2 weeks <u>before</u> the results of Dr. Wetzel's testing were produced to Holder. *Gov. App* 5 (docket)*; Holder App* 6(b)(Dr. Wetzel report dated March 23, 1998)*. Thus, Dr. Semone was not contacted prior to trial or for "further" testing as claimed. In addition, it is disingenuous to posit the fact of "Dr. Semone's finding" of brain damage, because there has never been a claim or evidence that Dr. Semone actually "found" brain damage in Holder. At best, the claim is that Dr. Semone "suspects the possibility" of brain damage.

of Holder had not been done: "Dr. Stephen Rothke, a clinical neuro-psychologist retained by [Holder's] trial counsel performed a neurological examination on [Holder] and presented a report." *Id. at 467-68.* Dr. Rothke considered whether "injuries [Holder] sustained several years ago are relevant to" the crimes charged and future dangerousness. *Id.* at 467. Dr. Rothke concluded that Holder did not display "<u>any</u> psychiatric diagnosis, nor [was] he in need of <u>any</u> psychological treatment . . ." *Id.* (emphasis added). Finally, the District Court noted that Dr. Wetzel, the Government's expert, concluded more specifically that there was "no psychological or neurological connection or causal relationship between the febrile seizure(s), traumatic amputation, and the head injury, and the crimes" charged. Dr. Wetzel did detect minor brain damage resulting from the 1992 brick incident, but concluded that its <u>only</u> impact was a <u>motor-skill</u> issue unrelated to Holder's culpability for the murder of Richard Helflin. *Id.*

The District Court erroneously accepted as true the claim that: 1) Dr. Semone was contacted in the "<u>beginning of March, 1998 . . . to review Dr. Wetzel's</u> findings, and determine the necessity of further neurological testing," *id.* at 466-67 (emphasis added); and 2) Dr. Semone, post-conviction, "concluded that [Holder's] brain damage could affect [Holder's] judgment, and his ability to assess danger."

*Id.*[27]  Nevertheless, based on the reports of Drs. Rothke and Wetzel and the testimony of Dr. Rothke, the Court concluded: "there [was] <u>no showing</u> by [Holder] that anything less than a <u>full and complete</u> neuropsychological exam was performed on [Holder]." *Id.* at 468 (emphasis added).

Therefore, the District Court concluded that Holder failed to establish that there was a disputable issue of fact regarding whether his trial attorneys "acted reasonably in not employing Dr. Semone." *Id.* at 468.   The District Court distinguished this case from *Wiggins v. Smith*, 539 U.S. 510 (2003), because in *Wiggins* the defense stopped investigating beyond an earlier pre-sentence report and a few social services records and presented no mitigation evidence. *Holder App.* 19 at 468.  Here, the District Court noted that trial counsel not only did not fail to investigate but investigated extensively and presented extensive mitigation evidence including experts.  Key to the District Court's finding was the conclusion that regardless of what led trial counsel to not obtain a <u>third</u> neuropsychological exam, "[t]here was no evidence <u>before [Holder's] trial counsel</u> that further mental

---

[27]Thus, even though the record establishes that Dr. Semone was <u>not</u> contacted <u>third</u> in sequence for the purpose of <u>further</u> evaluation and even though Holder's motion did not allege that Dr. Semone concluded that Holder was, <u>in fact</u>, brain damaged, the District Court obviously gave Holder an undue benefit in its analysis. Holder does not claim that the District Court's analysis of the record was factually incorrect.

examination of [Holder] would produce a favorable report." *Id*. at 469 (emphasis added).

**D.    The Mental Health Investigation Was Far From Deficient**

**1.  Holder's Actual Claim: Failure To Conduct A Full Neuro-Psychological Examination**

The record before the Court led to only one conclusion - that a full neuro-psychological evaluation had been done competently by qualified experts.  More importantly, nothing in the record even hinted at trial counsel being put on notice that the evaluations conducted were less than adequate.

The mental health investigation on Holder's behalf was extensive.  At Mr. Burr's instigation, professional mitigation investigator Caryn Tatelli, was appointed to investigate Holder's life history, gather third-party records, interview witnesses, identify potential avenues of mitigation and identify areas in which experts should be contacted.  In addition, a second full-time trial counsel, Jennifer (Brewer) Herndon, was added to Holder's defense team and she worked closely with Ms. Tatelli.[28]  Ms. Herndon and Ms. Tatelli developed much of the mitigation evidence, consulted with Richard Burr and presented the evidence at trial.  *See Gov. App* 6

---

[28]Ms.Tatelli testified at the motion hearing held on other claims.  An example of her work product was introduced which demonstrated the quality of the mental health investigation.  *Gov. App* 1 (Exhibit R, Sentencing Outline).

(Tatelli Time Record).  Moreover, the District Court presided over a trial that included much evidence relevant to mental health, including the planning and preparation for the offense, the offense itself, the testimony of acquaintances, Holder's statements to the FBI, Holder's testimony during the guilt phase, and the mitigation evidence itself.

Two experienced, qualified neuro-psychologists examined Holder and reduced their findings to writing.  *Holder App.* 6 at 147, 158, and 186 (CV's and reports).  In addition to being a published and practicing, board-certified neuro-psychologist, Dr. Rothke was a neuro-psychological consultant to Northwestern University's Medical School.  He had 8 years of experience conducting neuropsychology testing at the Rehabilitation Institute and headed up the Psychology Department for 5 years.  More importantly, the focus of his career had been on trauma, amputation and head injury patients.  Trial counsel requested the District Court to "certify" him as an expert in the areas of "clinical neuropsychology and rehabilitation psychology" and Dr. Rothke was paid over $4,000 for his work.  *Holder App.* 6 at 199-233 (testimony of Dr. Rothke).

Dr. Rothke conducted his examination of Holder on March 19, 1998.[29]  It included the administration of a battery of tests, an evaluation interview with Holder and a review of documents supplied by defense counsel[30].  These documents included a summary prepared by Ms. Tatelli of interviews of family, friends, teachers and many others who knew Holder.  By the time Dr. Rothke testified he also reviewed additional records including all of Holder's known medical records.[31]  From Holder's statements during the evaluation, Dr. Rothke learned that Holder did not suffer great pain during the train accident and actually calmed his friends who were present; Holder managed to resume normal activities after the amputation, including football; and Holder later sold drugs to make money.  While selling drugs, Holder claimed that he carried a gun for protection

---

[29]This was 7 days <u>after</u> counsel obtained permission to have Holder examined by Dr. Semone.  *Gov. App* 5 (Doc. 358).

[30]The Government was also investigating Holder's mental health and life history.  Some of the documents used by the defense were produced in discovery to Holder and reviewed by Holder's experts.

[31]Holder never disclosed to the District Court in his habeas motion the existence of any relevant medical records which were <u>not</u> actually reviewed and considered by Drs. Rothke and Wetzel.  Thus, it can be assumed that there was no deficiency in the depth of the mitigation investigation.

and because he was vulnerable to attack because of his amputated leg.[32]  He also

stated that he was the same person he was before the accident or head injury, felt

that God had protected him in saving his life, and he had not experienced flashbacks

or nightmares as a result of the accident.  The test results demonstrated that

Holder's ability to conceptualize and reason was not impaired.  *Holder App* 6(a).

Whereas Dr. Rothke's report was relatively brief by design[33], Dr. Wetzel

prepared a detailed 28-page report.  By 1998, Dr. Wetzel's curriculum vitae

spanned 35 years in the neuro-psychology field.  He evaluated Holder over two

days on March 21 and 22, 1998, and his report was prepared on March 23, 1998.[34]

Dr. Wetzel summarized the pertinent facts of the medical and education records.

He summarized his testing and his clinical interview with Holder and quoted large

portions of the interview.

---

[32]Such an admission contradicted the claim that Holder suffered from "naivete" and had an impaired capacity to appreciate danger as did the fact that Holder wore a bullet proof vest and fired his weapon inside the bank.

[33]Capital defense expert mitigation reports are often sparse by design so as to give the Government as little notice as possible to prepare to rebut defense claims. Thus, it is ironic that Holder now criticizes Dr. Rothke's report for what it does not specify.  An example is the April 1, 1998, amendment to Dr. Rothke's report concerning review of additional documents and Dr. Wetzel's report. *Holder App.* 6(a) at 152.

