## NO. 10-1304 EMSL

*Criminal*

IN THE

# UNITED STATES COURT OF APPEALS

FOR THE EIGHTH CIRCUIT

*UNITED STATES OF AMERICA*

*Appellee*

*v.*

*NORRIS G. HOLDER*

*Appellant*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

Addendum of Appellee

RICHARD G. CALLAHAN
United States Attorney

**STEVEN E. HOLTSHOUSER, #24277
JOSEPH M. LANDOLT, #6484
JOHN M. BODENHAUSEN, #94806**
Assistant United States Attorney
111 South 10th Street, Room 20.333
St. Louis, Missouri   63102

Attorneys for Appellee

**ADDENDUM**

## History of the Proceedings

In 1998, defendants Norris Holder and Billie Allen were convicted after separate trials of killing a security guard, Richard Heflin, during the commission of an armed bank robbery, in violation of 18 U.S.C. §2113(a) and (e) (Count I), and using and carrying a firearm during the commission of a crime of violence that resulted in the death of another person under circumstances constituting first-degree murder, in violation of 18 U.S.C. §924(j) (Count II). In accordance with the jury's recommendation, defendant Holder was sentenced to death on both counts.

In a decision that predated the Supreme Court's decision in Ring v. Arizona, 536 U.S. 584 (2002), the Eighth Circuit affirmed the defendants' convictions and death sentences, expressly rejecting defendant Allen's claim that the indictment violated the Fifth Amendment because it failed to allege at least one aggravating factor and one mental intent factor that would make the defendant eligible for the death penalty. United States v. Allen, 247 F.3d 741, 761-764 (8th Cir. 2001).

After deciding in Ring that the statutory aggravating factors that define eligibility for the death penalty are the functional equivalent of offense elements that need to be unanimously found by the petit jury under the reasonable doubt standard (and, presumably, alleged by indictment in federal prosecutions), the Supreme Court granted defendant Allen's certiorari petition, vacated the Eighth Circuit decision, and remanded the case for reconsideration in light of Ring. United States v. Allen, 536 U.S. 953 (2002). On reconsideration, a divided panel of the Eighth Circuit (R.S. Arnold & Melloy, JJ.; Hansen, J., dissenting in part) held that "the indictment in Allen's case failed to charge a federal capital offense, and that given Allen's timely

1

objections this failure cannot be dismissed as harmless." <u>United States v. Allen</u>, 357 F.3d 745 (8th Cir. 2004). The majority therefore ordered that the death penalty be vacated. On the government's petition, the court vacated the opinion, and ordered rehearing en banc, set for September 15, 2004. Defendant Holder had not raised the <u>Ring</u> issue on appeal, and the Supreme Court denied his petition for certiorari. <u>Holder v. United States</u>, 539 U.S. 916 (2003).

**Statement of Facts**

Shortly after 10:30 a.m. on March 17, 1997, the Lindell Bank and Trust Company (hereinafter "the Bank") was robbed in a violent, terrifying, "take-over" style robbery. The robbers, Billie Jerome Allen and Appellant Norris Holder, arrived in a stolen blue van; Holder, who was driving, left the engine running, and both robbers left the doors to the van open when they went into the Bank.

The surveillance cameras in the Bank were not activated until after the robbers had left. Allen and Holder, dressed in dark clothes and wearing masks, entered the lobby of the Bank heavily armed, with semi-automatic SKS assault rifles. Shooting began immediately, and the evidence reflected that both weapons were fired during the robbery. There were at least ten Bank employees in the lobby at the time; Richard Heflin, the security guard, who never fired a shot, was riddled with bullets and died. Although shots were sprayed around the Bank, no one else received serious physical injury.

Because of the robbers' disguises, no one inside the Bank was able to visually identify either Holder or Allen. The United States relied upon the physical evidence collected, the testimony of bank employees and patrons, and Holder's post-arrest statements to establish the actions of Holder and Allen within the Bank. This evidence clearly demonstrated that both Allen

and Holder fired their weapons, that Allen remained near the east doors in the lobby and shot Mr. Heflin with a Chinese SKS rifle numerous times, and that Holder went over the tellers' counter and took the money. The evidence also established that Holder played the lead role in planning the robbery and amassing an arsenal of weapons and ammunition and other equipment for the robbery. Holder also drove the getaway van.

It took only minutes for the robbery; Holder and Allen then fled in the waiting blue van, attempting their getaway. Their plan was to burn the getaway van, switch to a second stolen van in nearby Forest Park, and then switch to a third car parked in a Barnes Hospital parking garage. The second car contained a loaded weapon. However, the getaway van burst into flames a short distance from the second van. Appellant, Norris Holder, was captured as he fled the burning van; Billie Jerome Allen was arrested in the early morning hours of March 18.

Holder testified in his own defense. He admitted committing the bank robbery, but denied culpability in the murder of Richard Heflin.

**Physical Layout**

The Bank is located at 6900 Clayton Avenue in St. Louis, Missouri, near Highway 40 and McCausland Avenue. (Holder Tr., 3-18-98, p. 77-78). There are entrances to the lobby on both the east and west sides of the Bank. Each entrance has a double set of glass entry doors from the outside of the Bank to a vestibule and another set from the vestibule to the bank lobby. Along the south wall of the lobby, from east to west, are the safe deposit area including the Bank's vault and the tellers' line. These areas are separated by a counter from the rest of the lobby. Behind the tellers' line is a wall which separates the tellers' line from the drive up teller area and a series of rooms used by safe deposit customers. (Gov. Ex. 22A). The eastern entrance to the

3

Bank is adjacent to Forest Avenue. Directly across Forest Avenue to the east of the Bank is a bank parking lot. The drive-up area is on the south side of the bank. (Gov. Ex.'s 2A and 22A).

**The Robbery**

At approximately 10:35 a.m. on March 17, 1997, there were ten Bank employees within the bank lobby. Kelley Davis, the customer service manager, was at her desk across the lobby from the tellers' line. (Holder Tr., 3-18-98, pp. 72, 88). Amy Boehlje was behind the counter in the safe deposit area and Sandy Foppe was in the work room portion of the safe deposit area. (Holder Tr., 3-18-98, p. 88). Four tellers were behind the tellers' counter: Lisa Moore, on the east end of the counter; Mary Garvels, next to her; and Laura Riehmann and Virginia Michaels at the teller window immediately to the right of the break in the counter. Michael West, a maintenance man, was transacting business at Lisa Moore's window. (Holder Tr., 3-18-98, pp. 87-89; Holder Tr., 3-19-98, pp. 54-55). Debbie Stoltz was in the reception area in the middle of the lobby. Richard Heflin, a uniformed, armed security guard for the Bank[1] (Holder Tr., 3-18-98, p. 72; Holder Tr., 3-19-98, p. 32), was on duty and in the general area of the snack table; he had been talking with Michael West. (Holder Tr., 3-18-98, p. 90).

March 17, 1997, St. Patrick's Day, was also Customer Appreciation Day at the Bank. In the lobby bank employees had set up a snack table with punch and cookies next to the teller counter. (Holder Tr., 3-19-98, p. 83). A St. Patrick's Day parade was scheduled to begin at noon in the area, known as "Dogtown." (Holder Tr., 3-19-98, p121; Holder Tr., 3-20-98, p. 61). At

---

[1]Mr. Heflin had been married for six months to Dana Heflin, an assistant vice-president at the Bank. Although Dana Heflin normally worked in the lobby area of the Bank, on the morning of March 17 she was working at another Lindell Bank & Trust facility. (Holder Tr., 3-20-98, p. 11).

4

approximately 10:15 - 10:30 a.m., members of the "Sterling Club," a senior citizens club, who had gathered in the lobby of the Bank, left on a bus for a trip to one of the area gambling boats. (Holder Tr., 3-18-98, p. 86; Holder Tr., 3-19-98, p. 83).

