IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

No. 10-1304

NORRIS G. HOLDER,

Appellant,

v.

UNITED STATES OF AMERICA,

Appellee.

Appeal from the United States District Court
for the Eastern District of Missouri, Eastern Division,
The Honorable E. Richard Webber, District Judge

REPLY BRIEF OF APPELLANT

Michael J. Gorla
720 Olive Street, Suite 1630
St. Louis, Missouri 63101
(314) 621-1617
(314) 621-7448 - Facsimile
E-mail: mjgorla@msn.com

Joseph W. Luby
Death Penalty Litigation Clinic
6155 Oak Street, Suite C
Kansas City, Missouri 64113
(816) 363-2765
(816) 363-2799 - Facsimile
E-mail: jluby@dplclinic.com

*Counsel for Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

REPLY ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.     The record belies the government's retrospective gloss on counsel's "strategy.". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

     A.    The district court failed to consider any testimony or exhibits from the evidentiary hearing, where it was shown that trial counsel never entertained the purportedly "reasonable" strategy that the government imputes to him. . . . . . . . . . . . . . . . . . . . . . . . . 4

          1.    Having ordered a hearing on Mr. Holder's claim, the district court committed clear error by refusing to consider any of the evidence from the hearing, and instead divining trial counsel's "strategy" in a vacuum. . . . . . . . . . . . . . . . . . . 4

          2.    The documents relied on by the government do not prove that trial counsel understood the governing law—even if the district court had considered those documents or other post-conviction evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

          3.    The "reasonable" defense imputed to trial counsel has no legal basis, because a non-awareness of a serious risk of death is not a defense to the felony-murder charge of bank robbery in which a killing occurs. . . . . . . . . . . . . . . . . . . . . . 11

          4.    Based as it was on trial counsel's ignorant legal advice, Mr. Holder's decision to testify cannot be upheld as "knowing and voluntary.". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

     B.    Counsel's guilt-phase errors prejudiced Mr. Holder, who lost all credibility at sentencing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

     C.    Mr. Holder remains alternatively entitled to relief under *Cronic*, because the issues purportedly challenged by counsel were not material to conviction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

i

Appellate Case: 10-1304    Page: 2    Date Filed: 11/07/2011 Entry ID: 3847057

II.    Counsel performed ineffectively by acknowledging the need for an independent ballistics expert, and then failing to consult one. . . . . . . . . .  21

        A.    Mr. Holder timely argued below that counsel failed to consult a ballistics expert who could have concurred with the government's expert. There is no obligation for that *argument* to have been specifically pleaded within a *claim* that counsel chose his theory without adequately investigating the ballistics evidence. . . . . . . . .  22

        B.    The government engages in speculation to uphold trial counsel's "strategy," while ignoring counsel's own admission that he needed to consult an independent ballistics expert. . . . . . . . . . . . .  26

        C.    Mr. Holder does not seek any inequitable relief. . . . . . . . . . . . . . .  28

ii

III. Mr. Holder remains entitled to a hearing on his claim that counsel failed to develop evidence of her client's impaired judgment. . . . . . . . . . . . . . . . 32

    A.    By relying on its own disputable inferences of material fact, the government further proves the need for an evidentiary hearing. . . 32

        1.    The government's timeline of events. . . . . . . . . . . . . . . . . . 34

        2.    The credibility of Mr. Holder's post-conviction evidence. . . 36

        3.    Whether trial counsel ran out of time, or whether she did so "reasonably". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

        4.    The train-dragging. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

        5.    The seizures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

        6.    Drug-addicted parents. . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

        7.    The Blumeyer Housing Project. . . . . . . . . . . . . . . . . . . . . . 43

        8.    Whether the new mitigating evidence would contradict the old mitigating evidence at a retrial. . . . . . . . . . . . . . . . . . . . 44

    B.    The Rule 59(e) evidence on which Mr. Holder relies was properly submitted to and considered by the district court, which declined to consider only <u>some</u> of the Rule 59(e) affidavits. . . . . . . . . . . . . 45

        1.    The district court did not refuse to consider any of the evidence on which Mr. Holder relies in this appeal. . . . . . . 45

        2.    The district court properly exercised its discretion to consider Mr. Holder's Rule 59(e) evidence. . . . . . . . . . . . . . 48

        3.    The government's related objections are without merit .. . . 52

    C.    Appellant does not advance a claim of "ineffective assistance of expert.". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Appellate Case: 10-1304    Page: 4    Date Filed: 11/07/2011 Entry ID: 3847057

IV.     Trial counsel performed ineffectively by not grasping the straightforward statutory law defining the "pecuniary gain" aggravating circumstance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   54

     A.     Counsel failed to grasp clear statutory language. . . . . . . . . . . . . . .   54

     B.     Considering the overwhelming evidence that Richard Heflin was killed by Billie Allen rather than Norris Holder, it is unlikely that a correctly-instructed jury would have found that *Mr. Holder* committed the murder for the purpose of pecuniary gain. . . . . . . .   55

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   58

iv

**TABLE OF AUTHORITIES**

**Cases**

*Abbott v. Equity Group*, 2 F.3d 613 (5th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . 48

*Barrow v. Uchtman*, 398 F.3d 597 (7th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . 16

*Bear Stops v. United States*, 339 F.3d 777 (8th Cir. 2003). . . . . . . . . . . . . . . . . 56

*Caro v. Calderon*, 165 F.3d 1223 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . 53

*Castillo v. United States*, 34 F.3d 443 (7th Cir. 1994). . . . . . . . . . . . . . . . . . . . 37

*Cole v. Roper*, 623 F.3d 1183 (8th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Driscoll v. Delo*, 71 F.3d 701 (8th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Ferguson v. United States*, 623 F.3d 627 (8th Cir. 2010). . . . . . . . . . . . . . . . . . 49

*Florida v. Nixon*, 543 U.S. 175 (2004). . . . . . . . . . . . . . . . . . . . . . 1, 17, 18, 28

*Ford v. Elsbury*, 32 F.3d 931 (5th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . 48, 49

*Friend v. Aetna Finance Co.*, 622 F.2d 1217 (5th Cir. 1980). . . . . . . . . . . . . . . 48

*Grady v. United States*, 269 F.3d 913 (8th Cir. 2001). . . . . . . . . . . . . . . . . . . . 34

*Hart v. C.I.R.*, 730 F.2d 1206 (8th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . 50

*Hill v. Lockhart,* 474 U.S. 52 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Horton v. State*, 411 S.E.2d 223 (S.C. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Johnson v. Baldwin*, 114 F.3d 835 (9th Cir. 1997). . . . . . . . . . . . . . . . 15, 16, 29

*Kimmelman v. Morrison*, 477 U.S. 365 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Koskela v. United States*, 235 F.3d 1148 (8th Cir. 2001). . . . . . . . . . . . . . . . . . 35

Appellate Case: 10-1304     Page: 6     Date Filed: 11/07/2011 Entry ID: 3847057

*Latorre v. United States*, 193 F.3d 1035 (8th Cir. 1999). . . . . . . . . . . . . . . . . . . 35

*Laws v. Armontrout*, 863 F.2d 1377 (8th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . 7

*Macawber Eng'g v. Robson & Miller*, 47 F.3d 253 (8th Cir. 1995).. . . . . . . . . 47, 48

*Mackin v. City of Boston*, 969 F.2d 1273 (1st Cir. 1992). . . . . . . . . . . . . . . . . . . 48

*Marshall v. Cathel*, 428 F.3d 452 (3d Cir. 2005). . . . . . . . . . . . . . . . . . . . . . 40

*Mayle v. Felix*, 545 U.S. 644 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 52

*Miller-El v. Dretke*, 545 U.S. 231 (2005). . . . . . . . . . . . . . . . . . . . . . . . . 23

*Nelson v. United States*, 297 Fed. Appx. 563 (8th Cir. 2008). . . . . . . . . . . . 5, 9, 33

*New Hampshire v. Maine*, 532 U.S. 742 (2001). . . . . . . . . . . . . . . . . . . . . . 20

*Nichols v. Butler*, 953 F.2d 1550 (11th Cir. 1992). . . . . . . . . . . . . . . . . . . 30, 31

*Odem v. Hopkins*, 192 F.3d 772 (8th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . 56

*Osagiede v. United States*, 543 F.3d 399 (7th Cir. 2008). . . . . . . . . . . . . . . . . 54

*Parkus v. Delo*, 33 F.3d 933 (8th Cir. 1994).. . . . . . . . . . . . . . . . . . . 49, 50, 51

*People v. Young*, 581 N.E.2d 371 (Ill. Ct. App. 1991). . . . . . . . . . . . . . . . . . 19

*Rompilla v. Beard*, 545 U.S. 374 (2005).. . . . . . . . . . . . . . . . . . . . . . . . . 36

*Sears v. Upton*, 130 S. Ct. 3259 (2009). . . . . . . . . . . . . . . . . . . . . . . . 37, 38

*Sinisterra v. United States*, 600 F.3d 900 (8th Cir. 2010). . . . . . . . . . . . . . . 33, 37

*Strickland v. Washington*, 466 U.S. 668 (1984). . . . . . . . . . . . . 7, 16, 27, 38, 55, 56

*Stutzka v. McCarville*, 420 F.3d 757 (8th Cir. 2005). . . . . . . . . . . . . . . . . . . 50

Appellate Case: 10-1304     Page: 7     Date Filed: 11/07/2011 Entry ID: 3847057

*Thornburg v. Jingles*, 478 U.S. 30 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Todd v. Richmond*, 853 F. Supp. 1309 (D. Kan. 1994).. . . . . . . . . . . . . . . . . . . 46

*Tollett v. Henderson*, 411 U.S. 258 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Turpin v. Bennett*, 525 S.E.2d 354 (Ga. 2000). . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States v. Allen*, 247 F.3d 741 (8th Cir. 2001). . . . . . . . . . . . . . 3, 12, 18, 57

*United States v. Allen*, 357 F.3d 745 (8th Cir. 2001). . . . . . . . . . . . . . . . . . . . . 54

*United States v. Bolden*, 545 F.3d 609 (8th Cir. 2008).. . . . . . . . . . . . . . . . . . . 54

*United States v. Craycraft*, 167 F.3d 451 (8th Cir. 1999). . . . . . . . . . . . . . 25, 52

*United States v. Cronic*, 466 U.S. 648 (1984).. . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Dubray*, 727 F.2d 771 (8th Cir. 1984).. . . . . . . . . . . . . . . 4, 5, 9

*United States v. Flores*, 362 F.3d 1030 (8th Cir. 2004). . . . . . . . . . . . . . . . . . . 29

*United States v. Guerrero*, 488 F.3d 1313 (10th Cir. 2007) . . . . . . . . . . . . . . . 23

*United States v. Johnson*, 223 F.3d 665 (7th Cir. 2000).. . . . . . . . . . . . . . . . . . 3

*United States v. Johnson*, No. 02-C-6998, 2010 U.S. Dist. LEXIS133727
   (N.D. Ill. Dec. 13, 2010) (Memorandum Opinion and Order). . . . . . . . . . . 4

*United States v. Moore*, 639 F.3d 443 (8th Cir. 2011). . . . . . . . . . . . . . . . . . . . 29

*United States v. Moore*, 786 F.2d 1308 (5th Cir. 1986) . . . . . . . . . . . . . . . . . . 30

*United States v. Ryan*, 153 F.3d 708 (8th Cir. 1998). . . . . . . . . . . . . . . . . . . . . 29

*United States v. Washington*, 44 F.3d 1271 (5th Cir. 1995).. . . . . . . . . . . . . . . 29