[34]This was 3 days before the end of the guilt phase and the beginning of the penalty phase.  It was also 11 days after Holder's counsel obtained permission to hire Dr. Semone.  *Gov. App* 5.

Dr. Wetzel reached several pertinent conclusions: 1) Holder did not have any psychiatric disorder, including "[p]osttraumatic Stress Disorder related to the amputation of his left lower leg, to his head injury or any other incident or event"; 2) Holder was "average or above average in all areas of cognitive brain function"; 3) there was "no psychological or neuropsychological connection or causal relationship" between any aspect of Holder's mental history and the crimes charged; 4) and he had brain damage to "motor speed in his left hand" as a result of the brick injury to the right side of his head with the significance being that Holder was "slightly less likely to become a champion pin ball player or computer game player than he would have been before the injury." The complete battery of tests performed by Dr. Wetzel was discussed in the Appendix to his report. *Holder App.* 6 at 181-85.

The record was clear that Dr. Rothke performed a neuro-psychological examination of Holder and found no deficits. In addition to a personal evaluation and review of third-party materials, Dr. Rothke's report indicated that he performed neuropsychological tests. *Holder App* 6(a). By the time he testified on 3, 1998, he also had the benefits of Dr. Wetzel's test results. As a neuro-psychologist, Dr. Rothke testified that Holder did not have any neuro-deficits. *Holder App* 6(d)*; Trial Tr.* 4-3-98 at 78-81. Dr. Rothke's primary contribution to mitigation was to

endorse Holder's desire for a new prosthetic device as the motive for the

commission of the bank robbery[35]. *Id.* at 215-18.

On cross-examination, Dr. Rothke agreed that Holder did not suffer from <u>any</u>

psychiatric or mental disorder and that Holder had good problem-solving skills and

did not have "reduced capacity to control his actions and responses." *Id*. at 220-22.

Through Dr. Rothke, it was also established that Holder received $500 per month

from an insurance settlement due to the train accident and was scheduled to receive

a lump sum payment of $15,000 in 2005.[36] *Id.* at 226-27. Through Dr. Rothke, the

Government was also able to highlight various documents, considered by Dr.

Rothke, which demonstrated that Holder had a "lot of abilities" and a high capacity

for sports <u>play</u>, but lacked a willingness to <u>work</u> at an honest occupation. *Id.* at 232.

At its root, Holder alleged that Dr. Rothke's evaluation was inadequate and

perceived as such by trial counsel, that Dr. Semone was contacted <u>after</u> the results

---

[35]Of course, other evidence, including the statement Holder gave to the FBI that his motive was to get money to pay a lawyer to defend him on recent criminal charges, contradicted the "new leg" motive.

[36]The significance of this was that it also undercut the claim that Holder's motive for robbing the bank was financial desperation and desire to purchase a better leg. He had the wherewithal to purchase a better device - he did not have the immediate funds to pay an attorney in connection with recent criminal charges. The latter was his motive for committing the robbery as he explained to the FBI. At trial, his attorney corroborated his immediate need for funds to fight a state criminal charge.

of Dr. Rothke and Dr. Wetzel were in and that trial counsel had reason to believe an additional evaluation would be fruitful. Examination of the record reveals that Holder's claim concerning Dr. Semone was clearly contradicted by the chronology of events. Holder claimed that Dr. Rothke examined Holder first, followed by Dr. Wetzel and that Dr. Semone was contacted by trial counsel "to review Dr. Wetzel's findings, and determine the need for further neurological testing." *Holder App.* 3 at 33 (emphasis added). In his brief Holder states that:

> [d]espite the conclusions of Drs. Rothke and Wetzel, counsel Herndon sought out a third evaluation, from neuropsychologist Anthony Semone. The trial court granted attorney Herndon's motion to authorize the evaluation, but the evaluation never took place prior to trial.

*Appellant's Brief* at 52-53 (emphasis added). Holder also speculated that the logical inference of why the evaluation did not take place was that counsel "simply ran out of time." *Id.* at 53. Thus, Holder argues that the alleged need for Dr. Semone was conceived only in response to Dr. Wetzel's findings, trial counsel started to pursue the examination and trial counsel deficiently dropped the ball.[37]

---

[37]The speculation was that trial counsel "ran out of time." All trials are time management problems and reasonable attorneys have to prioritize. Any time constraints were not the fault of trial counsel. Given the reports of Drs. Rothke and Wetzel and the other information trial counsel possessed, there was no showing that trial counsel's prioritization of time was deficient.

Holder's argument is contradicted by the record. Dr. Semone's name was never mentioned in Caryn Tatelli's time log[38]. *Gov. App.* 6. Yet, Ms. Tatelli's time log demonstrated that it was her role to investigate experts and evaluate them. No where in the time log was there mention that Dr. Semone or any other neuro-psychologist needed to be consulted because Dr. Rothke was deficient or because Dr. Wetzel found a type of irrelevant brain damage. A review of the log reveals a clear strategy of focusing on Holder's unresolved "loss" issues, his family and neighborhood circumstances, the likelihood that he was not a high risk for violence in prison and his positive qualities.

The problem with Holder's claim concerning Dr. Semone is that the request to have him visit Holder in jail, which request was granted on March 12, 1998, was a <u>full week before</u> Dr. Rothke conducted a neuropsychology and rehabilitation psychology evaluation of Holder. *Holder App.* 6 at 147; 203. Dr. Richard Wetzel, did not evaluate Holder until March 21 and 22, 1998, and did not publish his report until March 23, 1998. *Id.* at 158. Therefore, Dr. Semone could <u>not</u> have been contacted in response to the findings of Drs. Rothke and Wetzel. The claim that counsel reached out to Dr. Semone because they had doubts about the adequacy of

---

[38]The time log is also very instructive on the number of hours being devoted to the mitigation investigation, its thoroughness, and the active involvement of several counsel.

Dr. Rothke's examination or because Dr. Wetzel found benign brain deficits is premised on a fiction.

There was nothing in the record to support the speculation that Dr. Semone was not pursued because counsel "ran out of time." *Appellant's Brief* at 53. There was plenty of time for counsel, personally or through Ms. Tatelli, to send Dr. Semone a package containing pertinent records and witness summaries. It would have been a typical task for Ms. Tatelli. *Gov. App* 6. If counsel had any reason to believe that "further" neuro-pychological testing was warranted or would bear fruit, there was plenty of opportunity to do so.

Moreover, Holder's trial began on March 10, 1998. He was found guilty on March 26, 1998. The penalty phase began on March 31, 1998, the mitigation evidence began on April 1, 1998 and it concluded on April 3, 1998. Holder was seen by several experts <u>during</u> the trial. Time never "ran out" and there was never a request made to the District Court for additional time to conduct an additional evaluation.

If counsel suspected the need for an additional evaluation or wanted one for any reason, Holder's §2255 motion could have been supported by an affidavit from Ms. Tatelli, Mr. Burr or Ms. Herndon. It was not. The trial record, the District Court's personal familiarity with the facts of the mitigation investigation, guilt

evidence, and un-controverted documents all supported the District Court's determination. Not one piece of evidence before the District Court, nor this Court, supported an inference that trial counsel had any reason to perceive the need for further neuro-psychological testing. Thus, Holder's argument concerning Dr. Semone was spurious and the District Court did not abuse its discretion in denying the argument without a hearing.

Holder's argument for a third mental health expert is similar to the argument rejected in *Cole v Roper*, 623 F.3d 1183 (8th Cir. 2010). Cole argued that even though two experts had found that he was not suffering from any mental disease or defect, his counsel should have obtained a third examination. *Id.* at 1189-90. In *Cole*, a post-conviction expert opined that the defendant was suffering from "extreme emotional distress" at the time of the offense. A far less rigorous investigation was made in *Cole* than here, but this Court held that it was "enough of an investigation to clear *Strickland*'s performance prong." *Id*. at 1190 (citation omitted). *Cf. Sinisterra v. United States*, 600 F.3d 900, 907-08 (8th Cir. 2010)(remanded for hearing where no mental health evidence presented in penalty phase and mitigation investigator not hired). *Cole* supports the propriety of the District Court's finding in this case.