Meanwhile Thomas Dirnberger, who lived near the Bank, was out walking his dog sometime before 10:30 a.m. on that same morning. He noticed a blue van drive down the street in the direction of the Bank. (Holder Tr., 3-18-98, pp. 287, 290). Three or four minutes later he saw the same van heading toward the Bank from the opposite direction. He noticed that it contained two black males. (Holder Tr., 3-18-98, p. 291).

Betty Thompson, a bank customer, had parked in the east parking lot and was walking up to the east door of the bank when she saw the blue van drive up to the Bank at a fast rate of speed and screech to a halt in front of the Bank on the wrong side of the street. (Holder Tr., 3-18-98, p. 300). Two men with rifles got out of the van; she could not identify them because they were masked, but she noticed that the driver walked with a limp. (Holder Tr., 3-18-98, pp. 302-303). (Norris Holder lost the lower part of his right leg when he attempted to hop a train at the age of 15; however, he was fitted with a prosthesis and was able to play basketball and football. (Holder Tr., 3-18-98, pp. 175-176; 3-25-98, p. 70)) Ms. Thompson testified that the men left the doors to the van open. (Holder Tr., 3-18-98, p. 303). She saw the two men run into the bank, the man who limped going in first, and within a few seconds she heard about four or five gunshots. She returned to her car and called 911 on her cell phone. (Holder Tr., 3-18-98, pp. 304, 311).

At approximately 10:35 a.m., Virginia Michael, the teller supervisor, was standing at her window and observed a person entering the bank. She testified that he "came in shooting" at the

area where Richard Heflin was. (<u>Holder</u> Tr., 3-20-98, pp. 17-18). He moved toward the safe deposit area, and toward Richard Heflin, and as he did so she saw him continue to move his gun lower and lower. (<u>Holder</u> Tr., 3-20-98, p. 19). Although none of the eyewitnesses inside the Bank ever saw the faces of the robbers, the evidence clearly indicates that Billie Allen was the man seen repeatedly firing at Mr. Heflin.

Kelley Davis was standing at her desk, talking on the telephone. She heard what sounded like firecrackers, and as she looked up and at the east doors of the lobby, she saw a man holding a gun. (<u>Holder</u> Tr., 3-18-98, pp. 91-92). The gun, a long black gun with a wood handle, was pointed at Richard Heflin, and Ms. Davis observed fire coming out of the end of the barrel. She observed Heflin being shot in the left leg; the leg blew back and blood flew out of it. Mr. Heflin's eyes and mouth were wide open, and he looked shocked. His hands were out to his side with his palms wide open. (<u>Holder</u> Tr., 3-18-98, pp. 92-93).

Ms. Davis glanced back at the assailant, and observed fire still coming out of the gun; she then looked back at Mr. Heflin, and observed that he had fallen on the floor on his back. She observed that his holster was empty, but that his gun was not in his hands. (<u>Holder</u> Tr., 3-18-98, pp. 93-94). Although she was unable to see the shooter, because she was now crouching down, she heard more gunfire, and observed Mr. Heflin's stomach explode and blood fly out of it. Mr. Heflin was lying on the floor helpless and not moving at the time of the gunfire. (<u>Holder</u> Tr., 3-18-98, p. 95). Ms. Davis then got under her desk and called 911. While on the telephone, she heard voices or a voice in the far corner of the lobby near the tellers and the safe deposit area, and also noticed a shadow in front of her desk. (<u>Holder</u> Tr., 3-18-98, p. 97). The gunfire continued for what "seemed like forever." (<u>Holder</u> Tr., 3-18-98, p. 98).

Sandra Foppe, who was in the work room portion of the safe deposit area, testified that she heard a noise that sounded like firecrackers going off, looked up and saw Mr. Heflin fall. She then heard more shots, and observed blood and pieces of Mr. Heflin's uniform flying around. She also saw gunsmoke and pieces of carpeting in the air. (Holder Tr., 3-19-98, pp. 56-57). Michael West took off running and dove over the teller counter. (Holder Tr., 3-19-98, p. 57). She observed one of the bank robbers, dressed in dark clothes, swing his feet over the gate into the teller area. (The gate was next to where Richard Heflin lay dying.) She noticed that the soles of the robber's shoes were black, and identified the shoes Holder was wearing when he was arrested, Exhibit 35(e), as the shoes that she had seen. (Holder Tr., 3-19-98, p. 58; Holder Tr., 3-23-98, p. 96). The robber, who was holding a gun with a banana clip, went over a second gate and behind the teller's area. (Holder Tr., 3-19-98, pp. 59-60).

Michael West corroborated Ms. Davis's and Ms. Foppe's descriptions of the attack on Richard Heflin. West testified that he was standing at Lisa Moore's teller station when he heard a noise, turned around, and saw a masked man coming in carrying a rifle pointed up in the air. When the man saw Mr. Heflin, he pointed the gun at him and shot him. After Mr. Heflin fell down, the man walked over on top of him and fired repeatedly. (Holder Tr., 3-19-98, pp. 72-75). Meanwhile, West saw the second masked man, who was wearing a long coat and carrying a rifle, approach and go over the teller counter. Virginia Michael also observed the man going behind the teller counter with a gun in his hand. (Holder Tr., 3-20-98, pp. 21-22, 34). West testified that he turned and ran, and jumped over the counter and left by an exit door in the basement. (Holder Tr., 3-19-98, pp. 75-76). Lisa Moore observed the gunman who had shot Mr. Heflin walk toward Michael West, at which point West jumped over the table and ran away.

7

(<u>Holder</u> Tr., 3-19-98, pp. 127-128). The gunman then turned toward Ms. Moore, who got down on the floor. Ms. Michael testified that as Mr. West jumped over the counter, she heard gunshots. (<u>Holder</u> Tr., 3-20-98, pp. 20-21).

Ms. Moore testified that she noticed the presence of the second gunman standing behind her; he said "Bitch, I say, 'Get down.'" (<u>Holder</u> Tr., 3-19-98, p. 128). He took money out of her drawer, dropping a pack of $20 bills on her in the process. She testified that at some point he fired his weapon, as if to tell her he meant business. (<u>Holder</u> Tr., 3-19-98, pp. 148, 150). He then said, "I am going to hit the back." A voice responded back to him, "Fuck the back. Get the bitch down now." (<u>Holder</u> Tr., 3-19-98, p. 129). At that time, the robber near her headed toward the other end of the tellers' counter, toward Ms. Michael; then he came back. After arguing between themselves, the robbers left the bank. Ms. Moore then stood up and set off the alarms and cameras, which were triggered to operate when one of the tellers pulled bait money from his or her drawer. (<u>Holder</u> Tr., 3-19-98, pp. 130-131).

After the robbers left, the employees began to survey the scene. Several testified that they noticed bullet holes sprayed all over the building, and that the lobby was filled with smoke. (<u>Holder</u> Tr., 3-19-98, pp. 63, 135). Sandra Foppe testified that after the robbers left, she got up, and saw Mr. Heflin lying on the floor, his hand on his stomach. He was grey. (<u>Holder</u> Tr., 3-18-98, p. 99). A short time later police and paramedics arrived; the paramedics worked on him for a while, and then took him away. She learned shortly thereafter that he was dead. (<u>Holder</u> Tr., 3-18-98, pp. 102-103). An audit reflected that approximately $51,949.00 had been taken. (<u>Holder</u> Tr., 3-20-98, p. 166).

Outside the Bank, Betty Thompson, the bank customer who had seen two men run into

8

the Bank, was still on the phone to 911 when she saw the men come out. The man carrying a bulky blue bag, the one who limped, got in on the driver's side of the van, and the van sped off. (Holder Tr., 3-18-98, pp. 305, 312). She identified the same van in Forest Park later that day. (Holder Tr., 3-18-98, p. 307). Alma Gilliam, another bank customer, was approaching the Bank when she saw the van parked in front with its doors open. She heard what sounded like gunshots, returned to her car, and attempted to call 911 on her cellular phone. She was unable to get through, and drove out of the parking lot. She stopped her car at the corner, and observed one of the robbers get into the passenger side of the van. He took his mask off and she saw his face. After about thirty seconds to one minute, the other robber came out, got into the van and drove away. (Holder Tr., 3-20-98, pp. 44-48, 56). The van was being followed by a Jeep, and as the van went by, she observed the license number. She then proceeded to a gas station in the area, and gave one of the attendants the license number. (Holder Tr., 3-20-98, p. 50). Later in the day she identified the van in Forest Park. (Holder Tr., 3-20-98, p. 51). The next day she identified Billie Allen as the person she saw get into the passenger seat of the van after the robbery. (Holder Tr., 3-20-98, p. 53).