*United States v. West*, 612 F.3d 993 (8th Cir. 2010). . . . . . . . . . . . . . . . . . . . . 29

vii

*United States v. Wilson*, 631 F.2d 118 (9th Cir. 1980)...................... 50

*Walker v. Lockhart*, 807 F.2d 136 (8th Cir. 1986)........................ 40

*Watson v. United States*, 493 F.3d 960 (8th Cir. 2007)................... 37

*White v. Dingle*, 616 F.3d 844 (8th Cir. 2010)...................... 25, 26, 52

*Wiggins v. Smith*, 539 U.S. 510 (2003).................... 4, 7, 21, 27, 39, 40

*Williams v. Taylor*, 529 U.S. 362 (2000). ............................ 39

*Winfield v. Roper*, 460 F.3d 1026 (8th Cir. 2006). ............... 25, 52, 53

*Wolfe v. State*, 96 S.W.3d 90 (Mo. 2003)............................. 26

*Wong v. Belmontes*, 130 S. Ct. 383 (2009)......................... 21, 44

**Statutes**

18 U.S.C. § 2113(a)............................................ 12

18 U.S.C. § 2113(e)...................................... 12, 13, 16

18 U.S.C. § 3591(a)(2) ........................................ 14

18 U.S.C. § 3591(a)(2)(D)...................................... 14

18 U.S.C. § 3592(c)(1). ....................................... 55

18 U.S.C. § 3592(c)(6). ....................................... 55

18 U.S.C. § 3592(c)(8). .................................... 55, 56, 57

18 U.S.C. § 3592(c)(9). ....................................... 55

18 U.S.C. § 3592(c)(13). ...................................... 55

Appellate Case: 10-1304    Page: 9    Date Filed: 11/07/2011 Entry ID: 3847057

18 U.S.C. § 3592(c)(14)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  55

28 U.S.C. § 2255. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

28 U.S.C. § 2255(b).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32, 37, 44

28 U.S.C. § 2255(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

## Rules

Fed. R. Civ. P. 15(c)(1)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25, 52

Fed. R. Civ. P. 59(e). . . . . . . . . . . . . . . . . . . . .  22, 45, 46, 47, 48, 49, 50, 51, 52

Rule 2(b) Governing Section 2255 Cases.. . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

## Other Authorities

K.A. Deffenbacher, et al., *A Meta-Analytic Review of the Effects of High Stress on Eyewitness Memory*, 28 L. & HUM. BEHAV. 687 (2004). . . . . .  30

National Academy of Sciences, *Strengthening Forensic Science in the United States:  A Path Forward*  (2009).. . . . . . . . . . . . . . . . . . . . . . . . . 30

National Institutes of Health, *Seizures and Epilepsy:  Hope Through Research*, available at <<http://www.ninds.nih.gov/disorders/epilepsy/ detail_epilepsy.htm>>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Appellate Case: 10-1304    Page: 10    Date Filed: 11/07/2011 Entry ID: 3847057

# REPLY ARGUMENT

## I. The record belies the government's retrospective gloss on counsel's "strategy."

The government insists that Charlie Shaw understood the law, and in doing so, chose to contest the "requirement" that Mr. Holder knew that a serious risk of death attended his conduct. Gov't Br., at 48-57. That choice, we are told, was made so that counsel could "preserve his credibility" with the jury, because a conviction on both death-eligible counts was inevitable. *Id.* at 59-63, citing *Florida v. Nixon*, 543 U.S. 175 (2004).

The trial and post-conviction records show that Mr. Shaw failed to grasp the law. As for trial, counsel never *argued* to the jury that his client was "not aware of a serious risk of death attending his conduct." *See* Tr. VII 65-93 (closing). If that were counsel's theory, we would expect him to argue it. Counsel instead argued that Mr. Holder never fired his gun, and then that Billie Allen's intentional murder cannot be "transferred" to Mr. Holder on the "murder" count. Tr. VII 66-70, 73-77, 80-85, 87, 91-92. He argued that Mr. Holder was guilty of "robbery" but cannot be convicted of "murder" unless the jury ignored the evidence about where the shots came from or that Mr. Holder was outside the bank. Tr. VII 80, 77 ("In order to convict him of murder, you have to leapfrog over what these people have told us, the people in the bank, and just, convict him of murder because, tragically, maniacally, and completely without justification, Billie Allen shot and killed Mr.

1

Heflin."). That was counsel's theory from the beginning of trial: Mr. Holder was good for a robbery under Count I, but no purposeful murder under Count II. *See* Voir Dire Tr. Mar. 11, 1998, at 171 ("Now, the actual charge is that the defendant unlawfully killed the guard, and tragically did so. Now, he unlawfully killed Richard Heflin with malice aforethought, maliciously, premeditatively, and deliberately.").

The contemporaneous evidence explains why counsel argued as he did: counsel's colleagues testified that Mr. Shaw did not understand the charges. According to co-counsel Jennifer Herndon, resource counsel Richard Burr, and Norris Holder himself, trial counsel believed that Count I charged robbery only and was not a capital offense, and that Count II required an intentional killing. Hrg. Tr. I 112-13; II 10-13, 15, 34-35, 167, 196-97, 211-12; Holder Depo. 49, 52-55. That evidence is not even discussed in the district court's orders. Add. 51-63, 108-14.

What is more, counsel fatally undermined the defense's credibility, rather than "preserving" it as the government contends. It is one thing for capital counsel to strategically concede all or most of the government's case in order to curry favor with the sentencer. That is not what Charlie Shaw did at all. Far from forthrightly conceding guilt as a matter of reasonable trial strategy, Mr. Shaw presented his own client's testimony that he never fired his weapon—testimony

2

that was contradicted by the government's ballistics and eyewitness evidence. Rather than "preserving" the defense's credibility, counsel forfeited it by setting up Mr. Holder to be branded as a liar. *See* Tr. VI 85, 99, 102, 106, 166-67; Tr. XII 178-79, 187-93, 216-18. Counsel's "strategy" gave the government easy pickings for the penalty phase. *E.g.* Tr. XII 178: "And he sat there and he lied to you, and he lied to you, and he lied to you. And that does not show remorse."

*The prejudice here is demonstrable.* As the penalty phase verdict form reflects, the jury unanimously rejected the proffered mitigating factor that "in the killing for which he was convicted, he did not fire the shots which resulted in the victim's death." Verdict Form at 8. The jury made this finding despite essentially uncontroverted physical and forensic evidence that even this Court described as "overwhelming" evidence that Mr. Holder did not fire the fatal shots. *United States v. Allen*, 247 F.3d 741, 777 (8th Cir. 2001). There is literally no other explanation for the jury's rejection of this mitigating factor other than as a consequence of the belief that no part of Mr. Holder's testimony ought to be credited—even when that testimony was independently corroborated by the physical and forensic evidence presented by the government. Given that "it only takes one juror to nix a death sentence," *United States v. Johnson*, 223 F.3d 665, 670 (7th Cir. 2000), Mr. Holder need only show a reasonable probability that one juror would have changed his or her mind during the deliberations absent

3

counsel's deficient performance.  Mr. Holder has met that "relatively low burden"
here.  *United States v. Johnson*, No. 02-C-6998, 2010 U.S. Dist. LEXIS133727, at
*11 (N.D. Ill. Dec. 13, 2010) (Memorandum Opinion and Order) (granting
penalty-phase relief in capital § 2255 case).

**A.      The district court failed to consider any testimony or exhibits from the evidentiary hearing, where it was shown that trial counsel never entertained the purportedly "reasonable" strategy that the government imputes to him.**

The Court must focus on what counsel did, not what he might have done.
*See Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003) (improper to rely on "post hoc
rationalization of counsel's conduct").  The government struggles mightily to
defend trial counsel's understanding of the law.  Charlie Shaw's "strategy," it
argues, was to admit the robbery but deny any intent to harm.  Gov't Br., at 52.
The problem is that counsel reached his strategy in "startling ignorance of the
law." *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986).  That ignorance is made
manifest by the unrefuted contemporaneous evidence from trial counsel's
colleagues, as well as the law and instructions governing Mr. Holder's crimes.

> **1.      *Having ordered a hearing on Mr. Holder's claim, the district court committed clear error by refusing to consider any of the evidence from the hearing, and instead divining trial counsel's "strategy" in a vacuum.***

In this case as in most, counsel's strategic thinking cannot be known from
the trial record alone.  Generally an ineffective assistance claim "cannot be

4

advanced without the development of facts outside the original record." *United States v. Dubray*, 727 F.2d 771, 772 (8th Cir. 1984). That is why courts hold hearings: "Our cases teach that issues regarding the ineffectiveness of counsel often require a hearing to consider evidence not disclosed on the face of the trial record." *Nelson v. United States*, 297 Fed. Appx. 563, 565 (8th Cir. 2008).

The hearing in this case showed that Charlie Shaw was fundamentally ignorant about the laws his client was charged with breaking. Count I charged bank robbery in which a killing occurs, and Count II charged the crime of using or carrying a firearm during a crime of violence which results in a murder. Gov't App. 207-13. But trial counsel believed that Mr. Holder was charged with "bank robbery" and "murder," with only the second charge being a capital offense, and even *it* requiring a premeditated and intentional killing:

●Co-counsel Jennifer Herndon described what Mr. Shaw told her: "Norris wasn't guilty of the murder; he was only guilty of the robbery because . . . not only had he not fired the shot that killed the victim, but he had not even fired his weapon at all." Hr. Tr. I 112.

●Resource counsel Dick Burr said the same thing. "[T]he way Charlie always referred to it is he's guilty of the bank robbery, but he's not guilty of the murder." Hr. Tr. II 10. Mr. Shaw believed that Count I was a non-capital offense. *Id.* at 12. He thought of Count II as a "murder" charge, and believed that his client

Appellate Case: 10-1304    Page: 15    Date Filed: 11/07/2011 Entry ID: 3847057

was innocent, because he did not intend to kill anyone. *Id.* at 11, 211-12 ("[H]e believed that if he could show that there was no premeditation as to the murder, . . . and perhaps, that his client had not even fired the gun, then he could not be found guilty of murder, . . . [and] he would be happy for Mr. Holder to be convicted of bank robbery and be saved for the death penalty.").

●Resource counsel Burr opened up the statute book, showed it to Mr. Shaw, and explained that the government need not prove a specific intent to kill. Hr. Tr. I 113-14, II 167. But Mr. Shaw remained "entrenched" in his position to the contrary. Hr. Tr. I 113.

●Mr. Shaw told his client that he would get to "go home" after a term of years if he took the stand and told the jury the truth. Hrg. Tr. I 49-50. Mr. Holder would "go home" because the jury would find him guilty only of robbery but not homicide, "since I didn't shoot anybody, I didn't kill anybody." *Id.*; Holder Depo. 49, 53-55.

●After the instructional conference during trial, Mr. Shaw's confusion persisted. He asked, "What happened to the murder charge?" Hr. Tr. II 15, 80. Thus, counsel did not understand that Mr. Holder was charged with the two separate and independently death-eligible crimes of bank robbery in which a killing occurs (Count I) as well as using a firearm during a crime of violence that results in murder (Count II).

6

Appellate Case: 10-1304   Page: 16   Date Filed: 11/07/2011 Entry ID: 3847057

Despite receiving extensive and credible testimonial evidence about this claim from persons with first-hand knowledge about Mr. Shaw's legal understanding of the charges, the district court simply ignored the record it ordered to be created as part of the 2255 proceedings. The post-conviction evidence is nowhere mentioned in the district court's dispositive orders. Add. 51-63, 108-14; App. 441-53, 669-75. That itself is error. A reviewing court must "reconstruct the circumstances of counsel's challenged conduct" as viewed "from counsel's perspective at the time," *Strickland v. Washington*, 466 U.S. 668, 689 (1984), and consider "all the circumstances." *Laws v. Armontrout*, 863 F.2d 1377, 1387 (8th Cir. 1988). In this case, Jennifer Herndon, Dick Burr, and Norris Holder are the *only* witnesses who describe trial counsel's strategy through trial counsel's own description of it.