**2. Holder's Belated Claim: Failure to Interview Terry Jett or Consult Trauma Expert**

In addition to attacking the District Court's ruling, Holder's 2008 Rule 59(e) motion asserted for the first time that counsel were deficient in failing to develop details of certain events in Holder's life and to consult a trauma expert. *Holder App* 22. In support of the Rule 59(e) motion, Holder <u>finally</u> supplied more than naked assertions, namely "declarations" from: 1) Russell Stetler, a mitigation specialist with the Federal Death Penalty Resource Counsel[39] and a Capital Habeas consultant; 2) Dr. Kathleen Wayland, a clinical psychologist and mitigation specialist; and 3) Jennifer Merrigan, a capital defense attorney.[40] Each of these reviewed the same records known to trial counsel, Holder's trial mitigation specialist and Drs. Reidy, Rothke and Wetzel. None of these declarants actually examined Holder. The Government responded to the motion, *Holder App* 23, and Holder replied by offering even more declarations, including those of lay witnesses and a new psychologist, Dr. Leslie Lebowitz. *Holder App* 24. No explanation was given why these declarations could not have been submitted in 2004 with his §2255 motion or even prior to the District Court's 2008 Memorandum and Order.

---

[39]Ironically, Mr. Stettler criticized a mitigation investigation that benefitted from input and consultation by one the leaders of the organization that employed Mr. Stettler, the Federal Death Penalty Resource Counsel.

[40]Holder still did not include an actual report of Dr. Semone's alleged evaluation of Holder.

The District Court denied the Rule 59(e) motion stating that the declarations constituted new evidence which could not be introduced into the record in connection with a Rule 59(e) motion, because they could have been presented with the Section 2255 motion.[41] *United States v. Metro St. Louis Sewer District*, 440 F.3d 930, 934-35 (8th Cir. 2006). On appeal, Holder, without justification, liberally references the Rule 59(e) motion and replies along with the declarations and ignores the District Court's refusal to accept the declarations as too late.[42]

This Court should also not consider the declarations or the belated claims. By not including them in his Section 2255 motion nor seeking leave to amend his motion, Holder waived those claims and arguments. *See, Argument II, Section B, supra.* Holder did not even obtain a certificate of appealability as to the District Court's refusal to consider these declarations. Therefore, the Government respectfully suggests that this Court is without jurisdiction to review the District Court's denial of the Rule 59(e) motion. *Id.*

---

[41]Holder waited over 5 years after the filing of his first Section 2255 motion to submit the declarations on which he now relies.

[42]Holder attempted to justify the inclusion of the new evidence based upon *Parkus v. Delo*, 33 F.3d 933 (8th Cir. 1994). As the District Court noted, Parkus does not support the consideration of such material, because in *Parkus* the material justifying remand had actually been included with the petitioner's Section 2255 motion rather than the Rule 59(e) motion. *Id.* at 936.

Alternatively, the belated claims are without merit. These claims were that counsel should have known that the neuro-psychological examinations actually conducted were deficient in several respects and, additionally, that counsel should have consulted a "trauma" expert.

### a. <u>Counsel Did Not Fail to Convey Relevant Facts to Experts</u>

Holder belatedly claimed that trial counsel failed to investigate, and the trial experts were not aware with sufficient "vividness", of several traumas, including infantile seizures, parental drug use, conditions of a housing project, the train accident and a head injury. As is clearly demonstrated by Ms. Tatelli's time record, her outline of Holder's life and witness summaries, and the actual mitigation evidence presented at trail, trial counsel far exceeded a reasonableness standard in investigating relevant facts in Holder's background. Likewise, these facts, many of which were contained in third-party documents, were communicated to the mental health experts. The reports of Drs. Rothke and Wetzel each listed the various documents received and reviewed by them. Based on the reports[43] of Drs. Rothke

---

[43]The District Court correctly characterized these reports as "summaries" of the information available to the experts. Holder failed to identify the absence of any pertinent information from said materials. For example, Dr. Rothke was provided summaries of third-party interviews by Caryn Tatelli and later a "Timeline of Norris Holder's Life Events." Dr. Wetzel's report included a very detailed chronology of the records he received. There is no claim on appeal that counsel failed to discover any material third-party document.

and Wetzel alone, the District Court conducted a detailed analysis of the claimed omissions and found each one refuted by the content of the reports. *Holder App.* 6(a) and (b); 25 at 686-88. Thus, the District Court found that the record clearly contradicted the claim of omitted information and did not even belatedly raise a triable issue of fact. *Id*.

Even if a higher level of trauma detail was neither discovered by counsel nor known by any expert, there was still no allegation or evidence that the non-discovery was due to a <u>deficiency by trial counsel</u> that failed to meet a reasonable standard of performance. The record demonstrated a robust investigation effort by counsel and their mitigation team. Unless the standard is strict liability or perfect hindsight, the record clearly contradicts the claim of deficient performance in uncovering any particular detail of Holder's life.

As to the District Court's rejection of the claim that the experts did not have relevant information, Holder argues that the District Court engaged in speculation and "guesswork" by using the term "appear" to describe what the records demonstrated. This is semantical non-sense. Hypothetically, to describe what a trial record proves, it is appropriate to state that "from the record it <u>appears</u> that fact *x* is true." If the record contradicts a claim and if the claim is not supported by

evidence challenging that record, a District Court certainly acts within its discretion to draw conclusions from the record before it.

Holder similarly gives a hyper-technical reading of the District Court's use of the term "appears" in footnote 10 of the District Court's denial of the Rule 59(e) motion. The District Court discussed at length the numerous documents the experts reviewed and the tests they performed. The District Court concluded: <u>based on</u> the review of the reports "it *appears* that their conclusions were based on far more than [Holder's] self-reporting." *Holder App* 25 at 688 n.10 (emphasis added). In doing so, the District Court did not speculate or draw inferences from competing facts.

Likewise, the District Court's conclusion that it was "highly likely that the experts were informed of additional information about [Holder] that was not specifically included in the reports" did not amount to speculation or factual inference. *Holder App.* 25 at 686. The quoted language was the second clause of a sentence concluding that the reports were "merely a *summary*" of the information reviewed. *Id.* (emphasis in original). The District Court was not speculating that the experts had received or reviewed unknown information. Rather, it made the obvious, common sense deduction that if a detail was in the records reviewed, the failure to <u>specifically mention</u> that detail in the <u>narrative</u> of the report was not evidence that the experts were unaware of that detail. *Id.*

The difference in style between Dr. Rothke's report and Dr. Wetzel's report highlights the point - Dr. Rothke noted the main facts of the train accident, but Dr. Wetzel summarized the detailed medical description of the traumas suffered in the accident. *Holder App.* 6(a) and (b). Both experts indicated they reviewed and considered the documents submitted to them. The fact that each report did not systematically re-state the contents of the medical/other records, provided no reason for trial counsel to doubt the adequacy of their evaluations. The presence of substantial details in the reports clearly contradicted the claim.

Holder next claims that his counsel was deficient for failing to discover and convey to experts 4 categories of information: 1) the train accident; 2) alleged seizures; 3) parental substance abuse; and 4) housing project conditions. All of these were known to counsel and the experts, but Holder claims that absence of "detailed and vivid accounts" of each demonstrated deficient performance. The record either clearly contradicted the claimed omissions or the omitted details were nothing more than amplifications of known facts and experiences.

### i. Train accident/Terry Jett

The details for the train accident were clearly reflected in the medical records and the descriptions given by Holder as evidenced by the reports of Drs. Rothke and

Wetzel.  These details were not lacking in "vividness".[44]  Dr. Wetzel based his more

detailed summary on the same medical records considered by Dr. Rothke.  From

those records, Dr. Wetzel noted:

> The accident occurred during October, 1991 when Mr. Holder was 15 years
> old.  He tried to jump on a train.  He slipped or fell.  The train ran over his
> left leg and right foot.  He was taken to St. Louis University for his initial
> care and was admitted.  The injury to his right foot was described as a
> <u>degloving of lateral right foot with amputation through the 4th and 5th  toes.</u>
> <u>(The bone of the fourth toe was preserved by report.  The skin and muscle</u>
> <u>were pulled off like a glove revealing the bones and deeper tissues).  The left</u>
> <u>leg was so severely crushed that it could not be saved.  Surgeons completed</u>
> <u>the traumatic (by the train) amputation.</u>

*Holder App* 6(b) at 162.  The vividness of this description speaks for itself.