Thomas Dirnberger, who had seen the blue van driving toward the Bank 20-25 minutes earlier, was riding in a car heading toward the Bank when he noticed the same blue van, proceeding at a high rate of speed, run the stop sign and head east onto Highway 40. (Holder Tr., 3-18-98, p. 293). He later identified the van in Forest Park. (Holder Tr., 3-18-98, p. 294).

William Green, an attorney and former prosecuting attorney, was in the middle of the six drive-through lanes at the Bank and noticed the blue van parked outside the bank with its doors open and unoccupied. When the teller came over the intercom, he heard what he believed to be

shots inside the bank, and he saw the teller duck down or step behind a wall. He then saw two individuals come from the Bank and get in the van. Each individual was carrying a rifle, and the driver was carrying a bag. (Holder Tr., 3-20-98, pp. 170-173). He followed the van as it left the Bank and entered the eastbound ramp to Highway 40. He continued to pursue it when it exited a short distance down the highway onto the Hampton-Forest Park exit. (Holder Tr., 3-20-98, pp. 175-176). He observed the van stop just before the intersection of Hampton and Wells Avenue in Forest Park. He heard some popping noises and saw the passenger exit the van. He also saw smoke. The van then began to roll forward onto Wells Avenue, about twenty or thirty yards. (Holder Tr., 3-20-98, p. 178). While he pulled up and continued to observe, the driver exited the van, and there appeared to be a struggle outside the van between the driver and two park workers. Meanwhile, a police car arrived. There was smoke coming from the van, and it became fully engulfed in flames. (Holder Tr., 3-20-98, pp.178-79). Mr Green testified that the van was in his sight during the entire series of events, and that he did not see anyone else get into the van. (Holder Tr., 3-20-98, p. 179).

Keith Smith, an employee of the City of St. Louis Parks Department, was driving with a co-worker westbound on Wells toward Hampton Avenue when he saw the van on fire. He saw the driver get out; the driver was on fire also. He and his coworker got out of their truck and went over to the driver. They assisted him to the ground to extinguish the fire. (Holder Tr., 3-20-98, pp. 185-189). The driver immediately got back up and ran to the van, which at that point was approximately twenty-five (25) feet away. (Holder Tr., 3-20-98, p. 190). By that time the police had arrived and taken him into custody (Holder Tr., 3-20-98, p. 191). The driver was Norris Holder.

Meanwhile, at approximately 10:35 a.m., Captain Robert Oldani of the St. Louis Metropolitan Police Department had just returned from roll call to a command van set up at the intersection of Clayton Avenue and Art Hill Place in the Dogtown area; he was in command of the Hibernians Parade for St. Patrick's Day. (Holder Tr., 3-20-98, pp. 60-62). He was advised that a citizen had reported persons armed with guns entering the Bank. (Holder Tr., 3-20-98, p. 63). He and two other officers were the first to respond to the scene. The robbers had left. When he entered the lobby through the east doors, he noticed a revolver on the floor near the doors, about ten feet from Mr. Heflin. (Holder Tr., 3-20-98, p. 71). The revolver was fully loaded and had not been fired. (Holder Tr., 3-20-98, pp. 85, 95). To his left, he saw Mr. Heflin on his back, bleeding profusely. The carpet where Mr. Heflin was lying had been ripped by gunfire. (Holder Tr., 3-20-98, pp. 72-73). In front of him Captain Oldani saw the tellers; some were still behind the teller windows and others were huddled together on the other side of the bank crying and holding onto each other. There were numerous spent shell casings and live rounds scattered around the floor. There was haze in the air from the burned gunpowder, and he could smell the strong odor of it in the air. (Holder Tr., 3-20-98, pp. 64-65). He immediately ordered an urgent ambulance and the city EMS and fire department responded within ten minutes. He also secured the scene. (Holder Tr., 3-20-98, pp. 67-68).

The police began processing the crime scene at the Bank. From the area on Forest Avenue in front of the Bank where the getaway van had been parked, they found a black stocking hat, an audio C.D.[2] and miscellaneous papers from the van. (Holder Tr., 3-20-98, pp. 84, 121).

_____

[2]In "Set It Off," a movie Holder and Allen watched before the robbery, a bank robber tosses C.D.'s from stolen getaway vehicles.

Also in the street outside of the east bank entrance they found two live cartridges. (Holder Tr., 3-20-98, p. 149). In the east vestibule between the sets of glass doors was a live cartridge, and another live round was nearby. (Holder Tr., 3-20-98, pp. 84-85, 94). Four more live rounds were recovered from behind the tellers' line and another by the gate which leads from the lobby to the safe deposit area. (Holder Tr., 3-20-98, pp. 85, 87-89, 101, 138; Gov. Ex. 22A). Nine bullet fragments were recovered from the floor in the area where Mr. Heflin fell. (Holder Tr., 3-20-98, p. 126). The carpet was damaged by bullets striking it in the area of Mr. Heflin's crotch. (Holder Tr., 3-20-98, pp. 86-87). Other bullet fragments were found behind Lisa Moore's teller station, beneath a desk directly in front of the area where Amy Boehlje took cover, just inside the east bank doors and imbedded in the interior portion of the south outer wall to the Bank. (Holder Tr., 3-20-98, pp. 141-142, 147, 153; Gov. Ex. 22A). Sixteen (16) spent shell casings were recovered within the bank.[3] Two were found by chairs just inside the east lobby doors and another just to the west of the doors. Three were recovered near the location Mr. Heflin fell. Three were found near the check desk in the lobby. Two more were directly in front of the teller line and one was behind the line. Two were recovered from the safe deposit area near the vault. Police recovered two casings from the area of the new accounts desk which is across the lobby from the teller line. (Holder Tr., 3-20-98, pp. 88-91, 98-100, 102, 115, 131-133, 137, 144-146; Gov. Ex. 22A). Pieces of carpet were blown from the area where Mr. Heflin fell and landed across a counter in the safe deposit area. (Holder Tr., 3-20-98, p. 143; Gov. Ex. 22A).

---

[3]Both the Russian and Chinese SKS rifles are semi-automatic weapons. In a semi-automatic weapon, each time the trigger is pulled, a bullet is fired and a spent shell is thrown from the weapon. The recovery of sixteen (16) spent shell casings means at least sixteen (16) shots were fired inside the Bank.

There was a considerable amount of damage from the bullets fired within the bank. One bullet penetrated two chairs by the east door and then struck the floor in front of the safe deposit area. Another bullet passed through one of the chairs. A bullet ricocheted off of the floor close to the location of Mr. Heflin's left leg as he lay on the floor. Several bullets struck the floor in the area of his crotch. There was extensive damage to the carpet in that area. A bullet passed through the counter in the safe deposit area, struck a desk leg and fragmented. Had this bullet not hit the desk leg, it could have hit Ms. Boehlje. Higher on the wall above this spot was another bullet hole. A bullet went through the gate between the lobby and safe deposit area, passed through three interior walls and landed against the south exterior wall of the bank. Another bullet passed through the wall behind the tellers' counter and landed near the south exterior wall. Both this bullet and the one just previously described passed through the wall behind Lisa Moore's teller station. A bullet struck the tile floor immediately in front of the teller line near the spot Mr. West jumped the counter. Two bullets struck the wall behind Virginia Michael's teller station. (Holder Tr., 3-20-98, pp. 86-91, 94-107; Tr., 3-24-98, p. 80-90; Gov. Ex.'s 3B, 3C, 22, 22A).