The rulings below failed to consider the relevant evidence pointing to counsel's strategy and whether it was professionally reasonable. Indeed, the district court's orders do not mention any post-conviction evidence at all.[1] Add.

---

[1]The government's brief only proves the district court's error. Citing two documents that bear trial counsel's signature, the government argues that both show counsel's sound understanding of the charges. Gov't Br., at 49-52. These documents are a letter urging the prosecutors not to seek the death penalty, and also a trial memorandum concerning instructions. *Id.* But neither document is mentioned in the rulings below, even though the government argued them both. Add. 51-63, 108-14; App. 344, 355, 441-53, 669-75; Hr. Tr. I 56-57, II 15-16, 36-40, 118-25, 197-200, 219; Gov't Exhibits Q, T (Gov't App. 196-205, 214-16).

(continued...)

7

51-63, 108-14; App. 441-53, 669-75.  Resource counsel, co-counsel and Mr. Holder himself all described Charlie Shaw's misapprehension of the law, but the district court never determined whether their post-conviction testimony was credible.  Add. 51-63, 108-14; App. 441-53, 669-75. Lacking an assessment of that evidence, the district court's ruling is necessarily "a post hoc rationalization of counsel's conduct than an accurate description of [his] deliberations prior to trial." *Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003).

It is, of course, lamentable that Charles Shaw died before Mr. Holder even filed for relief, and thus, that Mr. Shaw could not testify to what his strategies might have been.  *See* Add. 112-13.  The district court reasoned that its rulings would necessarily be based "at least to some extent, on the Court's observations" from trial.  Add. 112-13.  But the court did not rely on its own observations "to **_some_** extent."  It relied on them as the sole evidence even discussed.  Add. 51-63, 108-14; App. 441-53, 669-75.  Although it is within the purview of the district court to rely on its in-court observations in assessing claims, such reliance is plainly insufficient to properly adjudicate claims that largely concern events occurring outside the courtroom.  That is precisely the purpose of an evidentiary hearing—to develop those extra-record facts on which ineffectiveness claims

---

[1](...continued)
Thus, the district court ignored *both* parties' post-conviction evidence.

"normally" depend.  *Nelson v. United States*, 297 Fed. Appx. 563, 565 (8th Cir. 2008); *United States v. Dubray*, 727 F.2d 771, 772 (8th Cir. 1984).

The district court's assessment of counsel's "strategy" is clearly erroneous because it rests on a legal error:  failing to consider evidence made critically relevant by *Strickland*.  The "clearly erroneous" standard "does not inhibit an appellate court's power to correct errors of law,  . . . or a finding of fact that is predicated on a misunderstanding of the governing rule of law."  *Thornburg v. Jingles*, 478 U.S. 30, 79 (1986).  Charlie Shaw explained his view of the law to Ms. Herndon, Mr. Burr, and Mr. Holder, and their testimony is critical to ascertaining counsel's state of mind.  The district court gave no reason for rejecting this unrefuted testimony as non-credible or otherwise.  Add. 51-63.  It made no findings of fact on any of the hearing evidence.  It simply decided the claim in a vacuum, as if the evidentiary hearing it ordered had never taken place. The district court's judgment must be reversed.

> **2.**      ***The documents relied on by the government do not prove that trial counsel understood the governing law—even if the district court had considered those documents or other post-conviction evidence.***

Setting aside the fact that they were ignored by the district court, the government's factual arguments are unavailing.  *See* Gov't Br., at 49-52.  True enough, the defense filed a memorandum urging the court to instruct the jury on a *mens rea* requirement.  Gov't App. 196-205 (Ex. T).  But the government ignores

9

the fact that the memorandum was exclusively prepared by Richard Burr and Jennifer Herndon without any input from Mr. Shaw. *See* Hrg. Tr. II 78-80. In fact, Ms. Herndon testified that Mr. Shaw refused to read the memorandum, and that he was surprised after the instruction conference that there was no murder charge. *Id.* at 15, 80. While signing the document, Mr. Shaw opined that the instructions were irrelevant, because a conviction of "bank robbery" was a "separate thing" from a conviction for "murder." *Id.* at 80. Equally unilluminating is Government's Exhibit Q, which is a pretrial letter urging the federal prosecutor not to seek the death penalty, and noting that Mr. Holder would not face the death penalty for felony murder in state court. Gov't App. 214-16. The letter's language is similar to model or "form" letters that federal resource counsel circulates for pretrial use. Hr. Tr. II 94-95.

It is not remotely apparent that *Mr. Shaw* wrote the language about intentional murders in state court compared to felony murders in federal court. After all, the language contradicts what counsel argued to the jury: "You cannot transfer the individual crazy act of Allen, when Allen shoots somebody in the leg, and then Allen walks over and fires some more shots into him, you can't transfer that to somebody who wasn't there at the time." Tr. VII 87. It also contradicts Mr. Shaw's two motions for judgment of acquittal, which make clear that counsel did not understand that the robbery charged in Count I constituted a capital offense.

10

Said motions read as follows:

1. The evidence adduced is insufficient to sustain a conviction of the Defendant as to the crime charged and any and all lesser included offenses.

2. As to Count II, the Government failed to make a prima facie case as to Count II of the indictment in that there was no evidence to sustain the charge of malice aforethought which is the essential element which elevates the killing of an individual to the intentional status of Murder under Count II of the indictment.

Evid. Hrg. Ex. 4, 5. If Mr. Shaw's strategy were as proposed by the government—that is, that Mr. Shaw was contesting, as to **both** charges, a requirement that Mr. Holder was aware of the risk of death attending his conduct—then counsel would have surely asserted in his motions for judgment of acquittal as to Count I, as he did with respect to Count II, that the requisite mens rea for a capital offense was lacking. The fact that the motions do not contain such an assertion destroys the government's theory that Mr. Shaw was aware that Count I charged a capital offense.

**3.** ***The "reasonable" defense imputed to trial counsel has no legal basis, because a non-awareness of a serious risk of death is not a defense to the felony-murder charge of bank robbery in which a killing occurs.***

The government argues that counsel's strategy was "consistent with" the court's instructions and the requirement that Mr. Holder knew the "serious risk of death attending his conduct." Gov't Br., at 51-57. Yet, the offense charged in Count I is simply "felony murder" that requires no specific intent to kill. Count I

11

charged Mr. Holder with bank robbery in which a killing occurs.  The statute creates the offense of bank robbery, 18 U.S.C. § 2113(a), and it separately provides for the capital punishment when "death results" from the offense.  18 U.S.C. § 2113(e) ("Whoever, in committing any defense defined in this section . . . kills any person . . . , or if death results shall be punished by death or life imprisonment.").  Nothing in the statute remotely requires a showing that the defendant intended death, or even that the defendant was aware of a serious risk of death.  It suffices that the defendant committed a bank robbery, and that "death results" from the bank robbery.  That is exactly what this Court held on direct appeal.  It observed that the statute does not require a "specific intent to kill," and instead, the statute "is like common law felony murder."  *United States v. Allen*, 247 F.3d 741, 782 (8th Cir. 2001).

This Court took specific notice of Instruction 15, which is what the government relies on now in order to contend that Mr. Shaw's understanding of the law was "consistent with" the jury instructions.  This Court ruled that Instruction 15 was not erroneous, because it described a felony murder offense. *Id.* at 783 & n.16.  Norris Holder was thus charged with what amounts to felony murder, and no further homicidal intent was required.

All of this dooms the government's interpretation of Instruction 15, which stated the following elements:

Appellate Case: 10-1304     Page: 22     Date Filed: 11/07/2011 Entry ID: 3847057

> *One*, the defendant took money from the person and presence of another while that money was in the care and custody of the Lindell Bank & Trust Company;
>
> *Two*, such taking was by force and violence or intimidation;
>
> *Three*, the deposits of the Lindell Bank & Trust Company were then insured by the Federal Deposit Insurance Corporation; and
>
> *Four*, in committing ***this offense***, the defendant, or a person aided and abetted by the defendant, killed Richard Heflin.

Gov't App. 207 (emphasis added).  Because Instruction 15 charged felony murder, it was sufficient that Mr. Holder's accomplice in the robbery, i.e., "this offense," killed Richard Heflin.  "This offense" necessarily refers to the crime described in the three elements above it—just as the statute allows a death sentence when death results from "any offense defined in this section." 18 U.S.C.A. § 2113(e).  The jury never needed to refer to Instruction 16 on aiding and abetting, or *that* instruction's requirement that Mr. Holder was aware of a "serious risk" of death. There is no requirement for Norris Holder to have aided and abetted Billie Allen in a killing.  It sufficed that Norris Holder's accomplice ***in a robbery*** killed the victim:  "[I]n committing this offense, the defendant, or a person aided and abetted by the defendant, killed Richard Heflin."

The analysis of Count I is dispositive.  Mr. Holder could be sentenced to death or life without parole for felony murder under Count I and Instruction 15. Whatever additional facts were required for Count II—using or carrying a firearm

Appellate Case: 10-1304    Page: 23    Date Filed: 11/07/2011 Entry ID: 3847057

during a crime of violence which results in murder—there was no legal possibility that the government's conjured-up defense theory could have spared appellant from conviction or death-eligibility, even if counsel had actually entertained the "strategy" imputed to him.

For that matter, counsel conceded his client's eligibility for death. Section 18 U.S.C. § 3591(a)(2) specifies the threshold for death-eligibility when a defendant has otherwise committed a qualifying offense. As relevant here, the statute requires the defendant to have "intentionally and specifically engaged in an act of violence, knowing that the act created a ***grave risk of death*** to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act." 18 U.S.C. § 3591(a)(2)(D).

The government relied on Mr. Holder's own words to satisfy this requirement:

> Don't forget, he admitted there was a grave . . . my question was: "Wasn't there a grave risk of death to everybody in that bank?"
>
> "Yeah, I know that."

Tr. VII 64; *accord* Tr. VII 41-42 ("He admitted on the witness stand that there was a grave risk of death to people there."). The government well knew that it need not establish that Mr. Holder possessed a specific intent to kill in order for the robbery charge to be a capital-eligible offense. The government merely had to

14

prove that Mr. Holder intended to commit the underlying "act of violence" [i.e., the robbery], and that participation in the robbery created a grave risk of death. Notably, trial counsel did not object to the question, nor prepare his client for this line of examination; counsel simply had no understanding that an affirmative answer to the question would make his client eligible for death on the robbery charge.

**4.** ***Based as it was on trial counsel's ignorant legal advice, Mr. Holder's decision to testify cannot be upheld as "knowing and voluntary."***

The government urges that Mr. Holder made a "knowing and voluntary" decision to testify, based on the trial colloquy. Gov't Br., at 57-59; Add. 55-60. Trial court carried out a lengthy colloquy with Mr. Holder, Add. 55-60, but that is not dispositive. It is well-established that the exercise or waiver of a fundamental right is not "knowing and voluntary" when it is based on flawed legal advice. *Hill v. Lockhart,* 474 U.S. 52, 56 (1985) (voluntariness of guilty plea "depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases"); *Tollett v. Henderson*, 411 U.S. 258, 266-67 (1973) (same). The same principle applies to a defendant's decision of whether to testify. *See*, *e.g.*, *Horton v. State*, 411 S.E.2d 223, 224-25 (S.C. 1991) (Counsel ineffective for advising defendant not to testify, based on erroneous view as to the scope of impeachment for defendant's prior convictions); *Johnson v. Baldwin*, 114 F.3d

15

835, 838-40 (9th Cir. 1997) (counsel in rape case ineffectively advised defendant to testify in support of weak alibi defense, without first investigating to discover weakness of alibi or to strengthen the alibi through additional witnesses); *Barrow v. Uchtman*, 398 F.3d 597, 608 (7th Cir. 2005) (accepting claim but finding no *Strickland* prejudice).