 Holder argues that trial counsel was deficient in failing to locate witness

Terry Jett to describe the injury as the "meat" being ripped off the calf.  In addition,

Mr. Jett apparently saw the train drag Holder a distance and stated that Mr. Holder's

foot fell off.  *Holder App.* 24(b).[45]  The distinctions are insignificant.  The fact that a

lay witness used different terms to convey the same event as the experts reviewing

the medical records and Holder's personal account, did not amount to an omission

---

[44]Holder does not cite any authority for the proposition that there is a legal standard of reasonableness as to "vividness" or clarity of mental health information.

[45]Holder even failed to allege in his initial Rule 59(e) motion that trial counsel was deficient for not previously locating Terry Jett.  His declaration was not supplied until replying to the Government's response to the Rule 59(e) motion.

of material information due to counsel's negligence. Did experts need to be told a train does not stop on a dime or that Holder was dragged besides having his foot and leg "degloved"? Is a foot falling off not adequately conveyed by the phrase "traumatic (by the train) amputation"? Holder's own account was far less traumatic and Holder had no problem recounting it. In his Rule 59(e) motions, Holder wholly failed to offer the District Court any evidence that trial counsel had reason to question the completeness of the train accident accounts from Holder himself or the medical records.

Dr. Lebowitz, who never examined Holder, opined that the circumstances of the train accident would have had a "negative effect" on a child.[46] This statement of the obvious added nothing material to the other information known to counsel. Dr. Lebowitz added nothing to the calculus concerning the performance of trial counsel or the adequacy of the facts known to the trial experts.

Thus, even if properly presented to the District Court or preserved for review by this Court, the salient facts of the train accident were substantially known to trial counsel or experts. The record clearly contradicted any claim that trial counsel

---

[46]Holder was 15 at the time of the accident and sufficiently mature to be on the streets attempting to hop trains and had successfully done so in the past. He took part in the murder of Richard Helfin not too many years later. Continually referring to Holder as a "child" is misleading.

failed to act reasonably or professionally in its mitigation investigation of the train accident.

### ii. Seizures

Dr. Rothke's report did not mention seizures, because he did not have Holder's childhood medical records at the time of his evaluation. But Dr. Wetzel had them and Dr. Rothke reviewed them on April 1, 1998, according to the addendum to his report. *Holder App.* 6(a) and (b). Dr. Rothke's opinion was not impacted by the records. *Id.* Regardless, Holder failed to show that there were any materially significant records not available to any expert or not uncovered due to deficient performance of counsel.

Moreover, it is doubtful Holder actually suffered seizures. Holder himself <u>denied</u> a history of seizures to Ms. Tatelli, Dr. Rothke and Dr. Wetzel. Holder's mother likewise denied that Holder had such seizures. She and Holder <u>both</u> claimed that it was Holder's brother, Norrim[47], who had such seizures and Dr. Wetzel noted the lack of clarity in the known medical records as to who the seizure patient was. According to Ms. Tatelli's records, in a late night session with Holder's mother, she

---

[47]Given the similarity in first names, confusion in the medical records is understandable.

advised Ms. Tatelli that she did not think the records located by Ms. Tatelli pertained to Holder. *Gov. App.* 1 (Exhibit R, March 3, 1998 entry).

Regardless, whoever suffered the seizures received a clean bill of neurological health afterwards. *Id.* The seizures were benign, because an EEG conducted in connection with the seizure record was clear. *Holder App* 6(b) at 160. The benign report particularly casts doubt on the claim that Holder suffered the seizures, because the EEG in question, included in the records reviewed by Drs. Rothke and Wetzel, was <u>not</u> for Holder's name or birth date. *Id.*

Holder failed to direct the District Court, and fails now to direct this Court, to any evidence that the seizures[48] were not benign or, in fact, caused neurological deficits. Given that the trial experts who actually examined Holder in 1998 agreed that the seizures were insignificant, any claim that trial counsel should have known better or had reason to make further inquiry is without merit.

### iii. Drug Use By Parents

The theme summary prepared by Ms. Tatelli noted that "Kim Holder may have been using substances." *Gov. App* 1. However, a note to the summary of her testimony for counsel stated: "Kimberly may have had some substance abuse issues.

---

[48]Holder continually referred to "seizures" in the plural form. However, the medical records did not reflect more than one seizure, whether by Norrim or Norris Holder. *Holder App* 6(b).

She talked a bit about alcohol use in the initial interview. While she seemed very forthcoming in the initial interview, she may have more to say on this issue." *Gov. App* 1. Thus, Ms. Holder was not willing to endorse the notion that she abused substances. The only mention of the possibility of drug use by witnesses listed in the mitigation outline came from China Coleman, a paternal cousin: "Kim's possible history of substance use." *Id.* (emphasis added). In addition, Holder failed to point to any evidence that would have given trial counsel any reason to suspect that Holder's father was "addicted" to drugs.

The dilemma faced by trial counsel was obvious: further develop evidence of Kim Holder's drug or alcohol usage, lose her trust and cooperation and portray her in a negative light; or portray her as a loving, good mother who carried no blame for her son's actions, who could credibly convince the jury that her son had redeeming qualities and a family who cared about him and did not want to suffer the execution of a valued member. The notion of competing themes is evident in Ms. Tatelli's outline. Mr. Burr endorsed the importance of consistency and credibility in mitigation themes. *Hrg. Tr* II at 202.

To highlight evidence of parental drug use would have had the effect of undermining the credibility of priority themes, such as the unresolved amputation issues, the impact of the amputation and the brick-to-the-head injury. Here, the

114

priority themes were a combination of positives (Holder's positive qualities and contributions) and sympathetic negatives (the train accident and its aftermath, the head injury, and Holder's alleged motive for committing the crime, i.e., a new prosthetic leg). Attacking Holder's mother as an untruthful drug and alcohol user would have created inconsistent messages to the jury and been counterproductive.[49]

Also, Mr. Shaw was validly concerned that jurors would view such evidence as offering an excuse. *Hrg. Tr* I at 48. The academic debate among mental health professionals as to the role of parental drug use in the future misconduct of a child is interesting, but misses the "forest for the trees" in this case. Mr. Shaw, having spent his working life in front of St. Louis juries, kept his focus on how such jurors, rightly or wrongly, perceived such evidence. Mr. Shaw's focus was not only reasonable, but exceptionally insightful. The District Court agreed. *Holder App* 19 at 486. The failure to pursue suspected parental drug use more vigorously was reasonable and not deficient.

Holder failed to support his claim with any evidence that knowledge of parental drug abuse, if true, would have changed the trial experts' ultimate

---

[49]A good example if this was Cortez Harris, offered as a mitigation witness, but who on cross-examination provided corroboration for Holder's consideration of solving the guard problem. The cost of Mr. Harris to the defense far outweighed the benefit, but the cost was not foreseeable. In the case of Mrs. Holder, the cost of portraying her as a bad mother was foreseeable.

opinions/diagnoses. Again, the focal point of Holder's belated claim was that his trial counsel were deficient in failing to uncover certain facts and make them known to their experts which in turn rendered the experts' evaluations inadequate.

### iv. Housing Conditions

The conditions of Holder's life in the Blumeyer Housing Project were sufficiently explored and relevant facts were conveyed to or known by his experts. Ms. Tatelli actively pursued information on this topic, as reflected by her theme outline and time reports. *Gov. App* 1 and 6. Her theme summary referred to the issue as limitations on Holder's "choices" based on "environmental . . .factors." A review of Ms. Tatelli's witness outline showed entries such as "[h]istory and evolution of the Blue Meyers [sic] housing projects" and "[e]nvironment in the Blue Meyers [sic] housing projects" for 7 witnesses in addition to members of the Holder family who were capable of giving their first-hand accounts of Holder's personal experiences. *Gov. App.* 1. Ms. Tatelli also admitted to the District Court that the mitigation evidence told the jury the most significant parts of his life. *Hrg. Tr* I at 45 and 93.