Emergency rescue workers arrived at the Bank, treated Mr. Heflin, and took him to Barnes Hospital. When he arrived, he was moribund; he did not have a measurable blood pressure, was not breathing on his own, and had no obvious evidence of neurologic functioning. (Holder Tr., 3-19-98, p. 170). The trauma surgeon who treated him stated that "the particular weapon used in this case was thoroughly destructive..." (Holder Tr., 3-19-98, p. 171). The gunshot wound to the left leg shattered the thigh bone and severed the major blood vessel going down the leg, and vital structures in the abdominal cavity had been hit. (Holder Tr., 3-19-98, p.

171; (Holder Tr., 3-23-98, p. 22). The trauma team was unable to revive him, and he was pronounced dead at 11:09 a.m. (Holder Tr., 3-19-98, p. 173).

An autopsy revealed Mr. Heflin suffered at least eight (8) discrete bullet entry wounds and numerous puncture wounds caused by bullet fragments. (Holder Tr., 3-23-98, pp. 48, 50). At least four of the bullet wounds were potentially deadly. (Holder Tr., 3-23-98, p. 53). Only a wound to the left leg, a wound to the right thigh and a wound to the left knee were consistent with Mr. Heflin having received them while he was standing. (Holder Tr., 3-23-98, pp. 24, 27). Three of the lethal wounds entered through the buttocks, shattered the pelvis and massively damaged the abdomen. (Holder Tr., 3-23-98, pp. 11, 15, 16, 17, 49). The bullets which caused these wounds apparently ricocheted off of the floor and struck Mr. Heflin as he lay on his back on the floor. (Holder Tr., 3-23-98, pp. 12, 16, 17, 47). 7.62 by 39 millimeter bullets relating to these three wounds were recovered: one from the kidney, one from the liver and a third from the abdomen near the spinal column. (Holder Tr., 3-23-98, pp. 12, 15, 17). The wound which nearly severed his left leg was also lethal. (Holder Tr., 3-23-98, p. 26). The wound to the right thigh shattered his femur. Bullets and bullet fragments were also recovered from Mr. Heflin's right thigh, left thigh and left knee. (Holder Tr., 3-23-98, pp. 23, 28, 34). All of these bullets and fragments were taken to the police laboratory for comparison. Mr. Heflin also received less serious wounds to his left hand and lower left leg as well as two clusters of puncture wounds from fragments. (Holder Tr., 3-23-98, pp. 38, 41, 43). He was alive when he received all of these wounds. (Holder Tr., 3-23-98, p. 49). He was shot with "hollow point" ammunition, which is more destructive than non-hollow point. (Holder Tr., 3-23-98, p. 14). Some of the wounds were consistent with the shooter moving toward Mr. Heflin's left as he shot. (Holder

14

Tr., 3-23-98, pp. 18, 33, 35, 38). Upon examination of Mr. Heflin's clothing, a criminalist found over twenty (20) holes and rips to his shirt, t-shirt and trousers and corresponding damaged areas to his jockey shorts. (Holder Tr., 3-23-98, p. 180).

Police rapidly arrived at the scene of the burning van in Forest Park. John Ackermann, a St. Louis City police officer, received a call about the robbery at about 10:45 a.m. and arrived at the scene in Forest Park in time to see both the passenger and the driver exit the van. He observed the passenger, Allen, run across a path and into a wooded area of the park; he also observed the driver, Holder, leaning into the van. (Holder Tr., 3-20-98, pp. 196-197, 205). He ordered Holder to get down on the ground and crawl to him; he could hear rounds of ammunition going off inside the van and the van was in flames. Holder repeatedly refused to do so, but finally went to the ground, whereupon Ackermann handcuffed him, after a struggle, and pulled him to safety. (Holder Tr., 3-20-98, pp. 197-199). Holder was wearing a bulletproof vest. (Holder Tr., 3-20-98, pp. 200, 203).

Billie Allen had run into a wooded area. He encountered a City Forestry employee, Bobby Harris, who was working with another employee, Bruce Norman, in Forest Park hooking up a wood chipper to the back of a truck. Harris testified that a man came running toward him; he was patting the top of his hair. He stopped and asked if they were hiring; Harris noticed that there was smoke in the distance behind the man. He and Norman gave the man a ride to the Metrolink Station; he paid them $30 apiece. (Holder Tr., 3-20-98, pp. 225-228). He attempted to buy Norman's hat from him, but Norman refused. (Holder Tr., 3-20-98, p. 229). Harris identified Allen in a lineup the next day as the man he had seen in Forest Park. (Holder Tr., 3-

20-98, p. 231).[4]

The getaway van was "fully involved" in fire when the fire department arrived and put it out. Two weapons were seized from the van after the fire was extinguished. Holder's weapon, the Russian-made SKS with a bayonet and an extended magazine known as a banana clip attached to it, Exhibit 38, was on the floor between the driver's and passenger's seats. The Russian SKS still had some cartridges in the extended magazine at the time of the fire. (Holder Tr., 3-20-98, pp. 251-252). Allen's weapon, the Chinese SKS, Exhibit 37, which did not have a clip, was on the floor in front of the passenger's seat. It was not loaded at the time of the fire. (Holder Tr., 3-20-98, pp. 250-251, 257). Burned money was attached to the remains of the stock of the Russian SKS. A large quantity of partially burned money was found strewn about the front of the van. Police also seized a burned magazine, Exhibit 53, attached to the Russian SKS (Holder Tr., 3-20-98, pp. 253-54), and four other banana clips (Exhibit 39) from the van, (Holder Tr., 3-20-98, p. 254). The four magazines were of the extended type usable only in the altered Russian SKS, (Holder Tr., 3-24-98, p. 99), and had been consumed in the fire; they had exploded areas within them, indicating that there had been a "cook-off" of live ammunition. (Holder Tr., 3-24-98, p. 98). Also seized from the van were 85 fire-damaged shells, caliber 7.62 by 39mm; 79 .30 caliber bullets; 8 burned 12 gauge shotgun shells, and one loaded round of 7.62 by 39mm ammunition. (Holder Tr., 3-20-98, p. 269). A Radio Shack transceiver and yet

---

[4]Lakeshia Williams, who had seen Billie Allen the night before the bank robbery, saw him the afternoon of the bank robbery. She noticed that, unlike the night before, he now had a burn on one of his ears. (Holder Tr., 3-18-98, p. 244). Marcella Chowning, who had been with Lakeshia Williams and Billie and Norris the night before the robbery also noticed Allen's blister the next day. (Holder Tr., 3-18-98, p. 253). When Allen was arrested early in the morning after the robbery, he reeked of smoke. He had burn blisters on his right ear and right nostril, and his hair was singed. He also had a burn on his wrist. (Holder Tr., 3-23-98, p. 125).

16

another (the sixth) banana clip were recovered from the street by the burning van. There were 18 live rounds of 7.62 by 39 millimeter ammunition in this banana clip. (Holder Tr., 3-20-98, p. 248).

Police also found Allen's leather jacket on a hill near the scene, and retrieved from it three shotgun shells, Exhibit 47, and five stripper clips of ammunition for fast reloading, four of them fully loaded and holding ten rounds of 7.62 by 39 mm ammunition, and one of them partially loaded; in total, there were 44 rounds of ammunition loaded in the stripper clips and 6 loose live cartridges, Exhibit 46, in the pockets of the jacket. In the front pocket of the leather jacket were three Winchester 12 gauge shotgun shells loaded with triple aught buck. (Holder Tr., 3-20-98, pp. 241-243, 258; Holder Tr., 3-24-98, p. 104).

The Russian SKS, the Chinese SKS and all of the cartridges, shell casings and bullets recovered during the investigation were taken to the St. Louis Metropolitan Police Department Laboratory for analysis and comparison. Firearms examiner Frank Stubits reached the following conclusions:

The Russian-made SKS was a 7.62 X 39 mm calibered semiautomatic rifle with a bayonet attached and a loaded extended magazine. In the magazine were three spent shell casings, three "cooked-off" shell casings and one burnt bullet. The "cooked-off" casings were a result of the fire; the live cartridges in the magazine exploded within it, erupting from the magazine and leaving remnants of ammunition. (Holder Tr., 3-24-98, pp. 91-95). The Russian SKS, which was designed to hold only eleven rounds of ammunition, had been modified to accept the extended magazine or "banana clip," which held 37 rounds of ammunition. The Russian SKS was reloaded by exchanging an empty "banana clip" for a full one.