In this case, Mr. Holder testified under his own lawyer's ignorance of the law. Mr. Holder told counsel that he committed a bank robbery but didn't fire his weapon, and counsel advised his client that he would eventually get to "go home" if he took the stand and told the jury the truth. Hrg. Tr. I 49-50. Appellant would "go home" in the sense that a jury wouldn't convict him of intentional murder, and on the robbery count, would find that Mr. Holder committed only a robbery but no homicide. *Id.*; Holder Depo. 49, 52-55. Counsel didn't grasp that Mr. Holder's role in the robbery made him guilty and death-eligible under Count I as charged. The law offered no prospect of "going home," for Count I charged felony-murder and carried a sentence of death or life without parole. 18 U.S.C. § 2113(e). Norris Holder followed his lawyer's advice, took the stand at trial, and denied firing his weapon. He did so under the belief that his testimony was a viable defense to the "murder" charge—and that he would eventually "go home" after serving a term of years for robbery. That decision was not "knowing" or "voluntary" in any sense.

16

**B.** **Counsel's guilt-phase errors prejudiced Mr. Holder, who lost all credibility at sentencing.**

The government argues that Mr. Shaw's "defense" was to concede what couldn't be disputed and thereby save his credibility for the next phase. It likens this case to *Florida v. Nixon*, 543 U.S. 175 (2004), in which, "[T]rial counsel concluded that the best strategy to avoid the death penalty was to concede guilt, thereby preserving his credibility in urging leniency in the penalty phase." Gov't Br., at 60.

But trial counsel's tack destroyed the defense's credibility rather than preserving it. Unlike the attorney in *Nixon*, counsel did not silently stand aside, put the government to its proof, and place all eggs in the penalty-phase basket. *Contra Nixon*, 543 U.S. at 182-83. Counsel in *Nixon* performed as follows:

> The tactic employed by trial counsel was an excellent analysis of the reality of the case. The evidence of guilt would have persuaded any jury beyond all doubt, and for trial counsel to have inferred Mr. Nixon was not guilty would have deprived counsel of any credibility during the penalty phase.

*Id.* at 184 (alterations and ellipses omitted), quoted in Gov't Br., at 60.

That passage from the government's brief manifests the very prejudice suffered by Mr. Holder. Trial counsel deprived the defense of any credibility during the penalty phase by putting Mr. Holder on the stand to say he fired no shots—despite forensic and eyewitness evidence that both robbers fired their guns. Counsel, then, did not merely "concede that which could not reasonably be

17

disputed." Gov't Br., at 43. He fiercely disputed what the government's evidence showed. Counsel made his client's testimony the center of his defense, and in a case where powerful evidence refuted that testimony. Tr. I 68-69; VI 69-106, 173; VII 69, 76-77, 79-81, 86, 91-92; XII 201-02, 204, 208. He did so without even preparing his client to testify, other than by urging him at trial to tell the jury "what happened." Holder Depo. 101-02.

The resulting prejudice is demonstrable: the jury believed not only that Mr. Holder was lying during his testimony, but also that he fired the *fatal* shots even though "overwhelming" evidence was to the contrary. *United States v. Allen*, 247 F.3d 741, 777 (8th Cir. 2001). The government does not offer any other explanation for the jury's counter-evidentiary finding. *Nixon* holds that "counsel cannot be deemed ineffective for attempting to impress the jury with his candor and his unwillingness to engage in a useless charade." 543 U.S. at 192. By the same logic, counsel should be deemed ineffective in this case when he plowed ahead with a "useless charade" of a guilt-phase defense which had "dire implications for the sentencing phase." *Id.* Those "dire implications" prejudiced Mr. Holder: the prosecution pounced on the "remorseless" defendant throughout its closing argument, and it successfully urged the jury to send a "liar" to his death. Tr. XII 178-79, 187-93, 216-18. That jury rejected "overwhelming" evidence that it was Billy Allen who actually killed Richard Heflin. Mr. Holder is

18

entitled to a new and fair trial.

**C.  Mr. Holder remains alternatively entitled to relief under *Cronic*, because the issues purportedly challenged by counsel were not material to conviction.**

According to the government, trial counsel did not "totally fail" to test the prosecution's case, and Mr. Holder therefore cannot avail himself of *United States v. Cronic*, 466 U.S. 648 (1984).  Gov't Br., at 46-47.  The government notes that counsel attempted to show that Mr. Holder was trying to solve his need for money, that he did not fire shots at the guard, and that he believed no one would be hurt. *Id.* at 47.

But counsel made *those* points only because he misunderstood the law, and the matters contested were not material.  *See* Section I.(A)(3), above.  Mr. Shaw believed that his client would be convicted of simple robbery, that Count I was not a capital offense, and that Count II required an intentional and premeditated murder.   Hrg. Tr. I 112-13; II 10-13, 15, 34-35, 167, 196-97, 211-12; Holder Depo. 49, 52-55.  A defense based on legal error does not amount to the "meaningful adversarial testing" contemplated by the Sixth Amendment.  *See People v. Young*, 581 N.E.2d 371, 379 (Ill. Ct. App. 1991) (applying *Cronic* because counsel's sparse argument and cross-examination was aimed at an invalid legal theory).

Of course, even if Mr. Holder's "awareness of death" were a material

19

Appellate Case: 10-1304     Page: 29     Date Filed: 11/07/2011 Entry ID: 3847057

element, the defense's evidence conceded it.  The government relied on Mr.

Holder's own words to convict him—in marked contrast to its current argument

that the defense conceded only the lesser-included crime of simple robbery:

> He admitted on the witness stand that there was a grave risk of death to
> people there.
>
> He admitted that going in there with those guns and with Billie Allen
> was reckless, reckless of the safety of the people in that bank.
>
> That's all we have to prove.  He is clearly guilty of both counts.  There
> is no way around it.  He has no defense.

Tr. VII 41-42.

Having persuaded the jury that the defense's evidence clinched the case, the

government should not now be heard to argue that counsel's defense was

somehow viable.  The doctrine of judicial estoppel frowns upon such opportunism.

"[W]here a party assumes a certain position in a legal proceeding, and succeeds in

maintaining that position, he may not thereafter, simply because his interests have

changed, assume a contrary position . . ." *New Hampshire v. Maine*, 532 U.S. 742,

749 (2001).  Mr. Holder's conviction and sentence must be vacated.

20

**II. Counsel performed ineffectively by acknowledging the need for an independent ballistics expert, and then failing to consult one.**

We know that trial counsel appreciated the need to consult an independent ballistics expert. Hrg. Tr. I 119-20, 123-24; II 171-72, 205. We also know that counsel failed to do so, all the while plunging headlong into a self-defeating and refuted theory that his client never fired his rifle. *Id.*; Tr. I 68; VI 85-86, 101-02, 171-73; VII 81-84; XII 198-202, 208-09. If equipped with a defense expert's report that concurred with the government's analysis, a reasonable attorney would not forge ahead with a defense that Mr. Holder never shot his weapon or intended any harm. *See Wiggins v. Smith*, 539 U.S. 510, 535-36 (2003) (prejudice depends on what a "reasonable" attorney would have done after fully investigating); *Wong v. Belmontes*, 130 S. Ct. 383, 386 (2009) (question is whether "competent" attorney would have presented the mitigating evidence forgone by trial counsel). Alternatively, if a defense expert had refuted the government's evidence, then the expert could have corroborated Mr. Holder's testimony and severely blunted the government's argument that Mr. Holder must have been "lying." *See* Tr. XII 178-79, 187-93, 216-18. In either event, trial counsel's indolence fatally undermined his client's credibility at the ultimate trial.

21

**A. Mr. Holder timely argued below that counsel failed to consult a ballistics expert who could have concurred with the government's expert. There is no obligation for that _argument_ to have been specifically pleaded within a _claim_ that counsel chose his theory without adequately investigating the ballistics evidence.**

The ballistics claim is inextricably linked with appellant's claim that counsel erred by presenting Mr. Holder's testimony that he never fired his weapon. After all, a key reason that counsel was ineffective is that he did not adequately investigate the evidence that powerfully refuted his client's testimony. *That* issue was plainly explained to the district court during the hearing:

> Judge, it's going to be our position that it's a "damned if you do and damned if you don't" proposition, that had he got an expert, an expert would have agreed with Mr. Stubits, then the Court has to examine the merits of putting his client on the stand to say, "I didn't fire the gun" when there was no evidence to contradict that.

Hrg. Tr. I 122. That is the precise argument Mr. Holder asserts now.

The government nevertheless insists that appellant's claim is "new" because it wasn't pleaded. Because the claim is "new," the argument goes, it was not truly asserted before Mr. Holder's Rule 59(e) motion, it was a *de facto* amended claim that was untimely under the one-year limit in 28 U.S.C. § 2255(f), and it lies beyond the certificate of appealability granted by the district court. *See* Gov't Br., at 66-70, 72-73.

All of these arguments fail for the same reason: a prisoner must plead his or her claims, but there is no obligation to specifically plead every legal argument in

22

support of a claim.  *Cf. Miller-El v. Dretke*, 545 U.S. 231, 241 n.2 (2005) ("[T]he dissent conflates the difference between evidence that must be presented to the state courts to be considered by federal courts in habeas proceedings and theories about that evidence.").  The Rules Governing Section 2255 cases disclaim such a requirement.  Rule 2(b) directs the movant to state "all grounds" for relief as well as "the facts supporting each ground," but not each and every argument in support of each ground.

Courts routinely consider legal arguments beyond a pleading in order to interpret the prisoner's claims.  *See, e.g.*, *United States v. Guerrero*, 488 F.3d 1313, 1317 (10th Cir. 2007) ("[I]t is both reasonable and appropriate for both courts to fully consider contemporaneous memoranda in support of motions in order to fully interpret a movant's claim.").  That appears to the prevailing practice in the Eastern District of Missouri.  The "form" 2255 motion on the court's website leaves all of eleven lines for the prisoner to explicate each legal claim. *See* <<http://www.moed.uscourts.gov/sites/default/files/moed-0047.pdf>>, at 4. The form instructs the prisoner to state the "specific facts," and it expressly instructs the movant, "Do not argue or cite law."  *Id.*  Nothing prevents a prisoner from amplifying a claim with legal arguments in separate documents or orally.

In this case, appellant's claim took issue with counsel's incomplete investigation of ballistics evidence, and specifically, his failure to consult an

Appellate Case: 10-1304     Page: 33     Date Filed: 11/07/2011 Entry ID: 3847057

independent expert. App. 28-30. Later, appellant's counsel put the district court on notice of Mr. Holder's argument that an independent expert might have agreed with the government's, and thus, that such a report would have dissuaded defense counsel from offering his client's self-defeating testimony. Hrg. Tr. I 122. Appellant might have advanced that argument more elegantly in writing or even through pleading, but no source of law requires such elegance in order to support a legal claim with a legal argument.

The government wrongly insists that the evidentiary hearing did not involve the ballistics claim. Because that claim was not "on the table at the hearing," the argument goes, nothing at the hearing could have related to or revised the claim. Gov't Br., at 69. For disproof of this argument, one need look no further than the government's own brief. We know from the record that a hearing was denied on the claim concerning counsel's failure to develop mental health evidence. App. 266-67. Nevertheless, the government uses evidence from the hearing on *other* claims to argue that counsel's "strategic" decisions were "reasonable." *See* Gov't Br. at 115 (citing hearing and arguing that lead counsel was concerned about offering an "excuse" for Mr. Holder's crime). Of course, the government cannot have it both ways. If the hearing evidence may bear upon the mental health claim, so too may it bear upon other claims on which a hearing was denied.