Lay witnesses <u>did</u> testify about the living conditions in the housing project. *Trial Tr.* 4-1-98 through 4-3-98. Kimberly Holder (mother), *Trial Tr* 4-1-98 at 11-67, 95-96; Lawrence Gwen (Principal at Carver Elementary School), *Trial Tr* 4-1-

116

98 at 106-119; Cortez Harris (Holder's friend), *Trial Tr* 4-2-98 at 7-31; China

Coleman (Holder's paternal cousin), *Trial Tr* 4-2-98 at 105-112; Arnetta Kelly (a

community organizer in the Blumeyer Housing Project), *Trial Tr* 4-2-98 at 41-56;

Collette Howard (Holder's ex-girlfriend: "The realities of the housing projects"),

*Trial Tr* 4-2-98 at 100-105;  Lonzetta Curry (Holder's maternal grandmother:

"Realities of life in a housing project"), *Trial Tr* 4-2-98 at 87-94; and Wayne Ross

(Holder's friend), *Trial Tr* 4-3-98 at 28-46.  The District Court noted that trial

counsel made Holder's "early childhood in the slums" a "foundation" of their

mitigation, requested mitigators and closing argument.  *Holder App* 19 at 486.  The

belated declarations about public housing, submitted for the first time in reply to the

response to the Rule 59(e) motion, also made for interesting reading, but Blumeyer

was no more notorious, and perhaps less so, than other St. Louis public housing

areas such as Cochran, Pruitt Igoe or Kinloch.[50]  Because none of Holder's belated

expert declarations were the product of actually examining Holder, much of the

contents were based on conjecture, assumption and speculation.

---

[50]Holder attended school in the Rockwood School District of St. Louis County,
Missouri, not the urban core of the city.

Drs. Rothke and Wetzel[51] did not have to be specifically told that the conditions of Holder's upbringing were less than ideal or that life in public housing projects meant exposure to drugs, violence, single parenthood, crime, poverty and other social ills. The relevant inquiry was Holder's <u>individual</u> experiences, not those of others generally. The best source of that information was Holder himself or his family. Trial counsel and trial experts knew that Holder experienced the violent death of acquaintances and was himself part of the drug trafficking culture that contributed to the harsh conditions in the Blumeyer project. The record simply contradicted the suggestion that the conditions of Holder's upbringing were not reasonably explored, discovered, conveyed to experts or considered by experts.

### b. Failure To Consult "Trauma" Expert

Dr. Lebowitz claimed in her belated declaration that she was a trauma expert. While the label "trauma" expert is news to the Government, as it apparently was to trial counsel, the record leaves no doubt that the mitigation team actively sought expertise, often referred to in Ms. Tatelli's time log as a "secondary loss" expert, in connection with the effects of the train accident, amputation and other traumas on Holder. What has always been missing from any of Holder's habeas allegations is a

---

[51]Although Dr. Rothke came from Chicago, Dr. Wetzel was a long-time resident of St. Louis, Missouri.

credible claim that trial counsel had reason to suspect the need for a trauma expert and unreasonably failed to consult one.

While known under another name, Dr. Rothke was an amputation trauma expert. He was more qualified than Dr. Lebowitz when it came to the psychological effects of the significant trauma in Holder's life: the violent loss of his leg. Dr. Rothke was a trauma expert, given his background in treating trauma patients and he was Board Certified in "Rehabilitation Psychology." *Holder App* 6(a). Dr. Rothke's evaluation focused on determining any impact of the 1991 leg amputation or the 1992 head injury on Holder's commission of the offenses. *Holder App* 6(d) at 203-04 (testimony of Dr. Rothke). According to Dr. Rothke, he found no lasting effects of the head injury. *Id.* at 206-07. A video segment of news coverage of the train accident was played during his testimony, but Dr. Rothke concluded that there was no "significant change from his behavior before" the accident and that Holder had worked hard to return to normal life. *Id.* Holder's statements to Dr. Wetzel left counsel with even less to work with from the standpoint of credibly proving to the jury that the loss of Holder's leg had any lasting traumatic effect on him. *Holder App* 6(b). Finally, Dr. Wetzel similarly found no lasting impact from the train trauma or any other event in Holder's life. *Id*.

Thus, the record clearly contradicted the claim that a trauma expert was not consulted as a matter of fact and, further, that counsel acted unreasonably in failing to consult Dr. Lebowitz in particular. There was simply no allegation that counsel was even aware of Dr. Lebowitz or what she could have brought to the case that was different than what the experts already opined.

### 3. There Is No Right To Effective Assistance of Expert

Even if the experts lacked this information or were themselves deficient, the record did not support Holder's entitlement to a hearing or relief. Holder treats this issue as if his claim turns on whether the examinations of Drs. Rothke and Wetzel were adequate. But, the law is clear that there is no right to <u>effective assistance of experts</u>. To entertain such claims would immerse federal judges in an endless battle of experts to determine whether a particular psychiatric examination was appropriate. *See Harris v. Vasquez*, 949 F.2d 1497, 1518 (9th Cir. 1990); *Silary v. Peters*, 905 F.2d 986, 1013 (7th Cir. 1990). Furthermore, it would undermine the finality of state and federal criminal convictions, which would constantly be subject to psychiatric reappraisal years after the trial had ended. *Harris*, 949 F.2d at 1517-18; *Silary*, 905 F.2d at 1013.

Recently, this Circuit addressed such claims in *Cole*, where this Court cited with approval *Forsyth v. Ault*, 537 F.3d 887, 892 (8th Cir. 2008), *cert. denied*,

120

*Forsyth v. Burt*, 129 S.Ct. 1044 (2009), for the proposition that the Sixth

Amendment right to effective assistance of counsel does not "require favorable

expert 'shopping' for adequate performance." *Cole*, 623 F.3d at 1190. The Fourth

Circuit is in agreement and has consistently "rejected the notion that there is either a

procedural or constitutional rule of ineffective assistance of an expert witness,

rather than ineffective assistance of counsel." *Pruett v. Thompson,* 996 F.2d 1560,

1573 n. 12 (4th Cir. 1993); *see also Poyner v. Murray*, 964 F.2d 1404, 1418 (4th Cir.

1992); *Waye v. Murray*, 884 F.2d 765, 766-67 (4th Cir. 1989) (per curiam). A

capital defendant is also not entitled to an unlimited number of experts. *United*

*States v. Harden*, 846 F.2d 1229, 1231-32 (9th Cir. 1988). The need for additional

experts cannot be the "product of hindsight" or fail "to address the facts reasonably

relied upon by counsel at the time." *Wilson v. Greene*, 155 F.3d 396, 403 (4th Cir.

1998).

The issue is the performance of trial counsel, not experts. Under *Williams*,

the focus of the deficiency inquiry was on the performance of trial counsel, not

experts: whether the additional evidence was readily available and whether the

decision not to investigate was strategic. *Williams*, 529 U.S. at 395. *See also*,

121

*Foster v. Lockhart*, 9 F.3d 722, 726 (8th Cir. 1993).[52]  Using the analogy from

*Rompilla*, Holder's case did not involve a failure to look for a needle in a haystack.

But, it did involve a cessation of the search after reasonable efforts to determine

whether the haystack might contain a needle.  There was no evidence, or allegations

of the existence of evidence, that Holder's trial counsel had reason to question the

adequacy of the expert examinations or the sufficiency of the investigation into

Holder's life or the life of anyone connected to him.  Even if trial counsel did not

pursue an examination by Dr. Semone because they "ran out of time," time

management decisions and prioritization were strategic.  Counsel's actions must be

"considered in light of the scarcity of counsel's time and resources in preparing for

a sentencing hearing."  *Byram v. Ozmint*, 339 F.3d 203, 210 (4th Cir. 2003).


The Constitution guarantees reasonable competence, not perfection judged

from the perspective of hindsight.  *Yarborough v. Gentry*, 540 U.S. 1, 8

(2003)(citations omitted).  Here, given what trial counsel reasonably knew about

---

[52]The District Court correctly understood the analytical framework.  Recently in *Allen v. United States*, No. 4:07 -CV-27 ERW, the same District Court determined that Allen, Holder's co-defendant, had established his entitlement to a hearing on the effectiveness of his counsel's mitigation investigation. *Memorandum  and Order* at 45-62 (Doc. 147)(May 10, 2011)).  Allen made a far more extensive showing than Holder.

Holder's life and what their experts and the Government's expert opined, even if

Dr. Semone was still a factor by the time reports were received and reviewed by

counsel, counsel did not fail to meet a reasonable competence standard in deciding

not to pursue Dr. Semone or any other expert or witness.

**E.     The Record Before the District Court Clearly Contradicted Holder's Claim That He Was Prejudiced by the Claimed Deficiencies in The Mitigation Investigation**

**1. The Legal Standard**

In *Upton*, the Supreme Court stated the prejudice analysis for ineffective

assistance claims in capital penalty phase mitigation investigations as follows:

"'[W]e consider the totality of the available mitigation evidence - both that adduced

at trial, and the evidence adduced in the habeas proceeding - and re-weig[h] it

against the evidence in aggravation.'" *Upton*, 130 S.Ct. at 3266 (citation omitted).