The Chinese-made SKS was also a 7.62 X 39 mm calibered semiautomatic rifle. Unlike the Russian SKS, it had not been altered to accept banana clips. It had a fixed magazine and held 11 rounds when fully loaded. It was not loaded at the time of the fire; the magazine was still attached and was empty and undamaged. (Holder Tr., 3-24-98, p. 94). The Chinese SKS was designed to be reloaded by means of a "stripper clip" of the type found in Allen's jacket pocket. Each "stripper clip" held ten rounds of ammunition and was designed to reload the SKS quickly. (Holder Tr., 3-24-98, pp. 93-98, 100-102).

A total of one hundred eighty-four (184) 7.62 by 39 millimeter rounds were recovered during the course of the investigation. (Holder Tr., 3-24-98, pp. 107-108). All of this ammunition was high powered, Russian made, military-style ammunition of the hollow point design. Hollow point ammunition is designed to mushroom open upon impact to create more damage. (Holder Tr., 3-24-98, p. 112). Twenty-one (21) 12 gauge shotgun cartridges were also recovered.

Of the sixteen shell casings recovered from within the Bank, eight were positively identified as having been fired by Allen's Chinese SKS. Another three were consistent only with having been fired by the Chinese SKS.[5] Of the remaining five rounds, three could only have been fired by Holder's Russian SKS, and two could have been fired by either of the weapons. (Holder Tr., 3-24-98, pp. 128, 134-37, 143).

The bullets recovered from Mr. Heflin's liver, right thigh, left thigh and bullet fragments from the knee could not be positively identified to either firearm due to mutilation of the bullets.

---

[5]This total of eleven rounds accounts for all of the rounds that the Chinese SKS could have held without reloading. It also explains why the Chinese SKS was not loaded at the time of the fire in the getaway van. It had been fired in the bank until it was empty.

18

These items could have been fired from either firearm. (<u>Holder</u> Tr., 3-24-98, pp. 118, 124). The bullets recovered from the lethal wounds to Mr. Heflin's abdomen[6] and kidney were positively fired by Allen's Chinese SKS. (<u>Holder</u> Tr., 3-24-98, p. 119).

A bomb and arson expert testified that gasoline had been poured in a Z pattern in the van behind the two front seats and that vapors from the gasoline ignited, causing the van to burn. (<u>Holder</u> Tr., 3-20-98, pp. 277-279). Gasoline was on the clothes and black gloves Holder wore during the bank robbery. (<u>Holder</u> Tr., 3-23-98, p. 165). A detective from the bomb and arson unit testified that the exploding weapons and ammunition could have harmed people in the vicinity of the burning van, (<u>Holder</u> Tr., 3-23-98, p. 145), and that six of the shells that exploded made it outside the van. (<u>Holder</u> Tr., 3-23-98, p. 154).

Near the corner of Clayton Avenue and Faulkner Drive in Forest Park, police found the second getaway vehicle, a Dodge van which had been stolen overnight. Inside the Dodge van, the police recovered a 12 gauge shotgun with pistol grips, owned by Norris Holder. It was fully loaded with eight (8) rounds of 12 gauge ammunition. Some of this ammunition was also triple aught buckshot of the type found in the pocket of the jacket Allen discarded in Forest Park. The route Allen and Holder took from the Bank would have led directly to the Dodge van had the getaway van not caught fire and burned. (<u>Holder</u> Tr., 3-20-98, pp. 283-285; <u>Holder</u> Tr., 3-23-98, pp. 79-82).

About 10:00 p.m. on the 17th, police discovered the third getaway vehicle, Holder's Mercury Topaz, in the Barnes Hospital parking garage. The garage is only a short distance from

---

[6]The bullet from the abdomen appeared to have ricocheted off of a hard object before entering Mr. Heflin's body.

the location where the second getaway van was recovered. Allen's left thumb print was found on the window of the passenger's door of the Topaz. Holder's palm print was found on the window of the driver's door. Inside the Topaz was Holder's driver's license. (Holder Tr., 3-23-98, pp. 56-61, 87-89).

**Planning**

The government introduced detailed evidence of the substantial amount of planning that had preceded the bank robbery.

Norris Holder, who was born on December 16, 1975, (Holder Tr., 3-23-98, p. 119), was a regular customer of the Bank. (Holder Tr., 3-19-98, p. 107). Between January of 1996 and March of 1997 he made fifteen withdrawals of $500 from the Bank. (Holder Tr., 3-19-98, pp. 109-110). The last withdrawal before the robbery was on March 13, 1997. (Holder Tr., 3-19-98, p. 111). Holder admitted during questioning after his apprehension that he had committed the robbery because he needed money; he wanted to "start from scratch and live right," and he needed money for a lawyer. (Holder Tr., 3-24-98, p. 22). Holder admitted that he and Allen had chosen the Bank because he had an account there, and he knew the layout of the Bank and that it was near a highway. (Holder Tr., 3-24-98, p. 17). He also admitted that they stole two vehicles; that they used one as the getaway vehicle and parked the second in Forest Park, where they planned to switch vehicles, set the first vehicle on fire, and drive to Holder's car parked in the Barnes Hospital parking garage. (Holder Tr., 3-24-98, p. 19). He admitted that prior to going to the Bank, they had poured gasoline into the van. (Holder Tr., 3-24-98, p. 19). He admitted that he had carried a loaded Russian SKS with a bayonet, and that Allen carried a Chinese SKS without a bayonet. He stated that he was the second to enter the Bank, and heard

20

shooting and was confused because there wasn't supposed to be any shooting. He then leaped over the counter with the assault rifle and went through the teller drawers. He put the money in a green laundry bag, jumped back over the counter, and ran out of the Bank. He drove the van onto Highway 40, running the electric signals; when he flicked his lighter the inside of the van caught on fire and burst into flames as they were driving. (Holder Tr., 3-23-98, pp. 109-111, 117). He repeatedly professed surprise that there was any shooting and denied firing his weapon, but admitted that he wore a bullet proof vest, and that they had ammunition in five or six clips. (Holder Tr., 3-24-98, pp. 18, 20, 23, 56).

Other witnesses and physical evidence corroborated Holder's admissions. The government introduced evidence that on the evening of March 16, 1997, sometime after 11:00 p.m., a blue 1987 Astrovan was stolen from in front of its owner's residence. (Holder Tr., 3-18-98, p. 267). That vehicle was burned almost beyond recognition. (Holder Tr., 3-18-98, pp. 269-270). Also on the evening of March 16, 1997, a blue Dodge Caravan was stolen from in front of its owner's residence, also after 10 or 11:00 p.m. (Holder Tr., 3-18-98, p. 279). That vehicle was found in Forest Park on Faulkner Drive, near Barnes Hospital. (Holder Tr., 3-20-98, p. 283). The third vehicle, a 1988 gray Mercury Topaz was found parked in the Barnes Hospital parking garage, near Forest Park. (Holder Tr., 3-23-98, p. 57).

The Russian SKS assault rifle, equipped with a bayonet and a curved clip was purchased on November 19, 1996 and later sold to Norris Holder. (Holder Tr., 3-18-98, pp. 125,135). Holder, accompanied by Billie Allen, purchased the bulletproof vest from a kiosk at the St. Louis Center shopping center in downtown St. Louis on March 13, 1997. The salesman testified that he informed Holder and Allen that the vest would stop bullets from the types of weapons carried

by St. Louis police. (Holder Tr., 3-19-98, pp. 12-15). Allen was unable to purchase a vest because he did not have enough money. (Holder Tr., 3-19-98, p. 16). A Winchester 12-gauge shotgun was purchased for Norris Holder by his cousin in 1995. (Holder Tr., 3-18-98, p. 114). That weapon was placed in the second getaway vehicle. (Holder Tr., 3-23-98, p. 112).