Because Mr. Holder's argument did not amend his underlying claim, the

24

government cannot meritoriously invoke the statute of limitations. And even if counsel's argument *did* constructively amend the claim, there is no question that the amendment would "relate back" to the original pleading. An amended claim "relates back" to an original one when both involve the same conduct, transaction, occurrence, or "set of facts." Fed. R. Civ. P. 15(c)(1)(B); *Mayle v. Felix*, 545 U.S. 644, 655 (2005). Both "claims" in this case involved the same underlying failure of trial counsel to consult an independent ballistics expert. *Cf. United States v. Craycraft*, 167 F.3d 451, 457 (8th Cir. 1999) ("Failing to file an appeal is a separate occurrence in both time and type from a failure to pursue a downward departure or failure to object to the type of drugs at issue.").

Also meritless is the government's argument about the certificate of appealability. The district court granted a COA on Mr. Holder's claim that counsel was ineffective in not consulting an independent ballistics expert. App. 491. When the court granted that COA, it was already on notice that the claim involved an argument that a defense expert might have corroborated Officer Stubits' findings. Hrg. Tr. I 122. By granting a COA on the ballistics claim, the district court necessarily certified the arguments that were advanced in support of the claim. And even if there were any doubt on the question, this Court has the authority to grant such a COA itself. *See Winfield v. Roper*, 460 F.3d 1026, 1040 (8th Cir. 2006); *accord White v. Dingle*, 616 F.3d 844, 847 (8th Cir. 2010) ("We

25

have the discretion to consider issues outside the scope of the certificate of appealability[.]"). Mr. Holder specifically requests an expanded COA in the unlikely event that one is required.

**B.      The government engages in speculation to uphold trial counsel's "strategy," while ignoring counsel's own admission that he needed to consult an independent ballistics expert.**

The government also misreads the merits. It asserts that Mr. Holder is attempting to "straightjacket" trial counsel with an all-encompassing duty to retain forensic experts. Gov't Br., at 71. But no such universal duty exists, and none is asserted here. It is trial counsel himself who acknowledged the need to consult an independent expert in this particular case, who told his colleagues that he would do so, and who then failed to do so. Hrg. Tr. I 119-20, 123-24; II 171-72, 205. It is not surprising that counsel perceived the need to consult an expert. The entire theory of defense was that Mr. Holder did not fire his weapon, and so the forensic evidence was necessarily crucial to a determination of what the defense theory should be. *See Wolfe v. State*, 96 S.W.3d 90, 94 (Mo. 2003) ("Given that Wolfe has consistently maintained his innocence, and the defense theory that Cox was lying, the decision to avoid testing the hair samples cannot be justified as sound trial strategy."). It does not "straightjacket" counsel to require that a core theory of defense be investigated.

Also without merit is the government's argument that counsel "reasonably"

26

sought to "inject doubt" as to whether Mr. Holder fired his weapon. Gov't Br., at 73-74. In order for "doubt" to be "injected" into the government's case, counsel needed to investigate. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland v. Washington*, 466 U.S. 668, 691 (1984). Precisely because it was denying a hearing, the district court assumed, in Mr. Holder's favor, that an independent ballistics report would have contradicted Officer Stubits' findings. Add. 64-65. *That*, of course, would have would have "injected" a measure of "doubt"—at least enough doubt to prevent the government from castigating Mr. Holder as an unrepentant liar whose testimony was wholly uncorroborated. *See* Tr. XII 178 ("[T]his is really important, because you got to see him, you can consider his testimony in that witness stand. And what was it? One lie after the other."); *id.* at 216 ("They had to come from the Russian gun. It was conclusive. Absolutely certain."). Either that, or the expert would have affirmed Officer Stubits' finding and dissuaded any reasonable lawyer from presenting the very evidence that Charlie Shaw offered through his own client. *See Wiggins v. Smith*, 539 U.S. 510, 535-36 (2003) (prejudice depends on what a "reasonable" attorney would have done after fully investigating).

It is simply untrue that Mr. Holder fails to posit a "viable alternative strategy." Gov't Br., at 73. Appellant has pointed to *two* alternative strategies.

27

First, a reasonable attorney, aided by an independent ballistics analysis that corroborated the government's, would not pursue a doomed and credibility-destroying theory that Mr. Holder never fired his weapon. *See* Appellant's Br., at 49. If the government is correct that counsel may reasonably concede guilt in order to save "***credibility*** for the sentencing phase," *Florida v. Nixon*, 543 U.S. 175, 184 (2004), then counsel ought to make the concession in a manner that is indeed credible—that is, a concession unaccompanied by testimony that sets up the defendant to be branded a liar. Second, a reasonable attorney aided by a *pro-defense* expert report would be able to marshal tangible evidence in support of his client's otherwise uncorroborated testimony. In either case, a hearing is required to determine whether counsel reasonably truncated his investigation before choosing his credibility-dooming defense.

## C. Mr. Holder does not seek any inequitable relief.

The government wrongly argues that Mr. Holder has "unclean hands" because he "lied" at trial. Gov't Br., at 71-72. That argument rests on a mischaracterization of the claim:

> Holder now claims that, but for his counsel's allegedly deficient performance regarding the ballistics evidence, he would not have testified falsely.

*Id.*

That is not Mr. Holder's claim at all. Indeed, Mr. Holder steadfastly

28

Appellate Case: 10-1304    Page: 38    Date Filed: 11/07/2011 Entry ID: 3847057

maintains, to this date, that he did not fire his weapon.  Appellant was prejudiced by counsel's non-investigation *not* because he "lied," but because his testimony was easily cast into doubt by the ballistics testimony as well as the eyewitness account of one of the bank tellers.  The fact that a witness's testimony conflicts with other evidence in the case scarcely means that the witness has perjured himself.  *United States v. Moore*, 639 F.3d 443, 446 (8th Cir. 2011); *United States v. West*, 612 F.3d 993, 996 (8th Cir. 2010); *United States v. Ryan*, 153 F.3d 708, 714 (8th Cir. 1998).  That is why a defendant who testifies in his own defense, and is then convicted, does not automatically qualify for an "obstruction of justice" enhancement at sentencing.  *United States v. Flores*, 362 F.3d 1030, 1038-39 (8th Cir. 2004).  It is also why effective counsel has a duty to investigate the client's version of the events before presenting it to the jury.  In *Johnson v. Baldwin*, 114 F.3d 835, 838 (9th Cir.1997), for example, counsel failed to investigate the client's "incredibly lame" alibi defense before offering it at trial.  As a result, the defendant was convicted of rape despite strong evidence that no sexual intercourse even occurred.  *Id.* at 838-40.

But more often than not, "Inconsistency of testimony among witnesses can as easily be explained as the result of faulty recollections or differences of opinions."  *United States v. Washington*, 44 F.3d 1271, 1282 (5th Cir. 1995).  That tendency is hardly surprising in a case such as this, considering the harrowing and

29

explosive events at the Lindell Bank & Trust.  *See United States v. Moore*, 786 F.2d 1308, 1312 (5th Cir. 1986) ("[I]t is commonly believed that witnesses remember better under stress. The data indicate that the opposite is true."); *see more generally* K.A. Deffenbacher, et al., *A Meta-Analytic Review of the Effects of High Stress on Eyewitness Memory*, 28 L. & HUM. BEHAV. 687 (2004).

Failures of memory aside, there remains the possibility, as acknowledged by the district court, that a defense expert could have contradicted Officer Stubits' findings.  Add. 64-65.  The scientific community has come to question prevailing methods of ballistics analysis, which often rely on the examiner's subjective experiences.  "A fundamental problem with toolmark and firearms analysis is the lack of a precisely defined process."  National Academy of Sciences, *Strengthening Forensic Science in the United States:  A Path Forward* 154-55 (2009) (noting lack of consensus as to number and type of similarities required in order to match tool marks to a particular weapon).  Even *that* problem describes ballistics evidence under the best of circumstances, as opposed to a microscopic analysis of two rifles that have been severely burned in a gasoline fire.

The central issue here is that counsel failed to give his client fully-informed advice on whether to testify.  "The testimony of a criminal defendant at his own trial is unique and inherently significant."  *Nichols v. Butler*, 953 F.2d 1550, 1553 (11th Cir. 1992).  Counsel knew that Mr. Holder would deny firing his weapon,

30

for that is how appellant described the crime to his lawyer.  Hrg. Tr. I 129-31.

Because counsel knew what Mr. Holder would say from the stand, it was

incumbent upon counsel to investigate whether that testimony would be believed

by the jury in light of the other evidence—and thus, whether Mr. Holder's own

testimony might place him in the worst possible light at the ultimate trial.  Better

yet, counsel might have discovered evidence to question the prosecution's

ballistics analysis, and thus, to corroborate his testimony that was so compellingly

derided as untruthful.  *See*, *e.g.* Tr. XII 178 ("And he sat there and he lied to you,

and he lied to you, and he lied to you.  And that does not show remorse.").  Mr.

Holder was prejudiced in either event.

Appellate Case: 10-1304    Page: 41    Date Filed: 11/07/2011 Entry ID: 3847057

### III. Mr. Holder remains entitled to a hearing on his claim that counsel failed to develop evidence of her client's impaired judgment.

As with Mr. Holder's guilt phase claims, the government offers little more than a counter-historical journey through trial counsel's imagined thought processes. That approach is problematic enough when the post-conviction testimony disproves the "reasonable" strategies imputed to counsel. *See* Part I(A)(1), above (pp. 5-6). But it is even more problematic when a hearing has been denied, and when counsel has never been called upon to explain her strategies in the first place. The Court must remand this claim for the hearing the law requires. *See* 28 U.S.C. § 2255(b).

### A. By relying on its own disputable inferences of material fact, the government further proves the need for an evidentiary hearing.

Lost within the government's 54 pages of briefing on the claim is the modest relief that Mr. Holder seeks: a hearing. That relief is modest because the statute says it is. Section 2255 requires a hearing unless the record "conclusively" shows that the prisoner cannot prevail. "Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255(b). It is no surprise, then, that "issues regarding the ineffectiveness of counsel often require a hearing

32

to consider evidence not disclosed on the face of the trial record." *Nelson v. United States*, 297 Fed. Appx. 563, 565 (8th Cir. 2008).

Appellant's opening brief outlined a number of instances in which the district court failed to apply this simple rule, and instead reached dispositive factual inferences that the record does not *conclusively* establish. For example, the record does not compel the court's inference that trial counsel "reasonably" relied on mental health evaluations, because counsel has never been heard on what her strategy was, and the record shows that she recognized the need for a further evaluation. Appellant's Br., at 54-58. Likewise, the record does not conclusively show that counsel apprised the pretrial experts of the salient details in her client's background, and thus, that the experts reached informed diagnoses. *Id.* at 58-66. And nothing compels the district court's ruling that a finding of impaired judgment would simply be unbelievable in light of Mr. Holder's elaborately-planned crime. *Id.* at 73-75 (citing cases in which elaborate planning coexists with serious mental illness). That issue, too, requires a hearing. *See Sinisterra v. United States*, 600 F.3d 900, 907 (8th Cir. 2010) ("***If deemed credible and supported by evidence***, these factual assertions might present the kind of troubled history the Supreme Court has declared relevant to assessing a defendant's moral culpability.") (emphasis added).