Applying this test "will necessarily require a court to 'speculate' as to the effect of

the new evidence." *Id.*

**2. Holder's Actual Claim**

The analysis again must distinguish between the claims preserved for review

and those not preserved.  The District Court decided that Holder was not entitled to

a hearing on whether there was a reasonable probability that the outcome would

have been different if Dr. Semone had evaluated Holder.  *Holder App* 19 at 469-70.

Holder could have supported his petition with the results of an evaluation and a concrete diagnosis by Dr. Semone, but chose not to. Instead, Holder presented speculation of impairment. Given the quality of Holder's support for a hearing on prejudice, the District Court was not presented with a close question.

Between historical information about Holder available in March, 1998 and other evidence presented at trial, as well as the Government's strong likely rebuttal, it is not reasonably probable that the outcome would have been a life sentence if Dr. Semone would have given a mitigating opinion that Holder was naive about the risk to others. The District Court correctly focused on the Government's "compelling" evidence that Holder clearly knew there was a risk of harm to him and to others. *Holder App* 19 at 79. Additionally, the jury failed to find the relevant mitigators, i.e., that Holder didn't fire shots and didn't intend that anyone be harmed. *Id.* at 80. These were compelling justifications for the District Court's determination.

The District Court did not need to set forth every bases for finding that the record clearly contradicted Holder's claim of prejudice, but there were many. For example, both Holder and Allen came to the bank not just well-protected, but well-equipped to overwhelm any resistance with overwhelming violence - military assault rifles with live hollow-point rounds chambered and large volumes of additional ammunition. These weapons provided close-range, accurate lethality, as

opposed to the deterrent effect of the wider pattern from the shotgun at the ready in the second get-away vehicle.  Nothing done or said by Holder in the bank suggested that he was surprised or angered by murder of the guard.  Moreover, Holder had "cased" the bank and was a bank customer and knew that an armed guard was present.  Rather than naivete, the evidence was overwhelming that Holder knew there was a certainty of gun play.  Holder's post-arrest statements were a combination of lies and self-serving admissions, which would not corroborate a claim of mental deficits.

Witnesses testifying from memory, rather than Dr. Semone's brew of speculation and possibilities, defeated the viability of any claim of naivete having any probability of affecting the outcome.  Holder confided to Terry Gear that he would not be caught, was inspired by the violent films he watched, and was going to "get rid of" anyone who got in his way.  *Trial Tr.* 3-18-98 at 154-55, 172.  Holder advised Wayne Ross that he liked movie bandits who fought to the death.  *Trial Tr.* 3-18-98 at 183-84.  Even more devastating to a claim of naivete were Holder's discussions with Cortez Harris concerning what to do about the guard with a stun gun being a possible solution.  *Trial Tr.* 4-2-98 at 29-30.  The mere discussion made any claim that Holder knew he could not get in and out of the bank peacefully impossible to sell to a jury.  And, of course, Holder's own testimony

125

contravened Dr. Semone's theory. *Trial* Tr.3-25-98 at 130, 132, and 170-71 (Holder admissions that his actions put everyone in the bank at risk of harm). Holder's deposition testimony likewise contradicted any common sense view of mental deficits. *Gov. App* 7. Dr. Semone may have testifed <u>why</u> Holder may have thought his conduct endangered no one, but Dr. Semone could not have overcome the mountain of evidence which conclusively proved Holder did <u>not</u>, in fact, have such a belief.

If anything, the decision not to prove that Holder suffered from a brain damage-induced notion that no one would get hurt was wise rather than prejudicial. Dr. Semone would have planted internal inconsistency between the theme that Holder was driven by desperation for a new leg and a desire for a better material life and his so-called theory that Holder's broken brain made him think no one was at risk of harm if he and Billie Allen went into a bank with an armed guard to rob it supported by the weaponry and other circumstances here. It would have also undermined Holder's contradiction of the evidence in his own testimony - to have any chance of succeeding, Holder needed to have credibility with the jury. The District Court knew from Holder's demeanor and the content of his testimony, that no juror would be tempted to choose life based on Dr. Semone's speculation.

Holder as a witness was cogent and clear-headed and offered a hope to plant a seed of residual doubt about whether he did fire his weapon in the bank, a triable issue.

Finally, the District Court heard the closing arguments in this case and knew the power of the Government's argument. In its rejection of Holder's Rule 59(e) motion, it stated that the "basis for its decision that additional testimony about [Holder's] mental health would not have affected the outcome of the trial was the argument made by the Government during the guilt phase of the trial regarding [Holder's] knowledge of the risk of harm." *Holder App* 25 at 690. The hypothetical opinion of Dr. Semone could not possibly, much with reasonable probability, have overcome said argument and impacted the outcome.

This Court's decision in *United States v. Sinisterra,* does require a remand for a hearing on the question of prejudice. In *Sinisterra*, the District Court was confronted with affidavits from trial counsel as to actions taken and not taken and an actual evaluation of the petitioner which determined that "he likely suffered from brain damage and was at risk for poor judgment and impulsivity." *Id*. at 905. In *Sinisterra*, unlike in this case, "[n]o evidence of Sinisterra's mental health or capacity was presented."[53] *Id*. at 904. Thus, the need for a hearing on the extent of

---

[53]Trial counsel had consulted a psychiatrist who opined that the petitioner did not have mental deficits.

evidence not discovered or presented was compelling. Moreover, this Court found that a hearing was needed on both deficient performance and prejudice. As to the latter, the District Court had concluded only that the record at trial "sufficiently conveyed evidence of Sinisterra's childhood." *Id*. at 907  Aside from the fact that this Court found the evidence not presented to "differ in kind and substance"[54] from the evidence presented, the District Court had actually failed to evaluate the prejudicial impact of failing to present mental health expert evidence. *Id*.

This case bears no resemblance to *Sinisterra*. Holder's allegations of omitted expert evidence may have been different in <u>substance</u>[55], as it may have contradicted Holder's other experts and the Government's expert, but it was far from different in <u>kind</u>. It was but another flavor of the same element, namely expert mental health opinion. Experts often disagree, especially in the field of mental health. It is not remarkable, given a decade to complete the task, that Holder found an expert willing to speculate that possible brain damage may have made Holder naive about the risk of harm from bullets.

---

[54]Trial counsel had called 10 witnesses and played taped interviews of other witnesses. The newly developed information was not substantially covered by the witnesses presented.

[55]Although, as presented to the District Court it lacked substance given the fact that it was not based on an examination of Holder and amounted to merely speculative conclusions.

The actual mitigation and mental health evidence here was clear and consistent as to Holder's lack of significant mental deficits. Unlike in *Sinisterra*, here the District Court had a record which clearly contradicted and refuted the claim the hypothetical, non-specific opinions of Dr. Semone and even Dr. Lebowitz.[56] Such opinions could not have influenced the jury's assessment of Holder's moral culpability for the offenses. As discussed above, the case for death was overwhelming as was the case for the proposition that Holder's past traumas were not why he did what he did or the reason for the way he did it. No matter how credible the new experts could be, they would have been impeached by Holder's other experts and the Government's rebuttal, as well as the aggravating evidence. The District Court was in the best position to conduct this re-weighing and this Court should give it's determination that a hearing was not necessary to conduct it deference. The District Court here did not need a more complete record as it did in *Sinisterra*. This case is more like the facts presented in Wong v. Belmontes, 130 S.Ct. 383, 387-88 (2009)(jury acquainted with evidence of defendant's background and additional evidence would have provided insignificant benefit); and *Bobby v.*

---

[56]Of course, the District Court here did not actually give weight to Dr. Lebowitz's materials because they were untimely.

*Van Hook*, 130 S.Ct. 13, 19-20 (2009)(no prejudice because the additional evidence provided minor details).

## 2. Holder's Belated Claims

As the Government pointed out to the District Court in responding to Holder's Rule 59(e) motion, the problem with Holder's belated claims was that they were devoid of any specification of what evidence was not explored, what evidence was not presented and how its presentation to the jury would have impacted the outcome. Holder's voluminous untimely declarations merely criticized the mitigation investigation, rather than alleged what was missed and how it would have mattered to the outcome.