Holder had been thinking about committing a bank robbery for some time. Holder's acquaintance, Terry Gear, testified that, around New Year's Day of 1997, Holder asked him if he had ever thought about robbing a bank. Gear asked Holder if he had thought about the consequences involved, to which Holder replied that he wouldn't get caught. Gear also testified that Holder said that he needed some money. Holder also asked him if he had seen the movies "Heat" and "Set It Off." (Holder Tr., 3-18-98, pp. 151-152). Gear described the movie "Heat" as about high-class bank robbers and as involving guns and violence. He described the movie "Set It Off" as involving female bank robbers engaging in shootouts. (Holder Tr., 3-18-98, pp. 152-153). He observed to Holder that "the people in those movies died, and it really wasn't worth it." (Holder Tr., 3-18-98, p. 153).

Holder again responded that he had a plan, and described it for Gear. He stated that he had seen a bank on Grand and close by a highway. He planned that one person would get all the people down while the other person would collect the money, and someone else would watch the door. After they left, they would get on the highway, go down one exit, and change cars at an apartment complex. (Holder Tr., 3-18-98, pp. 153-154). Again Gear responded that the risk was too high, whereupon Holder responded that no one would be crazy enough to try to stop them with the firepower they had, indicating that he had an assault rifle that could go through bulletproof vests and police cars. He also stated that if someone tried to stop him, he would just

22

shoot at the cars and get rid of them, and that if someone got in his way, he would get rid of him. (Holder Tr., 3-18-98, pp. 154-155, 172).

Wayne Ross, a childhood friend of Norris Holder's, (Holder Tr., 3-18-98, p. 175), testified that he observed Norris and Billie Allen talking together at a nightclub named "Cloud Nine" on March 7th or 8th of 1997. (Holder Tr., 3-18-98, pp. 180-181; also Johnnie Grant, p. 224; Lakeshia Williams, p. 238). During the following week, he watched the movie "Heat" at his uncle's house with some friends, including Norris. (Holder Tr., 3-18-98, p181-182) All those present, including Norris, expressed admiration for the "hardness" of the bank robbers in the movie as they fought to the death in their gunfights with the police. (Holder Tr., 3-18-98, pp. 183-184). On March 15, Ross and a group of friends, including Norris, went to a bowling alley. As they were leaving, around midnight, Norris left the group, met up with Billie Allen, and he and Allen went back into the bowling alley. Ross and the others also went back into the bowling alley, and saw Norris and Billie whispering. He overheard them referring to knowing the "perfect place" along the highway, and that it had two doors. (Holder Tr., 3-18-98, pp. 187-188). He also overheard them say that they had to "do it quick" and "when did they want to do it." (Holder Tr., 3-18-98, p. 189). On Sunday, March 16, 1997, Ross stopped by Norris' house to trade some clothing with him before he returned to college from spring break. He observed two guns, some clips, and a bulletproof vest in Norris's closet. One of the guns had a "knife" on it and the other had something like Chinese writing on it. (Holder Tr., 3-18-98, pp. 190-192). Ross identified Plaintiff's Exhibits 37 and 38 as the guns he saw in Norris's closet, (Holder Tr., 3-18-98, pp. 193-194) and he identified Exhibit 42 as similar to the clip he saw, and Exhibit 34(b) as the bulletproof vest. (Holder Tr., 3-18-98, pp. 196-197) He identified Exhibit 60 as a

pump shotgun with a short handle that he had seen over the years in Norris's residence. (<u>Holder</u> Tr., 3-18-98, p. 205). Finally, Ross testified that he saw a stun gun on the table next to Norris's bed. (<u>Holder</u> Tr., 3-18-98, p. 199).

Ross testified that he invited Norris to accompany him back to campus, but Norris declined, saying that he had to "pull a lick" because he needed money. (<u>Holder</u> Tr., 3-18-98, p. 200). They discussed some of the details of the planned bank robbery, including Norris's plan that "nobody" would get hurt, (<u>Holder</u> Tr., 3-18-98, p. 201), and his plan to wear a bulletproof vest. (<u>Holder</u> Tr., 3-18-98, p. 202).

Lisa Moore, the bank teller, testified that a man accompanied Holder on the March 13th visit; while she waited on Holder, the other man sat on the edge of a chair in the lobby looking around. (<u>Holder</u> Tr., 3-19-98, p. 114). Ms. Moore later identified Billie Allen in a lineup as the man who accompanied Holder to the Bank that day. (<u>Holder</u> Tr., 3-19-98, pp. 119-120). As Holder and Ms. Moore chatted during Holder's transaction, he asked her "Does this bank always be this empty?" (<u>Holder</u> Tr., 3-19-98, p. 117).

Kevin Liddell, an employee of Radio Shack, testified that he sold Norris Holder a set of walkie-talkies (Exhibit 41 and Exhibit 15(1)) on the day before the robbery. (<u>Holder</u> Tr., 3-18-98, pp. 227-228). That same evening, Norris and Billie brought the movie "Set It Off" to the residence of Lakeshia Williams, set it up in the VCR, and instructed her not to watch it until they returned. (<u>Holder</u> Tr., 3-18-98, pp. 241-242; also Chowning, pp. 249-250). Later that evening Norris and Billie returned and watched the movie awhile, and then left the house with the tape still running. (<u>Holder</u> Tr., 3-18-98, p. 252).

Holder testified in his own defense. He admitted to robbing the Bank, but repeatedly

testified that, not only did he not know there was to be any shooting, he instructed Allen that there was to be no shooting at all. (Holder Tr., 3/25/98, pp. 70, 83-84, 104-105, 120) He portrayed Allen as the instigator of the crime, testifying that Allen suggested robbing the Bank as a way for Holder to obtain money to buy a better prosthesis,[7] (Holder Tr., 3/25/98, p. 75), that Allen asked to accompany him to the Bank when he went to deposit his disability check (Holder Tr., 3/25/98, p. 76), and that Allen paged him repeatedly the morning of the robbery. (Holder Tr., 3/25/98, p. 77). However, Holder admitted to supplying the Russian and Chinese SKS weapons, (Holder Tr., 3/25/98, p. 79), the walkie talkies, (Holder Tr., 3/25/98, p. 80), and to purchasing a bulletproof vest. (Holder Tr., 3/25/98, p. 78). He denied shooting his gun, (Holder Tr., 3/25/98, pp. 85, 102), and denied that he drove the car after the robbery. (Holder Tr., 3/25/98, p. 89). He testified that he set the van on fire to get Allen to stop the vehicle, (Holder Tr., 3/25/98, p. 92), and that once the van was stopped, he jumped out on the passenger side. (Holder Tr., 3/25/98, p. 93).

Holder ended his direct testimony with the following explanation for his participation in the robbery:

> I was in there trying to get some money to – what I thought I was doing the right thing trying to change my life for the better, just take some money that was insured, nobody get hurt, everybody is fine. To change my life for the better, not to take somebody's life. Not to hurt somebody, not to take somebody from their people, their family.

---

[7]In contrast, Allen, during the sentencing phase of his trial, was repeatedly characterized as a follower. See Allen Tr. 17, pp. 23-85.

(Holder Tr., 3/25/98, p. 106).

On cross-examination, Holder admitted that he willfully and intentionally robbed the Bank, that Richard Heflin was killed, and that his actions were reckless and placed everyone in the bank at a grave risk of death. (Holder Tr., 3/25/98, pp. 130, 132, 170-71). He admitted that he loaded his gun the evening before the robbery, and that he went into the Bank with his weapon ready to be fired, with a bullet in the chamber so that it could be fired by squeezing the trigger, (Holder Tr., 3/25/98, p. 108), that he doused the van with gasoline before the robbery, (Holder Tr., 3/25/98, p. 108), and that he wore a bulletproof vest. (Holder Tr., 3/25/98, p. 109) He admitted providing the Chinese SKS to Billie Allen, and to providing the ammunition and the shotgun, even though Allen had told him he was going to "go wild.". (Holder Tr., 3/25/98, pp. 122-23). He admitted to loading the five clips in the van. (Holder Tr., 3/25/98, p. 124). He denied firing the Russian SKS or dropping any live cartridges in the Bank. (Holder Tr., 3/25/98, pp. 124-26, 167). He also denied even seeing Richard Heflin until he was leaving the Bank, even though he passed within feet of him to get to the teller counter. (Holder Tr., 3/25/98, pp. 143-45). He admitted that, even though he considered Mr. Heflin his friend and didn't want him to get hurt, he did not stop and try to help him. (Holder Tr., 3/25/98, p. 147).