The government's brief only proves the point. Time and again, the

Appellate Case: 10-1304    Page: 43    Date Filed: 11/07/2011 Entry ID: 3847057

government defends the denial of a hearing below, but on the basis of its own factual inferences that are no more compelled by the record than the district court's were. But a hearing is required in any event. A court may not grant or deny section 2255 relief without "resolving outstanding factual disputes." *Grady v. United States*, 269 F.3d 913, 919 (8th Cir. 2001). The government's unwarranted factual inferences are outlined below.

1. ***The government's timeline of events*** – Even departing from the district court's ruling as "erroneous," Gov't Br., at 92, the government argues at length that counsel could not possibly have identified shortcomings in the findings of Drs. Wetzel and Rothke, and then, based on those shortcomings, perceived the need for a third evaluation by Dr. Semone. *Id.* at 96-103. The government relies on its own chronology: Trial counsel received authorization for Dr. Semone's analysis even before the other experts' findings were available to them, the government insists. Therefore, we are told, it is simply a "fiction" that counsel sought Dr. Semone's evaluation because of shortcomings from the others. *Id.* at 102.

The problem is that the record does not compel the government's partisan telling of events. First, the testimony of trial counsel Herndon and mitigation specialist Tatelli is that both wished for Dr. Semone to evaluate Mr. Holder, but there was an unspecified "timing issue," or the defense simply ran out of time.

34

Hrg. Tr. I 93-94; II 50.  That evidence suggests that counsel indeed believed that a further evaluation was necessary, and yet never undertook one.  Mr. Holder's evidence at least creates a disputed issue of material fact with the government's evidence.  Under the dictates of section 2255(b), that conflict cannot be decided by this Court, but rather must be resolved in the first instance by the district court after an evidentiary hearing.  *E.g.*, *Koskela v. United States*, 235 F.3d 1148, 1149 (8th Cir. 2001) (competing affidavits required a hearing); *Latorre v. United States*, 193 F.3d 1035, 1039 (8th Cir. 1999).

Second, the government simply *assumes* that a trial attorney must be wholly ignorant of an expert's conclusions or methods until that expert issues a report.  But lawyers routinely know an expert's methods before a report issues, and it is hardly unusual for counsel to know or be reasonably certain of the expert's essential conclusions.  The government's chronology is therefore inconclusive.  It is entirely possible for counsel to perceive the need for a third evaluation even before the previous reports were both available.  To be sure, the intervening reports may obviate the need for a further evaluation.  But the evidence does not suggest that happened; counsel instead faced an unspecified "timing issue."  Hrg. Tr. II 50.

Third and finally, the district court itself described the chronology as follows:  "In the beginning of March, 1998, Petitioner's trial counsel, Ms.

35

Herndon, contacted Dr. Semone, to review Dr. Wetzel's findings, and determine the necessity of further neurological testing; however, this review by Dr. Semone never took place." Add. 76-77. The government simply disagrees with the district court's rendering of the events. But it does not even argue that the court's rendering is "clearly erroneous." The government is entitled to its contrary view of the facts, but that view cannot definitively govern without a full and fair hearing.

If indeed counsel themselves believed that a further evaluation was necessary, it does not assist the government to cite *Cole v. Roper*, 623 F.3d 1183 (8th Cir. 2010). *See* Gov't Br., at 103-04, 120-21. In that case, counsel believed her investigation was complete and described it as such ***at a hearing***. 623 F.3d at 1190. Nothing in *Cole* creates an all-encompassing rule that it is always sufficient for counsel to consult two experts, regardless of which diagnoses those experts evaluate or the completeness of information counsel provides them. *See Rompilla v. Beard*, 545 U.S. 374, 382 (2005) (counsel ineffective despite using a "cadre of ***three*** mental health witnesses who were asked to look into Rompilla's mental state as of the time of the offense and his competency to stand trial").

2.      ***The credibility of Mr. Holder's post-conviction evidence*** – The government shows its hand most clearly in arguing that Mr. Holder's evidence simply lacks the "credibility" needed to create a reasonable probability of a

36

different sentence. Gov't Br., at 132. Courts do not determine the credibility of witnesses from legal briefs. They do so by taking live evidence, which is what the district court needs to do here. *See Sinisterra v. United States*, 600 F.3d 900, 907 (8th Cir. 2010) ("***If deemed credible and supported by evidence***, these factual assertions might present the kind of troubled history the Supreme Court has declared relevant to assessing a defendant's moral culpability.") (emphasis added); *Watson v. United States*, 493 F.3d 960, 964 (8th Cir. 2007) ("Although the district court was not required to credit Watson's assertion, it was required to hold a hearing before making factual determinations about Watson's credibility."); *Castillo v. United States*, 34 F.3d 443, 445 (7th Cir. 1994) ("[A] determination of credibility cannot be made on the basis of an affidavit."). After all, a hearing is required unless the record "conclusively shows" that that Mr. Holder cannot prevail. 28 U.S.C. § 2255(b). The government even admits that the district court assessed the "credibility" of appellant's evidence, but without a hearing. Gov't Br., at 132.

It does not help the government to cite *Sears v. Upton*, 130 S. Ct. 3259 (2009). True, a reviewing court must carefully re-weigh the new and old mitigating evidence against the aggravating evidence from trial. *Id.* at 3266; Gov't Br., at 132. But that duty is nothing new. It simply flows from the court's obligation to determine whether there exists a "reasonable probability" that at least

37

one juror would have reached a different sentence but for counsel's errors. *Strickland v. Washington*, 466 U.S. 668, 694-95 (1984). Nothing in *Upton* allows a court to determine a witness's credibility without a hearing. Indeed, the prisoner in *Upton* was provided a lengthy hearing on his claim. *Upton*, 130 S. Ct. at 3262, 3266 n.12 ("22 volumes"). The hearing featured two experts who testified that the prisoner suffered from head injuries and drug abuse that resulted in "problems with planning, sequencing and impulse control." *Id.* at 3262. It was noted that prisoner Sears' history "is replete with multiple head trauma, substance abuse, and traumatic experiences of the type expected to lead to these significant impairments." *Id.* at 3263. Mr. Holder seeks the same opportunity to prove his claims in court.

> 3. *Whether trial counsel ran out of time, or whether she did so "reasonably"* – The government insists that trial counsel cannot possibly have run out of time. It dismisses trial counsel's and the mitigation specialists' testimony to this effect as "speculation." Gov't Br., at 102. And it insists that counsel and the specialist were continuing to have Mr. Holder evaluated even during the trial, and so time never "ran out." *Id.* at 102-03.

It is the government that speculates. If indeed counsel were continuing to investigate through trial, that supports an inference that they were unprepared for trial. At the very least, the continuing investigation is consistent with running out

Appellate Case: 10-1304 Page: 48 Date Filed: 11/07/2011 Entry ID: 3847057

of time during the trial, as counsel and her mitigation specialist were busily assembling their penalty phase defense. But the broader point is that counsel have not been heard on Mr. Holder's claim. The record does not remotely disprove counsel's own claim that she forwent a further evaluation because of a "timing issue" rather than out of trial strategy. Appellant is entitled to hearing.

Quite inconsistently, the government argues that counsel's chosen means of spending her time was itself a "reasonable" strategic decision. Gov't Br., at 122. It is true enough that lawyers don't have unlimited time and resources to develop mitigating evidence. *Id.* But that does not mean attorney Herndon spent her time wisely as a matter of law. If counsel ran out of time, we do not know which tasks she performed at the expense of a further mental health evaluation, or indeed, whether she forwent the evaluation out of simple "inattention, not reasoned strategic judgment." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003).

Neither is it clear that counsel had sufficient time in the first place. Capital trial counsel, after all, is *per se* obligated to "conduct a thorough investigation of the defendant's background." *Id.* at 522; *Williams v. Taylor*, 529 U.S. 362, 396 (2000). Attorney Herndon was appointed all of five weeks before Mr. Holder's trial, and a mitigation specialist was appointed only two months before that. Hrg.

39

Tr. I 8-11, 102-04, 149; II 145; App. 32, 594.[2]  If trial counsel was unable to develop and present her client's history on account of time, she should have asked for more. Numerous attorneys have been held ineffective for failing to do so.  *E.g.*, *Marshall v. Cathel*, 428 F.3d 452, 466 (3d Cir. 2005); *Walker v. Lockhart*, 807 F.2d 136, 139-40 (8th Cir. 1986); *Turpin v. Bennett*, 525 S.E.2d 354, 356 (Ga. 2000).  But we cannot know whether counsel were effective without knowing what she did and why.  Speculation is no substitute for a hearing.  *See Wiggins*, 539 U.S. at 526-27 ("[T]he 'strategic decision' the state courts and respondents all invoke to justify counsel's limited pursuit of mitigating evidence resembles more a *post hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing.").

    **4.**      ***The train-dragging*** – Mr. Holder was not just hit by a train, or run over by one.  The train caught him by his leg and dragged him on the ground for 100 yards before it ripped his leg off.  *See* Appellant's Br., at 51, 59, 61-62, and sources cited.  That fact is clinically significant for a trauma diagnosis, according to trauma expert Leslie Lebowitz.  App. 644.  But the government minimizes the same fact, and along with it, the fact that it is omitted from the reports of Drs. Wetzel and Rothke.  *See* Gov't Br., at 111 ("Did experts need to be told a train

---

[2]By comparison, opposing counsel in this appeal took six and a half months to file the government's brief—a task that required no out-of-court investigation whatsoever.

Appellate Case: 10-1304   Page: 50   Date Filed: 11/07/2011 Entry ID: 3847057

does not stop on a dime or that Holder was dragged besides having his foot and leg 'degloved'?").  The government argues that it is not clinically significant that Mr. Holder was dragged helplessly until the train cut his leg off.  However, it cites no evidence for this proposition, which it is free to support at a hearing.

**5.** ***The seizures*** – Based on the medical records that were provided to Dr. Wetzel, the government insists that Mr. Holder suffered at most one seizure during his childhood.  Gov't Br., at 112-13 & n.48.  But those records are not necessarily complete, and appellant's evidence is that he experienced seizures during his infancy "on several different occasions."  App. 589, 642.  Again, a hearing is required to resolve conflicts such as these.

The government relatedly insists that Mr. Holder's seizures, if any, must have been harmless because he later had a clear EEG.  Gov't Br., at 113.  Of course, the government cites no evidence for the unstated premise that harmful seizures will necessarily appear on an EEG.[3]  Dr. Wetzel's report says no such thing.  App. 160.  And Dr. Lebowitz's affidavit suggests just the opposite, describing Mr. Holder's seizures as a "red flag" signaling the need for a trauma assessment.  App. 642.

---

[3]According to the National Institutes of Health, "Some people continue to show normal brain wave patterns even after they have experienced a seizure. In other cases, the unusual brain waves are generated deep in the brain where the EEG is unable to detect them." *Seizures and Epilepsy:  Hope Through Research*, available at <<http://www.ninds.nih.gov/disorders/epilepsy/detail_epilepsy.htm>>

41

Appellate Case: 10-1304   Page: 51   Date Filed: 11/07/2011 Entry ID: 3847057

**6.** ***Drug-addicted parents*** – The government speculates that counsel had a strategic reason for not emphasizing the drug abuse of Mr. Holder's parents, and especially his mother. Gov't Br., at 114-16. Had counsel done so, argues the government, she risked alienating Kimberly Holder as a helpful witness, destroying the credibility of her testimony describing her son's "redeeming qualities," undermining the defense's theory that Mr. Holder committed the robbery in order to purchase a new prosthetic leg, and insulting the jury by offering an "excuse" for the crime. *Id.* at 114-16.