However, if this Court, unlike the District Court, reaches the merits of the belated claims, said claims also fail to establish prejudice. All of the consistent trial evidence clearly contradicted the notion that prior trauma had anything to do with Holder's blame-worthiness or moral culpability for the violent death of Richard Helfin. Neither Dr. Rothke nor Dr. Wetzel found that Holder suffered from any mental illness, much less PTSD. In rejecting Holder's Rule 59(e) motion, the District Court reasoned that the evidence cited in its original Memorandum and Order clearly contradicted the claim of prejudice from the omission of additional mental health evidence as to Holder's "knowledge of the risk of harm." *Holder App*

25 at 690.  Among the evidence cited by the District Court were Holder's pre-robbery statements about the need to solve the guard issue, the weaponry brought to the bank, Holder's bullet-proof vest, the preparations to burn the getaway vehicle and the fact that Allen and Holder possessed bullets which could shoot through police cars.[57]  The District Court noted Holder's failure to offer any evidence that would have rebutted this "rather strong evidence."  *Holder App* 25 at 691.  The failure to offer even allegations of such rebuttal evidence was precisely the burden Holder failed to meet.  The burden was on Holder to establish his right to a hearing on the prejudice prong.  The claimed factual omissions merely added more details to facts already known to the jury, such as the various traumas Holder suffered.

Dr. Lebowitz neither examined Holder nor concluded that <u>he does or did</u> suffer from PTSD[58].  She never opined that Holder in fact had PTSD or that it in fact impacted Holder's actual ability to assess the danger to himself or others.  Holder cites a portion of her declaration in his brief which clearly demonstrates that

---

[57]The District Court could have cited many more facts, including Holder's attempt to crawl back into the burning van to retrieve his weapon and shoot it out with police and Holder's pre-robbery viewing of films depicting mass carnage during bank robberies.

[58]PTSD was a claim made by Allen's mental health experts and the claim was effectively rebutted by the Government's experts, one of whom was Dr. Wetzel. Ironically, Allen's mitigation case also included claims of brain damage but primarily argued that he was a "follower" of Holder.

her entire view is based on assumptions. *Appellant's Brief* at 72. The District

Court was entitled to evaluate the character and quality of the evidence supplied by

Holder. In conducting its prejudice analysis of the claims it decided, the District

Court did exactly what the Supreme Court in *Upton* subsequently held it must - re-

weigh the evidence. In doing so, the District Court had to assess credibility and

Holder offered the District Court nothing that would have credibly or probably

altered the outcome.

Holder cites no authority for the proposition that the District Court had a

burden to <u>disprove</u> any claim made by Holder as a matter of law. *Appellant's Brief*

at 73 and 74. Here, unlike in *Wiggins*, Holder pointed the District Court to nothing

that possessed a character or quality of sufficient credibility to create a "reasonable

probability that at least one juror would have struck a different balance." *Wiggins*,

539 U.S. at 537. Having failed to meet his burden, even Holder's belated claims

did not warrant a hearing or relief.

**F.     Conclusion:**

As in *United States v. Tinajero-Ortiz*, 635 F.3d 1100 (8th Cir. 2011), "the

same district court which presided over [the trial] proceedings did not abuse its

discretion in denying" Holder an evidentiary hearing on the claim he presented. *Id.*

at 1106. As to <u>belated</u> claims, whether or not based on evidence and allegations

considered by the District Court, Holder's claims are barred, waived or this Court is without jurisdiction to consider them.  Alternatively, even the additional allegations did not warrant a hearing as to deficient performance or prejudice.

Holder's counsel oversaw a mitigation team effort that went well beyond the minimum requirements of reasonableness and professionalism.  Given yet another decade, undoubtedly more information about the same topics could be discovered, but that is not the standard.  Whether timely or belated, Holder failed to establish deficient performance of counsel that had a causal nexus to the outcome.

**IV.** **THE DISTRICT COURT CORRECTLY DETERMINED THAT COUNSEL WAS NOT INEFFECTIVE IN FAILING TO OBJECT TO THE PECUNIARY GAIN INSTRUCTION.**

**STANDARD OF REVIEW AND ANALYTICAL FRAMEWORK**

The standard of review outlined above with regard to Issue I applies to the present issue.

**ARGUMENT**

Holder's §2255 motion alleged that trial counsel and appellate counsel were ineffective for not objecting to the general applicability of the pecuniary gain statutory aggravator, 18 U.S. C. § 3292(c)(8), on the grounds that the "there was no evidence to support it." *Holder App 3* at 37-38. However, by the time the District Court ruled on Holder's motion, his claim also included the allegation that the instruction did not "properly convey the requirements of this factor to the jury." *Holder App 19* at 478. The jury was instructed as follows:

> To establish that a defendant committed an offense in the expectation of the receipt of anything of pecuniary value, the government must prove that the defendant committed <u>the offense</u> in the expectation of anything in the form of money, property, or anything else having some economic value, benefit, or advantage.

*Trial Tr.* 4-3-98 at 149 (emphasis added).

On appeal, Holder abandoned the former argument. The District Court rejected his argument. *Holder App 19* at 480. This Court's decision in *United*

*States v. Bolden*, 545 F.3d 609 (8th Cir. 2008), confirms the correctness of the

District Court's determination. The *Bolden* panel held that the pecuniary gain

aggravator was not limited to murder-for-hire situations and could apply to bank

robberies in which a guard was killed prior to obtaining the funds of the bank. Id. at

614-16. *Bolden* also affirmed a District Court's wide discretion in forumlating jury

instructions. *Id*. at 616 (citation omitted).

Holder persists in his argument that his counsel were ineffective in not

objecting to or seeking appellate review of the actual language of the instruction,

specifically its reference to the "offense." The District Court held that counsel's

failure to object to an instruction which did not specify the offense as the murder, as

opposed to the robbery, was neither deficient nor prejudicial under *Strickland*. As

to deficiency, the District Court reasoned that the context of the term "offense", the

failure of counsel's arguments to suggest that the offense was robbery and the fact

that the instruction tracked the language of the statute "made it clear that the receipt

of something of pecuniary value must flow from the death, not the robbery."

*Holder App 19* at 480. As to prejudice, the District Court found that there was none

because "the jury would have found the existence of this factor if worded

differently." *Id*. at 481. Support for this conclusion was taken from the evidence

that Mr. Helfin was shot so that Allen and Holder could "successfully obtain the

funds from the bank without interference by [Mr.] Heflin." *Id.* at 481-82. In short, the killing was directly related to the pecuniary gain. *Id.* at 482.

The problem with Holder's present claim is that he argues that trial and appellate counsel, had they acted professionally, would have been aware of the legal argument that the phrase "of murder" should be added after "the offense", even though the statute did not contain such a limitation. The Government concedes that such a limitation is now appropriate and, in fact, the instruction in *Bolden* contained such a limitation. *Bolden*, 545 F.3d at 616. However, *Bolden* was tried in 2006, not 1998, and Holder offers only 2 authorities to support an inference that counsel should have known that such a limitation was required: *United States v. Davis*, 904 F.Supp. 554, 558n.3 (E.D.La. 1995), and *United States v. Allen*, 357 F.3d 745 (8th Cir. 2001)(*Allen II*). Of course, the obvious problem with the latter authority, aside from the fact that it was reversed by *Allen III* on other grounds, is that it post-dated Holder's trial and could not have been known to trial or appellate counsel.[59]

_____

[59] Another problem is that Holder takes the discussion of whether the pecuniary gain aggravator was "necessarily linked" to the murder out of context. The discussion in question was part of an analysis of the indictment and whether it was, in fact, defective, as opposed to the issue presented here concerning the propriety of the instruction. *Allen II* never had a reason to discuss the issue presented by Holder.

*Davis,*[60] however, was a 1995 District Court ruling on pretrial motions challenging the constitutionality of various provisions of the Federal Death Penalty Act.  It did not address pecuniary gain except to hold that it was not vague or overly broad as applied to a murder-for-hire case, to which the Court incorrectly thought the aggravator was limited.  That proposition has, of course, been rejected by this circuit in *Bolden*, as well as many other circuits.  *Bolden*, 545 F.3d at 615 (cases cited).  Nothing in *Davis* would or should have put Holder's counsel on notice that the simple phrase "the offense" was materially ambiguous.  *Davis* hardly represented a signal to trial and appellate counsel of a developing body of case-law concerning the specificity claim here.