He admitted to fully loading the pistol-gripped shotgun found hidden in the stolen Dodge van to be used as the second getaway van, (Holder Tr., 3/25/98, p. 135), but denied that he intended it to use it on anyone attempting to prevent his escape. (Holder Tr., 3/25/98, pp. 134-36). He testified that his statement to F.B.I. agent Jan Hartman that he had accidentally set the van on fire was untrue, (Holder Tr., 3/25/98, pp. 110-111), and denied that he had told Detective Carroll that he had not been involved in the bank robbery. (Holder Tr., 3/25/98, p. 111). He did

26

not recall attempting to enlist his friend Terry Gear in the robbery, (Holder Tr., 3/25/98, p. 112), nor in telling Gear that he would get rid of anybody who got in his way. (Holder Tr., 3/25/98, p. 113). He repeatedly denied that he drove the van away from the Bank, in spite of all the eyewitness testimony to the contrary. (Holder Tr., 3/25/98, pp. 114-117). He denied that when he returned to the van as the police were approaching, he was reaching for his Russian SKS. (Holder Tr., 3/25/98, pp. 153-54). He denied that he had told Special Agent Hartman that he robbed the bank to get money to pay his lawyer. (Holder Tr., 3/25/98, p. 119).

Holder was charged by Indictment with the crimes of Count I, the robbery of Lindell Bank & Trust which resulted in a death, and Count II, using or carrying a firearm during and in relation to a crime of violence which results in a murder. The jury returned verdicts of guilty as to each count. (Holder Tr., 3/25/98, p. 119).

**The Penalty Phase**

As to each of Count I and Count II, the United States submitted two statutory aggravating factors and four non-statutory aggravating factors to the jury. The statutory aggravating factors were :

> 1. That Norris G. Holder, in the commission of the offense, or in escaping apprehension for the violation of the offense, knowingly created a grave risk of death to one or more persons in addition to Richard Heflin;
> 2. That Norris G. Holder committed the offense in the expectation of the receipt of anything of pecuniary value.

The Government relied on the evidence presented at the guilt phase of the trial to prove these statutory aggravating factors.

The non-statutory aggravating factors were:

1. That Norris G. Holder's conduct in committing the offenses was substantially greater

in degree than that described in the definition of the crime, apart from the statutory aggravating factors;

2. That Norris G. Holder has committed other criminal acts in addition to the capital offenses committed in this case;

3. That Norris G. Holder is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to society; and

4. That Richard Heflin's personal characteristics as an individual human being and the impact of the death of Richard Heflin upon his family make this crime more worthy of the death penalty than other murders.

(Holder Appendix, pp 84-88).

As to the first non-statutory aggravating factor, that Holder's conduct was substantially greater in degree, the Government relied upon the evidence submitted at the guilt phase. As to the second non-statutory aggravating factor, that Holder had committed other criminal acts, the Government introduced evidence that Holder pleaded guilty in 1995 to the crimes of carrying a concealed weapon and possession of controlled substances. In connection with these offenses, the Government introduced evidence that Holder, while driving an autombile, refused to stop the vehicle for a period of time after being signaled by a police car to pull over, and when he finally did pull over, attempted to throw away a plastic bag containing 4-5 rocks of crack cocaine. (Holder Tr., 3/31/98, pp. 43-46). A passenger in Holder's vehicle told police that Holder had hidden a pistol inside the door panel on the passenger side of the car. (Holder Tr., 3/31/98, p. 48). The pistol was loaded. (Holder Tr., 3/31/98, p. 49). In addition, in May, 1995, Holder sold a stolen vehicle which had been altered to appear legitimate. (Holder Tr., 3/31/98, pp. 65-67, 70). The VIN on the dashboard had been replaced with the VIN from the vehicle Holder was driving when he was arrested for crack possession and carrying a concealed weapon. (Holder Tr., 3/31/98, pp. 77-85).

As to the future dangerousness non-statutory aggravating factor, the Government

presented evidence that Holder was on probation for the crack possession and carrying a concealed weapon charges when he robbed the Bank. He did not fulfill three conditions of the probation:

1) He did not attend the Turnaround Program, a kind of "scared straight" program for youthful offenders (Holder Tr., 3/31/98, p 101-02);

2) He did not maintain employment. (Holder Tr., 3/31/98, p. 103) He also failed to attend scheduled employment counseling, (Holder Tr., 3/31/98, p. 105-08, 113), and indicated to his probation officer that he should not have to work for the minimum wage (Holder Tr., 3/31/98, p. 109);

3) He failed to attend regularly scheduled meetings with his probation officer (Holder Tr., 3/31/98, pp. 119-121). He did so poorly that his probation was extended for an additional year (Holder Tr., 3/31/98, p. 121).

As further evidence of future dangerousness, the Government introduced evidence that Holder failed to exhibit remorse for the robbery and murder. He showed no remorse when he was interviewed on the night of the crime by Detective Carol and by Special Agent Jan Hartman. Further, he failed to exhibit true remorse on the witness stand at trial.

As to the victim impact non-statutory aggravating factor, the United States presented testimony from Mr. Heflin's mother, his wife of six months, his three children, his ex-wife (the children's mother), two of his siblings, two co-workers and a former co-worker. This testimony established that Mr. Heflin, a decorated veteran who was forty-seven years old at the time of his death, was a hard working family man who was cheerful and well liked. The witnesses testified about their last contacts with Mr. Heflin and the effect of his murder on their lives. (Holder Tr.,

3/31/98, pp. 144-227).

Bank employees spoke of emotional difficulties resulting from the robbery. Kelley Davis testified that Mr. Heflin was like a brother to her, and that a year after the robbery she still had nightmares every night and episodes of sleepwalking during which she attempted to climb out the window. She also testified that she couldn't go anywhere by herself. (Holder Tr., 3/31/98, pp. 150-51). Janice Walton, a bank employee for twenty-five years, testified that she was looking for other employment, because she could not face the possibility of another robbery. (Holder Tr., 3/31/98, pp. 158-59). Heflin's wife, who worked at the Bank, testified that she had not gone back into the Bank since the robbery. (Holder Tr., 3/31/98, p. 225).

**Mitigating Evidence**

Holder submitted two statutory mitigating factors and seventeen non-statutory mitigating factors for each count. (Holder App. at 96-101). His statutory mitigating factors were "1) that Norris G. Holder did not have a significant prior history of other criminal conduct and 2) other factors in Norris G. Holder's background, record, or character or any other circumstances of the offenses that mitigate against imposition of the death sentence." His non-statutory mitigating factors were as follows:

> 1. That in the killing for which Norris G. Holder was convicted, he did not fire the shots which resulted in the victim's death.
> 2. That Norris G. Holder did not intend for any person to be killed during the course of the offenses which he committed.
> 3. That Norris G. Holder suffered a series of losses in his life which he failed to process, despite recommendations that he receive counseling. These losses include the desertion of his father at a young age, the loss of his leg, and the death of his grandfather.
> 4. That Norris G. Holder's childhood was characterized by inconsistent parenting.
> 5. That despite growing up in a rough neighborhood with economic instability, Norris G. Holder was continuously striving to improve his situation and that of his

30

family.

6. That in the absence of his father, Norris G. Holder assumed the role of the man of the house at a very young age.

7. That Norris G. Holder lacked a positive male role model while growing up.

8. That Norris G. Holder felt a sense of responsibility to provide emotional and financial support to his mother, brothers and sister.