The government is wrong in numerous respects. First, Mr. Holder has never had a hearing on his claim, so we can't know what strategic concerns, if any, may have motivated counsel's failure to inform the experts of the family's pervasive drug abuse. Second, the government misapprehends appellant's claim as well as the trial record. Counsel *did* present trial testimony about the family's drug abuse. Kimberly Holder testified that she and her ex-husband abused crack cocaine repeatedly, that Mrs. Holder was "heavily" into crack cocaine for a period of six or seven years, and that Norris Holder became the de facto father of his younger siblings as a result. Tr. X 22-26, 31-32. Norris Holder, Sr., testified to like effect. Tr. XII 114-17. The problem is not that counsel failed to inform *the jury* that Mr. Holder's parents were addicted to crack; it was that they failed to relay this information to *the mental health experts*. That failure deprived the experts of

42

Appellate Case: 10-1304   Page: 52   Date Filed: 11/07/2011 Entry ID: 3847057

relevant information needed for an accurate diagnosis.  Parental drug abuse is a "traumatic event" for a child because "it constitutes a profound abandonment of the child and invariably initiates a cascade of other adverse events."  App. 643.  If the government believes that counsel had a strategic reason for withholding this information from Drs. Rothke and Wetzel, it is free to explore that far-fetched possibility at the hearing.

**7.**     ***<u>The Blumeyer Housing Project</u>*** – Similar errors infect the government's analysis of Mr. Holder's chaotic upbringing.  The government first insists that evidence about the Blumeyers was offered at trial.  Gov't Br., at 116-18.  But that fact does not answer appellant's claim.  The claim is that counsel failed to provide the mental health experts with this important information about the client.  On that score, the government speculates that information about the Blumeyers was unnecessary, because the only relevant inquiry is Mr. Holder's "individual experiences."  *Id.* at 118.  But once again, no scientific evidence is cited for the proposition that it is solely one's "individual experiences" that inform a mental health diagnosis.  And Mr. Holder's evidence is to the contrary.  Gun violence was an everyday event at the Blumeyers, and children lived in fear of being shot or hurt.  App. 643.  It is psychologically damaging "to be constantly frightened, at risk for serious injury or death, and to live in circumstances in which genuine safety is unobtainable."  *Id.* (per Dr. Lebowitz).

Appellate Case: 10-1304     Page: 53     Date Filed: 11/07/2011 Entry ID: 3847057

The government next speculates that Drs. Rothke and Wetzel must have "reasonably explored" the conditions of Mr. Holder's upbringing. Gov't Br., at 118. That proposition, too, is contested by the record, which shows that the pretrial experts mentioned nothing beyond Mrs. Holder's "general difficulties" and the fact that she "had it hard," along with appellant's own drug dealing just before his nineteenth birthday. App. 126, 167, 687. The record does not "conclusively show" that counsel gave the experts the facts they needed for a reliable diagnosis. 28 U.S.C. § 2255(b). Mr. Holder is entitled to a hearing.

**8.** ***Whether the new mitigating evidence would contradict the old mitigating evidence at a retrial*** – The government argues that mental health evidence would have contradicted counsel's theory that Mr. Holder committed the robbery in order to purchase a new prosthetic leg and otherwise to lead a better material life. Gov't Br., at 126. But that does not extinguish the prejudice to Mr. Holder. For one thing, objectively "reasonable" or "competent" counsel may not have pursued the "new leg" theory if fully informed by a reliable and fully-considered diagnosis of the client's mental health. *Wong v. Belmontes*, 130 S. Ct. 383, 386 (2009); *Wiggins v. Smith*, 539 U.S. 510, 535-36 (2003).

More to the point, we do not even know whether counsel Herndon would have persisted in the same theory, because Mr. Holder was denied a hearing. Ms. Herndon may not concur with the inconsistency cited by the government. After

44

Appellate Case: 10-1304    Page: 54    Date Filed: 11/07/2011 Entry ID: 3847057

all, it is not inconsistent for a defendant to be "driven by desperation for a new leg and a desire for a matter material life," Gov't Br., at 126, **and** to be traumatically impaired in his capacity to understand the danger that his conduct posed to other people. A traumatized individual need not be so impaired that his crime lacks a motive.

**B. The Rule 59(e) evidence on which Mr. Holder relies was properly submitted to and considered by the district court, which declined to consider only *some* of the Rule 59(e) affidavits.**

The government complains that Mr. Holder "liberally" cites the affidavits of trauma expert Leslie Lebowitz, train accident witness Terry Jett, and mitigation specialist Jennifer Merrigan. Gov't Br., at 104-05. It is true that these documents were first filed in connection with Mr. Holder's motion to alter or amend the judgment. App. 587-95, 637-50. But it is not true that the district court refused to consider this evidence, as the government wrongly argues. Gov't Br., at 85, 105.

**1. *The district court did not refuse to consider any of the evidence on which Mr. Holder relies in this appeal.***

Contrary to the government's argument, the district court did not register a blanket refusal to consider **all** of the Rule 59(e) evidence. The ruling below is as follows:

> Petitioner has submitted two affidavits along with his Rule 59(e) Motion. One affidavit is from Mr. Russell Stetler, and the other is from Dr. Kathleen Wayland; both affidavits discuss why they believe that the pretrial mental health investigation of Petitioner was unreasonable. While the Court appreciates the amount of time invested in creating

45

these affidavits, they do not alter the Court's opinion on this ineffective assistance of counsel issue. This is because the affidavits qualify as new evidence which could have been offered prior to the Court's Order rejecting Petitioner's § 2255 Motion. Thus, they cannot be introduced in a Rule 59(e) motion. . . . ***The affidavits of Mr. Stetler and Dr. Wayland*** could have, and should have, been presented to the Court in conjunction with Petitioner's § 2255 Motion.

Add. 128 (emphasis added; footnotes omitted).

There was extensive Rule 59(e) evidence beyond these two documents, including the affidavit of mitigation specialist Merrigan, the declaration of trauma expert Lebowitz, and the declarations of mitigation witnesses Terry Jett, Andrew Bell, Keisha Brown, Nickia Harris, Yolanda Curry, Cortez Harris, and Tanitra Harris.  App. 587-595, 637-64.  The district court, then, declined to consider two expert affidavits attacking the completeness of trial counsel's "mental health investigation" and use of experts.  Add. 128.  Yet, it did not refuse to consider affidavits that amplified the traumatic facts underlying Mr. Holder's claim, or an expert declaration on the clinical significance of the pervasive trauma thereby described.  *Id.*; *accord Todd v. Richmond*, 853 F. Supp. 1309, 1312-13 & n.2 (D. Kan. 1994) (allowing party to "sharpen its analysis" on motion to reconsider, analyzed under same standards as Rule 59(e)).

The key point is this:  the district court's plain language shows that it declined to consider only the affidavits of Russell Stetler and Kathleen Wayland.  Mr. Holder's appellate brief does not ever rely on those two documents.  The

46

government is simply wrong in arguing that appellant "takes liberties by placing rejected documents before this Court." Gov't Br., at 85.

Additionally, the district court engaged the Rule 59(e) evidence on which Mr. Holder *does* rely. The core theory of Mr. Holder's argument on appeal is that numerous traumatizing events from his childhood impaired his judgment, that the pretrial defense experts were not adequately aware of these events, and that the district court should hold a hearing to consider their clinical significance and likely effect upon a jury informed of that significance. Appellant's Br., at 51-77. The district court considered the generalized "trauma" theory. Among other rulings, the court held that it "appears" that Drs. Wetzel and Rothke were "aware of many, if not all, of the specific instances of trauma cited by Petitioner." Add. 126. And, because the court believed it "highly likely" that these two experts considered information beyond that described in their reports, the court concluded that "the experts were, in fact, aware of the various instances of trauma that Petitioner alleges that they were unaware of, as a result of ineffective assistance of counsel." Add. 127. This Court should not refuse to consider evidence that wasn't refused by the district court. *Cf. Macawber Eng'g v. Robson & Miller*, 47 F.3d 253, 257 & n.4 (8th Cir. 1995) ("[W]e will not consider evidence that the district court did not").

## 2. *The district court properly exercised its discretion to consider Mr. Holder's Rule 59(e) evidence.*

The district court had ample discretion to consider Mr. Holder's Rule 59(e) evidence as it did. A court has "wide," "substantial," or "considerable" discretion to permit new materials under Rule 59(e). *See Macawber*, 47 F.3d at 257 n.4; *Mackin v. City of Boston*, 969 F.2d 1273, 1279 (1st Cir. 1992); *Abbott v. Equity Group*, 2 F.3d 613, 629 n. 59 (5th Cir. 1993). New evidence is particularly appropriate when a party lacks notice of a district court's dispositive reasoning, or of the type of evidence that the court will require. *See Ford v. Elsbury*, 32 F.3d 931, 937-38 (5th Cir. 1994) (no clear and obvious notice that district court would require "summary judgment-type evidence" on motion to remand diversity case to state court); *Friend v. Aetna Finance Co.*, 622 F.2d 1217, 1218 (5th Cir. 1980) (not clear to plaintiff that district court would treat defendant's post-judgment motion as motion for summary judgment).

These same considerations justify consideration of Mr. Holder's Rule 59(e) evidence. For one thing, the district court did not announce its reasons for denying a hearing until the dispositive order. Add. 76. A previous order granted a hearing on specified claims, but without explaining why any claims were given or denied a hearing. App. 266-67. Only in its dispositive order did the district court credit trial counsel with a "decision" not to pursue Dr. Semone's assistance, following counsels' review of the reports from Drs. Wetzel and Rothke. Add. 79.

48

Even the government contests that rendering of the events as "erroneous." Gov't Br., at 92. Likewise, the district court concluded, as a matter of law, that expert testimony diagnosing Mr. Holder as mentally ill could not have changed the trial's outcome. Add. 79-80. The court believed that such testimony could not possibly overcome the evidence that Mr. Holder was aware of his dangerous conduct, in light of his extensive preparations for the crime. *Id.* Yet, *that* belief is stated without the benefit of testimony from Dr. Semone or any expert, and without affording Mr. Holder any opportunity to present testimony that elaborate preparations do not disprove that a defendant is naive about dangers to other people.

The legal landscape confirms the propriety of Mr. Holder's Rule 59(e) evidence. Section 2255 claims presumptively require a hearing. Live evidence is needed unless the record "conclusively" defeats the prisoner's claim. 28 U.S.C. § 2255(b). Mr. Holder was entitled to presume that the district court would consider his claim without requiring "summary judgment-type evidence" in support of it. *Ford*, 32 F.3d at 938; *see also Ferguson v. United States*, 623 F.3d 627, 630 (8th Cir. 2010) ("We presume that district judges know the law[.]"). It was not improper, then, for that same evidence to be presented and considered under Rule 59(e).

The habeas case of *Parkus v. Delo*, 33 F.3d 933 (8th Cir. 1994), further

49

Appellate Case: 10-1304   Page: 59   Date Filed: 11/07/2011 Entry ID: 3847057

countenances appellant's Rule 59(e) evidence.  Mr. Holder hereby requests the Court to take judicial notice of its case file in *Parkus v. Delo*, No. 93-2992.  *See Stutzka v. McCarville*, 420 F.3d 757, 760-61 & n.2 (8th Cir. 2005); *Hart v. C.I.R.*, 730 F.2d 1206, 1207 n.4 (8th Cir. 1984); *United States v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980) ("a court may take judicial notice of its own records in another case").  The relevant portions from the *Parkus* record are reproduced in the addendum to this reply brief, for the Court's convenience.  Reply Add. 1-14.

The Court in *Parkus* ordered an evidentiary hearing.  *See* 33 F.3d at 938-40.  A hearing was required on a claim that trial counsel failed to discover that Parkus had been diagnosed as mentally retarded and schizophrenic as a child.  Parkus's claim rested centrally on evidence that was presented for the first time on a motion to alter or amend the judgment.  *Id.* at 939-40 & n.5 (referencing Tabs 23 and 24 of appendix); Reply Add. 4-5 (same, and showing that these documents accompanied Parkus's Rule 59(e) motion).  That evidence included medical records from Parkus's childhood, as well as an affidavit from trial counsel's mental health expert, who stated that he would have diagnosed Parkus with a mental disease or defect if he had known the defendant's full clinical history.  *Parkus*, 33 F.3d at 939-40; Reply Add. 4, 6 (Dr. Daniel's affidavit).