Holder fares no better in his attempt to establish prejudice from the omission of the phrase "of murder" following the word "offense" in the body of penalty phase instructions.  The District Court held that the jury would have found the pecuniary gain statutory aggravator even if the offense was specifically limited to murder.  This is, in essence, a finding of fact that is entitled to deference as the District Court presided over the trial, heard all of the evidence and arguments, saw all the exhibits, saw the jury's reaction to the evidence and observed the demeanor of the witnesses.

---

[60]Holder cites to footnote 3 of *Davis*, but that footnote concerned the "Heinous, cruel or depraved manner" aggravator, not pecuniary gain.

In so finding, the Court engaged in precisely the type of speculation required by *Upton* as discussed in Argument III, *supra*. The District Court's determination is also buttressed by the fact that there was little, if any, chance that the jury was actually confused as to whether the "offense" was murder or robbery. None of the arguments of counsel suggested that the offense was robbery and specifically focused on the murder in weighing aggravators and mitigators. The Government urged the jury to impose death for the reason that the murder was committed for no greater motive than material wealth. *See, e.g., Trial Tr.*, 4/3/98, at 165 ("This violent bank takeover, with these incredible weapons, the plan to burn the van later, take out anybody who got in their way, and what happened in that bank, where they put so many people in danger for money . . ." (emphasis added); at 166 ("It's an intention, on this defendant's part, to cause harm, to cause death."); at 167 ("the whole plan, when they went in there, was to take Richard Heflin out . . . "); at 170-71 ("You saw the bags of money, that's what it was all about, so he could pay his lawyer. . . . it is so immoral for someone to go into that bank, . . . and take Richard Heflin's life . . . ; to trade Richard Heflin's life so he can pay his lawyer and buy more gold and cars and whatever else he wanted to buy."); at 170 ("The fact that they took this man's life and took him away from his family for money, that alone outweighs all of those mitigators."); at 185 ("Weigh them against the fact that this

murder was for money."); at 227 ("the fact that it is done for the most reprehensible reason of all, for money, so this guy can have money."

Holder's prejudice argument is flawed in that it presumes that the pecuniary gain aggravator would not have been given at all if counsel had objected. The logic of this argument escapes the Government. The prejudice analysis focuses on the error, namely the failure to object to the inclusion of the missing phrase, and then weighs as if the error were corrected. But it cannot be presumed that a pecuniary gain instruction would not have been given, rather than simply modified, if counsel had objected. Had counsel done so and had the District Court granted the request, the pecuniary gain aggravator would have been submitted as modified and there is no doubt that the jury would have still found the aggravator and given it the same weight. The pecuniary gain aggravator was not invalid as was the aggravator in *Stringer v. Black*, 503 U.S. 222, 229-32 (1992). Holder failed to carry his burden of showing that there is a reasonable probability that a modified pecuniary gain aggravator would have resulted in a different outcome.

His prejudice logic also fails if their was a deficiency by appellate counsel. Even if appellate counsel raised the issue and prevailed, the instructional error would have been subject to harmless error analysis. *United States v. Dvorak*, 617 F.3d 1017, 1024-25 (8th Cir. 2010). "Generally, when evaluating jury instructions,

139

we review for abuse of discretion." *United States v. Gill,* 513 F.3d 836, 849 (8th Cir.2008). "In conducting such review, this court must determine whether the instructions, taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury." *United States v. Beckman,* 222 F.3d 512, 520 (8th Cir.2000) (internal quotations omitted). In addition, harmless-error analysis applies to issues of instructional error, "whether one of mis-describing an element or omitting an element altogether." *United States v. Inman,* 558 F.3d 742, 749-50 (8th Cir.2009); *see also Neder v. United States,* 527 U.S. 1, 9, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) ("We have often applied harmless error analysis to cases involving improper on a single element of the offense."). Accordingly, an error in jury instructions "may be disregarded if it is 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.' " *Inman,* 558 F.3d at 749 (quoting *Neder,* 527 U.S. at 18, 119 S.Ct. 1827).

Here, as the District Court found, the jury would still have imposed the death penalty even if the instruction in questions had been corrected. Thus, there was no prejudice from any error by trial or appellate counsel.

**V. THE DISTRICT COURT CORRECTLY HELD THAT THE INDICTMENT ERROR WAS NON-STRUCTURAL AND HARMLESS.**

**STANDARD OF REVIEW AND ANALYTICAL FRAMEWORK**

A substantive constitutional claim in a §2255 motion is reviewed de novo.

**ARGUMENT**

Holder contends that the failure to allege the statutory aggravators in the indictment constituted structural error and therefore not subject to harmless error analysis.[61] This was a substantive claim in his §2255 motion. Holder acknowledges that his argument is foreclosed in this Circuit by the *en banc* opinion in *United States v. Allen*, 406 F.3d 940, 943 (8th Cir. 2005), *cert. denied*, 127 S.Ct. 826 (2006), (*Allen III*), but contends that the issue is not "settled" by the Supreme Court. He argues that the issue was "sidestepped" in *United States v Resendiz-Ponce*, 549 U.S. 102, 103-04 (2007). It is true that the Supreme Court did not directly address the issue in *Resendiz-Ponce*, but nothing in *Resendiz-Ponce* undermines the holding in *Allen III*.

*Allen III* held that the indictment error was not structural, that harmless error analysis applied and that the error was harmless on a variety of levels. With due

---

[61]This case was indicted and tried before the Supreme Court reversed *Walton v Arizona*, 497 U.S. 639 (1990), in *Ring v. Arizona*, 536 U.S. 584 (2002).

respect to the view of Justice Scalia in *Resendiz-Ponce*, *Allen III* was correctly decided. Holder had notice of the fact that the offense charged was capital and that the Government alleged the applicability of specific statutory and non-statutory aggravators. The Grand Jury that indicted Holder, the same one that indicted Allen, heard more than enough evidence to convince any Grand Jury, if asked, to return a capital indictment containing the same allegations in the Government's Notice of Intent to Seek Death. In addition, the petit jury in this case found the elements necessary to properly convict Holder of the capital counts and to find him eligible for the death penalty. The District Court correctly applied *Allen III* and held that any error was harmless. *Holder App* 19 at 438. Holder's argument is thus without merit and contrary to controlling precedent.

## **CONCLUSION**

Holder was the Lindell Bank and Trust robber who jumped over the counter and sprayed the bank with gunfire after Allen had murdered Richard Helfin according to a plan masterminded by Holder and inspired by the violent films he viewed to prepare for the robbery.  There was, in the final analysis, no doubt whatsoever about Holder's identity and role.  His counsel were faced with a daunting task and pursued sound strategies based on experience and substantial investigation.  This Court should affirm the District Court's denial of Holder's request for relief under §2255.

Respectfully submitted,

RICHARD G. CALLAHAN
United States Attorney

 */s/ Steven E. Holtshouser*
STEVEN E. HOLTSHOUSER, #24277
**JOSEPH M. LANDOLT, #6484**
**JOHN M. BODENHAUSEN, #94806**
Assistant United States Attorneys
111 South 10th Street, Room 20.333
St. Louis, Missouri  63l02
(314)-539-2200

143

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains <u>33220</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using WordPerfect 10 in Times New Roman 14 point type.

3. I electronically filed this Brief with the Clerk of the Court for the Eighth Circuit Court of Appeals by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. This Brief has been scanned for viruses and is virus-free and has been filed in searchable, Portable Document Format.

**Dated:** <u>7/1/2011</u>

*/s/ Steven E. Holtshouser*

STEVEN E. HOLTSHOUSER

## <u>CERTIFICATE OF SERVI CE</u>

I hereby certify that the foregoing was electronically filed with the Clerk of the Court for the United States Court of Appeals, for the Eighth Circuit by using CM/ECF system. Ten paper copies of the foregoing Brief with the Addendum attached along with three paper copies of the Appendix will be filed with the Court along with one paper copy mailed to the participants in the case by U.S. mail, postage prepaid, within five days of the Court's notice that the Brief has been reviewed and filed.

Michael J. Gorla
720 Olive Street, Suite 1630
St. Louis, MO 63101

Joseph W. Luby
Death Penalty Litigation Clinic
6155 Oak Street, Suite C
Kansas City, MO 64113

this __1st__ day of July 2011.

*/s/ Steven E. Holtshouser*

STEVEN E. HOLTSHOUSER



**ADDENDUM**