9. That Norris G. Holder's motive for these offenses grew out of his attempt to reduce the impact of his disability, improve his life, and provide care for his family.

10. That Norris G. Holder provided a positive role model to Norrim Holder, Norrell Holder, Normeka Holder, Tony Sanders, and others.

11. That Norris G. Holder has been a father figure to his brother Norrim. Due to Norris' influences and efforts, Norrim has made many positive changes in his life.

12. That Norris G. Holder is a likeable person who provides support and help to many of his extended family, friends, and associates.

13. That Norris G. Holder does not have a history of violent behavior and the offenses for which he was convicted are inconsistent with his personality and usual behaviors.

14. That Norris G. Holder has a large family who is very attentive to and supportive of him and will help him make an adequate adjustment to prison life.

15. That Norris G. Holder has made an adequate adjustment to being confined in jail and is not a problem inmate.

16. That Norris G. Holder does not present a substantial risk of being dangerous or violent if confined in prison for life without the possibility of release.

17. That Norris G. Holder can continue to provide a positive influence in the lives of Norrim, Norrell, and Normeka Holder while incarcerated in prison.

Holder presented the testimony of thirty-one witnesses in the penalty phase, who testified in support of the two statutory and seventeen non-statutory mitigating factors. Thirteen of the witnesses were family members, six were family friends or neighbors, two were teachers from the Rockwood School District, and two were from youth service groups Holder had attended. Generally, these witnesses testified that Holder came from a disadvantaged background, acted as a parent figure to his siblings and was likeable and non-violent. Holder's mother, Kimberly Holder, testified <u>inter alia</u> that she and Norris's father split up when he was nine, that his grandfather with whom he was close died when Holder was ten, that after he lost his leg in the

train accident he could no longer play sports as well as he had before, and that she worked two and sometimes three jobs to support herself and her family. She testified that during part of Holder's childhood she used crack cocaine, and that during that period she was not a good mother; that the family lived in the Blumeyer housing project, where Holder was exposed to a lot of crack users and drug dealers, and that he began dealing drugs; that Holder participated in the school desegregation program, attending schools in the Rockwood School District, but dropped out of high school; and that after Holder's train accident, there was a settlement with the insurance company, as a result of which she received $10,000, and Holder received $10,000, plus $500 a month until the year 2000. She also testified that Holder told her how sorry he was that Mr. Heflin had died. (Holder Tr., 4/1/98, pp. 11-67, 95-96).

On cross-examination, Kimberly Holder testified that under the insurance settlement, Holder would receive $500 a month until 2005, instead of 2000, and that in 2005 he would receive an additional $15,000. (Holder Tr., 4/1/98, p. 75). She testified that, after seventh grade, Holder's rate of absenteesim went up, from 25 days in eighth grade to 61 days in ninth grade. (Holder Tr., 4/1/98, pp. 84-86). She also testified that Holder was involved in three incidents of sexually assaulting female students, in May, 1990, in March, 1991, and in December, 1993, for which he was suspended. He never returned to school after the 1993 suspension. (Holder Tr., 4/1/98, pp. 89-90, 96-97).

Holder's friend, Cortez Harris, testified that Holder was a good friend and not a "trouble-starter." (Holder Tr., 4/2/98, p. 9). On re-direct examination, he testified that Holder had discussed the plans for the bank robbery before it occurred, and had made clear that part of the plan was that no one was going to get hurt. He testified that Holder had shown him a stun gun

that was supposed to be used to stun the guard, but that Allen had shot the guard instead. (Holder Tr., 4/2/98, p. 28). On re-cross, he testified that Holder had told him that the stun gun would stun the guard for a minute, and that all they needed was a minute or a minute-and-a-half to do the robbery. (Holder Tr., 4/2/98, pp.29-30). Holder's friend, Wayne Ross, testified on cross-examination that he had seen the stun gun on the side of Holder's bed the day before the robbery. (Holder Tr., 4/3/98, p. 38) (No stun gun was found in Holder's arsenal the day of the robbery.)

In addition to the testimony of family and friends, four employees of the Ste. Genevieve County Sheriff's Department testified that Holder had made a good adjustment to confinement. (Holder Tr., 4/1/98, pp. 119-121; 203-212; Holder Tr., 4/3/98, pp. 2-11, 22-28). One witness, a forensic psychologist offered as an expert on risk assessment and future dangerousness, testified that Holder was not a disproportionate risk to prison society. (Holder Tr., 4/1/98, . 146, 182-187). Holder's attorney testified that Holder owed a substantial amount of money in attorney fees and fines to various municipalities, and that he was supposed to meet her at 1:00 p.m. the day of the robbery with the money he owed her. (Holder Tr., 4/2/98, pp.72-82). An expert in the area of orthotics and prosthetics testified that the foot on Holder's prosthesis was broken, and probably was broken at the time of the robbery. (Holder Tr., 4/1/98, pp. 232, 235-237). Finally, an expert in clinical neuropsychology and rehabilitation psychology testified that Holder did not suffer from any psychiatric or mental disorder. However, Holder did not deal with the emotional impact of the amputation of his leg, and his psychological "denial" caused him to focus only on what he needed to do to return to being a whole individual. It therefore caused him to get involved in the crime, because in his eyes, it was the only way he could get a better prosthesis.

(<u>Holder</u> Tr., 4/3/98, pp. 91-93).

**The Jury's Findings**

The jury's findings regarding the aggravating and mitigating factors were identical for each count. (<u>Holder</u> App. at 94-101, 109-119). The jury unanimously found the existence of both statutory aggravating factors and the first three of the four non-statutory aggravating factors. The jury did not unanimously find the fourth non-statutory aggravating factor which involved victim impact. <u>Id</u>. No juror found either statutory mitigating factor submitted by Holder. No juror found non-statutory mitigating factors 1, 2, 5, 9, and 17. Nine jurors found statutory mitigating factor 3, that Holder suffered a series of losses in his life which he failed to process, despite recommendations that he receive counseling; twelve found factor 4, that Holder's childhood was characterized by inconsistent parenting; eleven found factor 6, that in the absence of his father, Holder assumed the role of the man of the house at a very young age; twelve found factor 7, that Holder lacked a positive male role model while growing up; eleven found factor 8, that Holder felt a sense of responsibility to provide emotional and financial support to his mother, brothers and sister; two found factor 10, that Holder provided a positive role model to his siblings and others; twelve found factor 11, that due to Holder's role as a father figure to his brother, Norrim Holder, Norrim has made many positive changes in his life; ten found factor twelve, that Holder is a likeable person who provides support and help to many of his extended family, friends, and associates; nine found factor 13, that Holder does not have a history of violent behavior and the offenses for which he was convicted are inconsistent with his personality and usual behaviors; six found factor 14, that Holder has a large family that is very

34

attentive to and supportive of him and will help him make an adequate adjustment to prison life; six found factor 15, the Holder has made an adequate adjustment to being confined in jail and is not a problem inmate; and ten found factor 16, that Holder does not present a substantial risk of being dangerous or violent if confined in prison for life without the possibility of release. The jury found no additional mitigating factors not submitted by Holder. Id. The jury returned a sentence of death as to Count I and death as to Count II. (Holder App. at 102, 120).

# CERTIFICATE OF SERVICE

I hereby certify that the foregoing addendum was electronically filed with the Clerk of the

Court for the United States Court of Appeals, for the Eighth Circuit by using CM/ECF system. Ten

paper copies of the Addendum will be filed with the Court's brief and one paper copy mailed to the

participants in the case by U.S. mail, postage prepaid, within five days of the Court's notice that the

Brief has been reviewed and filed.

Michael J. Gorla
720 Olive Street, Suite 1630
St. Louis, MO 63101

Joseph W. Luby
Death Penalty Litigation Clinic
6155 Oak Street, Suite C
Kansas City, MO 64113

this ___6th___ day of July 2011.

/s/ Steven E. Holtshouser
ASSISTANT UNITED STATES ATTORNEY