The documents cited by the *Parkus* opinion make clear that the Court was relying on Rule 59(e) evidence.  The Court's factual summary refers to five

50

different mental health reports from 1968 to 1973—all of which are contained in "Appellant's App. Vol. III, Tab 24." *Parkus*, 33 F.3d at 936 n.2, 938. Two more recent reports, from Drs. O'Connor and Pincus, appear within "Appellant's App. Vol. III, Tab 23." *Id.* at 936-37. The key affidavit—from trial counsel's mental health expert, Dr. A.E. Daniel—likewise appears as "Appellant's App. Vol. III, Tab 24, Exh. 5." *Id.* at 939 ("[Dr.] Daniel now concludes that Parkus suffered from a mental disease or defect at the time of Steffenhagen's murder."). From Parkus's appendix, we know that ***all*** of these documents come from his motion to alter or amend the judgment. *See* Reply Add. 4-5 (Exhibits 5-A through 5-E: reports from late 1960s and early 1970s); Reply Add. 4 (reports of Drs. O'Connor and Pincus); Reply Add. 4, 6 (affidavit of Dr. Daniel).

Parkus's brief makes this fact abundantly clear. *See* Reply Add. 8-14. The brief repeatedly cited these evaluations as exhibits accompanying Parkus's Rule 59(e) motion. *Id.* The brief explained that the affidavits were not presented until after the district court denied relief and vacated its earlier order granting a hearing. Reply Add. 14. Thus, it is clear that Parkus "could" have filed his evidence before the Rule 59(e) motion, given the pendency of the state's motion to vacate the grant of a hearing. Even though the state did not contest the propriety of the Rule 59(e) documents, *see* "Brief of Appellee" in Case No. 93-2922 (filed Dec. 10, 1993), the *Parkus* opinion shows that it is not irregular for courts to consider Rule 59(e)

51

evidence in habeas cases, including when determining the need for a hearing.  The district court was within its discretion to consider the Rule 59(e) evidence on which Mr. Holder now relies.

### 3. *The government's related objections are without merit.*

Because Mr. Holder's evidence was properly submitted to and considered by the district court on Rule 59(e), there is no merit to the government's related procedural objections.  *See* Gov't Br., at 85-86, 105-06.  The claim is not untimely.  Even if the Rule 59(e) evidence somehow "amended" it, the amendment would relate back to the original filing's claim that counsel were ineffective for not discovering and presenting evidence concerning Mr. Holder's mental health, including his ability to understand the danger of his conduct.  *See* Fed. R. Civ. P. 15(c)(1)(B); *Mayle v. Felix*, 545 U.S. 644, 655 (2005); *United States v. Craycraft*, 167 F.3d 451, 457 (8th Cir. 1999) (relation back depends on whether counsel's failures are of the same "type" and occurred at the same "time").

Neither is Mr. Holder's appellate claim beyond the certificate of appealability granted by the district court.  A COA was granted on the same underlying claim of counsel's ineffectiveness for not developing mental health evidence, and that claim was not amended by the Rule 59(e) evidence.  Even if it were, this Court has discretion to grant a COA on its own, even after oral argument.  *White v. Dingle*, 616 F.3d 844, 847 (8th Cir. 2010); *Winfield v. Roper*,

Appellate Case: 10-1304     Page: 62     Date Filed: 11/07/2011 Entry ID: 3847057

460 F.3d 1026, 1040 (8th Cir. 2006). As with the ballistics claim, Mr. Holder requests an expanded COA in the unlikely event that one is required.

**C.     Appellant does not advance a claim of "ineffective assistance of expert."**

The government warns the Court not to burden itself with a claimed right to the effective assistance of experts. Gov't Br., at 120-21. But Mr. Holder does not advance such a claim. His argument is not that the experts failed to perform their tasks; it is that trial counsel failed to furnish the experts with the evidence needed for a fully-informed mental health diagnosis, including relevant evidence beyond the client's self-reports. Appellant's Br., at 58-70; *see Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1999) (counsel must "present th[e] experts with information relevant to the conclusion of the expert"). Counsel compounded that failure by not following up on numerous "red flags" signaling the need for a trauma assessment. Appellant's Br., at 68-69. Counsel even believed that a further evaluation was necessary, but she never obtained it. *Id.* at 56-58. The relevant failures are counsel's, and Mr. Holder is entitled to a hearing.

Appellate Case: 10-1304     Page: 63     Date Filed: 11/07/2011 Entry ID: 3847057

**IV. Trial counsel performed ineffectively by not grasping the straightforward statutory law defining the "pecuniary gain" aggravating circumstance.**

The government advances essentially two arguments in defense of the ruling below. First, it contends that effective counsel need not anticipate future developments in the law, and that this Court's opinions in *United States v. Bolden*, 545 F.3d 609 (8th Cir. 2008), and *United States v. Allen*, 357 F.3d 745 (8th Cir. 2001), did not exist at the time of trial. Gov't Br., at 136-37. Second, it relies on the district court's purportedly "factual" finding that the jury would have necessarily found the "pecuniary gain" aggravator if properly instructed. *Id.* at 137-39. These arguments mischaracterize Mr. Holder's claim, the governing law, and the record of trial.

**A. Counsel failed to grasp clear statutory language.**

Counsel must know the law. "Counsel's duty to know the applicable law, at least when it matters to his client's defense, has been clearly established by *Strickland* and its progeny." *Osagiede v. United States*, 543 F.3d 399, 408 (7th Cir. 2008). The government does not quarrel with this premise, but instead argues that no *judicial precedent* existed at the time of trial to alert counsel that the statutory term "offense" describes a murder rather than the underlying robbery, and that the killing itself must have a financial motive. *See* Gov't Br., at 136-37. The government thus advances a straw-man argument that counsel need not

54

anticipate future changes in the law.

In this case, trial counsel need not have looked up any precedents, much less anticipated future ones. He need only have looked up the very statute being invoked by the prosecution: 18 U.S.C. § 3592(c)(8). As explained in Mr. Holder's opening brief, that subsection is surrounded by parallel subsections in which the term "offense" clearly and plainly refers to murder. *See* 18 U.S.C. §§ 3592(c)(6), (9), (13), (14). The introductory subsection lists a series of twenty felony offenses that are automatically death-eligible when the crime results in a death, but the list conspicuously omits the offense of robbery. *See* 18 U.S.C. § 3592(c)(1); Appellant's Br., at 80-81. The government wholly fails to address this elementary and straightforward body of law. This is not a case in which trial counsel failed to be clairvoyant. Counsel need only have consulted a statute book, not a crystal ball.

**B.** **Considering the overwhelming evidence that Richard Heflin was killed by Billie Allen rather than Norris Holder, it is unlikely that a correctly-instructed jury would have found that *Mr. Holder* committed the murder for the purpose of pecuniary gain.**

The government's analysis of *Strickland* prejudice is likewise erroneous. As a threshold matter, the district court's ruling is not a "factual finding" entitled to any particular deference. *See* Gov't Br., at 137-38. Rather, the prejudicial effect of counsel's errors is a mixed question of law and fact, requiring a court to assess the materiality of counsel's failing in light of the entire record. *Strickland*

55

*v. Washington*, 466 U.S. 668, 698 (1984).  That question is subject to *de novo* review on appeal.  *E.g.*, *Bear Stops v. United States*, 339 F.3d 777, 779-80 (8th Cir. 2003); *Odem v. Hopkins*, 192 F.3d 772, 774 (8th Cir. 1999); *Driscoll v. Delo*, 71 F.3d 701, 706-07 (8th Cir. 1995).

The government compounds its error of law with an error of fact.  It argues that the prosecutor's closing argument proves that the jury must have understood that the word "offense" referred to murder, and that the government's contention was that the murder itself was financially motivated.  *See* Gov't Br., at 138-39.  The government is wrong.  The prosecutor himself argued that Mr. Holder undertook the robbery for the purpose of financial gain, and that the aggravator was met by Mr. Holder's admission that he committed ***the robbery*** for money:

> As to the second aggravating factor, ladies and gentlemen, that the defendant committed the offense in the expectation of the receipt of anything of pecuniary value, or for money.  He admitted that.  He confessed to you on the witness stand.  And whether you find he did it for the reasons that he told Jan Hartman, and Tom Carol at the time of his arrest, that he did it to live better or he did it for a lawyer or you believe what he told you here – he did it to get a new leg – he did it for the money.

Tr. IX 30; *accord* Tr. XII 227 ("[I]t is done for the most reprehensible reason of all, for money, so this guy can have money.").

But most importantly, reasonable jurors who correctly understood the law would not have found the "pecuniary gain" aggravator.  In order for the aggravator to exist, the jury would have had to find that "***The defendant*** committed the

56

offense . . . in the expectation of the receipt of anything of pecuniary value." 18 U.S.C. § 3592(c)(8) (emphasis added). The aggravator, then, requires a specific motive for Mr. Holder's crime: the jury had to find that *Mr. Holder* had a financial motivation for the killing. But a defendant cannot have a specific motive for a killing that he doesn't specifically intend, and the "overwhelming" evidence was that Billie Allen committed the murder. *United States v. Allen*, 247 F.3d 741, 777 (8th Cir. 2001). Norris Holder was convicted under a felony-murder or accomplice theory, and neither of appellant's two convictions required a specific intent to kill. *Id.* at 782-84. The theories of conviction are in great tension with Mr. Holder having any motivation at all, much less a financial one. There is at least a "reasonable probability" that a jury would reject a counterintuitive charge that an unintentional murder had a financial motive. Mr. Holder must be resentenced.

Appellate Case: 10-1304     Page: 67     Date Filed: 11/07/2011 Entry ID: 3847057

# CONCLUSION

WHEREFORE, for the foregoing reasons, appellant respectfully requests that the Court reverse the judgment of the district court, and remand with instructions to vacate appellant's convictions and sentences, or, alternatively, to remand with instructions to conduct further proceedings that include an evidentiary hearing.

Respectfully submitted,

/s/ Michael J. Gorla
Michael J. Gorla
720 Olive Street, Suite 1630
St. Louis, Missouri 63101
(314) 621-1617
(314) 621-7448 - Facsimile
E-mail: mjgorla@msn.com

/s/ Joseph W. Luby
Joseph W. Luby
Death Penalty Litigation Clinic
6155 Oak Street, Suite C
Kansas City, Missouri 64113
(816) 363-2765
(816) 363-2799 - Facsimile
E-mail: jluby@dplclinic.com

*Counsel for Appellant*

Appellate Case: 10-1304     Page: 68     Date Filed: 11/07/2011 Entry ID: 3847057

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rules of Appellate Procedure 32(a)(7)(C), the undersigned certifies that this reply brief complies with the applicable type-volume limitations of Federal Rules of Appellate Procedure 32(a). This reply brief was prepared using a proportionally spaced type (Times New Roman, 14 points). Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), this brief contains 13,971 words, according to the word count function of WordPerfect X4 word processing software.

/s/ Joseph W. Luby
*Counsel for Appellant*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 7, 2011, a copy of the foregoing Reply Brief was submitted to the Eighth Circuit Court of Appeals and served upon Messrs. Steven E. Holtshouser, Joseph M. Landolt, John M. Bodenhausen, and Roger Alan Keller, Jr., Assistant United States Attorneys, via the CM/ECF system.

/s/ Joseph W. Luby
*Counsel for Appellant*